# **EXHIBIT A**
# TO THE NOTICE OF REMOVAL

## <u>TABLE OF CONTENTS</u>

Pleadings from C.A. No. N24C-06-188-KMV

**Page**

Docket Report ...................................................................................................................3

Complaint for Judgment on Promissory Note .................................................................5

    Exhibit A ..................................................................................................................16

    Exhibit B ..................................................................................................................19

    Exhibit C ................................................................................................................111

    Exhibit D ................................................................................................................121

    Exhibit E ................................................................................................................126

    Exhibit F ................................................................................................................131

    Exhibit G ................................................................................................................144

    Exhibit H ................................................................................................................176

    Exhibit I ..................................................................................................................184

    Exhibit J ..................................................................................................................189

    Exhibit K ................................................................................................................194

    Exhibit L ................................................................................................................199

    Exhibit M ................................................................................................................204

Case Information Statement ...........................................................................................215

Praecipe .........................................................................................................................217

Summons ........................................................................................................................218

Writ Issuance .................................................................................................................220

Sheriff's Return .............................................................................................................221

Click to Print                                     Printed on: 7/23/2024 15:00:14 GMT-0400 (Eastern Daylight Time)

**Case History Search**
Search Created:
7/23/2024 15:00:14 GMT-0400 (Eastern
Daylight Time)

---

| | | | | |
|---|---|---|---|---|
| **Court:** | DE Superior Court-New Castle County | **Judge:** | Vavala, Kathleen M | **File & ServeXpress Live Date:** 6/21/2024 |
| **Division:** | N/A | **Case Number:** | N24C-06-188 KMV | **Document(s) Filed:** 21 |
| **Case Type:** | CDBT - Debt/Breach of Contract | **Case Name:** | Capital Funding, LLC vs Cranston Apartments LLC | **Date Range:** All |

⬆ Export   1-6 of 6 transactions   <<Prev  Page 1 of 1  Next>>

| Transaction | ▼Date/Time | Option | Case Number Case Name | Authorizer Organization | # | Document Type | Document Title | Review Status | Size |
|---|---|---|---|---|---|---|---|---|---|
| 73673396 | 7/16/2024 9:49 AM EDT | File And Serve | N24C-06-188 KMV Capital Funding, LLC vs Cranston Apartments LLC | Colleen Redmond, DE Superior Court-New Castle County | 7 | Sheriffs Return | Writ returned. Served Rabbi Vogel, Agent on 7-8-2024 at 17032 Minos Conaway Rd C-O File Right Corporate Services LLC, Reg Agent Lewes, DE 19958. | Accepted | 0.3MB |
| 73540626 | 7/2/2024 4:05 PM EDT | File And Serve | Multi-Case | Colleen Redmond, DE Superior Court-New Castle County | 6 | Letter | LETTER TO COUNSEL ON JULY 2, 2024 ADVISING THAT THIS MATTER HAS BEEN REASSIGNED TO J. VAVALA. | Accepted | 0.1MB |
| 73528637 | 7/1/2024 4:15 PM EDT | File And Serve | Multi-Case | Colleen Redmond, DE Superior Court-New Castle County | 5 | Letter | LETTER TO COUNSEL ON JULY 1, 2024 ADVISING THAT THIS MATTER HAS BEEN REASSIGNED TO J. JURDEN. | Accepted | 0.1MB |
| 73524368 | 7/1/2024 11:55 AM EDT | File And Serve | N24C-06-188 KMV Capital Funding, LLC vs Cranston Apartments LLC | Colleen Redmond, DE Superior Court-New Castle County | 4 | Writ(s) Issued | (1) Writ Issued for Sussex County on 6-27-24 Check #525681 Amount $30.00 | Accepted | 0.1MB |
| 73466152 | 6/24/2024 1:07 PM EDT | File And Serve | N24C-06-188 KMV Capital Funding, LLC vs Cranston Apartments | Michael J Barrie, Benesch Friedlander Coplan & Aronoff LLP - | 2 | Praecipe | Praecipe • Linked to (1) | Accepted | 0.1MB |
| | | | | | 3 | Summons | Summons • Linked to (1) | Accepted | 0.1MB |

| | | | LLC | Delaware | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 73455797 | 6/21/2024 2:23 PM EDT | File Only | N24C-06-188 KMV Capital Funding, LLC vs Cranston Apartments LLC | Michael J Barrie, Benesch Friedlander Coplan & Aronoff LLP - Delaware | 1 | Complaint | Complaint for Judgment on Promissory Note • Linked from (2) | Accepted | 0.2MB |
| | | | | | | Exhibits | Exhibit A to Complaint | Accepted | 0.1MB |
| | | | | | | Exhibits | Exhibit B to Complaint | Accepted | 0.8MB |
| | | | | | | Exhibits | Exhibit C to Complaint | Accepted | 0.3MB |
| | | | | | | Exhibits | Exhibit D to Complaint | Accepted | 0.1MB |
| | | | | | | Exhibits | Exhibit E to Complaint | Accepted | 0.2MB |
| | | | | | | Exhibits | Exhibit F to Complaint | Accepted | 0.8MB |
| | | | | | | Exhibits | Exhibit G to Complaint | Accepted | 3.1MB |
| | | | | | | Exhibits | Exhibit H to Complaint | Accepted | 0.4MB |
| | | | | | | Exhibits | Exhibit I to Complaint | Accepted | 1.2MB |
| | | | | | | Exhibits | Exhibit J to Complaint | Accepted | 1.1MB |
| | | | | | | Exhibits | Exhibit K to Complaint | Accepted | 0.2MB |
| | | | | | | Exhibits | Exhibit L to Complaint | Accepted | 1.5MB |
| | | | | | | Exhibits | Exhibit M to Complaint | Accepted | 0.4MB |
| | | | | | | Case Information Statement | Case Information Statement | Accepted | 0.2MB |

1-6 of 6 transactions    <<Prev   Page 1 of 1   Next>>

EFiled: Jun 21 2024 02:23PM EDT
Transaction ID 73455797
Case No. N24C-06-188 FWW

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CAPITAL FUNDING, LLC, | ) | C.A. No. _____ |
| | ) | |
| Plaintiff, | ) | Mortgage Instrument Nos. |
| v. | ) | 20220519-0053479 |
| | ) | 20230303-0013981 |
| CRANSTON APARTMENTS LLC, | ) | |
| | ) | Tax Parcel Id. Numbers: |
| Defendant. | ) | 07-037.40-152, |
| | ) | 07-037.40-151, |
| | ) | 07-037.40-150, |
| | ) | 07-037.40-149. |
| | ) | |
| | ) | Affidavit of Defense Required |
| | ) | Under 10 Del. C. § 3901 |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

## COMPLAINT FOR JUDGMENT ON PROMISSORY NOTE

Plaintiff Capital Funding, LLC (the "Plaintiff"), by and through its undersigned counsel, hereby files this Complaint and, in support thereof, avers as follows:

## THE PARTIES AND JURISDICTION

1.     Plaintiff Capital Funding, LLC is a Maryland limited liability company having its principal office at 2455 House Street, Baltimore, Maryland 21230.

2.     Defendant Cranston Apartments LLC (the "Defendant") is a Delaware limited liability company with a registered agent located at c/o File Right Corporate Services LLC, 17032 Minos Conaway Road, Lewes, Delaware 19958.

24538780

3.      This Court has jurisdiction pursuant to 10 Del. C. § 541.

**COUNT I**
**(Breach of Promissory Note)**

4.      Plaintiff incorporates each of the proceeding paragraphs as though set forth fully herein.

**I.      The Property.**

5.      Defendant is the owner of real property located at 3310 and 3314 Old Capital Trail, Wilmington, Delaware 19808 (the "Property").  The Property consists of thirteen (13) buildings containing 157 rentable apartment units set on approximately eight (8) acres of land.  Defendant also owns all of the parking lots and unimproved land within the Property.

6.      Specifically, the real property within the Property owned by Defendant consists of the following:

> a.      The six (6) room ranch style house commonly known as 3310 Old Capital Trail, Wilmington, Delaware 19808, on 0.4 acres of land and designated as tax parcel no. 07-037.40-150 (the "3310 Old Capital Trail Property").  The 3310 Old Capital Trail Property is referred to as Parcel No. 0703740150 (Tract 2) within the legal description of the Property (the "Legal Description").  A true and correct copy of the Legal Description is attached hereto as **Exhibit A**.

b.    The apartment buildings commonly known as Cranston Hall Apartments located at 3314 Old Capital Trail, Wilmington, Delaware 19808, on 5.67 acres of land, with building no. 1 containing eighteen (18) rentable units, building no. 2 containing fourteen (14) rentable units, building no. 3 containing eight (8) rentable units, building no. 4 containing twelve (12) rentable units, building no. 5 containing sixteen (16) rentable units, building no. 6 containing fourteen (14) rentable units, and building no. 7 containing fourteen (14) rentable units, and designated as tax parcel no. 07-037.40-149 (the "North Cranston Hall Apartments").  The North Cranston Hall Apartments are referred to as Parcel No. 0703740149 (Tract 2) within the Legal Description.  *See* **Ex. A**.

c.    A small "Bridge Parcel" that fronts 3310 Old Capital Trail Property is a 0.18 acre of land located at 3314 Old Capital Trail, Wilmington, Delaware 19808, containing no buildings, and designated as tax parcel no. 07-037.40-151 (the "Bridge Parcel"). The Bridge Parcel is referred to as Parcel No. 0703740151 (Tract 2) within the Legal Description.  *See id.*

d.      The apartment buildings commonly known as Cranston Hall
Apartments located at 3314 Old Capital Trail, Wilmington,
Delaware 19808, on 2.83 acres of land, with building no. 1
containing thirteen (13) rentable units, building no. 2 containing
fourteen (14) rentable units, building no. 3 containing fourteen
(14) rentable units, building no. 4 containing eight (8) rentable
units, and building no. 5 containing twelve (12) rentable units,
and designated as tax parcel no. 07-037.40-152 (the "South
Cranston Hall Apartments").   The South Cranston Hall
Apartments are referred to as Parcel No. 0703740152 (Tract 1)
within the Legal Description.  *See id.*

## II.    The Loan.

7.      On or about April 27, 2022, Defendant received a commercial loan in
the original principal amount of $21,050,000.00 (the "Loan"), as evidenced by that
certain Loan Agreement, dated as of as of April 27, 2022, by and among Defendant,
Plaintiff in such capacity as Agent, and the lenders from time to time party thereto
(the "Lenders").  A true and correct copy of the Loan Agreement is attached hereto
as **Exhibit B.**

8.      On or about February 28, 2023, at the request of Defendant, Plaintiff
increased the Loan to $22,750,000.00, as evidenced by that certain First Amendment

to Loan Agreement, dated as of February 28, 2023, by and among Defendant, Plaintiff in such capacity as Agent, and the Lenders. A true and correct copy of the First Amendment to Loan Agreement is attached hereto as **Exhibit C**. The Loan Agreement and First Amendment to Loan Agreement are collectively referred to herein as the "Loan Agreement".

9.      Simultaneously with the execution and delivery of the Loan Agreement, Defendant made, executed, and delivered to Plaintiff as a Lender that certain Promissory Note (the "Original Note") dated as of April 27, 2022, in the original principal amount of $21,050,000.00 evidencing the Loan made to Defendant. A true and correct copy of the Note is attached hereto as **Exhibit D.**

10.     On or about February 28, 2023, Defendant made, executed, and delivered to Plaintiff as a Lender that certain Amended and Restated Promissory Note dated as of February 28, 2023 (the "A&R Note"), in the amount of $22,750.000.00 evidencing the Loan made to Defendant. A true and correct copy of the A&R Note is attached hereto as **Exhibit E**. The Original Note and A&R Note are referred to herein as the "Note".

11.     Pursuant to Paragraph 5 of the A&R Note:

> Upon and after the occurrence of an Event of Default, and as provided in the Loan Agreement, the Loan evidenced by this Note may be declared, and immediately shall become, due and payable without demand, notice or legal process of any kind; *provided, however*, that upon the occurrence of an Event of Default pursuant to the

> provisions of Section 8.1(g) of the Loan Agreement, the
> Loan evidenced by this Note shall automatically be due
> and payable, without demand, notice or acceleration of
> any kind whatsoever.

**Ex. E** (A&R Note) Paragraph 5.

### III.    The Mortgage.

12.    As security for the Loan, Defendant granted a mortgage and security interest in the Property to Plaintiff.

13.    On or about April 27, 2022, Defendant executed and delivered to Plaintiff that certain Assignment of Rents and Leases, dated as of April 27, 2022 (the "Assignment of Rents and Leases").

14.    The Assignment of Rents and Leases was recorded in the New Castle County Recorder of Deeds (the "Land Records") as Instrument No. 20220519-0053480, on May 19, 2022.  A true and correct copy of the recorded Assignment of Rents and Leases is attached hereto as **Exhibit F**.

15.    On or about April 27, 2022, Defendant executed and delivered to Plaintiff that certain Mortgage, Security Agreement, Assignment of Leases and Rents, Financing Statement and Fixture Filing, dated as of April 27, 2022 (the "Original Mortgage").

16.    The Original Mortgage was recorded in the Land Records as Instrument No. 20220519-0053479, on May 19, 2022.  A true and correct copy of the recorded Original Mortgage is attached hereto as **Exhibit G**.

17.     On or about February 28, 2023, Defendant executed and delivered to Plaintiff that certain First Modification to Mortgage, Security Agreement, Assignment of Leases and Rents, Financing Statement and Fixture Filing, dated as of February 28, 2023 (the "First Modification to Mortgage").    The Original Mortgage and First Modification to Mortgage are collectively referred to herein as the "Mortgage".

18.     The First Modification to Mortgage was recorded in the Land Records as Instrument No. 20230303-0013981 on March 3, 2023.  A true and correct copy of the recorded First Modification to Mortgage is attached hereto as **Exhibit H**.

19.     Pursuant to the Mortgage, Defendant granted Plaintiff a mortgage lien on and security interest in all of Defendant's present and future right, title and interest in and to (i) the Property meaning the land described in Exhibit A attached to the Mortgage, and (ii) including, but not limited to, all accounts, documents, equipment, fixtures, general intangibles, inventory, leases, proceeds, rents, and other property at or related to the Property (as more particularly described in the Mortgage and defined therein as the "Mortgaged Property").

**IV.    Events of Default.**

20.     Defendant is in default under the Loan for, among other things, failing to pay, as required by Section 2.1(b) of the Loan Agreement, the accrued interest on the Loan on the first calendar day of each month beginning February 1, 2024, with

such failures continuing through today. Defendant's failure to pay the accrued interest when due constitutes an event of default (an "Event of Default") under Section 8.1(b)(ii) of the Loan Agreement.

21.    By correspondence dated March 6, 2024, Plaintiff notified Defendant of its default under the Loan for failure to pay interest due February 1, 2024, with such failure continuing for more than five (5) days, and demanded that it immediately pay the past due amount.  Despite demand, Defendant failed to pay this past due amount.  A true and correct copy of the forgoing notice is attached hereto as **Exhibit I**.

22.    By correspondence dated April 5, 2024, Plaintiff notified Defendant of its default under the Loan for failure to pay interest due February 1, 2024, and March 1, 2024, with such failure continuing for more than five (5) days, and demanded that it immediately pay the past due amount.  Despite demand, Defendant failed to pay the past due amounts.  A true and correct copy of the forgoing notice is attached hereto as **Exhibit J**.

23.    By correspondence dated May 3, 2024, Plaintiff notified Defendant of its default under the Loan for failure to pay interest due February 1, 2024, March 1, 2024, and April 1, 2024, with such failure continuing for more than five (5) days, and demanded that it immediately pay the past due amount.  Despite demand,

Defendant failed to pay the past due amounts.  A true and correct copy of the forgoing notice is attached hereto as **Exhibit K**.

24.     By correspondence dated May 29, 2024, Plaintiff notified Defendant of its default under the Loan for failure to pay interest due February 1, 2024, March 1, 2024, April 1, 2024, and May 1, 2024, with such failure continuing for more than five (5) days, and demanded that it immediately pay the past due amount.  Despite demand, Defendant failed to pay the past due amounts.  A true and correct copy of the forgoing notice is attached hereto as **Exhibit L**.

25.     In light of the foregoing defaults, by correspondence dated June 13, 2024, Plaintiff again notified Defendant of its defaults under the Loan, elected to accelerate the Loan, pursuant to Section 8.2(a) of the Loan Agreement and Paragraph 5 of the Note, and demanded that Defendant immediately pay the Loan in full. Further as a result of the occurrence and continuation of the Events of Default, pursuant to Section 7.10(b) of the Loan Agreement, as of June 12, 2024, the balance in the Payment Reserves was applied to the outstanding Loan.  A true and correct copy of the forgoing notice is attached hereto as **Exhibit M**.

26.     As of June 14, 2024, Defendant owes Plaintiff a total of **$25,104,663.94** under the Note and Mortgage, consisting of the following:

| | |
|---|---|
| Principal | $22,361,258.42 |
| Interest Due | $583,890.33 |
| Default Interest | $1,658,854.17 |
| Late Fees | $83,041.44 |

9

| | |
|---|---|
| Exit Fee (1.00%) | $223,612.58 |
| Deferred Interest | $194,007.00 |
| **Total:** | **$25,104,663.94**, plus accruing interest and default interest in the total amount of $10,422.83 *per diem*, fees (including attorneys' fees) and costs, together with the protective advances made on Defendant's behalf. |

27.     Despite demand, none of the above amounts have been paid.

28.     Defendant is in default under the Note for, among other things, failing to pay all principal, interest, and other amounts due under the Note upon acceleration.

29.     Defendant's failure to pay the sums due under the Note upon acceleration of the Loan constitutes an Event of Default and is without privilege or justification.

30.     Plaintiff has faithfully and in good faith fulfilled all of its obligations to Defendant, has and vested with all of the rights under the Loan Agreement and Note evidencing the Loan, and has otherwise performed all acts necessary to preserve all of its rights under the Note.

WHEREFORE, Plaintiff Capital Funding, LLC demands that the Court:  (i) enter judgment in favor of Plaintiff and against Defendant in an amount of not less than $25,104,663.94, plus accruing interest and default interest in the total amount of $10,422.83 *per diem* after June 14, 2024, fees (including attorneys' fees) and costs, together with the protective advances made on Defendant's behalf, plus interest accruing at the applicable judgment rate in effect from and after the date of judgment and additional attorneys' fees hereafter incurred; and (ii) grant Plaintiff such other and further relief as the Court deems just and proper under the circumstances.

Dated: June 21, 2024
      Wilmington, Delaware

**BENESCH, FRIEDLANDER,**
    **COPLAN & ARONOFF LLP**

*/s/ Michael J. Barrie*
Michael J. Barrie (No. 4684)
Kevin M. Capuzzi (No. 5462)
John C. Gentile (No. 6159)
1313 North Market Street, Suite1201
Wilmington, Delaware 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
mbarrie@beneschlaw.com
kcapuzzi@beneschlaw.com
jgentile@beneschlaw.com

*Counsel to Plaintiff*

EFiled:  Jun 21 2024 02:23PM EDT
Transaction ID 73455797
Case No. N24C-06-188 FWW

## Exhibit A

## EXHIBIT A

## LEGAL DESCRIPTION

All that certain lot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the City of Wilmington, County of New Castle, State of Delaware.

ALL that certain lot, piece or parcel of land with the buildings thereon erected, situate in Christiana Hundred, New Castle County and State of Delaware, and more particularly bounded and described, as follows, to-wit:

## TRACT 1

BEGINNING at a point in the middle of the Old Capitol Trail (formerly known as Centre Road) at the distance of Three Hundred one feet five inches Northeasterly from the intersection of the middle line of the said Old Capitol Trail and the middle line of the Newport and Gap Turnpike Road, being a corner of land formerly of Eugene Woodward, now of Edwin C. Denny, Jr., et. al., Trustees; thence by the middle of said Old Capitol Trail North 40 degrees East One hundred eighteen feet to a point in the center of said road, a corner of this land and lands formerly of John A. Cranston, now known as Cranston Heights Addition; thence by line of said lands South 50 degrees East Seven hundred eighty feet to a point in a corner of land formerly of the Newport Land and Improvement Company and now known as Avalon; thence by line of said land South 86 degrees West Three hundred sixty and one-half feet to a point in line of said lands formerly of Eugene Woodward now of Edwin C. Denny, Jr., et. al., Trustees; and thence thereby North 33 degrees 50 minutes West Five hundred forty-three feet to a point in the middle of said Old Capitol Trail and place of beginning.

EXCEPTING from the tract or piece of land above described ALL THAT CERTAIN portion thereof conveyed to the State of Delaware by deed of William A. Mitchell and wife, dated the 25th day of February, A.D. 1932 and recorded in the Office of the Recorder of Deeds in and for New Castle County aforesaid in Deed Record H, Volume 35, Page 160.

THE SAID ABOVE DESCRIBED tract or piece of land being also bounded and described as follows, to-wit:

BEGINNING at a point in the Southeasterly side of Old Capitol Trail (at 60 feet wide), said point being located from the intersection of the center lines of said Old Capitol Trail and Newport and Gap Turnpike by the following two courses and distances: (1) North 40 degrees East by said center line of said Old Capitol Trail Three hundred six and twenty-two one-hundredths feet to a point: and (2) South 36 degrees 50 minutes East, crossing said Old Capitol Trail, Thirty and eighty one-hundredths feet to the Southeasterly side thereof; thence by said Southeasterly side of said Old Capitol Trail North 40 degrees East One hundred Twenty-one and twenty-two one-hundredths feet to a pipe: thence South 50 degrees 11 minutes East Six hundred seventy-five and thirty-seven one-hundredths feet to a monument, and continuing the an same course Ninety-seven and seventeen one-hundredths feet to a corner distant South 89 degrees 4 minutes West eleven and forty-eight one-hundredths feet from a pipe: thence south 89 degrees 04 minutes West One hundred ninety-eight and seventy-eight one-hundredths feet to a monument: thence South 88 degrees 43 minutes west One hundred sixty-six and sixty-four one-hundredths feet to a corner for the tract hereby conveyed: thence North 36 degrees 50 minutes West Five hundred ten and forty-three one hundredths feet to a point on the aforesaid Southeasterly side of Old Capitol Trail, the place of Beginning.

**TRACT 2**

BEGINNING at a point on the Southeasterly side of Old Capitol Trail (at 60 feet wide), said point being located from the intersection of the center lines of said Old Capitol Trail and Newport and Gap Turnpike by the following two courses and distances: (1) North 40 degrees East by said center line of said Old Capitol Trail Four Hundred twenty and thirty-two one-hundredths feet to a point; and (2) South 50 degrees 11 minutes East, crossing said Old Capitol Trail, Thirty feet to the Southeasterly side thereof; thence from said beginning point by said Southeasterly side of said Old Capitol Trail North 40 degrees 14 minutes East One hundred and sixty-three one-hundredths (100.63) feet to a pipe in line of land now or late of U. A. W. Local 435; thence by line of said lands and lands now or late of D. Flinn Estate South 72 degrees 05 minutes East Nine hundred forty-six and three one-hundredths (946.03) feet to a pipe at a corner for lands now or late of Philip DiEgidio; thence by line of said lands South 1 degree 14 minutes 30 seconds East Two hundred sixty-nine and forty one-hundredths (269.40) feet to a stone in line of lands now or late of S. Wedwick; thence by line of said lands South 88 degrees 19 minutes West Three hundred seventy-seven and seventy-six one-hundredths (377.76) feet to a pipe, a corner for lands conveyed to Cranston Hall, Inc. by deed of Lillie M. Kershaw, Widow, and Edwin Kershaw, single man, dated the Twenty-ninth day of May, A.D. 1963, and recorded in the Office of the Recorder of Deeds in and for New Castle County aforesaid in Deed Record E, Volume 71, Page 477; thence by line of said lands North 50 degrees 11 minutes West (passing over a monument at 97.17 feet) a total distance of Seven hundred seventy-two and fifty-four one-hundredths (772.54) feet to the said Southeasterly side of the aforesaid Old Capitol, at 60 feet wide, the point and place of Beginning.

NOTE FOR INFORMATION: Being Parcel No. 0703740152 (Tract 1), 0703740151, 0703740150 and 0703740149 (Tract 2), of the City of Wilmington, County of New Castle.

EFiled: Jun 21 2024 02:23PM EDT
Transaction ID 73455797
Case No. N24C-06-188 FWW

## Exhibit B

# LOAN AGREEMENT

**by and among**

## Capital Funding, LLC,
**a Maryland limited liability company**

**(as Agent)**

**Certain Lenders Party Hereto From Time to Time**

**(as Lenders)**

**and**

## CRANSTON APARTMENTS LLC,
**a Delaware limited liability company**

**(as Borrower)**

**dated as of April 27, 2022**

## LOAN AGREEMENT

**THIS LOAN AGREEMENT** (this "Agreement") is made as of April 27, 2022, by and among CRANSTON APARTMENTS LLC, a Delaware limited liability company (together with its successors and assigns, each individually and collectively, "Borrower"), having its principal office at 475 Oberlin Avenue South, Suite 211, Lakewood, New Jersey 08701, and CAPITAL FUNDING, LLC, a Maryland limited liability company, having its principal offices at 1422 Clarkview Road, Baltimore, Maryland 21209 (together with its successors and assigns, individually as a "Lender" and as "Agent") and the Lenders (as hereinafter defined) time to time party hereto.

### RECITALS

Borrower has requested that the Lenders make a term loan to Borrower in the aggregate principal sum of up to $21,050,000.00 (the "Loan") for the purpose of financing the Borrower's acquisition of, and financing capital expenditures at, the Property (as hereinafter defined) and funding certain reserves and to pay closing costs and fees.

Lenders are willing to make the Loan, and Borrower is willing to borrow the Loan, on the terms and conditions set forth in this Agreement and the other Loan Documents.

### AGREEMENTS

NOW, THEREFORE, Borrower and Lenders hereby agree as follows:

### ARTICLE I
### DEFINITIONS, ACCOUNTING PRINCIPLES, UCC TERMS.

1.1     Definitions.  As used in this Agreement, the following terms shall have the following meanings unless the context hereof shall otherwise indicate:

"Account" individually and "Accounts" collectively mean any rights of Borrower arising from the operation of the Project to payment for goods sold or leased or for services rendered, including, without limitation, all rights to payment and all accounts arising from the Lease and/or operation of the Project and all presently existing or hereafter acquired or created accounts, accounts receivable, contract rights, notes, drafts, instruments, acceptances, chattel paper, leases and writings evidencing a monetary obligation or a security interest in, or a lease of, goods, all rights to payment of a monetary obligation or other consideration under present or future contracts or by virtue of  property that has been sold, leased, licensed, assigned, or otherwise disposed of, services rendered or to be rendered, loans and advances made or other considerations given, by or set forth in or arising out of any present or future chattel paper, note, draft, lease, acceptance, writing, bond, insurance policy (including, without limitation, the right to receive refunds of unearned insurance premiums), instrument, document or general intangible, and all extensions and renewals of any thereof, all rights under or arising out of present or future contracts, agreements or general interest in goods that gave rise to any or all of the foregoing, including all commercial tort claims, other claims or causes of action now existing or hereafter arising in connection with or under any agreement or document or by operation of law or otherwise, all collateral security of any kind (including, without limitation, real property mortgages and deeds of trust), Supporting Obligations, letter-of-credit rights and letters of credit given by any Person with respect to any of the foregoing, all books and records in whatever media (paper, electronic or otherwise) recorded or stored, with respect to any or all of the foregoing and all equipment and general intangibles necessary or beneficial to retain, access and/or process the information contained in those books and records, and all proceeds (cash proceeds and non-cash proceeds) of the foregoing.  Accounts shall include the proceeds

thereof (whether cash or non-cash, moveable or immoveable, tangible or intangible) received from the sale, exchange, transfer, collection or other disposition or substitution thereof.

"Affiliate" means, with respect to any Person: (a) each Person that controls, is controlled by or is under common control with such Person; (b) each Person that, directly or indirectly, owns or controls, whether beneficially or as a trustee, guardian or other fiduciary, any of the Stock of such Person; and (c) each of such Person's officers, directors, members, joint venturers and partners.

"Agency" means the United States Department of Housing and Urban Development or any agency thereof, the Federal Home Loan Mortgage Corporation or the Federal National Mortgage Association.

"Agency Financing" means financing granted through a program insured by HUD, the Federal Home Loan Mortgage Corporation or Federal National Mortgage Association and consistent with any commitment letter or as otherwise provided in this Agreement.

"Agency Lender" means Agent, or any Affiliate of Agent.

"Agent" means Capital Funding, LLC, a Maryland limited liability company, in its capacity as collateral and administrative agent for the Lenders hereunder, as such capacity is established in, and subject to the provisions of ARTICLE XI, and the successors and assigns of Capital Funding, LLC in such capacity.

"Agreement" is defined in this preface to this Agreement.

"Approved Capital Expenditures" is defined in Section 7.2.

"Assignment of Rents and Leases" means that certain Assignment of Rents and Leases with respect to the Property executed by the Borrower and Agent of even date herewith, as the same may be amended, restated, replaced, subleased or modified from time to time.

"Base Rate" means the higher of the following: (i) the per annum rate which Agent publicly announces from time to time to be its prime lending rate, as in effect from time to time, plus 0% per annum, or (ii) the Federal Funds Rate, as in effect from time to time, *plus* one-half of one percent (0.50%) per annum (any changes in such rates to be effective as of the date of any change in such rate). Agent's prime lending rate is a reference rate and does not necessarily represent the lowest or best rate charged to customers.  Agent may make commercial loans or other loans at rates of interest at, above or below Agent's prime lending rate.

"Benchmark" means (i) initially, and continuing unless and until replaced by a Benchmark Replacement pursuant to Section 2.1(b) hereof, Term SOFR, and (ii) if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to Term SOFR of the then-current Benchmark, then the applicable Benchmark Replacement.

"Benchmark Replacement" means, with respect to any Benchmark Transition Event, the first alternative set forth in the order below that can be determined by Agent for the applicable Benchmark Replacement Date:

> (1) the sum of (A) Daily Simple SOFR and (B) the related Benchmark Replacement Adjustment;

(2) subject to the provisos at the end of this definition, the sum of: (A) the alternate rate of interest that has been selected or recommended by the Relevant Governmental Body as the replacement for the then-current Benchmark and (B) the related Benchmark Replacement Adjustment;

(3) subject to the provisos at the end of this definition, the sum of (A) the ISDA Fallback Rate and (B) the related Benchmark Replacement Adjustment; or

(4) the sum of: (A) the alternate rate of interest that has been selected by Agent and Borrower (subject to their mutual agreement but in the absence of any such agreement after two (2) Business Days' discussion, then that alternate benchmark rate selected by Agent in the exercise of its sole, unfettered discretion), giving due consideration to any evolving or the-prevailing market convention for determining a rate of interest for U.S. dollar-denominated floating rate syndicated credit facilities, as the replacement for the then-current Benchmark and (B) the related Benchmark Replacement Adjustment; provided that, in the case of clauses (2) and (3) above, such rate, or the underlying rates component thereof, is or are displayed on a screen or other information service that publishes such rate or rates from time to time selected by Agent in its reasonable discretion. Notwithstanding the foregoing or anything herein to the contrary, in no event shall the Benchmark Replacement be less than .10%.

"Benchmark Replacement Adjustment" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the first alternative set forth in the order below that can be determined by Agent as of the applicable Benchmark Replacement Date:

(1) subject to the proviso at the end of this definition, the spread adjustment, or method for calculating or determining such spread adjustment (which may be a positive or negative value or zero) that has been selected, endorsed or recommended by the Relevant Governmental Body for the applicable Unadjusted Benchmark Replacement;

(2) subject to the proviso at the end of this definition, if the applicable Unadjusted Benchmark Replacement is equivalent to the ISDA Fallback Rate, then the ISDA Fallback Adjustment; or

(3) the spread adjustment (which may be a positive or negative value or zero) that has been selected by Agent and Borrower (subject to their mutual agreement but in the absence of any such agreement after two (2) Business Days' discussion, then that adjustment selected by Agent in the exercise of its sole, unfettered discretion), giving due consideration to any evolving or then-prevailing market convention for calculating or determining such spread adjustment for U.S. dollar-denominated floating rate syndicated credit facilities utilizing the applicable Unadjusted Benchmark Replacement; provided that, in the case of clauses (1) and (2) above, such adjustment is displayed on a screen or other information service that publishes such Benchmark Replacement Adjustment from time to time as selected by Agent in its reasonable discretion.

"Benchmark Replacement Date" means the earliest to occur of the following events with respect to the then-current Benchmark:

(1)    in the case of clause (1) or (2) of the definition of "Benchmark Transition Event," the later of (A) the date of the public statement or publication of information referenced therein and (B) the date on which the administrator of such Benchmark permanently or indefinitely ceases to provide such Benchmark;

(2)    in the case of clause (3) of the definition of "Benchmark Transition Event," the first date on which such Benchmark has been determined and announced by the regulatory supervisor for the administrator of such Benchmark to be non-representative (which, if the regulatory supervisor has announced a specified future date that such Benchmark will not be representative, will be such specified future date); provided that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (3) and even if such Benchmark continues to be provided on such date; or

(3)    in the case of clause (4) of the definition of "Benchmark Transition Event", the date of the applicable change in law.

"Benchmark Transition Event" means the occurrence of one or more of the following events, with respect to the then-current Benchmark:

(1)    a public statement or publication of information by or on behalf of the administrator of such Benchmark announcing that such administrator has ceased or will cease to provide such Benchmark, permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark;

(2)    a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark, the Board of Governors of the Federal Reserve System, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark, a resolution authority with jurisdiction over the administrator for such Benchmark or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark, which states that the administrator of such Benchmark has ceased or will cease to provide such Benchmark permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark; or

(3)    a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark announcing that such Benchmark is not, or as of a specified future date will not be; representative; or

(4)    a change in law that Agent determines (which determination shall be conclusive and binding for all purposes absent manifest error) prohibits, restricts or limits the use of such Benchmark.

"Benchmark Unavailability Period" means (i) if a Benchmark Transition Event has not occurred, unless and until a Benchmark Replacement is implemented with respect to the then-current Benchmark in accordance with Section 2.1(b) below, each and every period of time for which Agent for any reason determines (which determination shall be conclusive and binding absent manifest error) that reasonable and adequate means do not exist for ascertaining the then-current Benchmark for an applicable interest period, or (ii) if a Benchmark Transition Event has occurred, the period if any (x) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder in accordance with Section 2.1(b); and (y) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark.

"Borrower" is defined in the preface to this Agreement.

"Borrower's knowledge" means (i) the actual knowledge of Borrower, or (ii) the knowledge Borrower would have had if Borrower had made due inquiry regarding the fact or other matter in question as a prudent business person would be expected to make in the management of the Borrower's business affairs.

"Breakage Costs" is defined in Section 2.1(c)(iii).

"Business Day" means any day on which banks, savings and loan associations, savings banks, or other financial institutions are generally open for regular banking business in the State of Maryland and the State of Delaware.

"CapEx Reserve" is defined in Section 7.2.

"CARES Act" means the Coronavirus Aid, Relief, and Economic Security Act, as amended from time to time (including any successor thereto), and all requests, rules, requirements, regulations, administrative guidance related to the same and directives thereunder or issued in connection therewith, regardless of the date enacted, adopted issued or implemented.

"CARES Act Deferred Payroll Taxes" means collectively, the employer portion of Social Security Payroll Taxes for the period beginning March 27, 2020 and ending December 31, 2020 deferred by Borrower in accordance with Section 2302 of the CARES Act.

"CARES Act Obligations" means collectively, all CARES Act PPP Loans.

"CARES Act PPP Loan" means one more unsecured loans, all interest, fees, costs and expenses accrued or payable in connection therewith, obtained by Borrower through the Paycheck Protection Program of the CARES Act made by CFG Community Bank or another SBA qualified lender acceptable to Agent and guaranteed by the SBA.

"CFG" is defined in Section 8.4.

"Chattel Paper" means a record or records (including, without limitation, electronic chattel paper) that evidence both a monetary obligation and a security interest in specific goods, a security interest in specific goods and software used in the goods, or a lease of specific goods; all Supporting Obligations with respect thereto; any returned, rejected or repossessed goods and software covered by any such record or records and all proceeds (in any form including, without limitation, accounts, contract rights, documents, chattel paper, instruments and general intangibles) of such returned, rejected or repossessed goods; and all proceeds (cash proceeds and noncash proceeds) of the foregoing.

"Claim" means any liability, suit, action, claim, demand, loss, expense, penalty, fine, judgment or other cost of any kind or nature whatsoever, including fees, costs and expenses of attorneys, consultants, contractors and experts.

"Closing Date" means the date on which all or any part of the Loan is disbursed by the Lenders to or for the benefit of Borrower, including to any loan escrow funding agent.

"Collateral" means, collectively, all of Borrower's right, title and interest in and to the Property, Improvements, Equipment, Rents, Accounts, General Intangibles, Instruments, Inventory, Money, Deposit Accounts, Permits (to the full extent assignable), Imposition Deposits, Payment

Reserves, Chattel Paper, Documents and all Proceeds, all whether now owned or hereafter acquired, and including replacements, additions, accessions, substitutions, and products thereof and thereto, all other assets of the Borrower, wherever located, whether now owned or existing or hereafter acquired or arising, together with all proceeds thereof, and all other property of Borrower or Person which is or hereafter may become subject to a Lien in favor of Agent on behalf of the Lenders as security for any of the Loan Obligations.

"Conforming Changes" means, with respect to any Benchmark, any technical, administrative or operational changes (including changes to the definition of "Base Rate", the definition of "interest period", timing and frequency of determining rates, and making payments of interest and other administrative matters) that Agent decides may be appropriate to reflect the adoption and implementation of such Benchmark and to permit the administration thereof by Agent in a manner substantially consistent with market practice (or, if Agent decides that adoption of any portion of such market practice is not administratively feasible or if Agent determines that no market practice for the administration of such Benchmark exists, in such other manner of administration as Agent decides is necessary in connection with the administration of this Agreement).

"Control Agreement" is defined in Section 4.22(b).

"Constituent of Borrower" is defined in Section 10.14(b).

"Daily Simple SOFR" means, for any day, SOFR, with the conventions for this rate (which may include a lookback) being established by Agent in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for business loans; provided, that if Agent decides that any such convention is not administratively feasible for Agent, then Agent may establish another convention in its reasonable discretion.

"Debt" means the outstanding principal amount set forth in, and evidenced by, this Agreement and the Note together with all interest accrued and unpaid thereon and all other sums owing to Lenders in respect of the Loan under the Note, this Agreement, the Security Instrument or any other Loan Document.

"Default" means the occurrence or existence of any event which, but for the giving of notice or expiration of time or both, would constitute an Event of Default.

"Default Rate" means a per annum rate of interest equal to the lesser of (a) seven hundred and fifty (750) basis points (i.e., 7.50 percentage points) in excess of the Effective Rate, or (ii) the maximum rate of interest which may be collected from Borrower under applicable law.

"Deposit Account" is defined in Section 4.22.

"Determination Date" is, in the case of Term SOFR, a monthly date which is two (2) U.S. Government Securities Business Days prior to the first day of each month and effective as of the first day of such month and in the case of the Base Rate or any Benchmark Replacement, that date selected by Agent in accordance with the terms of this Agreement.

"Disbursement Date" is the first date on which a Lender disburses any proceeds of the Loan to or for the account of Borrower or to any loan escrow or funding agent.

"Disclosure Document" is defined in Section 10.15(a).

"<u>Documents</u>" means all documents of title or receipts, whether now existing or hereafter acquired or created, and all proceeds (cash proceeds and noncash proceeds) of the foregoing.

"<u>EBITDAR</u>" means for any period Gross Income from Operations for such period less all Operating Expenses (except for interest, taxes and assessments, depreciation, amortization, and lease expenses) for such period.

"<u>Effective Rate</u>" means the per annum rate equal to Term SOFR (or the Base Rate or the Benchmark Replacement if and as selected by the Agent in accordance with the terms hereof) plus the Margin. Notwithstanding the foregoing, the Effective Rate shall in no event be less than 4.05 basis points (*i.e.*, 405 percentage points) per annum).   Agent's determination of the Effective Rate as of each Determination Date shall be conclusive and binding, absent manifest error.

"<u>Environmental Indemnity Agreement</u>" means that certain Environmental Indemnity Agreement dated as of the date hereof by and among Borrower and Guarantor in favor of Agent and Lenders, as the same may be amended, restated, replaced or modified from time to time.

"<u>Environmental Permit</u>" means any Permit issued under any Hazardous Materials Law with respect to any activities or businesses conducted on or in relation to the Property and/or the Improvements.

"<u>Environmental Reports</u>" is defined in <u>Section 2.4(c)(v)</u>.

"<u>Equipment</u>" means all equipment, machinery, computers, chattels, tools, parts, machine tools, furniture, furnishings, fixtures and goods (other than inventory) of every nature (including, without limitation, embedded software), presently existing or hereafter acquired or created and wherever located, whether or not the same shall be deemed to be affixed to real property, and all of such types of property leased by the Borrower and all of the Borrower's rights and interests with respect thereto under such leases (including, without limitation, options to purchase), together with all accessions, additions, fittings, accessories, special tools, and improvements thereto and substitutions therefor and all parts and equipment that may be attached to or that are necessary or beneficial for the operation, use and/or disposition of such personal property, all licenses, warranties, franchises and General Intangibles related thereto or necessary or beneficial for the operation, use and/or disposition of the same, together with all Accounts, Chattel Paper, Instruments and other consideration received by Borrower on account of the sale, lease or other disposition of all or any part of the foregoing, and together with all rights under or arising out of present or future Documents and contracts relating to the foregoing and all proceeds (cash proceeds and noncash proceeds) of the foregoing.

"<u>Event of Default</u>" means any "Event of Default" as defined in Article VIII hereof.

"<u>Exhibit</u>" means an Exhibit to this Agreement, unless the context refers to another document, and each such Exhibit shall be deemed a part of this Agreement to the same extent as if it were set forth in its entirety wherever reference is made thereto.

"<u>Exit Fee</u>" is defined in <u>Section 9.1(a)</u>.

"<u>Extension Option</u>" is defined in Section 2.1(e).

"<u>Federal Funds Rate</u>" means, for any day, the rate per annum (rounded upwards, if necessary, to the next 1/100[th] of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with member banks of the Federal Reserve System, as published by the Federal

Reserve Bank of New York on the next succeeding Business Day or if such rate is not so published for any Business Day, the Federal Funds Rate for such day shall be the average rounded upwards, if necessary, to the next 1/100th of 1% of the quotations for such day on such transactions received by Agent from three Federal funds brokers of recognized standing selected by Agent in the exercise of its unfettered discretion.  For purposes of this Agreement the Federal Funds Rate shall not be less than zero percent (0%).

"Federal Reserve Bank of New York's Website" means the website of the Federal Reserve Bank of New York at http://www.newyorkfed.org, or any successor source.

"Financial Conduct Authority" means the regulator of financial services firms and prudential regulator of banks and financial markets in the United Kingdom.

"Financial Covenants" is defined in Section 4.12(a).

"GAAP" means generally accepted accounting principles in the United States as set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"General Intangibles" means all general intangibles of every nature, whether presently existing or hereafter acquired or created, and without implying any limitation of the foregoing, further means all books and records, commercial tort claims, other claims (including without limitation all claims for income tax and other refunds), payment intangibles, Supporting Obligations, choses in action, causes of action in tort or equity, contract rights, judgments, customer lists, royalty payments, licenses, letter-of-credit rights, letters of credit, contractual rights, the right to receive refunds of unearned insurance premiums, rights as lessee under any lease of real or personal property, amounts received as an award in or settlement of a suit in damages, deposit accounts, interests in joint ventures, general or limited partnerships, or limited liability companies or partnerships, rights in applications for any of the foregoing, books and records in whatever media (paper, electronic or otherwise) recorded or stored with respect to any or all of the foregoing, all Supporting Obligations with respect to any of the foregoing, and all equipment and general intangibles necessary or beneficial to retain, access and/or process the information contained in those books and records, and all proceeds (cash proceeds and noncash proceeds) of the foregoing.

"Governmental Authority" means any board, commission, carrier, intermediary, department or body of any municipal, county, state or federal governmental unit, or any subdivision of any of them, that has or acquires jurisdiction over the Borrower, Manager, the Property and/or the Improvements or the use, operation or improvement of the Project.

"Guarantee" by any Person means any obligation, contingent or otherwise, of such Person directly or indirectly guaranteeing any Indebtedness or other obligation of any other Person and, without limiting the generality of the foregoing, any obligation, direct or indirect, contingent or otherwise, of such Person (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation (whether arising by virtue of partnership arrangements, by agreement to keep-well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement conditions or otherwise), or (b) entered into for the purpose of assuring in any other manner the obligee of such Indebtedness or other obligation of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part), *provided, however*, that the term Guarantee shall not include

endorsements for collection or deposit in the ordinary course of business.  The term "<u>guarantee</u>" used as a verb has a corresponding meaning.

"<u>Guarantor</u>" means, each individually and collectively, (i) Elimelech Tress, an individual, (ii) Menachem Tress, an individual, and (iii) any Loan Party that has executed or delivered, or shall in the future execute or deliver, any Guarantee of any portion of the Loan Obligations.

"<u>Guaranty Agreement</u>" means any document evidencing any Guarantee of any portion of the Loan Obligations executed by a Guarantor.

"<u>Hazardous Materials</u>" means petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives; flammable materials; radioactive materials; polychlorinated biphenyls ("PCBs") and compounds containing them; lead and lead-based paint; asbestos or asbestos-containing materials in any form that is or could become friable; underground storage tanks, whether empty or containing any substance; any substance the presence of which on the Property is prohibited by any federal, state or local authority; any substance that requires special handling; and any other material or substance now or in the future defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," or "pollutant" within the meaning of any Hazardous Materials Law or regulated under any Hazardous Materials Law.

"<u>Hazardous Materials Laws</u>" means all federal, state, and local laws (including common law), ordinances and regulations and standards, rules, policies and other governmental requirements, administrative rulings and court judgments and decrees (including any judicial or administrative interpretations, guidance, directives, policy statements or opinions) in effect now or in the future and including all amendments, that relate to the protection or pollution of the environment or human health and safety or to Hazardous Materials.  Hazardous Materials Laws include, but are not limited to, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., the Toxic Substance Control Act, 15 U.S.C. Section 2601, et seq., the Clean Water Act, 33 U.S.C. Section 1251, et seq., and the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, and their state analogs.

"<u>HUD</u>" means the United States Department of Housing and Urban Development or any agency thereof.

"<u>Impositions</u>" and "<u>Imposition Deposits</u>" mean the Impositions and Imposition Deposits defined in the Security Instrument and set forth on <u>Exhibit G</u> to this Agreement.

"<u>Improvements</u>" means all buildings, structures and improvements of every nature whatsoever now or hereafter situated on the Property, including, but not limited to, (i) the apartment project Borrower intends to construct, and (ii) all gas and electric fixtures, radiators, heaters, engines and machinery, boilers, ranges, elevators and motors, plumbing and heating fixtures, carpeting and other floor coverings, water heaters, awnings and storm sashes, and cleaning apparatus which are or shall be attached to the Property or said buildings, structures or improvements.

"<u>Indebtedness</u>" means any (a) obligations for borrowed money, (b) obligations, payment for which is being deferred by more than thirty (30) days, representing the deferred purchase price of property other than accounts payable arising in connection with the purchase of inventory customary in the trade and in the ordinary course of the business of Borrower or Guarantor, (c) obligations, whether or not assumed, secured by Liens or payable out of the proceeds or production from the Accounts and/or real or personal property now or hereafter owned or acquired by Borrower or Guarantor, and (d) the amount of

any other obligation of Borrower or Guarantor (including obligations under financing leases) which would be shown as a liability on a balance sheet prepared in accordance with GAAP.

"Indemnitees" is defined in Section 6.10(a).

"Instruments" means a negotiable instrument or any other writing that evidences a right to payment of a monetary obligation and is not itself a security agreement or lease and is of a type that in the ordinary course of business is transferred by delivery with any necessary endorsement or assignment, and all Supporting Obligations with respect to any of the foregoing and all proceeds (cash proceeds and non-cash proceeds) with respect to any of the foregoing.

"Inventory" means all inventory of Borrower and all right, title and interest of Borrower in and to all of its now owned and hereafter acquired goods and other personal property (including, without limitation, embedded software) furnished under any contract of service or intended for sale or lease, including, without limitation, all raw materials, work-in-process, finished goods and materials and supplies of any kind, nature or description which are used or consumed in Borrower's business or are or might be used in connection with the manufacture, packing, shipping, advertising, selling or finishing of such goods and other personal property, and all licenses, warranties, franchises, General Intangibles, personal property and all documents of title or documents relating to the same, together with all Accounts, Chattel Paper, Instruments and other consideration received by Borrower on account of the sale, lease or other disposition of all or any part of the foregoing, and together with all rights under or arising out of present or future Documents and contracts relating to the foregoing and all proceeds (cash proceeds and noncash proceeds) of the foregoing.

"ISDA Definitions" means the 2006 ISDA Definitions published by the International Swaps and Derivatives Association, Inc., or any successor thereto, as amended or supplemented from time to time, or any successor definitional booklet for interest rate derivatives published from time to time by the International Swaps and Derivatives Association, Inc. or such successor thereto.

"ISDA Fallback Adjustment" means the spread adjustment (which may be a positive or negative value or zero) that would apply for derivatives transactions referencing the ISDA Definitions to be determined upon the occurrence of an index cessation event with respect to the then-current Benchmark.

"ISDA Fallback Rate" means the rate that would apply for derivatives transactions referencing the ISDA Definitions to be effective upon the occurrence of an index cessation date with respect to the then-current Benchmark, excluding the applicable ISDA Fallback Adjustment.

"Late Charge" is defined in Section 2.1(c)(viii).

"Leases" means all oral or written leases, subleases, licenses, concessions, rental agreements, occupancy agreement and other agreements for the use or occupancy made or agreed to by, any person or entity and any and all amendments, extensions, renewals, modifications and replacements thereof pertaining to all or any part of the Property, or any possessory interest therein, whether such leases or other agreements have been heretofore or are hereafter made or agreed to.

"Lenders" means each of (a) Capital Funding, LLC, in its capacity as a lender hereunder, (b) each other Person party hereto in its capacity as a lender hereunder, (c) each other Person that becomes a party hereto as Lender as provided for herein, and (d) the respective successors of all of the foregoing, and "Lenders" means all of the foregoing.

10

"<u>Lien</u>" means any voluntary or involuntary mortgage, security deed, deed of trust, lien, pledge, assignment, security interest, title retention agreement, financing lease, levy, execution, seizure, judgment, attachment, garnishment, charge, lien or other encumbrance of any kind, including those contemplated by or permitted in this Agreement and the other Loan Documents.

"<u>Loan</u>" is defined in the recitals of this Agreement and is evidenced by this Agreement, the Note and other Loan Documents.

"<u>Loan Commitment</u>" means the obligation hereunder of Lenders to make a term loan in the original principal amount of up to approximately $21,050,000.00.

"<u>Loan Commitment Percentage</u>" means, as to any Lender, (a) on the Closing Date, the percentage set forth opposite such Lender's name on <u>Exhibit C</u> to this Agreement under the column "<u>Loan Commitment Percentage</u>", and (b) on any date following the Closing Date, the percentage equal to the principal amount of the Loan held by such Lender on such date *divided by* the aggregate principal amount of the Loan on such date.

"<u>Loan Documents</u>" means, collectively, this Agreement, the Assignment of Rents and Leases, the Note, the Security Instrument, the Guaranty Agreement, the Environmental Indemnity Agreement and the Management Subordination Agreement, together with any and all other documents executed by Borrower, any other Loan Party, and Guarantor or others evidencing, securing or otherwise relating to the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"<u>Loan Obligations</u>" means all present and future debts, obligations and liabilities of Borrower to Lenders arising pursuant to, or on account of, the provisions of this Agreement, the Note or any of the other Loan Documents, including the aggregate of all outstanding principal and all interest accrued and unpaid thereon owing from time to time under the Note and the other Loan Documents and all expenses, fees, charges and other amounts from time to time owing under the Note, this Agreement, or the other Loan Documents and the obligation to perform, observe and comply with all covenants, agreements and other obligations from time to time owing to, or for the benefit of, Lenders pursuant to the Loan Documents.

"<u>Loan Party</u>" means Borrower, Manager (if an Affiliate of Borrower) and Guarantor, individually, and "<u>Loan Parties</u>" means Borrower, Manager (if an Affiliate of Borrower) and Guarantor, collectively.

"<u>Management Agreement</u>" means any property management, professional services or consulting agreements entered into by and between Borrower and Manager, pursuant to which Manager is to provide such services with respect to the Project.

"<u>Management Subordination Agreement</u>" means that certain Subordination and Collateral Assignment of Management Agreement dated as of the date hereof among Agent, Borrower and Manager, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"<u>Manager</u>" means Riverwood Management LLC, a New Jersey limited liability company**,** together with its successors and assigns, and any other entity engaged to provide property management services at the Project.

11

"<u>Margin</u>" means three hundred ninety-five (395) basis points (i.e., 3.95 percentage points).

"<u>Maturity Date</u>" means the thirty-six (36) month anniversary of the Closing Date, or such other date on which the final payment of principal of the Note becomes due and payable as therein or herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise, subject to the Extension Option.

"<u>Money</u>" means all monies, cash, rights to deposit or savings accounts or other items of legal tender obtained from or for use in connection with the operation of the Property.

"<u>Mortgaged Property</u>" means the Property, the Improvements thereon and all real or personal property owned by the Borrower and encumbered by the Security Instrument, together with all tangible or intangible rights pertaining to the Property and Improvements, as more particularly defined in the Security Instrument as the "Mortgaged Property".

"<u>Note</u>" means, collectively, one or more Promissory Notes of even date herewith (including all schedules, riders, allonges, endorsements, addenda or amendments together with any renewals, replacements, substitutions or extensions thereof) executed by Borrower of even date herewith in an aggregate principal amount (or, if more than one Note is issued to a Lender, in an aggregate original principal amount) equal to such Lender's Pro Rata Share of the Loan Commitment.

"<u>Operating Expenses</u>" means the total of all expenditures of whatever kind relating to the operation, maintenance and management of the Property and the Project that are incurred on a regular monthly or other periodic basis, including without limitation, utilities, ordinary repairs and maintenance, insurance, license fees, taxes and assessments, advertising expenses, management fees not to exceed three percent (3%) of Gross Income from Operations (or such greater amount as Agent may consent to in its sole discretion), administrative service fees, professional fees, payroll and related taxes, computer processing charges, operational, equipment or other lease payments as approved by Agent, and other similar costs, but excluding depreciation, Debt Service, and capital expenditures, all calculated on a monthly basis in accordance with GAAP consistently applied.

"<u>Patriot Act</u>" is defined in <u>Section 10.14</u>.

"<u>Payment Reserves</u>" means, as applicable, the CapEx Reserve, the Replacement Reserve, the Imposition Deposits, any reserve funds related to any CARES Act Deferred Payroll Taxes, CARES Act PPP Loan or any other amounts owed by Borrower pursuant to similar stimulus programs, and any other escrow or reserve fund established pursuant to the Loan Documents.

"<u>Permits</u>" means all licenses, permits and certificates used or necessary in connection with the ownership, operation, use or occupancy of the Property and/or the Project thereon, including, without limitation, certificates of occupancy, business licenses, building or other similar permits issued in connection with any construction or rehabilitation and all such other permits, licenses and rights, obtained from any governmental, quasi-governmental or private person or entity whatsoever concerning ownership, operation, use or occupancy.

"<u>Permitted Encumbrances</u>" means (a) the lien of current real property taxes, water charges, sewer rents and assessments not yet due and payable; (b) the items specified in <u>Exhibit F</u>; (c) the exceptions (general and specific) and exclusions set forth in the Title Policy; (d) other matters to which like properties are commonly subject; (e) the rights of tenants (as tenants only) under leases (including subleases) pertaining to the related Mortgaged Property which the Loan Documents do not require to be

subordinated to the lien of the Security Instrument; and (f) if the Loan is cross-collateralized with another loan or loans, the lien of the security instrument for such other loan(s), provided that none of such items (a) through (f), individually or in the aggregate, materially interferes with the value, current use or operation of the Mortgaged Property or the security intended to be provided by the Security Instrument or with the current ability of the related Mortgaged Property to generate net cash flow sufficient to service the related Loan or the Borrower's ability to pay its obligations when they become due.

"Person" means any natural person, firm, trust, corporation, partnership, limited liability company, trust and any other form of legal entity.

"Proceeds" means all awards, payments, earnings, royalties, issues, profits, liquidated claims, and proceeds (including proceeds of insurance and condemnation or any conveyance in lieu thereof) from the sale, conversion (whether voluntary or involuntary), exchange, transfer, collection, loss, damage, condemnation, disposition, substitution or replacement of any of the Collateral.

"Prohibited Activities and Conditions" is defined in Section 6.1.

"Project" means the on-site and off-site improvements and all fixtures, tenant improvements and appurtenances now or hereafter located on the Property and/or in the Improvements.

"Property" means the real estate located at 3310 and 3314 Old Capitol Trail, Wilmington, Delaware, known as "Cranston Hall Apartments", owned by Borrower, which is more particularly described in Exhibit A hereto, upon which the Project is located.

"Pro Rata Share" means (a) with respect to a Lender's right to receive payments of principal and interest with respect to the Loan, the Loan Commitment Percentage of such Lender, and (b) for all other purposes (including, without limitation, the indemnification obligations set forth in this Agreement) with respect to any Lender, the percentage obtained by *dividing* (i) such Lender's then outstanding principal amount of the Loan, *by* (ii) the then outstanding principal amount of the Loan of all Lenders.

"Purchase Agreement" means, collectively, (i) that certain Purchase and Sale Agreement and Joint Escrow Instructions dated as of December 28, 2021, by and between Joyce McKay, Trustee of the Donald McKay Revocable Trust, a trust having an address c/o Gibson & Perkins, PC, Suite 204, 100 W. Sixth Street, Media, Pennsylvania 19063 ("Seller"), and SBT Acquisitions LLC, as thereafter assigned to Borrower, and (ii) any and all general assignments, bills of sale and all other documents executed in connection therewith.

"Relevant Governmental Body" means the Board of Governors of the Federal Reserve System and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board of Governors of the Federal Reserve System and/or the Federal Reserve Bank of New York or any successor thereto.

"Remedial Work" is defined in Section 6.8.

"Rents" means all rent and other payments of whatever nature from time to time payable pursuant to the Leases (including, without limitation, rights to payment earned under lease(s) for space in the Improvements for the operation of ongoing retail businesses), deposits (whether for security or otherwise but excluding any resident trust accounts), issues, profits, revenues, royalties, rights, benefits, and income of every nature of and from the Property and the operations conducted or to be conducted thereon.

13

"<u>Required Lenders</u>" means, subject to the provisions of Article XI, at any time Lenders holding sixty-six and two thirds percent (66 2/3%) or more of the outstanding principal balance of the Loan, provided, however, in all events Capital Funding, LLC, a Maryland limited liability company, shall be a Required Lender.]

"<u>Required Repairs</u>" is defined in Section 7.2.

"<u>Reserve Account Depository</u>" is defined in <u>Section 7.10</u>.

"<u>Response</u>" means (a) "response" as such term is defined in CERCLA, 42 U.S.C. § 9601(25) or any other applicable Hazardous Materials Law, or (b) all other actions required by any Governmental Authority or voluntarily undertaken to (i) clean up, remove, treat, abate, monitor or in any other way address any Hazardous Materials at, in, on, under or from any Property, or otherwise in the environment; (ii) prevent the release or threat of release, or minimize the further release, of any Hazardous Material; or (iii) perform studies and investigations in connection with, or as a precondition to, clause (i) or (ii) above.

"<u>SBA</u>" means the United States Small Business Administration.

"<u>Secondary Market Transactions</u>" is defined in <u>Section 10.15(a)</u>.

"<u>Security Instrument</u>" means that certain Mortgage, Security Agreement, Assignment of Leases and Rents, Financing Statement of Fixture Filing, of even date herewith from the Borrower in favor of and for the benefit of Agent and Lenders and covering the Mortgaged Property, as the same may be amended, restated, replaced, subleased or modified from time to time.

"<u>Single Purpose Entity</u>" means an entity whose organizational documents provide substantially to the effect that it was formed or organized solely for the purpose of owning and operating the Mortgaged Property and undertaking the Project, and prohibit it from engaging in any business unrelated to the Mortgaged Property and the Project, and whose organizational documents further provide substantially to the effect that it does not have any assets other than those related to its interest in and operation of the Mortgaged Property and undertaking of the Project, or any indebtedness other than as permitted by the Loan Documents, that it has its own books and records and accounts separate and apart from those of any other person, and that it holds itself out as a legal entity, separate and apart from any other person or entity.

"<u>SOFR</u>" with respect to any day means the secured overnight financing rate published for such day by the Federal Reserve Bank of New York, as the administrator of the benchmark (or a successor administrator), on the Federal Reserve Bank of New York's website.

"<u>Stock</u>" means all shares, options, warrants, general or limited partnership interests, membership interests, participations or other equivalents (regardless of how designated) in a corporation, limited liability company, partnership or any equivalent entity, whether voting or nonvoting, including, without limitation, common stock, preferred stock, or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the Securities and Exchange Commission under the Securities Exchange Act of 1934, as amended).

"<u>Supporting Obligation</u>" means a letter-of-credit right, secondary obligation, or obligation of a secondary obligor, or secondary obligation that supports the payment or performance of an account, chattel paper, a document, a general intangible, an instrument, or investment property.

14

"Survey" is defined in Section 2.4(c).

"Taxes" means all taxes, assessments, vault rentals and other charges, if any, general, special or otherwise, including all assessments for schools, public betterments and general or local improvements, which are levied, assessed or imposed by any public authority or quasi-public authority, and which, if not paid, will become a lien, on the Property or the Improvements.

"Term" means the date hereof through the Maturity Date, as the same may be extended, or earlier termination of the Loan.

"Term SOFR" means the Term SOFR Reference Rate for a tenor of one month on the Determination Date, as such rate is published by the Term SOFR Administrator (rounded upwards, if necessary, to the next 1/100 of 1%); provided, however, that if as of 5:00 p.m. (New York City time) on any Determination Date the Term SOFR Reference Rate for a tenor of one month has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator (rounded upwards, if necessary, to the next 1/100 of 1%) so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Determination Date.  Notwithstanding the foregoing or anything herein to the contrary, in no event shall Term SOFR be less than one tenth of one percent (0.10%).

"Term SOFR Administrator" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by Agent in its reasonable discretion).

"Term SOFR Reference Rate" means the forward-looking term rate based on SOFR.

"Title Policy" is defined in Section 2.4(c).

"Transfer" means the conveyance, assignment, sale, transfer, mortgaging, collateral assignment, encumbrance, pledging, alienation, hypothecation, granting of a security interest in, granting of options with respect to, or other disposition of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) all or any portion of any legal or beneficial interest (i) in all or any portion of the Mortgaged Property or any other real or personal property of Borrower; (ii) in the Stock of any corporation which is a Loan Party, a member of a Loan Party (if the Loan Party is a limited liability company), a partner of a Loan Party or, if applicable, a partner of a general partner of a Loan Party; or (iii) in a Loan Party (or any trust of which the Loan Party is a trustee), or, (iv) if a Loan Party is a limited or general partnership, limited liability company, joint venture, trust, nominee trust, tenancy in common or other unincorporated form of business association or form of ownership interest, in any Person having a direct or indirect legal or beneficial ownership in the Loan Party, including any legal or beneficial interest in any constituent limited partner or member of the Loan Party whether directly or through multiple tiers of ownership.  The term "Transfer" shall also include, without limitation, the following:  an installment sales agreement wherein a Loan Party agrees to sell the Mortgaged Property or any other real or personal property of Borrower, or any part thereof or any interest therein, for a price to be paid in installments; an agreement by a Loan Party leasing all or a substantial part of the Mortgaged Property or any other real or personal property of Borrower to one or more Persons pursuant to a single transaction or related transactions, or a sale, assignment or other transfer of, or the grant of a security interest in, a Loan Party's right, title and interest in and to any Leases or any Rent; any instrument subjecting the Mortgaged Property to a condominium regime or transferring

15

ownership to a cooperative corporation or other form of multiple ownership or governance; the dissolution or termination of a Loan Party, any general partner of a Loan Party, any general partner of any general partner of a Loan Party, if applicable, or, if the Loan Party is a limited liability company, any corporate member of a Loan Party; the issuance of new Stock in any corporation which is a Loan Party, membership interest of a Loan Party (if the Loan Party is a limited liability company), partnership interest of a Loan Party or, if applicable, a partner of a general partner of a Loan Party; or the merger or consolidation with any other Person of a Loan Party, any general partner of a Loan Party, any general partner of any general partner of a Loan Party, if applicable, or, if a Loan Party is a limited liability company, any corporate or member of a limited liability company that is a Loan Party.

"<u>Unadjusted Benchmark Replacement</u>" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"<u>U.S. Government Securities Business Day</u>" means any day except for a Saturday, a Sunday or a day on which the Securities Industry and Financial Markets Association, or any successor thereto, recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

1.2     <u>Singular and Plural Forms</u>.  Singular terms shall include the plural forms and vice versa, as applicable, of the terms defined.  Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.  For example, all references to a defined term that includes more than one Person (for example Borrower or Guarantor) shall mean, refer to and include each of the Persons included within the defined term (for example with respect to Borrower).  All references to a defined term that includes more than one written instrument, document, agreement or thing (for example Security Instrument, Assignment of Rents and Leases, Leases or Guaranty Agreements), means and includes each document, agreement or thing encompassed within the defined term.

1.3     <u>UCC Definitions</u>.  Terms contained in this Agreement shall, unless otherwise defined herein or unless the context otherwise indicates, have the meanings, if any, assigned to them by the Uniform Commercial Code in effect in the State of Maryland.

1.4     <u>Accounting Terms</u>.  All accounting terms used in this Agreement shall be construed in accordance with GAAP, except as otherwise specified.

1.5     <u>Amendments, Etc</u>.  All references to other documents or instruments shall be deemed to refer to such documents or instruments as they may hereafter be extended, renewed, modified, or amended and all replacements and substitutions therefore.

1.6     <u>Laws, Etc</u>.  Any reference to a code, act, statute or regulation means that law, code, act, statute or regulation as amended or supplemented from time to time and any corresponding provisions of successor laws, codes, acts, statutes or regulations and any reference to any law, code, act or statute shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.

ARTICLE II
TERMS OF THE LOAN

2.1     <u>The Loan</u>.  Borrower has agreed to borrow the Loan from Lenders, and Lenders have agreed to make the Loan to Borrower, subject to Borrower's compliance with and observance of the terms, conditions, covenants, and provisions of this Agreement and the other Loan Documents, and

16

Borrower has made the covenants, representations, and warranties herein and therein as a material inducement to Lenders to make the Loan.

(a) <u>Loan</u>. On the Closing Date, Lenders shall make a Loan to Borrower in the amount of $21,050,000.00. The proceeds of the Loan shall be used to finance the acquisition ofand finance capital expenditures at the Property and to fund certain reserves and pay closing costs and fees.

(b) <u>Interest</u>.

(i) Except as otherwise provided in this Agreement, the unpaid principal amount of the Loan and any interest not paid when due, shall bear interest with respect to so much of the principal amount of the Loan outstanding for a calendar month, at the Effective Rate.

(ii) Interest on the unpaid principal amount of the Loan shall be (x) payable monthly in arrears commencing on June 1, 2022 and on the first day of each month thereafter until the principal, together with all interest and other charges payable with respect to the Loan, shall be fully paid; and (y) calculated on the basis of a 360-day year and the actual number of days elapsed. Interest not paid when due (after giving effect to any grace period) shall accrue like interest as principal and shall be immediately payable.

(iii) All agreements among Borrower, Agent and Lenders are expressly limited, so that in no event or contingency, whether because of the advancement of the Loan, acceleration of maturity of the unpaid principal balance, or otherwise, shall the amount paid or agreed to be paid to Agent or any Lender for the use, forbearance, or retention of the money to be advanced under this Agreement or any Loan Document exceed the highest lawful rate permissible under applicable usury laws. If, under any circumstances, fulfillment of any provision of the Loan, this Agreement, the other Loan Documents or any other agreement pertaining to the Loan, after timely performance of such provision is due, shall involve exceeding the limit of interest validity prescribed by law that a court of competent jurisdiction deems applicable, then, *ipso facto*, the obligations to be fulfilled shall be reduced to the limit of such validity. If, under any circumstances, Agent or any Lender shall ever receive as interest an amount that exceeds the highest lawful rate, the amount that would be excessive interest shall be applied to reduce the unpaid principal balance of the Loan and not to pay interest, or, if such excessive interest exceeds the unpaid principal balance of the Loan, such excess shall be refunded to Borrower. This provision shall control every other provision of all agreements among Borrower, Agent and Lenders.

(iv) <u>Temporary Unavailability of Benchmark</u>. During any Benchmark Unavailability Period, the Loan shall be converted by Agent to a Loan bearing interest at the Base Rate.

(v) <u>Benchmark Replacement</u>. Notwithstanding anything to the contrary herein or in any other Loan-related document, upon the occurrence of a Benchmark Transition Event, Agent shall cause this Agreement to be amended to replace the current Benchmark, effective as of the Benchmark Replacement Date, with a Benchmark Replacement in accordance with the terms of this Section 2.1(b). Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. on the fifth (5th) Business Day after the Agent has posted such proposed amendment to all Lenders and the Borrower so long as the Agent has not received, by such time, written notice of objection to such amendment from Lenders comprising a majority of the Lenders.

(vi) <u>Conforming Changes</u>. In connection with the implementation of Term SOFR or any Benchmark Replacement, the Agent shall have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any

17

other Loan-related document, any amendments implementing such Conforming Changes shall become effective without any further action or consent of any party to this Agreement other than Agent.

(vii)    Notices; Standards for Decisions and Determinations.  The Agent will promptly notify the Borrower and all Lenders of (i) any occurrence of a Benchmark Transition Event, and its corresponding Benchmark Replacement Date; (ii) the implementation of any Benchmark Replacement; (iii) the effectiveness of any Conforming Changes; and (iv) the commencement or conclusion of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Agent pursuant to this Section 2.1(b), including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action, will be conclusive and binding absent manifest error and may be made in its reasonable discretion and without consent from any party hereto other than Agent.

(c)    Principal.

(i)    Maturity Date. The entire unpaid principal balance of the Loan and all accrued but unpaid interest and all other charges payable with respect to the Loan shall be due and payable on the Maturity Date.

(ii)    [Reserved]

(iii)    Prepayment. Borrower may repay all or any portion of the Loan without premium or penalty at any time, subject to payment of the Exit Fee as provided for herein, provided that (a) not less than thirty (30) days prior to any prepayment of principal, Borrower shall notify Agent in writing that Borrower is making a prepayment in the amount specified in such written notice, and (b) if such prepayment of principal occurs on any day other than the first day of a calendar month, Borrower shall indemnify Agent and each Lender and hold Agent and each Lender harmless from any losses, costs and/or expenses which Agent and each Lender sustains or incurs arising from the reemployment of funds obtained by Agent and each Lender hereunder or for any loss, cost, expense, penalty, claim or liability, including any loss incurred in obtaining, prepaying, liquidating or employing deposits or other funds from third parties and any loss of revenue, profit or yield, as determined by any Lender in its judgment reasonably exercised incurred by such Lender with respect to the payment or prepayment of any amount on a date other than the date such amount is required or permitted to be paid or prepaid ("Breakage Costs").  Agent shall deliver to Borrower a statement setting forth the amount and basis of determination of any Breakage Costs in such detail as determined in good faith by the Agent to be adequate, it being agreed that such statement and the method of its calculation shall be adequate and shall be conclusive and binding upon the Borrower, absent manifest error.

(iv)    Manner and Time of Payment. All payments of interest, principal and fees shall be made in lawful money of the United States in immediately available funds, without counterclaim or setoff and free and clear of, and without any deduction or withholding for, any taxes or other payments by wire transfer to Agent on behalf of the Lenders to such account as Agent shall from time to time designate.  Payments shall be credited on the Business Day on which immediately available funds are received prior to 3:00 P.M. Eastern Standard Time; payments received after 3:00 P.M. Eastern Standard Time shall be credited to the Loan on the next Business Day.  Payments which are by check, which Agent may at its option accept or reject, or which are not in the form of immediately available funds shall not be credited to the Loan until such funds become immediately available to Agent, and, with respect to payments by check, such credit shall be provisional until the item is finally paid by the payor bank.

(v)      Application of Payments. Except to the extent otherwise required by law or by the express terms of any other Loan Document, Agent shall apply and credit funds received by Agent pursuant to this Agreement or any other Loan Document in such manner and order of priority as Agent shall determine in Agent's sole discretion; provided, however, that in the absence of any contrary determination by Agent, such funds shall be applied and credited (a) first, to pay, or reimburse Agent and each Lender for amounts advanced by Agent and each Lender (other than principal of the Loan) pursuant to any provision of the Loan Documents (including without limitation those fees, charges, costs and expenses described in subsections (vi) and (vii) below, (b) second, to fund any deposits that Borrower may be required by the terms of any Loan Document to make with Lender, including any such deposits to be used to pay the cost of repairing or constructing any improvements, insurance premiums, Taxes, Payment Reserves, and utility charges, (c) third, to pay any Late Charges due under this Agreement or any other Loan Document, (d) fourth, to pay any other sums due under the Loan Documents, excluding interest earned or accrued and principal, (e) fifth, to pay any interest earned or accrued, and (f) sixth, to pay principal outstanding.

(vi)      Billing. Agent may submit monthly billings reflecting payments due; provided, however, that any changes in the interest rate which occur between the date of billing and the due date may be reflected in adjustments in the billing for a subsequent month.  Neither the failure of Agent to submit a bill, nor any error in any such bill shall excuse Borrower from the obligation to make full payment of all Borrower's payment obligations when due.

(vii)      Default Rate Interest. Upon and during the continuance of any Event of Default, any unpaid principal, accrued interest, Late Charges and other amounts payable under this Agreement or any other Loan Document shall bear interest, compounded monthly, at the Default Rate; provided, however, that if collection from Borrower of interest at such rate would be contrary to applicable law, then such amounts shall bear interest at the highest rate which may be collected from Borrower under applicable law.

(viii)      Late Charge. If any payment (whether of fees, interest or principal or upon any acceleration of the Loan, but excluding the payment due on the Maturity Date) is not paid within five (5) days of the date on which the payment is due, Borrower shall pay to Agent in addition to the delinquent payment and without any requirement of notice or demand by Agent or any Lender except as may be imposed by law, a "Late Charge" equal to five percent (5%) of the amount of the delinquent payment.  Late Charges are (a) payable in addition to, and not in limitation of, the Default Rate; (b) intended to compensate Agent and Lenders for administrative and processing costs incident to late payments; (c) not interest; and (d) not subject to refund or rebate or credit against any other amount due. Borrower expressly acknowledges and agrees that this Late Charges provision is reasonable under the circumstances existing on the date of this Agreement, which it would be extremely difficult and impractical to fix Agent's and each Lender's actual damages arising out of any late payment and that the Late Charge shall be presumed to be the actual amount of such damages incurred by Agent or Lenders.  In addition, in the event that any loan payment check tendered by Borrower to Agent is not honored upon presentment for demand, Borrower shall pay to Agent upon demand an amount equal to Two Hundred Fifty Dollars ($250.00).  No provision in this Agreement (including the provisions for Late Charges and for additional interest on any amounts remaining unpaid after the Maturity Date) shall be construed as in any way excusing Borrower from its obligation to make each payment promptly when due.

(d)      Acceleration upon Certain Transfers.  The unpaid principal balance of the Loan and interest thereon and all other Loan Obligations shall become immediately due and payable, and Borrower shall immediately pre-pay the Loan and all unpaid Loan Obligations in the event of any Transfer not expressly permitted by this Agreement, the Security Instrument or any of the other Loan Documents.

(e)     Extension Option.  Borrower may extend the Maturity Date two (2) times for a period of twelve (12) months each (each, an "Extension Option") from April 27, 2025 through April 26, 2026, and April 27, 2026 through April 26, 2027, respectively, upon Borrower's satisfaction of the following conditions:

(i)     Borrower shall have delivered to Agent written notice of such election no earlier than ninety (90) days and no later than thirty (30) days prior to the then-applicable Maturity Date;

(ii)     Borrower shall have paid to agent an extension fee in the amount equal to twenty-five (25) basis points (i.e., 0.25 percentage points) of the principal balance of the Loan outstanding at the time each such Extension Option is exercised by Borrower, which fee shall be non-refundable and fully earned when paid;

(iii)     No Default or Event of Default shall have occurred and be continuing;

(iv)     Borrower and Manager shall have complied in full with all requirements to cooperate with Agency Lender in connection with the preparation of the Agency Financing application and Agency Financing submission process set forth in this Agreement as determined by Agent in its reasonable discretion; and

(v)     Agent shall have received each Loan Party's current financial statements, certified as correct by each applicable party.

2.2     Security for the Loan.  The Loan will be evidenced, secured and guaranteed by the Loan Documents including, without limitation, the Security Instrument. In addition, Borrower hereby assigns, pledges and grants to the Agent, for the benefit of the Lenders, and agrees that the Agent shall have a perfected and continuing security interest in, and Lien on, all of the personal property of Borrower, whether now owned or existing or hereafter acquired or created and wherever situated and including, without limitation, (a) all of Borrower's Accounts, Inventory, Chattel Paper, Documents, Instruments, Equipment, Rents, Money, Deposit Accounts, Permits, Imposition Deposits, Payment Reserves and General Intangibles, whether now owned or existing or hereafter acquired or arising, (b) all returned, rejected or repossessed goods, the sale or lease of which shall have given or shall give rise to an Account or Chattel Paper,  (c) all insurance policies relating to the foregoing,  (d) all books and records in whatever media (paper, electronic or otherwise) recorded or stored, with respect to the foregoing and all equipment and general intangibles necessary or beneficial to retain, access and/or process the information contained in those books and records, and all of Borrower's other personal property of any kind or nature whatsoever, and (e) all cash proceeds and noncash proceeds and products of the foregoing.  Borrower further agrees that the Agent shall have in respect thereof all of the rights and remedies of a secured party under the Uniform Commercial Code as well as those provided in this Agreement, under each of the other Loan Documents and under applicable Laws.

2.3     Origination Fee; Transaction Costs.  On or before the Closing Date, Borrower shall have paid to Agent, for the benefit of the Lenders, in accordance with their respective Pro Rata Shares, an origination fee in an amount equal to 1% of the principal amount of the Loan; and Borrower shall have paid or reimbursed Agent for all title insurance premiums, recording and filing fees, costs of environmental reports, physical condition reports, appraisals and other reports, the fees and costs of Agent's and each Lender's counsel and all other third party out of pocket expenses incurred in connection with the origination of the Loan.  The origination fee shall be deemed to be fully earned upon the earlier to occur of (a) issuance of any commitment letter, or (b) the Closing Date, and shall be non-refundable upon payment.  The origination fee shall be due and payable on the Closing Date or on the earlier termination or expiration of any commitment letter.

20

2.4     <u>Conditions Precedent to Closing</u>.  The obligation of Lenders to make the Loan hereunder is subject to the fulfillment by Borrower or waiver by Agent and Lenders of the following conditions precedent no later than the Closing Date:

(a)     <u>Representations and Warranties; Compliance with Conditions</u>.  The representations and warranties of Borrower and other Loan Parties, as applicable, contained in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the Closing Date with the same effect as if made on and as of such date, and no Default or an Event of Default shall have occurred and be continuing; and Borrower shall be in compliance in all material respects with all terms and conditions set forth in this Agreement and in each other Loan Document on its part to be observed or performed.

(b)     <u>Loan Agreement and Note</u>.  Agent shall have received a copy of this Agreement and the Note, in each case, duly executed and delivered on behalf of Borrower.

(c)     <u>Delivery of Loan Documents; Title Insurance; Reports; Leases</u>.

(i)     <u>Security Instrument, Assignment of Leases</u>.  Agent shall have received from Borrower fully executed and acknowledged counterparts of the Security Instrument and the Assignment of Leases and evidence that counterparts of the Security Instrument and Assignment of Leases have been delivered to the title company for recording, in the judgment of Agent, so as to effectively create upon such recording valid and enforceable Liens upon the Property, of the requisite priority, in favor of Lenders (or such other trustee as may be required or desired under local law), subject only to the Permitted Encumbrances .  Agent shall have also received from each Loan Party, as applicable, fully executed counterparts of the other Loan Documents.

(ii)     <u>Title Insurance</u>.  Agent shall have received title insurance policies issued by a title company acceptable to Agent and dated as of the Closing Date, or a commitment to issue a policy with title insurance (either in the form of a commitment or pro forma policy) (collectively, the "<u>Title Policy</u>").  The Title Policy shall (i) provide coverage in amounts satisfactory to Agent, (ii) insure Lenders that the Security Instrument creates a valid first priority lien on the Property encumbered thereby of the requisite priority, free and clear of all exceptions from coverage other than Permitted Encumbrances, (iii) contain such endorsements and affirmative coverages as Agent may request, and (iv) name Lenders as the insureds.  The Title Policy shall be assignable.  Agent also shall have received evidence that all premiums in respect of the Title Policy have been paid.

(iii)     <u>Survey</u>.  Agent shall have received a current land survey for the Property, certified to the title company, Agent, and Lenders and their successors and assigns, in form and content satisfactory to Agent and prepared by a professional and properly licensed land surveyor satisfactory to Agent in accordance with the Accuracy Standards for ALTA/NSPS Land Title Surveys as adopted by ALTA, American Congress on Surveying & Mapping and National Society of Professional Surveyors in 2021 or such other standard as Agent may approve in its sole discretion (the "<u>Survey</u>").  The Survey shall reflect the same legal description contained in the Title Policy and shall include, among other things, a metes and bounds description of the real property comprising part of the Property satisfactory to Agent.  The surveyor's seal shall be affixed to the Survey and the surveyor shall provide a certification for the Survey in form and substance acceptable to Agent.

(iv)     <u>Insurance</u>.  Agent shall have received valid certificates of insurance and the endorsements related thereto for the policies required pursuant to <u>Section 4.5</u> hereunder, satisfactory to Agent in its sole discretion, and evidence of the payment of all insurance premiums payable for the existing policy period.

4893-8949-7115.6

(v)    <u>Environmental Reports</u>.  Agent shall have received a Phase I environmental report (and, if recommended by the Phase I environmental report, a Phase II environmental report) (collectively, the "<u>Environmental Reports</u>") in respect of the Property, in each case satisfactory in form and substance to Agent.

(vi)    <u>Zoning</u>.  With respect to the Property, Agent shall have received, at Agent's option, letters or other evidence with respect to the Property from the appropriate municipal authorities (or other Persons) concerning applicable zoning and building laws, in substance satisfactory to Agent.

(vii)    <u>Building Codes</u>.  Agent shall have received letters or other evidence with respect to the Property from the appropriate municipal authorities (or other Persons) concerning applicable building laws, in substance satisfactory to Lender.

(viii)    <u>Encumbrances</u>.  Borrower shall have taken or caused to be taken such actions in such a manner so that Agent and Lenders have a valid and perfected first priority Lien as of the Closing Date with respect to the Security Instrument on the Property, subject only to applicable Permitted Encumbrances, and Agent shall have received satisfactory evidence thereof.

(ix)    <u>Flood Certificates</u>.  Agent shall have received a Flood Determination Certificate satisfactory to Agent and Lenders.

(d)    <u>Related Documents</u>.  Each additional document not specifically referenced herein, but relating to the transactions contemplated herein, shall be in form and substance satisfactory to Agent, and shall have been duly authorized, executed and delivered by all parties thereto and Agent shall have received and approved certified copies thereof.

(e)    <u>Delivery of Organizational Documents</u>.  Borrower shall deliver or cause to be delivered to Agent copies certified by each applicable Loan Party (excluding any Loan Party that is an individual) of all organizational documentation related to each Loan Party and/or the formation, structure, existence, good standing and/or qualification to do business, as Agent may request in its sole discretion, including good standing certificates, qualifications to do business in the appropriate jurisdictions, resolutions authorizing the entering into of the Loan, execution and delivery of the Loan Documents, as applicable, and incumbency certificates as may be requested by Agent.

(f)    <u>Opinions of Borrower's Counsel</u>.  Agent shall have received opinions from Borrower's counsel with respect to the due execution, authority, enforceability of the Loan Documents and such other matters as Agent may require, all such opinions in form, scope and substance satisfactory to Agent and Agent's counsel in their discretion.

(g)    <u>Basic Carrying Costs</u>.  Borrower (or other Persons) shall have paid all basic carrying costs relating to the Property which are in arrears, if any, including without limitation, (i) accrued but unpaid insurance premiums, (ii) currently due Taxes (including any in arrears) and (iii) currently due other charges, which amounts shall be funded with proceeds of the Loan.

(h)    <u>Completion of Proceedings</u>.  All corporate and other proceedings taken or to be taken in connection with the transactions contemplated by this Agreement and other Loan Documents and all documents incidental thereto shall be satisfactory in form and substance to Agent, and Agent shall have received all such counterpart originals or certified copies of such documents as Agent may request.

(i)    <u>Payments</u>.  All Payment Reserves, payments, deposits or escrows required to be

made or established by Borrower under this Agreement, the Note and the other Loan Documents on or before the Closing Date shall have been paid.

(j)  Origination Fee; Transaction Costs.  Borrower shall have paid to Agent the origination fee pursuant to Section 2.3 and shall have paid or reimbursed Agent and Lenders for all title insurance premiums, recording and filing fees, costs of environmental reports, termite inspection reports, physical condition reports, appraisals and other reports, the fees and costs of Agent's and Lenders' counsel and all other third party out of pocket expenses incurred by Agent or Lenders in connection with the origination of the Loan.

(k)  Material Adverse Change.  There shall have been no material adverse change in the financial condition or business condition of any Loan Party or the Project since the date of the most recent financial statements delivered to Lender.  The income and expenses of the Project, the occupancy thereof, and all other features of the transaction shall be as represented to Agent without material adverse change.  No Loan Party nor any of their constituent Persons shall be the subject of any bankruptcy, reorganization, or insolvency proceeding.

(l)  [Reserved]

(m)  Acquisition.  The transactions contemplated by the Purchase Agreements and closing thereunder shall have been completed and consummated, all in terms and conditions satisfactory to Agent.

(n)  Tax Lot.  Agent shall have received evidence that the Property constitutes one (1) or more separate tax lots, which evidence shall be satisfactory in form and substance to Agent.

(o)  Physical Condition Reports.  Agent shall have received physical condition reports with respect to the Property, which reports shall be satisfactory in form and substance to Agent.

(p)  Termite Inspection Reports.  If required, Agent shall have received termite inspection reports with respect to the Property, which reports shall be satisfactory in form and substance to Agent.

(q)  Management Agreement.  Agent shall have received a true and correct copy of the fully executed Management Agreement, which shall be satisfactory in form and substance to Agent, and copies of all necessary approvals in accordance with all legal requirements.

(r)  Resumes and Personal Financial Statements.  Agent shall have received current resumes of each Guarantor who is an individual, along with current financial statements and copies of all tax returns filed for the three (3) most recent years.

(s)  Appraisal.  Agent shall have received an appraisal of the Property, which shall be satisfactory in form and substance to Agent.

(t)  [Reserved]

(u)  Further Documents.  Agent or its counsel shall have received such other and further approvals, opinions, documents and information as Agent or its counsel may have requested including the Loan Documents in form and substance satisfactory to Agent and its counsel.

ARTICLE III
BORROWER'S REPRESENTATIONS AND WARRANTIES

To induce Agent and Lenders to enter into this Agreement, and to make the Loan to Borrower, Borrower represents and warrants to Agent and Lenders as follows:

3.1    Existence, Power and Qualification.  Borrower is a duly organized and validly existing limited liability company, has the power to own or lease its properties and to carry on its business as is now being conducted, and is duly qualified to do business and is in good standing in every jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes qualification necessary.

3.2    Power and Authority.  Borrower has full power and authority to borrow the Indebtedness evidenced by the Note and to incur the Loan Obligations provided for herein, all of which have been authorized by all proper and necessary action.  All consents, approvals authorizations, orders or filings of or with any court or Governmental Authority, if any, required for the execution, delivery and performance of the Loan Documents by any Loan Party have been obtained or made.  Each Loan Party has the full power and authority to incur liabilities and obligations provided for in the respective Loan Documents to which it is a party, all of which have been authorized by all proper and necessary action.  All consents, approvals authorizations, orders or filings of or with any court or Governmental Authority, if any, required for the execution, delivery and performance of the Loan Documents by each Loan Party have been obtained or made.

3.3    Due Execution and Enforcement.  Each of the Loan Documents to which a Loan Party is a party constitutes a legal, valid and binding obligation of the Loan Party, enforceable in accordance with its respective terms (except as such enforcement may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, or other laws affecting the enforcement of creditors' rights generally and by general principles of equity) and does not violate, conflict with, or constitute any default under any law, government regulation, decree, judgment, the Loan Party's articles of organization or incorporation, partnership agreement/operating agreement or by-laws, as applicable, or any other material agreement or instrument binding upon the Loan Party.  There is no valid offset, defense, counterclaim or right of rescission available to Borrower with respect to any of the Loan Documents.  The Loan Documents contain provisions that render the rights and remedies of Agent and Lenders adequate for the practical realization against the Mortgaged Property of the principal benefits of the security intended to be provided thereby, including realization by judicial or, if applicable nonjudicial foreclosure, subject to bankruptcy, insolvency, fraudulent transfer, reorganization or other similar laws affecting the enforcement of creditors' rights generally and to general principles of equity.

3.4    Single Purpose Entity.  Borrower is a Single Purpose Entity.

3.5    Pending Matters.

(A)    Operations; Financial Condition.  No action or investigation is pending or threatened before or by any court or administrative agency which might result in any material adverse change in the financial condition, operations or prospects of any Loan Party.  No Loan Party is in violation of any agreement, the violation of which might reasonably be expected to have a material adverse effect on its business or assets.  No Loan Party is in violation of any order, judgment, or decree of any court, or any statute or governmental regulation to which it is subject.

(B)    Property Improvements.  There are no proceedings pending or threatened, to acquire through the exercise of any power of condemnation, eminent domain or similar proceedings any

24

part of the Property, the Improvements or any interest therein, or to enjoin or similarly prevent or restrict the use of the Property or the operation of the Project in any manner.  No portion of the Project or the Improvements is subject to any unrepaired casualty or other damage.

      3.6    <u>Financial Statements Accurate</u>.  All financial statements heretofore or hereafter provided by or on behalf of each Loan Party are and will be true and complete in all material respects as of their respective dates and fairly present the respective financial condition of such Loan Party as of such date, and there are no material liabilities, direct or indirect, fixed or contingent, as of the respective dates of such statements which are not reflected therein or in the notes thereto or in a written certificate delivered with such statements.  The financial statements of each Loan Party have been and will be prepared in accordance with GAAP.  There has been no material adverse change in the financial condition, or operations of any Loan Party since the dates of such statements except as fully disclosed in writing with the delivery of such statements.  All financial statements of the operations of the Project hereafter provided to Agent will be true and complete in all material respects as of their respective dates, and to Borrower's knowledge, all such financial statements provided to Agent shall be true and correct in all material respects.

      3.7    <u>Certificates of Occupancy</u>.  All certificates of occupancy and other Permits and licenses necessary or required in connection with the use and occupancy of the Improvements have been validly issued.

      3.8    <u>Utilities; Roads; Access</u>.  All utility services necessary for the operation of the Improvements for their intended purposes have been fully installed, including telephone service, cable television, water supply, storm and sanitary sewer facilities, natural gas and electric facilities, including cabling for telephonic and data communication, and the capacity to send and receive wireless communication.  All roads and other accesses necessary to serve the Property and Improvements have been completed, are serviceable in all weather, and where required by the appropriate Governmental Authority, have been dedicated to and formally accepted by such Governmental Authority.

      3.9    <u>Use of Loan Proceeds</u>.  The proceeds of the Loan shall be used for the purpose of financing the acquisition of and financing capital expenditures at the Property, funding certain reserves and paying closing costs and fees pursuant to the terms and conditions set forth herein.

      3.10    <u>Fraudulent Conveyances</u>.  Borrower: (a) has not entered into this Agreement or any of the other Loan Documents with the actual intent to hinder, delay, or defraud any creditor; and (b) has received reasonably equivalent value in exchange for its obligations under the Loan Documents.  Giving effect to the transactions contemplated by the Loan Documents, the fair saleable value of Borrower's assets exceeds and will, immediately following the execution and delivery of the Loan Documents, be greater than Borrower's probable liabilities, including the maximum amount of its contingent liabilities or its debts as such debts become absolute and mature.  Borrower's assets do not and, immediately following the execution and delivery of the Loan Documents will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted.  Borrower does not intend to, and does not believe that it will, incur debts and liabilities (including, without limitation, contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts to be payable on or in respect of obligations of Borrower).

      3.11    <u>Other Indebtedness</u>.  Borrower has no outstanding Indebtedness, secured or unsecured, direct or contingent (including any guaranties), other than: (a) the Loan, (b) the CARES Act Obligations set forth on Schedule 3.23 and (c) Indebtedness which represents trade payables or accrued expenses incurred in the ordinary course of business of owning and operating the Property.  No Indebtedness other than the Loan will be secured (senior, subordinate or pari passu) by the Property.

3.12    <u>Other Obligations</u>.  Borrower has no material financial obligation under any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Borrower is a party or by which Borrower or the Property or other Collateral is otherwise bound, other than obligations incurred in the ordinary course of the operation of the Project, other than obligations under the Security Instrument and the other Loan Documents.

3.13    <u>Solvency</u>.  Each Loan Party is solvent for purposes of 11 U.S.C. §548, and the borrowing of the Loan will not render any Loan Party insolvent for purposes of 11 U.S.C. §548.

3.14    <u>Payment of Taxes and Property Impositions</u>.  Each Loan Party has filed all federal, state, and local tax returns which it is required to file and has paid, or made adequate provision for the payment of, all taxes which are shown pursuant to such returns or are required to be shown thereon or to assessments received by any Loan Party, including, without limitation, provider taxes.  All such returns are complete and accurate in all respects.  Borrower has paid or made adequate provision for the payment of all applicable Taxes, governmental assessments and other outstanding governmental charges (including, without limitation, water and sewer charges), and ground rents (if applicable) due with respect to the Property.

3.15    <u>Title to Collateral</u>.  Borrower has good and marketable title to the Mortgaged Property described in the Security Instrument and all of the other Collateral, subject to no lien, mortgage, pledge, encroachment, zoning violation, or encumbrance, except Permitted Encumbrances.  There are no senior, pari passu or junior mortgages or mortgage liens encumbering the Mortgaged Property or any portion thereof other than the Security Instrument.  No rights exist which under law could give rise to any lien that would be prior to or equal with the lien of the Security Instrument.

3.16    <u>Priority of Mortgage</u>.  The Security Instrument constitutes a legal, valid and enforceable first lien against the Borrower's fee interest in the Mortgaged Property in the principal amount of the Loan, prior to all other liens or encumbrances, including those which may hereafter accrue, excepting only Permitted Encumbrances.  The Security Instrument and the other Loan Documents establish and create a valid and enforceable lien on the property described therein.  There are no subordinate mortgages or junior liens encumbering the Mortgaged Property.  There is no mezzanine debt related to the Mortgaged Property.  The Assignment of Rents and Leases creates a valid first-priority collateral assignment of, or a valid first-priority lien or security interest in, rents and certain rights under the related lease or leases, subject only to a license granted to the Borrower to exercise certain rights and to perform certain obligations of the lessor under such lease or leases, including the right to operate the related leased property, except as the enforcement thereof may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity; no person other than Borrower owns any interest in any payments due under such lease or leases that is superior to or of equal priority with Agent's and Lenders' interest therein.

3.17    <u>Location of Chief Executive Offices</u>.  The location of each Loan Party's principal place of business and chief executive office is set forth on <u>Schedule 3.17</u>.

3.18    <u>Disclosure</u>.  All information furnished or to be furnished by a Loan Party to Agent and Lenders in connection with the Loan or any of the Loan Documents, is, or will be at the time the same is furnished, accurate and correct in all material respects and complete insofar as completeness may be necessary to provide Agent and Lenders with true and accurate knowledge of the subject matter.

3.19    <u>Trade Names</u>.  No Loan Party has changed its legal name, been known by any other name or been a party to a merger, reorganization or similar transaction within the last five (5) years.

4893-8949-7115.6

3.20    ERISA.  Borrower is in compliance with all applicable provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").

3.21    Ownership.  The ownership interest of each Loan Party is correctly and accurately set forth in the organizational chart of the Borrower on Schedule 3.21.

3.22    Compliance With Applicable Laws.  The Project and its operations and the Property comply in all material respects with all covenants and restrictions of record and applicable laws, ordinances, rules and regulations, including, without limitation, the Americans with Disabilities Act and the regulations thereunder, and all applicable laws, zoning ordinances, rules covenants and restrictions governing the Project and the Property or constitute a legal non-conforming use or structure and any nonconformity with zoning laws constitutes a legal non-conforming use or structure which does not materially and adversely affect the use, operation or value of the Project or the Mortgaged Property.  In the event of casualty or destruction, (a) the Project may be restored or repaired to the full extent necessary to maintain the use of the structure immediately prior to such casualty or destruction, (b) law and ordinance insurance coverage has been obtained for the Project in an amount satisfactory to Agent that provides coverage for additional costs to rebuild and/or repair the property to current zoning laws, or (c) the inability to restore the Project to the full extent of the use or structure immediately prior to the casualty would not materially and adversely affect the use, operation or value of the Mortgaged Property.

3.23    CARES Act Obligations.  Borrower represents and warrants that Schedule 3.23 sets forth a true and correct summary of all Cares Act Obligations, including the total amounts outstanding, any amounts Borrower intends to return to the applicable Governmental Authority, full amounts received, and the dates such amounts were received by Borrower.  Borrower further represents and warrants that all requests by Borrower complied with the requirements of the applicable CARES Act program.

3.24    Bankruptcy.  Neither the Mortgaged Property, nor any portion thereof, is the subject of, and none of Borrower or Guarantor is a debtor in, any state or federal bankruptcy, insolvency or similar proceeding.

3.25    Usury.  The Effective Rate (exclusive of any default interest, late charges, yield maintenance charge, or prepayment premiums) complies with, or is exempt from, applicable state or federal laws, regulations and other requirements pertaining to usury.

3.26    Other Proceedings.  There is no pending, filed or threatened action, suit or proceeding, arbitration or governmental investigation involving Borrower, Guarantor, or the Mortgaged Property, an adverse outcome of which would reasonably be expected to materially and adversely affect (a) title to the Mortgaged Property, (b) the validity or enforceability of the Security Instrument, (c) Borrower's ability to perform under the Loan Documents, (d) Guarantor's ability to perform under the Loan Documents to which it is a party, (e) the use, operation or value of the Mortgaged Property, (f) the principal benefit of the security intended to be provided by the Loan Documents, (g) the current ability of the Mortgaged Property to generate net cash flow sufficient to service the Loan or (h) the current principal use of the Mortgaged Property.

3.27    Access.  The Property (a) is located on or adjacent to a public road and has direct legal access to such road, or has access via an irrevocable easement or irrevocable right of way permitting ingress and egress to/from a public road, (b) is served by or has uninhibited access rights to public or private water and sewer (or well and septic) and all required utilities, all of which are appropriate for the current use of the Property, and (c) constitutes one or more separate tax parcels which do not include any property which is not part of the Mortgaged Property.

3.28    Encroachments.   Based solely on the Survey and the Title Policy, all material Improvements are within the boundaries of the Property, except encroachments that do not materially and adversely affect the value or current use of the Mortgaged Property, after taking into account any applicable provisions of the Title Policy.   No improvements on adjoining parcels encroach onto the Property except for encroachments that do not materially and adversely affect the value or current use of the Mortgaged Property, after taking into account any applicable provisions of the Title Policy.   No improvements encroach upon any easements except for encroachments the removal of which would not materially and adversely affect the value or current use of the Mortgaged Property after taking into account any applicable provisions of the Title Policy.

3.29    Fixtures, Furniture and Equipment.   Borrower owns the fixtures, furniture and Equipment required by all state and federal laws and regulations for the operation of the Property, if any.

ARTICLE IV
AFFIRMATIVE COVENANTS OF BORROWER

Borrower agrees with and covenants unto Agent and the Lenders that until the Loan Obligations have been paid in full:

4.1    Payment of Loan/Performance of Loan Obligations.   Borrower shall duly and punctually pay or cause to be paid the principal and interest of the Note in accordance with the terms set forth herein and duly and punctually pay and perform or cause to be paid or performed all Loan Obligations hereunder and under the other Loan Documents.

4.2    Maintenance of Existence.   Borrower shall each maintain its existence as a limited liability company, and shall maintain its qualification to do business in the jurisdiction in which the Mortgaged Property is located an in each other jurisdiction in which the character of the property owned by either of them or in which the transaction of its business makes qualification necessary.

4.3    Maintenance of Single Purpose.   Borrower shall maintain its existence as a Single Purpose Entity.

4.4    Accrual and Payment of Taxes.   During each fiscal year, Borrower shall make accurate provision for the payment of all current tax liabilities of all kinds, including, without limitation, federal and state income taxes, franchise taxes, payroll taxes and Taxes, all required withholding of income taxes of employees, all required old age and unemployment contributions, and all required payments to employee benefit plans, and pay the same when they become due.

4.5    Insurance.

(a)    Insurance Requirements.   Borrower shall maintain the same levels of insurance coverage as are currently in existence as evidenced by the ACORD certificates of insurance provided to Agent as of the date hereof to the extent such insurance coverages are acceptable to Agent.   Notwithstanding the foregoing, upon notice from Agent following an Event of Default or as required for the submission of any application to HUD for the Agency Financing, Borrower shall obtain and maintain the following insurance coverages with respect to the Property, the Improvements and the Project thereon:

(i)    Insurance against loss or damage by fire, casualty and other hazards as now are or subsequently may be covered by a comprehensive "all risk" policy

28

including time element coverage, with such endorsements as Agent may from time to time require and which are customarily required by institutional lenders of similar properties similarly situated, including, at a minimum, building ordinance or law, demolition, increased cost of construction, lightning, windstorm, civil commotion, hail, riot, strike, water damage, sprinkler leakage, collapse, malicious mischief, theft, explosion, smoke, aircraft, vehicles, vandalism, falling objects and weight of snow, ice or sleet, and covering the Project in an amount equal to one hundred percent (100%) of the full insurable replacement value of the Project (exclusive of footings and foundations below the lowest basement floor) without deduction for depreciation. The determination of the replacement cost amount shall be determined by the "Insurable Value" or "Cost Approach to Value" as reflected in an appraisal, with a waiver of depreciation, and shall be adjusted annually to comply with the requirements of the insurer issuing the coverage, or as may be determined to be required by Agent, and, unless the insurance required by this paragraph shall be effected by blanket and/or umbrella policies in accordance with the requirements of this Agreement, the policy shall include inflation guard coverage that ensures that the policy limits will be increased over time to reflect the effect of inflation. Each policy shall, subject to Agent's approval, contain: (i) a replacement cost endorsement, without deduction for depreciation; (ii) either an agreed amount endorsement or a waiver of any co-insurance provisions; and (iii) an ordinance or law coverage or enforcement endorsement if the Improvements or the use of the Property constitutes any legal nonconforming structures or uses, and shall provide for deductibles in such amounts as Agent may permit in its sole discretion.

(ii)     Commercial general liability insurance under a policy containing "Comprehensive General Liability Form" of coverage (or a comparably worded form of coverage) and the "Broad Form CGL" endorsement (or a policy which otherwise incorporates the language of such endorsement), providing coverage on an occurrence basis if available on commercially reasonable terms, and if not then on a claims made basis with a six (6) year tail at termination. Any such policy shall include, at a minimum, coverage against claims for personal injury, bodily injury, death and property damage liability with respect to the Project and the operations related thereto, whether on or off the Property, and the following coverages: Contractual Liability, Independent Contractor, Personal Injury and Advertising Injury Protection, Medical Payment (with a minimum limit of $5,000 per person), Broad Form Cross Suits Liability Endorsement, where applicable, hired and non-owned automobile coverage (including rented and leased vehicles), and, if any alcoholic beverages shall be sold, manufactured or distributed in the Project, liquor liability coverage, all of which shall be in such amounts as Agent may from time to time require, but not less than an amount per Project of One Million Dollars ($1,000,000) per occurrence, Two Million Dollars ($2,000,000) in the aggregate. The deductible amount shall not exceed One Hundred Thousand ($100,000) per occurrence. Such liability policy shall delete the contractual exclusion under the personal injury coverage, if possible, and if available, shall include the following endorsements:  Notice of Accident, Knowledge of Occurrence, and Unintentional Error and Omission.

(iii)     If required by Agent, Loss of rents insurance for the Property: (i) covering the same perils of loss as are required to be covered by the property insurance required under this Section 4.5; (ii) in an amount of 100% of the gross rental income of each Project for a period of twelve (12) months as projected by Agent, containing a one hundred eighty (180) day extended period of indemnity endorsement; (iii) including either an agreed amount endorsement

29

or a waiver of any co-insurance provisions, so as to prevent Borrower, Agent and any other insured thereunder from being a co-insurer; and (iv) providing that any covered loss thereunder shall be payable to Agent.

(iv)     During the period of any new construction on the Property, a so-called "Builder's All-Risk Completed Value" or "Course of Construction" insurance policy in non-reporting form for any improvements under construction, including, without limitation, for demolition and increased cost of construction or renovation, in an amount equal the amount of the general contract plus the value of any existing trust note for improvements and materials stored on or off the real property, including "soft cost" coverage, and Workers' Compensation Insurance covering all persons engaged in such construction, in an amount at least equal to the minimum required by law.  In addition, each contractor and subcontractor shall be required to provide Agent with a certificate of insurance for (i) workers' compensation insurance covering all persons engaged by such contractor or subcontractor in such construction in an amount at least equal to the minimum required by law, and (ii) general liability insurance showing minimum limits of at least Three Million Dollars ($3,000,000), including coverage for products and completed operations.  Each contractor and subcontractor also shall cover Borrower and Agent as an additional insured under such liability policy and shall indemnify and hold Borrower and Agent harmless from and against any and all claims, damages, liabilities, costs and expenses arising out of, relating to or otherwise in connection with its performance of such construction.

(v)     If the Project contains steam boilers, steam pipes, steam engines, steam turbines or other high pressure vessels, insurance covering the major components of the central heating, air conditioning and ventilating systems, boilers, other pressure vessels, high pressure piping and machinery, elevators and escalators, if any, and other similar equipment installed in the Improvements, in an amount equal to one hundred percent (100%) of the full replacement cost thereof, which policies shall insure against physical damage to and loss of occupancy and use of the Improvements arising out of an accident or breakdown covered thereunder.

(vi)     Flood Hazard insurance, in the maximum amount allowable by law, if any portion of the Improvements is located in a federally designated "special flood hazard area" and in which flood insurance is available.  In lieu thereof, Agent will accept proof, satisfactory to it in its sole discretion, that the improvements are not within the boundaries of a designated "special flood hazard area."

(vii)     Workers' compensation and employers' liability insurance or other similar insurance which may be required by governmental authorities or applicable legal requirements in an amount at least equal to the minimum required by law.

(viii)     Such other insurance coverages, in such amounts, and such other forms and endorsements, as may from time to time be required by Agent in its sole discretion and which are customarily required by institutional lenders to similar properties, similarly situated, including, at minimum, coverages against other insurable hazards (including, by way of example only, earthquake, sinkhole and mine subsidence), which at the time are commonly insured against and generally available.

(b)    <u>Additional Requirements/Provisions</u>:

(i)    Borrower is required to provide Agent with original renewals or replacements of such insurance policies or certificates during the Term of the Loan.

(ii)    If the Project is located in a seismically active area or an area prone to geologic instability and mine subsidence, Agent may require an inspection by a qualified structural or geological engineer satisfactory to Agent, and at Borrower's expense. Each Project must be structurally and geologically sound and capable of withstanding normal seismic activity or geological movement. Agent reserves the right to require earthquake insurance or Maximum Probable Loss insurance on a case-by-case basis.

(iii)    All insurance policies shall have a term of not less than one (1) year and shall be in the form and amount and with deductibles as, from time to time, shall be acceptable to Agent in its sole discretion. All such policies shall be primary, provide for loss payable solely to Agent and Lenders and shall contain a standard "non-contributory mortgagee" endorsement or its equivalent relating, inter alia, to recovery by Agent and Lenders notwithstanding the negligent or willful acts or omissions of Borrower and notwithstanding: (i) occupancy or use of the Project for purposes more hazardous than those permitted by the terms of such policy; (ii) any foreclosure or other action taken by Agent or any Lender pursuant to a Security Instrument upon the occurrence of an Event of Default thereunder; or (iii) any change in title or ownership of the Project.

(iv)    All insurance policies must be written by a licensed insurance carrier in the State in which the Project is located and that has a long-term senior debt rating of at least "AA" by Standard & Poor's Rating Service.

(v)    All liability insurance policies must name "Capital Funding, LLC, a Maryland limited liability company, and its successors and/or assigns as their interests may appear" as additional insureds, and all property insurance policies must name "Capital Funding, LLC, a Maryland limited liability company, and its successors and/or assigns as their interests may appear" as the named mortgage holder entitled to all insurance proceeds as loss payee. Agent shall have the right, without Borrower's consent, by notice to the insurance company and to Borrower, to change the additional insured and named mortgagee endorsements in connection with any sale, assignment or other transfer of the Loan.

(vi)    All insurance policies for the above required insurance must provide for thirty (30) days prior written notice of cancellation to Agent.

(vii)    Policies or binders, together with the evidence of the above required insurance on ACORD Form 27 or its equivalent, must be submitted to Agent prior to setting the interest rate on the Loan. Borrower shall not carry separate insurance, concurrent in kind or form or contributing in the event of loss, with any insurance required under this <u>Section 4.5</u>. If the limits of any policy required hereunder are reduced or eliminated due to a covered loss, Borrower shall pay the additional premium, if any, in order to have the original limits of insurance reinstated, or Borrower shall purchase new insurance in the same type and amount that existed immediately prior to the loss.

(viii)    If Borrower fails to maintain and deliver to Agent the original policies or certificates of insurance required by this Agreement, Agent may, at its option, procure such insurance and Borrower shall pay or, as the case may be, reimburse Agent and Lenders for, all premiums thereon promptly, upon demand by Agent, with interest thereon at the Default Rate from the date paid by Agent or any Lender to the date of repayment and such sum shall constitute a part of the Loan Obligations.

(ix)     The insurance required by this Agreement may, at the option of Borrower, be effected by blanket and/or umbrella policies issued to Borrower or to an Affiliate of Borrower covering each Project and the properties of such Affiliate; provided that, in each case, the policies otherwise comply with the provisions of this Agreement and allocate to the Project, from time to time, the coverage specified by this Agreement, without possibility of reduction or coinsurance by reason of, or damage to, any other property (real or personal) named therein.  If the insurance required by this Agreement shall be effected by any such blanket or umbrella policies, Borrower shall furnish to Agent original policies or certified copies thereof, with schedules attached thereto showing the amount of the insurance provided under such policies which is applicable to the Project.

(x)     None of Agent, Lenders or their respective agents or employees shall be liable for any loss or damage insured by the insurance policies required to be maintained under this Agreement; it being understood that: (i) Borrower shall look solely to its insurance company for the recovery of such loss or damage; (ii) such insurance company shall have no rights of subrogation against Agent, Lender, or any of their respective agents or employees; and (iii) Borrower shall use its best efforts to procure from such insurance company a waiver of subrogation rights against Agent and each Lender. If, however, such insurance policies do not provide for a waiver of subrogation rights against Agent and each Lender (whether because such a waiver is unavailable or otherwise), then Borrower hereby agrees, to the extent permitted by law and to the extent not prohibited by such insurance policies, to waive its rights of recovery, if any, against Agent, Lender, and each of their respective agents and employees, whether resulting from any damage to the Project, any liability claim in connection with the Project or otherwise.  If any such insurance policy shall prohibit Borrower from waiving such claims, then Borrower must obtain from such insurance company a waiver of subrogation rights against Agent and each Lender.

(c)     At its option, Agent agrees that Agent shall make the net proceeds of insurance or condemnation (after payment of Agent's and Lender's reasonable costs and expenses) available to Borrower for Borrower's repair, restoration and replacement of the Improvements, Equipment and Inventory damaged or taken on the following terms and subject to Borrower's satisfaction of the following conditions:

(i)     The aggregate amount of all such proceeds shall not exceed the aggregate amount of all such Loan Obligations;

(ii)     At the time of such loss or damage and at all times thereafter while Agent or any Lender is holding any portion of such proceeds, there shall exist no Default or Event of Default;

(iii)     The Improvements, Equipment, and Inventory for which loss or damage has resulted shall be capable of being restored to its preexisting condition and utility in all material respects with a value equal to or greater than that which existed prior to such loss or damage and such restoration shall be capable of being completed prior to the earlier to occur of (A) the expiration of loss of rents insurance as determined by an independent inspector or (B) the original Maturity Date of the Loan;

(iv)     Within thirty (30) days from the date of such loss or damage Borrower shall have given Agent a written notice electing to have the proceeds applied for such purpose;

(v)     Within sixty (60) days following the date of notice under the preceding subparagraph (iv) and prior to any proceeds being disbursed to Borrower, Borrower shall have provided to Agent all of the following:

32

(A)     complete plans and specifications for restoration, repair and replacement of the Improvements, Equipment and Inventory damaged to the condition, utility and value required by this <u>Section 4.5</u>;

(B)     if loss or damage exceeds $50,000, fixed-price or guaranteed maximum cost bonded construction contracts for completion of the repair and restoration work in accordance with such plans and specifications;

(C)     if required by Agent, builder's risk insurance for the full cost of construction with Agent named under a standard mortgagee loss-payable clause;

(D)     such additional funds as in Agent's reasonable opinion are necessary to complete such repair, restoration and replacement;

(E)     copies of all permits and licenses, if any, necessary to complete the work in accordance with the plans and specifications;

(vi)     Agent may, at Borrower's expense, retain an independent inspector to review and approve plans and specifications and completed construction and to approve all requests for disbursement, which approvals shall be conditions precedent to release of proceeds as work progresses;

(vii)     No portion of such proceeds shall be made available by Agent for architectural reviews or for any other purposes which are not directly attributable to the cost of repairing, restoring or replacing the Improvements, Equipment and Inventory for which a loss or damage has occurred unless the same are covered by such insurance;

(viii)     Borrower shall diligently pursue such work and shall complete such work prior to the earlier to occur of the expiration of business interruption insurance or the Maturity Date;

(ix)     Borrower, Guarantor and the Project each continues to achieve the requirements of the Financial Covenants set forth in <u>Section 4.12(b)</u> below;

(x)     Each disbursement by Agent of such proceeds and deposits shall be funded subject to conditions and in accordance with disbursement procedures which a commercial construction lender would typically establish in the exercise of sound banking practices and shall be made only upon receipt of disbursement requests on an AIA G702/703 form (or similar form approved by Agent) signed and certified by Borrower and, if required by the Agent, its architect and general contractor with appropriate invoices and lien waivers as required by Agent;

(xi)     Agent, for the benefit of the Lenders, shall have a first lien and security interest in all building materials and completed repair and restoration work and in all fixtures and equipment acquired with such proceeds, and Borrower shall execute and deliver such mortgages, deeds of trust, security agreements, financing statements and other instruments as Agent shall request to create, evidence, or perfect such lien and security interest; and

(xii)     In the event and to the extent such insurance proceeds are not required or used for the repair, restoration and replacement of the Improvements, Equipment and Inventory for which a loss or damage has occurred, or in the event Agent does not permit Borrower to have the insurance proceeds applied to the restoration of the Improvements, Equipment, or Inventory, or, if the conditions set forth herein for such application are otherwise not satisfied, then Agent shall be entitled without notice to or consent from Borrower to apply such proceeds, or the balance thereof, at Agent's option either (A) to

33

the full or partial payment or prepayment of the Loan Obligations (without premium) in the manner aforesaid, or (B) to the repair, restoration and/or replacement of all or any part of such Improvements, Equipment and Inventory for which a loss or damage has occurred.

(d)     Borrower appoints Agent as Borrower's attorney-in-fact to cause the issuance of or an endorsement of any insurance policy to bring Borrower into compliance herewith and, as limited above, at Agent's sole option, to make any claim for, receive payment for, and execute and endorse any documents, checks or other instruments in payment for loss, theft, or damage covered under any such insurance policy; however, in no event will Agent or any Lender be liable for failure to collect any amounts payable under any insurance policy.

4.6     Financial and Other Information.   Borrower shall provide to Agent, and cause the Guarantor to provide to Agent, at its address set forth in Section 10.7, the following financial statements and information on a continuing basis during the Term of the Loan:

(a)     Periodic from Borrower.   Within (i) forty-five (45) days after the end of each calendar month, (ii) one hundred twenty (120) days after the end of each calendar year with respect to financial statements, and (iii) fourteen (14) days after written request submitted to Borrower by Agent, Borrower shall deliver to Agent, true, complete and correct financial statements for Borrower for such calendar month, year or other period requested by Agent.  Such financial statements shall include for each such period a (A) balance sheet, (B) an statement of income and expenses, (C) a statement of changes in financial position, (D) a detailed statement showing the computation of Debt Service Coverage Ratio of Borrower and each ratio and requirement that is the subject of a Financial Covenant, and (E) with respect to clause (ii), a year-end budget for the Project, and such further detailed information with respect to the Property and the financial affairs of Borrower as may be reasonably requested by Agent.  Within forty-five (45) days after the end of each calendar month, Borrower shall deliver to Agent financial statements prepared internally for Borrower for such calendar month accurately reflecting income, expenses, and such other information required to determine Debt Service Coverage Ratio as provided in Section 4.12 and such other information as Agent may reasonably request.  All such financial statements shall be manually signed and certified as true and correct by each manager of Borrower as to quarterly and annual statements and by a manager or the chief financial officer of Borrower as to monthly statements.  The annual financial statements required to be submitted under this subsection must be reviewed by a certified public accountant reasonably acceptable to Agent, subject to subsection (h) below, and shall otherwise be in a form satisfactory to Agent and Lenders.

(b)     [Reserved]

(c)     Annual from Guarantor.   Within (i) one hundred twenty (120) days after the end of each calendar year and (ii) fourteen (14) days after request therefor, Borrower shall deliver to Agent and Lenders true, complete and correct financial statements for such calendar year or other twelve (12) month period for each Guarantor (which shall at a minimum include a detailed balance sheet, a detailed statement of net worth and verification of liquidity).   Each such financial statement shall be manually signed and certified as true and correct by the party to the financial statement.  Subject to subsection (h) below, the financial statements required to be submitted under this subsection need not be audited financial statements provided the submitted financial statements shall otherwise be in a form satisfactory to Agent and Lenders.

(d)     Tax Returns.   Within fifteen (15) days after the filing deadline, as may be extended from time to time, copies of all federal tax returns of Borrower and Guarantor, together with all supporting documentation and required schedules. Borrower shall also deliver all K-1s for Guarantor within fifteen (15) days after the filing deadline.

(e)     Insurance Report.  As soon as practicable and in any event by the last day of each calendar year, a report in form and substance satisfactory to Agent outlining all material insurance coverage maintained as of the date of such report by the Loan Parties in respect of the Property, and all material insurance coverage planned to be maintained by the Loan Parties with respect to the Property in the immediately succeeding calendar year.

(f)     Information Regarding Collateral.  Borrower will furnish to Agent prompt written notice of any change (i) in any Loan Party's identity or corporate structure, or (ii) in any Loan Party's Federal Taxpayer Identification Number.  Borrower agrees not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the UCC or otherwise that are required in order for Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral as contemplated by the Loan Documents.  Borrower also agrees promptly to notify Agent if any material portion of the Collateral is damaged or destroyed.  Further, to the extent not paid by Agent from the Payment Reserves, Borrower agrees to furnish Agent, within one hundred twenty (120) days after the end of each calendar year, evidence of the payment of all property taxes owing in respect of the Property for such calendar year.

(g)     Post-Closing Lien Searches. As soon as practicable and in any event within thirty (30) days following the Closing Date, at Borrower's sole cost expenses, copies of such UCC and real property lien searches as Agent and/or Lenders shall determine to be necessary to evidence the perfection and first-priority nature of the security interests granted to Agent pursuant to the Loan Documents.

(h)     Other Requirements.

(i)     Agent reserves the right to require that the annual financial statements of Borrower or Guarantor be audited and prepared by a nationally recognized accounting firm or independent certified public accountant acceptable to Agent, at their respective cost and expense, if: (A) an Event of Default exists; (B) required by HUD, internal policy, or by any investor in any securities backed in whole or in part by the Loan or any rating agency rating such securities; or (C) Agent has reasonable grounds to believe that the unaudited financial statements do not accurately represent the financial condition of Guarantor.

(ii)     Agent further reserves the right to require such other financial information of Borrower or Guarantor, in such form and at such other times (including monthly or more frequently) as Agent shall deem necessary, and Borrower agrees promptly to provide or to cause to be provided, such information to Agent.  All financial statements must be in the form and detail as Agent may from time to time reasonably request.

4.7     Compliance Certificate.  At the time of furnishing the monthly or quarterly operating statements required under the foregoing section, Borrower shall furnish, or cause to be furnished, to Agent a compliance certificate in the form attached hereto as Exhibit B executed by the chief financial officer or a manager of the Borrower.

4.8     Books and Records.  Borrower shall keep and maintain, or cause to be kept and maintained, at all times at the Property and upon Agent's request shall make available at the Property, complete and accurate books of account and records (including copies of supporting bills and invoices) adequate to reflect correctly the results of the operation of the Project, and copies of all written contracts, leases, subleases (if any), and other instruments which affect the Property, which books, records, contracts, leases, subleases (if any) and other instruments shall be subject to examination and inspection at any reasonable time by Agent (upon reasonable advance notice, which for such purposes only may be given orally, except in the case of an emergency or following an Event of Default, in which case no

35

advance notice shall be required and in which case Lenders shall have the option to participate directly in any examination or inspection); provided, however, that if an Event of Default has occurred and is continuing, Borrower shall deliver or cause to be delivered to Agent upon written demand all books, records, contracts, leases and subleases (if any) and other instruments relating to the Project or its operation, other than such documents required by law to be maintained at the Property and Borrower authorizes Agent to obtain a credit report on Borrower at any time.

4.9     Payment of Indebtedness.  Borrower shall duly and punctually pay or cause to be paid all other Indebtedness now owing or hereafter incurred by Borrower in accordance with the terms of such Indebtedness, except such Indebtedness owing to those Persons other than Agent and Lenders which is being contested in good faith and with respect to which any execution against properties of Borrower has been effectively stayed and for which reserves and collateral for the payment and security thereof have been established as determined by Agent in its sole discretion.

4.10     Conduct of Business.  Borrower shall conduct the operation of the Project at all times in a manner consistent with the level of operation of the Project as of the date hereof, including without limitation, the following:

(A)     to operate the Project in a prudent manner and in compliance with applicable laws and regulations relating thereto and cause all Permits and any other agreements necessary for the use and operation of the Project;

(B)     to keep all Improvements and Equipment located on or used or useful in connection with the Project in good repair, working order and condition, reasonable wear and tear excepted, and from time to time make all needed and proper repairs, renewals, replacements, additions, and improvements thereto to keep the same in good operating condition;

(C)     to maintain sufficient cash in the operating accounts of the Project in order to satisfy the working capital needs of the Project; and

(D)     to keep all required Permits and insurance coverage current and in full force and effect.

4.11     [Reserved]

4.12     Financial Covenants.

(a)     As used in this Agreement, the following terms shall have the following meanings unless the context hereof shall otherwise indicate:

(i)     "Debt Service" means, with respect to any particular period of time, scheduled principal and interest payments due under the Note and all other outstanding Indebtedness of Borrower, including but not limited to interest and principal payments.

(ii)     "Debt Service Coverage Ratio" means the ratio for the applicable period in which: the numerator is the Net Operating Income from the Rents under the Leases for such period; and the denominator is the Debt Service due and payable for such period.

(iii)     "Financial Covenant" means the obligation of Borrower a to satisfy the Minimum Debt Service Coverage Ratio requirement pursuant to Section 4.12 and all other obligations of any party under Section 4.12).

(iv)     "Gross Income from Operations" shall mean all income, computed on an accrual basis in accordance with GAAP consistently applied, derived for each full or partial month during the term of the Loan from the operation of the Property and the Project in the aggregate from whatever source, including, but not limited to, all interest income, if any, rent, utility charges, escalations, forfeited security deposits, service fees or charges, license fees, parking fees, professional fees, rent concessions or credits, and any business interruption insurance proceeds but excluding sales, use and occupancy or other taxes on receipts applicable to the Property required to be accounted for by any tenant to any government or Governmental Authority, refunds and uncollectible accounts, sales of furniture, fixtures and equipment, proceeds of casualty insurance and condemnation awards, and interest on credit accounts.

(v)     "Minimum Debt Service Coverage Ratio" means a Debt Service Coverage Ratio of not less than (i) 1.00:1.00 for the Test Periods ending March 31, 2023 and June 30, 2023, (ii) 1.05:1.00 for the Test Period ending on September 30, 2023, and (iii) 1.10:1.00 for each Test Period thereafter.

(vi)     "Net Operating Income" means Rents, less any of the following but only if paid by Borrower: Taxes, insurance premiums, reserves, ground rents, utility charges, and other charges as provided in the Security Instrument.

(vii)     "Test Period" means a period ending on the last day of each calendar quarter and comprised of the twelve most recent calendar months then ended or such other period so designated (taken as one accounting period).

(b)     Financial Covenants. Borrower covenants and agrees that for so long as the Loan or any part thereof is unpaid:

(i)     Borrower Performance.

(A)     Debt Service Coverage Ratio.     Borrower shall achieve and maintain compliance with the Minimum Debt Service Coverage Ratio, tested quarterly beginning with the period ending March 31, 2023, as follows: (1) for the period ending March 31, 2023, on a trailing three (3) month basis, (2) for the period ending June 30, 2023, on a trailing six (6) month basis, (3) for the period ending September 30, 2023, on a trailing nine (9) month basis, and (4) for the Test Period ending on December 31, 2023, and for all other Test Periods thereafter, on a trailing twelve (12) month basis.

(B)     No Additional Debt or Liens.     Borrower shall have no outstanding Indebtedness, secured or unsecured, direct or contingent (including any guaranties), other than the Loan, the CARES Act Obligations set forth on Schedule 3.23 and real estate Taxes due but not yet payable. No Indebtedness other than the Loan will be secured (senior, subordinate or pari passu) by the Property.

(C)     No Pledge of Ownership Interests.     The membership interests in Borrower shall not be pledged for the benefit of any Person other than in favor of Agent and Lenders.

(ii)     Guarantor Performance.     There shall have been no material adverse change in the financial condition or business condition of Guarantor, individually or taken as a whole, since the date of the financial statements delivered to Agent and/or Lenders immediately prior to the Closing Date.

4.13     [Reserved]

4.14    Agency Financing.

(a)    Borrower shall, and shall cause Manager to, (i) timely provide all financial statements and other information requested by the Agency Lender, (ii) otherwise cooperate with the Agency Lender with respect to the Agency Financing and the application therefore in all respects, including but not limited to adding a master lease and converting the Leases to sublease agreements, if so required by Agency Lender, and (iii) execute, acknowledge, certify and deliver all instruments of any kind or character required for the Agency Financing application of the Agency Financing.

(b)    Borrower shall pay or cause to be paid all fees, costs and expenses, including Agent's and Lenders' reasonable attorneys' fees incident to the Agency Financing together with such fees payable to Agency Lender as required by Agency Lender.

(c)    Borrower agrees that in the event Agent determines within the last six (6) months of the initial Term (before giving effect to any Extension Option), in Agent's sole discretion, that there is sufficient EBITDAR on a trailing twelve (12) month basis to refinance the Loan with the Agency Financing, and the EBITDAR performance of the Project is no longer accelerating on a quarterly basis, then Borrower, at Agent's sole discretion, will cooperate with Agency Lender in submitting any application for Agency Financing within 30 days of Agent's determination.

(d)    Borrower shall and shall cause each Loan Party to cooperate to accommodate the requirements of the closing process for the Agency Financing.

4.15    Updated Appraisals.  For so long as the Loan remains outstanding, if any Event of Default shall occur hereunder and be continuing, or if, in Agent's judgment, a material depreciation in the value of the Property shall have occurred, or if required or desirable for the Agency Financing, then in any such event, Agent, may cause the Property to be appraised by an appraiser selected by Agent, and in accordance with Agent's appraisal guidelines and procedures then in effect, and Borrower agrees to cooperate in all respects with such appraisals and furnish to the appraisers all requested information regarding the Property and the Project.  Borrower agrees to pay all reasonable costs incurred by Agent in connection with such appraisal which costs shall be secured by the Security Instrument and shall accrue interest at the Default Rate until paid.

4.16    Comply with Covenants and Laws.  Borrower shall comply and cause each other Loan Party to comply, in all material respects, with all applicable covenants and restrictions of record and all laws, ordinances, rules and regulations and keep the Project and Property in compliance in all material respects with all applicable laws, ordinances, rules and regulations, including, without limitation, the Americans with Disabilities Act and regulations promulgated thereunder, and laws, ordinances, rules and regulations relating to zoning, health, building codes, and setback requirements, and keep the Permits for the Project in full force and effect.

4.17    Taxes and Other Charges.  Subject to Borrower's right to contest the same as set forth in Section 11(d) of the Security Instrument, Borrower shall pay or cause to be paid all Taxes, assessments, charges, claims for labor, supplies, rent, and other obligations which, if unpaid, might give rise to a Lien against property of Borrower, except Liens to the extent permitted by this Agreement.

4.18    Leases.  Borrower shall comply with the terms and conditions of Exhibit D in connection with the leasing of space within the Improvements.  In addition, Borrower shall deposit with Agent on the date of Borrower's receipt thereof any and all termination fees or other similar funds paid by a tenant in connection with any tenant's election to exercise an early termination option contain in its respective Lease or otherwise at the Property.

38

4.19   Certificate.  Within 10 days after Agent's written request, Borrower shall furnish Agent with a certificate stating that Borrower has complied with and is in compliance with all terms, covenants and conditions of the Loan Documents to which Borrower is a party and that there exists no Default or Event of Default or, if such is not the case, that one or more specified events have occurred, and that the representations and warranties contained herein are true and correct with the same effect as though made on the date of such certificate.

4.20   Lender's Right to Pay and Perform.  If, after any required notice, Borrower fails to promptly pay or perform any of the Loan Obligations within any applicable grace or cure periods, Lender, without notice to or demand upon Borrower, and without waiving or releasing any Loan Obligation or Event of Default, may (but shall be under no obligation to) at any time thereafter make such payment or perform such act for the account and at the expense of Borrower.  Lender may enter upon the Property for that purpose and take all action thereon as Lender considers necessary or appropriate.  At the option of Lender, following the occurrence of an Event of Default, Lender may apply any undisbursed Loan proceeds to the satisfaction of the conditions of the Loan Documents.  Without limiting the generality of the foregoing, Lender may pay directly from the proceeds of the Loan all interest, tax and insurance bills.  The execution hereof by Borrower shall, and hereby does, constitute an irrevocable authorization so to advance the proceeds of the Loan.  No further direction or authorization from Borrower shall be necessary to warrant such direct advances.  Each advance shall be secured by the Security Instrument and shall satisfy the obligations of Lender hereunder to the extent of the amount of the advance.

4.21   Notification by Borrower.   Borrower will promptly give notice to Lender of the occurrence of any Event of Default hereunder or under any of the other Loan Documents.

4.22   [Reserved]

4.23   Representations and Warranties.  Borrower shall immediately notify Agent in writing, in the event any representation or warranty contained in this Agreement, the other Loan Documents or any document delivered in connection with the Loan Documents, becomes untrue or there shall have been any material adverse change in any such representation or warranty.

4.24   [Reserved]

4.25   Management.  The management of the Project shall be by either Manager or Borrower or an Affiliate of Borrower approved by Lender, for so long as Manager, Borrower or said Affiliate is a professional property management company approved by Agent and is not prohibited from providing any services to Borrower by any Governmental Authority or applicable laws , including without limitation those of HUD.  Such management arrangement shall be pursuant to a written Management Agreement approved by Lender.  In no event shall any Manager be removed or replaced or any Management Agreement modified, extended, terminated, canceled or replaced (i) without the prior written consent of Agent and applicable Governmental Authorities and (ii) unless the Manager executes a subordination agreement substantially in the form of the subordination agreement entered into in connection with this Agreement.  In the event of (a) an Event of Default hereunder or (b) a change in control of the Manager, or (c) the Manager becomes insolvent or the debtor in any bankruptcy or insolvency proceeding, Agent shall have the right to terminate, or to direct Borrower to terminate such Management Agreement upon thirty (30) days' notice and to retain or to direct Borrower to retain, a new Manager approved by Lender.

4.26   Mortgage Tax.  Borrower hereby agrees to pay any and all documentary stamp taxes and intangible taxes which may become due and payable in connection with the Security Instrument, together with any fines, penalties, interest or similar charges resulting from the non-payment thereof, whenever the same shall become due and payable, whether upon the recording of the Security Instrument or at any later

date.  Borrower hereby agrees to indemnify, defend, and hold harmless Lenders from and against any and all claims, charges, actions, suits, proceedings, law suits, obligations, losses, damages, expenses or liabilities (joint and/or several) including, without limitation, reasonable attorney's fees, suffered or incurred by Agent or any Lender as a result of any assessment by any applicable Governmental Authority with respect to recording fees and expenses, including documentary stamp taxes and intangible taxes, now or at any time hereafter payable with respect to the recording of the Security Instrument; this indemnification shall be a continuing one and shall be unaffected by the fact that the Loan has been repaid in full.  Borrower acknowledges that Lenders have relied and were entitled to rely upon the agreements set forth in this Section as a material condition precedent to the making of the Loan.  It shall be an Event of Default under this Agreement if Borrower defaults in its obligations hereunder.

4.27    _Income from Property_.  Borrower shall first apply all income from Leases, and all other income derived from the Property, to pay Property expenses, including all amounts then required to be paid under the Loan Documents, before using or applying such income for any other purpose.

4.28    _Post-Closing Covenants_.  Borrower shall comply with the post-closing covenants set forth on _Schedule 4.28_ within the time frames set forth therein.

4.29    _COVID-19 Relief Programs_.

(a)    If Borrower receives a loan constituting a CARES Act PPP Loan, Borrower shall: (i) cause the proceeds of each such loan to be deposited in a Deposit Account maintained at CFG Community Bank or such other account reasonably acceptable to Agent; (ii) use the proceeds of such CARES Act PPP Loan for uses that are eligible for forgiveness under Section 1106 of the CARES Act and in the manner required under the CARES Act to obtain forgiveness of the largest possible amount of the CARES Act PPP Loan, (iii) take all commercially reasonable actions necessary to maximize the amount of the CARES Act PPP Loan to be forgiven in accordance with the terms of the CARES Act, (iv) maintain such books, records, and documentation as described by the SBA in regulations and administrative guidance related to the Paycheck Protection Program provisions of the CARES Act to evidence that Borrower has used the proceeds of such CARES Act PPP Loan solely for purposes permitted under the CARES Act and otherwise qualified for loan forgiveness as described in the foregoing clause (iii); (v) apply for forgiveness of its CARES Act PPP Loan with its SBA qualified lender promptly after the end of the eight week period immediately following Borrower's receipt of such loan, or such later period should such period be extended, and (vi) provide notice to Agent thereof within five (5) days of when such CARES Act PPP Loan is forgiven, or if all or a portion of such CARES Act PPP Loan is not forgiven.  If Borrower has received a loan under the Payment Protection Program provisions of the CARES Act Borrower shall not (x) participate in the payroll tax credit program described in Section 2301 of the CARES Act or (y) on or after the date its CARES Act PPP Debt is forgiven, participate in the payroll tax deferral program described in Section 2302 of the CARES Act.

(b)    Should Borrower elect to incur CARES Act Deferred Payroll Taxes, Borrower shall: (i) repay to the applicable Governmental Authority all CARES Act Deferred Payroll Taxes at the times required by the CARES Act and otherwise in accordance with the requirements of the CARES Act, (ii) within five (5) days after receipt, provide copies to Agent of any notices or other correspondence submitted or received by Borrower from any Governmental Authority in connection with the CARES Act Deferred Payroll Taxes, and (iii) at the request of Agent, provide a calculation of estimated CARES Act Deferred Payroll Taxes and any other information related thereto.  The failure to make any such payment of CARES Act Deferred Payroll Taxes to the applicable Governmental Authority when due shall be an immediate Event of Default.

40

ARTICLE V
NEGATIVE COVENANTS OF BORROWER

Until the Loan Obligations have been paid in full, Borrower shall not:

5.1     Other Investments; Contingent Liabilities.  (a) Make, assume, acquire or continue to hold any investment in any real property (other than the Project) or any Person, whether by stock purchase, capital contribution, acquisition of indebtedness of such Person or otherwise (including, without limitation, investments in any joint venture or partnership), (b) guaranty or otherwise become contingently liable for the indebtedness, liabilities and other obligations of any Person, or (c) make any loans or advances, or otherwise extend credit to any Person.

5.2     No Liens; Exceptions.  Create, incur, assume or suffer to exist any Lien upon or with respect to the Property and Improvements or any of its properties, rights, income or other assets relating thereto, including, without limitation, the Collateral, whether now owned or hereafter acquired, other than the following permitted Liens:

        (a)     Liens at any time existing in favor of Agent and Lenders;

        (b)     Permitted Encumbrances;

        (c)     Inchoate Liens arising by operation of law for the purchase of labor, services, materials, equipment or supplies, provided payment shall not be delinquent and, if such Lien is a lien upon any of the Property or Improvements, such Lien must be fully disclosed to Agent and bonded off and removed from the Property and Improvements, within thirty (30) days of its creation, in a manner satisfactory to Agent; and

        (d)     Liens incurred in the ordinary course of business in connection with workers' compensation, unemployment insurance or other forms of governmental insurance or benefits, or to secure performance of tenders, statutory obligations, leases and contracts (other than for money borrowed or for credit received with respect to property acquired) entered into in the ordinary course of business as presently conducted or to secure obligations for surety or appeal bonds.

5.3     Merger, Consolidation, Etc.  Except as otherwise provided in the Security Instrument, consummate or suffer or permit any other Loan Party to consummate or suffer any merger, consolidation or similar transaction, or sell, assign, lease or otherwise dispose of substantially all of its assets (whether now or hereafter acquired), without the prior written consent of the Agent, which consent may be granted or refused in Agent's sole discretion.

5.4     Maintain Single-Purpose Entity Status.

        (a)     Dissolve or terminate or materially amend, or suffer, permit, tolerate or allow any other Loan Party to dissolve or terminate or materially amend, the terms of its certificate of incorporation, articles of organization, operating agreement or partnership agreement or by-laws, as applicable, the terms of which require Borrower and any other Loan Party to be a Single Purpose Entity;

        (b)     at any time own any encumbered asset other than (i) the Property, and (ii) incidental personal property necessary for the operation of the Property;

        (c)     at any time be engaged directly or indirectly, in any business other than the ownership, management and operation of the Property;

41

(d)　　incur, create or assume any Indebtedness, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than (i) the Loan, (ii) the CARES Act Obligations set forth on <u>Schedule 3.23</u> and (iii) Indebtedness which represents trade payables or accrued expenses incurred in the ordinary course of business of owning and operating the Property; none of which (other than the Loan) shall be secured (senior, subordinate or *pari passu*) by the Property;

(e)　　become insolvent or fail to pay its debts from its assets as the same shall become due;

(f)　　fail to do all things necessary to preserve Borrower's existence as a Single Purpose Entity, and will not, nor will any partner, limited or general, member or shareholder thereof, amend, modify or otherwise change its partnership certificate, partnership agreement, articles of organization, operating agreement, articles of incorporation or by-laws in a manner which adversely affects the Borrower's existence as a Single Purpose Entity;

(g)　　fail to maintain books and records and bank accounts separate from those of its Affiliates, including its members, general partners or shareholders, as applicable;

(h)　　fail to at all times hold itself out to the public as a legal entity separate and distinct from any other entity (including any Affiliate thereof, including the general partner or any member or shareholder of the Borrower or any Affiliate of the general partner or any member or shareholder of the Borrower, as applicable);

(i)　　fail to file its own tax returns; or

(j)　　fail to maintain its assets in such a manner that it is not costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate or any other Person.

5.5　　<u>Change of Business</u>.  Make any material change in the nature of its business as it is being conducted as of the date hereof.

5.6　　<u>Changes in Accounting</u>.  Change its methods of accounting, unless such change is permitted by GAAP, and provided such change does not have the effect of curing or preventing what would otherwise be an Event of Default or Default had such change not taken place.

5.7　　<u>ERISA Funding and Termination</u>.  Permit (a) the funding requirements of ERISA with respect to any employee plan to be less than the minimum required by ERISA at any time, or (b) any employee plan to be subject to involuntary termination proceedings at any time.

5.8　　<u>Transactions with Affiliates</u>.  Enter into any transaction with a Person which is an Affiliate of Borrower other than in the ordinary course of its business and on fair and reasonable terms no less favorable to Borrower, than those they could obtain in a comparable arms-length transaction with a Person not an Affiliate.

5.9　　<u>Transfer of Property or any Ownership Interests</u>.  Borrower shall not: (a) permit or suffer the Transfer of any of the Stock or ownership interests of any Loan Party or (b) permit or suffer any other Transfer.

5.10　　<u>Change of Use; Property Management</u>.  Alter or change the use of the Project without the express written consent of Agent in its sole discretion; or permit any management agreement for the Project or enter into any Lease for the Project, unless Borrower first notifies Agent and provides Agent a

42

copy of the proposed lease agreement or management agreement, obtains Agent's written consent thereto, and obtains and provides Agent with a subordination agreement in form satisfactory to Agent, as determined by Agent in its sole discretion, from such manager or operator subordinating to all rights of Agent.

5.11    Place of Business.  Change its chief executive office or its principal place of business without first giving Agent at least thirty (30) days prior written notice thereof and promptly providing Agent such information and amendatory financing statements as Agent may request in connection therewith.

5.12    Acquisitions.  Directly or indirectly, purchase, lease, manage, own, operate, or otherwise acquire any property or other assets (or any interest therein) which are not used in connection with the operation of the Property and Improvements or the Project.

5.13    Dividends, Distributions and Redemptions.  As long as any Event of Default exists, or if any Event of Default would result from a distribution, Borrower shall not declare or pay any distributions to its shareholders, members or partners, as applicable, or purchase, redeem, retire, or otherwise acquire for value, any Stock or ownership interests in Borrower now or hereafter outstanding, return any capital to its shareholders, members or partners as applicable, or make any distribution of assets to its shareholders, members or partners, as applicable. Borrower shall not declare or pay any dividends or other distributions if on such date any CARES Act Obligations remain outstanding such that they have not been indefeasibly paid in full or forgiven pursuant to Section 1106 of the CARES Act.

5.14    Amendments to CARES Act PPP Loan.  Borrower shall not amend, restate, supplement, waive or otherwise modify the Cares Act PPP Loan if the effect of such amendment, supplement, waiver or other modification would be adverse to Agent and Lenders.

ARTICLE VI
ENVIRONMENTAL HAZARDS

6.1    Prohibited Activities and Conditions.

(a)    Borrower shall comply, and cause all tenants and other persons occupying the Property to (i) comply with all Hazardous Materials Laws and Environmental Permits applicable to its operations and the Property; (ii) obtain and maintain in full force and effect all Environmental Permits applicable to its operations and the Property; and (iii) conduct all Responses required by any Governmental Authority or under any applicable Hazardous Materials Laws, and in accordance with, the requirements of any Governmental Authority and applicable Hazardous Materials Laws.

(b)    Except for matters described in Section 6.2, Borrower shall not cause or permit or suffer, any of the following:

(i)    The presence, use, generation, release, treatment, processing, storage (including storage in above ground and underground storage tanks), handling, or disposal of any Hazardous Materials in, on, under, at or from the Property or any Improvements;

(ii)    The transportation of any Hazardous Materials to, from, or across the Property;

(iii)    Any occurrence or condition in, on, under or at the Property or the Improvements, which occurrence or condition (x) is or may be in violation of Hazardous Materials Laws,

43

(y) could reasonably expected to result in a Response required by any Governmental Authority or under any applicable Hazardous Materials Laws or (z) could reasonably be expected to result in a Lien and other encumbrance on a Property pursuant to any Hazardous Materials Law; or

(iv)     Any violation of or noncompliance with any Hazardous Materials Laws or the terms of any Environmental Permit applicable to the Property, the Improvements or the Borrower's operations thereon.

The matters described in clauses (i) through (iv) above are referred to collectively in this Article VI as "Prohibited Activities and Conditions" and individually as a "Prohibited Activity and Condition."

6.2     Exclusions.     Notwithstanding any other provision of Article VI to the contrary, "Prohibited Activities and Conditions" shall not include the safe and lawful use and storage of quantities of: (a) pre-packaged supplies, medical waste, cleaning materials and petroleum products customarily used in the operation and maintenance of comparable facilities; (b) cleaning materials, personal grooming items and other items sold in pre-packaged containers for consumer use and used by occupants of the Project; and (c) petroleum products used in the operation and maintenance of motor vehicles from time to time located on the Property's parking areas or used to maintain or repair the Property or Improvements, so long as all of the foregoing are used, stored, handled, transported and disposed of in compliance with Hazardous Materials Laws.

6.3     Preventive Action.     Borrower shall take all appropriate steps (including the inclusion of appropriate provisions in the Leases approved by Agent which are executed after the date of this Agreement) to prevent its employees, agents, contractors, tenants and occupants of the Project from causing or permitting any Prohibited Activities and Conditions.

6.4     [Reserved]

6.5     Borrower's Environmental Representations and Warranties.     Borrower represents and warrants to Agent and Lenders that:

(a)     Neither Borrower nor Guarantor has at any time caused or permitted any Prohibited Activities and Conditions;

(b)     To the best of Borrower's knowledge after reasonable and diligent inquiry, no Prohibited Activities and Conditions, violations of Hazardous Materials Laws, or contamination that would reasonably be expected to result in a Response required under Hazardous Materials Laws exist or have existed in connection with the Property;

(c)     Each of Borrower and Guarantor has complied with all Hazardous Materials Laws, including all requirements for notification regarding releases of Hazardous Materials.  Without limiting the generality of the foregoing, Borrower or Guarantor has obtained all Environmental Permits required for the operation of the Project, Property and the Improvements in accordance with Hazardous Materials Laws now in effect and all such Environmental Permits are in full force and effect.  To the best of Borrower's knowledge after reasonable and diligent inquiry, no event has occurred or condition exists with respect to the Project, the Property and/or Improvements that constitutes, or with the passing of time or the giving of notice would constitute, noncompliance with any Hazardous Materials Law or the terms of any Environmental Permit;

44

(d)     There are no actions, suits, claims or proceedings pending or threatened that involves the Project, the Property and/or the Improvements and alleges, arises out of, or relates to any Prohibited Activity and Condition, Response or Hazardous Materials Law;

(e)     Neither Borrower nor Guarantor has received any complaint, order, notice of violation or other communication from any Governmental Authority with regard to air emissions, water discharges, noise emissions or Hazardous Materials, or any other environmental, health or safety matters affecting the Project, the Property, the Improvements.  The representations and warranties in this Article VI shall be continuing representations and warranties that shall be deemed to be made by Borrower throughout the term of the Loan evidenced by the Note, and shall survive until and after the Loan Obligations have been paid in full.

6.6     Notice of Certain Events.  Borrower shall promptly notify Agent in writing of any and all of the following that may occur:

(a)     Borrower's discovery of any breach of the covenants in Section 6.1 or any Prohibited Activity and Condition;

(b)     Borrower's receipt of or knowledge of any complaint, order, notice of violation or other communication from any Governmental Authority or other Person with regard to present, or future alleged violations of Hazardous Materials Law, Prohibited Activities and Conditions or any other environmental, health or safety matters affecting the Property, the Improvements or any other property of Borrower or any other Loan Party that is adjacent to the Property;

(c)     Any representation or warranty in this Article VI or the Environmental Indemnity Agreement which becomes untrue at any time after the date of this Agreement;

(d)     Any decision by the SBA that any and/or all of the CARES Act PPP Loan has been forgiven, and/or (B) any and/or all of the CARES Act PPP Loan will not be forgiven; and/or

(e)     Any notification from the SBA or the CARES Act PPP Loan lender or any other Governmental Authority that there has been a default with respect to the CARES Act PPP Loan or the occurrence of any event or condition that results in the CARES Act PPP Loan becoming due prior to its scheduled maturity or that enables or permits the holder or holders thereof to declare the CARES Act PPP Loan to be due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity.

Any such notice given by Borrower shall not relieve Borrower or any other Person of, or result in a waiver of, any obligation under this Agreement, the Note, or any of the other Loan Documents.

6.7     Costs of Inspection.  Borrower shall pay promptly the costs of any environmental inspections, tests or audits required by Agent in connection with any foreclosure or deed in lieu of foreclosure, or, if required by Agent, as a condition of Agent's consent to any "Transfer", or required by Agent following a reasonable determination by Agent that Prohibited Activities and Conditions may exist.  Any such costs incurred by Agent and Lenders (including the fees and out-of-pocket costs of attorneys and technical consultants whether incurred in connection with any judicial or administrative process or otherwise) which Borrower fails to pay promptly shall become an additional part of the Loan Obligations.

6.8     Remedial Work.  If any investigation, site monitoring, containment, clean-up, restoration or other remedial work ("Remedial Work") is necessary to comply with any Hazardous Materials Law or

45

order of any Governmental Authority that has or acquires jurisdiction over the Property, the Improvements or the use, operation or improvement of the Property under any Hazardous Materials Law, Borrower shall, by the earlier of (a) the applicable deadline required by Hazardous Materials Law or (b) thirty (30) days after notice from Agent demanding such action, begin performing the Remedial Work, and thereafter diligently prosecute it to completion, and shall in any event complete such work by the time required by applicable Hazardous Materials Law.  If Borrower fails to begin on a timely basis or diligently prosecute any required Remedial Work, Agent may, at its option, cause the Remedial Work to be completed, in which case Borrower shall reimburse Agent and Lenders on demand for the cost of doing so.  Any reimbursement due from Borrower to Agent and Lenders shall become part of the Loan Obligations.

6.9     Cooperation with Governmental Authorities.  Borrower shall cooperate with any inquiry by any Governmental Authority and shall comply with any governmental or judicial order which arises from any Hazardous Materials Law or any alleged Prohibited Activity and Condition.

6.10    Indemnity.

(a)     Borrower and Guarantor shall hold harmless, defend and indemnify: (i) Agent, (ii) Lenders; (iii) any subsequent owner or holder of any interest in the Note; (iv) the officers, directors, partners, agents, shareholders, employees and trustees of any of the foregoing; and (v) the heirs, legal representatives, successors and assigns of each of the foregoing (together, the "Indemnitees") against all proceedings, claims, damages (including punitive damages to the extent awarded to a third party), losses, liabilities, expenses, penalties, costs, fines, encumbrances, liens, judgments, assessments, obligations or settlement payments (whether initiated or sought by any Governmental Authority or private parties), including reasonable fees and expenses of attorneys, expert witnesses and Remedial Work, whether incurred in connection with any judicial or administrative process or otherwise, arising directly or indirectly from any of the following:

(i)     Any breach of any representation or warranty of Borrower or any other Loan Party, as applicable, in this Article VI or the Environmental Indemnity Agreement;

(ii)    Any failure by Borrower or any other Loan Party, as applicable, to perform any of their obligations under this Article VI or the Environmental Indemnity Agreement;

(iii)   The existence or alleged existence of any Prohibited Activity and Condition;

(iv)    The presence or alleged presence of Hazardous Materials in, on, around or under the Property, the Improvements or any property of Borrower that is adjacent to the Property;

(v)     Compliance with or actual or alleged violation of any Hazardous Materials Law; or

(vi)    the environmental condition of the Property or any environmental matter related to Borrower's operations at the Property.

(b)     Counsel selected by Borrower to defend Indemnitees shall be subject to the reasonable approval of those Indemnitees, which approval shall not be unreasonably withheld, delayed or conditioned.  Notwithstanding anything contained herein, any Indemnitee may elect to defend any claim or legal or administrative proceeding at the Borrower's expense if such Indemnitee has reason to believe that its interests are not being adequately represented or diverge from other interests being represented by

46

such counsel (but Borrower shall be obligated to bear the expense of at most only one such separate counsel).  Nothing contained herein shall prevent an Indemnitee from employing separate counsel in any such action at any time and participating in the defense thereof at its own expense.

(c)     Borrower shall not, without the prior written consent of those Indemnitees who are named as parties to a Claim settle or compromise the Claim if the settlement (i) results in the entry of any judgment that does not include as an unconditional term the delivery by the claimant or plaintiff to Agent and each Lender of a written release of those Indemnitees, satisfactory in form and substance to Agent; or (ii) may materially and adversely affect any Indemnitee, as determined by such Indemnitee in its sole discretion.

(d)     The liability of Borrower to indemnify the Indemnitees shall not be limited or impaired by any of the following, or by any failure of Borrower or any other Loan Party to receive notice of or consideration for any of the following:

(i)     Any amendment or modification of any Loan Document;

(ii)     Any extensions of time for performance required by any of the Loan Documents;

(iii)     The accuracy or inaccuracy of any representations and warranties made by Borrower under this Agreement or any other Loan Document;

(iv)     The release of Borrower or any other Person, by Agent or any Lender or by operation of law, from performance of any obligation under any of the Loan Documents;

(v)     The release or substitution in whole or in part of any security for the Loan Obligations; and

(vi)     Agent or any Lender's failure to properly perfect any lien or security interest given as security for the Loan Obligations.

(e)     Borrower shall, at its own cost and expense, do all of the following:

(i)     Pay or satisfy any judgment or decree that may be entered against any Indemnitee or Indemnitees in any legal or administrative proceeding incident to any matters against which Indemnitees are entitled to be indemnified under this Article VI or the Environmental Indemnity Agreement;

(ii)     Reimburse Indemnitees for any expenses paid or incurred in connection with any matters against which Indemnitees are entitled to be indemnified under this Article VI or the Environmental Indemnity Agreement; and

(iii)     Reimburse Indemnitees for any and all expenses, including reasonable fees and costs of attorneys and expert witnesses, paid or incurred in connection with the enforcement by Indemnitees of their rights under this Article VI or the Environmental Indemnity Agreement, or in monitoring and participating in any legal or administrative proceeding.

(f)     In any circumstances in which the indemnity under this Article VI applies, Agent and each Lender may, if it deems it reasonably necessary, employ its own separate legal counsel and consultants to prosecute, defend or negotiate any Claim or legal or administrative proceeding and Agent

47

and each Lender, with the prior written consent of Borrower (which shall not be unreasonably withheld, delayed or conditioned) may settle or compromise any Claim or legal or administrative proceeding. Borrower shall reimburse Agent and Lenders upon demand for all costs and expenses incurred by Agent and each Lender, including all costs of settlements entered into in good faith, and the fees and out of pocket expenses of such attorneys and consultants.

(g)     The provisions of this Article VI shall be in addition to any and all other obligations and liabilities that Borrower may have under the applicable law or under the other Loan Documents, and each Indemnitee shall be entitled to indemnification under this Article VI without regard to whether Agent, Lender or that Indemnitee has exercised any rights against the Property and/or any Improvements or any other security, pursued any rights against any Indemnitee, or pursued any other rights available under the Loan Documents or applicable law.  If Borrower consists of more than one person or entity, the obligation of those persons or entities to indemnify the Indemnitees under this Article VI shall be joint and several.  The obligations of Borrower to indemnify the Indemnitees under this Article VI shall survive any repayment or discharge of the Loan Obligations, any foreclosure proceeding, any foreclosure sale, any delivery of any deed in lieu of foreclosure, and any release of record of the lien of the Security Instrument.

ARTICLE VII
PAYMENT RESERVES

7.1     Establishment of Payment Reserves.     Borrower understands and agrees that, notwithstanding the establishment of the Payment Reserves as herein required, all of the proceeds of the Loan have been, and shall be considered, fully disbursed and shall bear interest and be payable on the terms provided in the Loan Documents. Agent shall have the right, in its good faith credit judgment and discretion, to establish and fund reserves related to any CARES Act Deferred Payroll Taxes, CARES Act PPP Loan or any other amounts owed by Borrower pursuant to similar stimulus programs.

7.2     Required Repairs; CapEx Reserve.     Borrower shall perform all of the repairs or replacements to the Property as more particularly set forth on Exhibit E (the "Required Repairs").  The Required Repairs shall be completed in a good and workmanlike manner on or before the "completion date", if any, set forth on Exhibit E for the particular item of the Required Repairs.  On the Closing Date, Borrower shall deposit with Agent the amount(s) set forth on Exhibit G to perform the Required Repairs, which Required Repairs may be completed with funds deposited in the CapEx Reserve (as defined below).  If the Required Repairs are not completed when and as provided under this Agreement, or upon the occurrence and during the continuation of an Event of Default, Agent, at its option, in addition to all other rights and remedies of Agent under this Agreement or other Loan Documents, may withdraw all funds in the CapEx Reserve and apply such funds either to completion of the Required Repairs or towards payment of the Loan Obligations in such order, proportion and priority as Agent may determine in its sole discretion.  On the Closing Date, Borrower shall deposit with the Agent the amount set forth on Exhibit G to perform those certain capital expenditures desired to be performed by Borrower and approved by Agent in its reasonable discretion (the "Approved Capital Expenditures"), which Approved Capital Expenditures are further described on Exhibit G. Amounts so deposited with Agent are referred to as the "CapEx Reserve".  The capital expenditures as described in the Approved Capital Expenditures shall be completed within thirty-six (36) months from the Closing Date.  If the Approved Capital Expenditures are not completed when and as provided under this Agreement or as agreed upon by Agent and Borrower in writing, each in their sole discretion, or upon the occurrence and during the continuation of an Event of Default, Agent, at its option, in addition to all other rights and remedies of Agent under this Agreement or other Loan Documents, may withdraw all funds in the CapEx Reserve and apply such funds either to completion of the Approved Capital Expenditures or towards payment of the Loan Obligations in such order, proportion and priority as Agent may determine in its sole discretion.  If the cost to complete the

Required Repairs and Approved Capital Expenditures exceeds the amounts set forth in the CapEx Reserve, Borrower shall be responsible for providing evidence to Agent of Borrower's payment in full of all excess costs prior to reimbursement from Agent.

7.3     <u>Replacement Reserve</u>.  Borrower shall pay to Agent, for the benefit of the Lenders, on the first day of each month following the eighteen (18)-month anniversary of the Closing Date, one-twelfth of the annual amount per unit set forth on <u>Exhibit G</u> (the "<u>Replacement Reserve Monthly Deposit</u>"), which is the amount estimated by Agent in its sole discretion to be due for replacements and repairs required to be made to the Property.  Amounts so deposited are referred to as the "<u>Replacement Reserve</u>".  Agent may reassess its estimate of the amount necessary for the Replacement Reserve from time to time and increase the monthly amounts required to be deposited into the Replacement Reserve upon thirty (30) days' written notice to Borrower if Agent determines in its reasonable discretion that an increase is necessary to maintain the proper maintenance and operation of the Property.

7.4     <u>Disbursements from the CapEx Reserve and the Replacement Reserve</u>.

(a)     So long as no default or Event of Default exists and except as may be otherwise provided in this Agreement or other Loan Documents, Agent shall, to the extent funds are available in the CapEx Reserve, make disbursements to the Property from the CapEx Reserve, to or for the benefit of the Borrower to reimburse the Borrower for the Required Repairs or the Approved Capital Expenditures and make disbursements from the Replacement Reserve upon Borrower's written request, as provided in Section 7.4(b)(ii) below.

(b)     Agent shall have no obligation to disburse any amount from the the CapEx Reserve or the Replacement Reserve unless the following additional conditions are satisfied:

(i)     Agent receives a written request from Borrower for the applicable disbursement from the CapEx Reserve or Replacement Reserve, and a certification by Borrower in a form acceptable to Agent that the applicable item of repair and/or replacement has been completed;

(ii)     The delivery to Agent by Borrower of invoices, receipts, or other evidence satisfactory to Agent verifying the cost of performing the repair, the replacement, or completing the applicable work, or otherwise evidencing the obligation to be paid;

(iii)     To the extent applicable, the delivery to Agent of affidavits, lien waivers, and other evidence reasonably satisfactory to Agent showing that all materialmen, laborers, subcontractors, and any other parties who might or could claim statutory or common law liens and are furnishing or have furnished labor, material, or equipment to the Property have been paid all amounts due for labor, materials or equipment furnished to said Property; and

(iv)     Such other terms and conditions as may be provided in this Agreement or which are reasonably required by Agent.

7.5     [Reserved]

7.6     [Reserved]

7.7     [Reserved]

7.8      [Reserved]

7.9      [Reserved]

7.10     Security Interest in Payment Reserves.

(a)      Agent or its assignee may either hold the Payment Reserves in a separate account or accounts at CFG Community Bank or another depository institution or trust company determined by Agent in its sole discretion (such depository being referred to in this Agreement as the "Reserve Account Depository").  Borrower shall not be entitled to interest on any part of the Payment Reserves.  As additional security for the payment and performance by Borrower of the Loan Obligations, Borrower hereby unconditionally and irrevocably assigns, conveys, pledges, mortgages, transfers, delivers, deposits, sets over and confirms unto Agent, and hereby grants to Agent and Lenders, a security interest in (A) the Payment Reserves, (B) the depository or other accounts into which the Payment Reserves have been deposited, (C) all insurance on said accounts, (D) all accounts, contract rights, and general intangibles or other rights and interests pertaining thereto, (E) all sums now or hereinafter therein or represented thereby, (F) all replacements, substitutions or proceeds thereof, (G) all instruments and documents, now or hereafter evidencing the Payment Reserves or such accounts, (H) all powers, options, rights, privileges, and immunities pertaining to the Payment Reserves (including the right to make withdrawals therefrom), and (I) all proceeds of the foregoing.  Borrower hereby expressly authorizes and consents to the accounts into which the Payment Reserves have been deposited being held in Agent's name or the name of any entity servicing the Note for Agent, and hereby acknowledges and agrees that Agent, or at Agent's election, such servicing agent, shall have exclusive control over said accounts.  Notice of the assignment and security interest granted to Agent and Lenders herein may be delivered by Agent at any time to the financial institution wherein the Payment Reserves have been established, and Agent, or such servicing entity, shall have possession of all passbooks or other evidences of such accounts.  Borrower hereby assumes all risk of loss with respect to amounts on deposit in the Payment Reserves.  Borrower shall execute and deliver such account control agreements as may be required by Agent to perfect Agent's lien on and security interest in the Payment Reserves.

(b)      Upon an Event of Default, Agent may, but shall not be obligated to, apply at any time the balance then remaining in the Payment Reserves against the Loan Obligations in whatever order Agent shall determine in Agent's sole and absolute discretion.  To the extent Agent withdraws any funds from the Payment Reserves as a result of Borrower's Default, Borrower shall replenish the Payment Reserves within fourteen (14) days of Agent's demand.  No such application of the Payment Reserves by Agent shall be deemed to cure any Default or Event of Default hereunder, and any such application shall not limit Borrower's obligation to deposit any deficiency of which Agent gives notice.  Upon full payment and performance of the Loan Obligations and in accordance with its terms or at such earlier time as Agent may elect, the balance of the Payment Reserves then in Agent's possession shall be paid over to Borrower and no other party shall have any right or claim thereto.

(c)      Borrower hereby knowingly, voluntarily, and intentionally stipulates, acknowledges and agrees that the advancement of the funds from the Payment Reserves as set forth herein is at Borrower's direction and is not the exercise by Agent of any right of set off or other remedy upon an Event of Default.  Borrower hereby waives all right to withdraw funds from the Payment Reserves, and all rights to receive disbursements from the Payment Reserves except in compliance with the Loan Documents.

(d)      Upon an Event of Default, Agent may, without notice or demand (it being expressly agreed by Borrower that Borrower is waiving any notice of acceleration and intent to accelerate) on Borrower, at its option (i) withdraw any and all funds (including, without limitation,

50

interest) then remaining in the Payment Reserves and apply the same, after deducting all reasonable costs and expenses of safekeeping, collection, and delivery (including, but not limited to, reasonable attorneys' fees, costs, and expenses) to the Loan Obligations in such manner as Agent shall determine in its sole and absolute discretion, (ii) exercise any and all rights and remedies of a secured party under the applicable Uniform Commercial Code, and/or (iii) exercise any other remedies available at law or in equity.

The exercise of any or all of Agent's right to initiate and complete a judicial or non-judicial foreclosure under the Security Instrument shall not preclude its exercise of its rights under this <u>ARTICLE VII</u>.

ARTICLE VIII
EVENTS OF DEFAULT AND REMEDIES

8.1     <u>Events of Default</u>.  The occurrence of any one or more of the following shall constitute an "<u>Event of Default</u>" hereunder:

(a)     Borrower's failure to pay the entire amount of the Debt and other Loan Obligations on or before the Maturity Date; or

(b)     Borrower's failure to pay any regularly scheduled monthly installment of principal, interest, or other amounts due or required by the Note, this Agreement, the Security Instrument, or any of the other Loan Documents or owed to the Agent or any Lender by Borrower or any other Loan Party (other than the amount payable on the Maturity Date) as and when the same shall be due within five (5) days; or

(c)     The failure to pay when due, any Taxes, insurance premiums or payment of money (other than as provided in <u>Section 8.1(a)</u> or <u>(b)</u>) required by the Note, this Agreement, the Security Instrument, or any of the other Loan Documents or owed to the Agent or any Lender by Borrower or any other Loan Party; or

(d)     Dissolution or a change in composition of any Loan Party (including without limitation any Transfer not expressly permitted in the this Agreement, the Security Instrument or any of the other Loan Documents, or any failure to furnish to Agent financial statements and other information required by <u>Section 4.6</u> when due; or

(e)     The failure of any Loan Party to perform or keep or abide by any term, covenant or term, covenant or condition of any of the Loan Documents (other than as set forth in <u>Section 8.1(a)</u>, <u>(b)</u>, <u>(c)</u> or <u>(d)</u> ), which can be cured with the payment of money, within five (5) days after notice from Agent; or

(f)     The failure of any Loan Party to perform or keep or abide by any term, covenant or term, covenant or condition of any of the Loan Documents (other than as set forth in <u>Section 8.1(a)</u>, <u>(b)</u>, <u>(c)</u> or <u>(d)</u>), that cannot be cured with the payment of money (but is otherwise susceptible of curing), within thirty (30) days after notice from Agent, provided that if such failure cannot reasonably be cured within such thirty (30) day period and Borrower shall have commenced to cure within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for so long as it shall require Borrower in the exercise of due diligence to cure such failure, it being agreed that no such extension shall be for a period in excess of sixty (60) days; or

(g)     the filing of a bankruptcy proceeding, assignment for the benefit of creditors, issuance of a judgment in excess of $25,000 hereafter awarded against any Loan Party by any court of competent jurisdiction that remains unsatisfied or otherwise in force and effect for a period of thirty (30)

51

days after the date of such award and the enforcement of said judgment against the assets of any Loan Party has not been stayed by an order of a court of competent jurisdiction, execution, garnishment, or levy against, or the appointment of a representative of any kind for the commencement of any proceeding for relief from indebtedness by or against any Loan Party; or

(h)     the happening of any event which, in the reasonable judgment of the Agent, materially and adversely affects the Borrower's ability to repay the Loan or the value of the Collateral; or

(i)     if any written representation, covenant or warranty made to the Agent or any Lender by any Loan Party is breached or is untrue in any material respect when made; or

(j)     inability to manage the affairs of any Loan Party; or

(k)     failure to timely provide any financial information on request or to permit an examination of books and records, after the expiration of all notice, grace or cure periods, if any, set forth in the Loan Documents; or

(l)     the Borrower shall convey, transfer or otherwise divest itself of title to the Property; or

(m)     the Borrower shall encumber the Property or the Project with any secondary financing, without the prior written approval of Agent which approval may be granted or withheld for any reason or for no reason whatsoever in Agent's sole and absolute discretion; or

(n)     Borrower fails to promptly perform or comply with any of the covenants contained in the Loan Documents with respect to maintaining insurance; or

(o)     any permit, license, certificate or approval that Borrower is required to obtain with respect to the construction, operation, development, leasing or maintenance of the Improvements or the Property lapses or ceases to be in full force and effect; or

(p)     if Borrower incurs additional Indebtedness without the prior written approval of the Agent, or

(q)     a default by Borrower or any Affiliate of Borrower on any other obligations owed by them to Agent or any Lender; or

(r)     the occurrence of any material adverse change in the financial condition or prospects of any Loan Party or the existence of any other condition which, in Agent's reasonable determination, constitutes a material impairment of any such Person's ability to operate the Project or of such Person's ability to perform their respective obligations under the Loan Documents, which is not remedied within thirty (30) days after written notice; or

(s)     the occurrence of any "Reportable Event" under ERISA which Agent determines in good faith constitutes grounds for imposition of liability against Borrower under Section V, Subtitle D of ERISA; or

(t)     the failure to satisfy any of the Financial Covenants; or

(u)      if any Loan Party or other tenant or manager of any of the Property should be assessed fines or penalties in excess of $100,000 in the aggregate in any calendar year or on more than two separate occasions by any Governmental Authority with jurisdiction over the Project; or

(v)      the receipt by Agent or any Lender of a written notice from Borrower or any other party that was sent with the intention of terminating, limiting or restricting the indebtedness secured by the Security Instrument;

Notwithstanding anything in this Section, all requirements of notice shall be deemed eliminated if Agent or any Lender is prevented from declaring an Event of Default by bankruptcy or other applicable law. The cure period, if any, shall then run from the occurrence of the event or condition of Default rather than from the date of notice.

8.2      Remedies.  Upon the occurrence of any one or more of the foregoing Events of Default, Agent or any Lender may, at its option:

(a)      Declare the entire unpaid principal and accrued but unpaid interest of the Loan Obligations to be, and the same shall thereupon become, immediately due and payable, without presentment, protest or further demand or notice of any kind (including, without limitation, notice of acceleration and notice of intent to accelerate), all of which are hereby expressly waived; provided, however, that immediately upon an Event of Default resulting from bankruptcy or other insolvency proceeding, the Loan Obligations shall automatically and immediately be due and payable in full; and/or

(b)      Proceed to protect and enforce its rights by action at law (including, without limitation, bringing suit to reduce any claim to judgment), suit in equity and other appropriate proceedings including, without limitation, for specific performance of any covenant or condition contained in this Agreement; and/or

(c)      Exercise any and all rights and remedies afforded by the laws of the United States, the states in which the Property or other Collateral is located or any other appropriate jurisdiction as may be available for the collection of debts and enforcement of covenants and conditions such as those contained in this Agreement and the Loan Documents; and/or

(d)      Exercise the rights and remedies of setoff and/or banker's lien against the interest of Borrower in and to every account and other property of Borrower which is in the possession of Agent or any Lender or any Person who then owns a participating interest in the Loan, to the extent of the full amount of the Loan; and/or

(e)      Exercise its rights and remedies pursuant to any of the Loan Documents.

Any failure of Agent or any Lender to make any election of remedies following an Event of Default shall not constitute a waiver of Agent's or any Lender's right to make the election in the event of any subsequent Event of Default.

8.3      Costs of Collection and Enforcement.  Borrower agrees to pay (a) all attorneys' fees and other costs and expenses of any nature incurred by Agent and each Lender in connection with this Agreement or the enforcement of Agent's or any Lender's rights and remedies under the Loan Documents, including attorneys' fees incurred by Agent and each Lender for legal advice concerning Agent and each Lender's rights and remedies (whether or not an Event of Default in fact occurs, and whether or not any remedies are in fact exercised); (b) all attorneys' fees, as determined by the court, and all other costs, expenses and fees incurred by Agent and each Lender in connection with any suit or

53

proceeding instituted to collect the Loan Obligations or to enforce Agent's and each Lender's rights and remedies under the Loan Documents, whether or not such suit or proceeding is prosecuted to judgment or conclusion; (c) all attorneys' fees and other costs and expenses incurred by Agent and each Lender in connection with any bankruptcy, insolvency or reorganization proceeding or receivership involving Borrower or any affiliate of Borrower, including any guarantor, and including all attorneys' fees incurred in making any appearances in any such proceeding or in seeking relief from any stay or injunction issued in or arising out of any such proceeding; and (d) all attorneys' fees and other costs and expenses incurred in any appellate proceedings and any post-judgment proceedings to collect or enforce the judgment.

8.4    Offsets.   No indebtedness shall be deemed to have been offset or shall be offset or compensated by all or part of any claim, cause of action, counterclaim or cross-claim, whether liquidated or unliquidated, which Borrower now or hereafter may have or may claim to have against Agent or any Lender.   Furthermore, in respect to the present indebtedness of, or any future indebtedness incurred by, Borrower to Agent or any Lender, Borrower waives, to the fullest extent permitted by law, the benefits of any applicable law, regulation, or procedure which substantially provides that, where cross-demands for money have existed between persons at any point in time when neither demand was barred by the applicable statute of limitations, and an action is thereafter commenced by one such person, the other may assert in his answer the defense of payment in that the two demands are compensated so far as they equal each other, notwithstanding that an independent action asserting the claim would at the time of filing the answer be barred by the applicable statute of limitations.   This Agreement and the other Loan Documents are not subject to any right of rescission, set-off, abatement, diminution, counterclaim or defense as against Agent or any Lender, including, without limitation, any assignee of Agent or any Lender, including the defense of usury, and the operation of any of the terms of the Loan, or the exercise of any right thereunder, will not render the Loan unenforceable, in whole or in part, or subject to any right of rescission, set-off, abatement, diminution, counterclaim or defense, including the defense of usury and whether or not such rescission, set-off, abatement, diminution, counterclaim or other defense arises out of or relates to the Loan Documents or any agreement between Borrower, Agent or any Lender or any affiliate of Agent or any Lender, and Capital Funding Group, Inc., a Maryland corporation ("CFG") with respect to any obligation or commitment of or by CFG to make a Loan to Borrower insured by HUD under the provisions of Section 232 of the National Housing Act, and the regulations thereunder.

ARTICLE IX
EXIT FEE

9.1    Exit Fee.

(a)    As used in this Agreement, "Exit Fee" means, with respect to the Property, the amount set forth on Exhibit H.

(b)    Borrower shall pay the Exit Fee to Agent, for the benefit of Agent, on demand in any of the following events: (i) Agent delivers a commitment for Agency Financing for the Property as required by Agency Lender or as otherwise provided in this Agreement and Borrower does not accept the Agency Financing, or (ii) Borrower accepts Agency Financing with a maturity greater than five (5) years from a lender other than the Agency Lender, or (iii) Borrower has defaulted in its obligation to cooperate with Agent to obtain the Agency Financing for the Property as provided in Section 4.14, or (iv) the Agency Lender is unable to obtain a commitment for the Agency Financing for the Property on account of any matter not within the control of the Agency Lender, including, without limitation, any material negative or adverse change in the financial condition of Borrower, Manager or Guarantor, any lien, pending or threatened litigation or other event effecting the Property or the Borrower or any Manager or Guarantor which causes the Property, Borrower, Manager or Guarantor or the Project not to be eligible

54

for Agency Financing, or (v) in the event Borrower repays the Loan other than as a result of any Agency Financing, in which event the Exit Fee shall be payable.

ARTICLE X
MISCELLANEOUS

10.1    <u>Waiver</u>.   No remedy conferred upon, or reserved to, Agent or any Lender in this Agreement or any of the other Loan Documents is intended to be exclusive of any other remedy or remedies, and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing in law or in equity. Exercise of or omission to exercise any right of Agent or any Lender shall not affect any subsequent right of Agent or any Lender to exercise the same.  No course of dealing between Borrower and Agent or any Lender or any delay on Agent's or any Lender's part in exercising any rights shall operate as a waiver of any of Agent's or any Lender's rights. No waiver of any Default under this Agreement or any of the other Loan Documents shall extend to or shall affect any subsequent or other then existing Default or shall impair any rights, remedies or powers of Agent or any Lender.  If Borrower consists of more than one person or entity, each such person or entity shall be jointly and severally liable for the performance of each of the obligations of Borrower to Lenders hereunder.

10.2    <u>Costs and Expenses</u>.   Borrower will bear all taxes, fees and expenses (including actual reasonable attorneys' fees and expenses of counsel for Agent and Lenders) in connection with the Loan, the Note, the preparation of this Agreement and the other Loan Documents (including any amendments hereafter made), and in connection with any modifications thereto and the recording of any of the Loan Documents.  If, at any time, an Event of Default occurs or Agent or any Lender becomes a party to any suit or proceeding in order to protect its interests or priority in any collateral for any of the Loan Obligations or its rights under this Agreement or any of the Loan Documents, or if Agent or any Lender is made a party to any suit or proceeding by virtue of the Loan, this Agreement or any Collateral and as a result of any of the foregoing, Agent or any Lender employs counsel to advise or provide other representation with respect to this Agreement, or to collect the balance of the Loan Obligations, or to take any action in or with respect to any suit or proceeding relating to this Agreement, any of the other Loan Documents, any Collateral, Borrower, or to protect, collect, or liquidate any of the security for the Loan Obligations, or attempt to enforce any security interest or lien granted to Agent or any Lender by any of the Loan Documents, then in any such events, all of the actual attorney's fees arising from such services, including attorneys' fees for preparation of litigation and in any appellate or bankruptcy proceedings, and any expenses, costs and charges relating thereto shall constitute additional obligations of Borrower to Agent or any Lender payable on demand of Agent or any Lender.  Without limiting the foregoing, Borrower has undertaken the obligation for payment of, and shall pay, all recording and filing fees, revenue or documentary stamps or taxes, intangibles taxes, and other taxes, expenses and charges payable in connection with this Agreement, any of the Loan Documents, the Loan Obligations, or the filing of any financing statements or other instruments required to effectuate the purposes of this Agreement, and should Borrower fail to do so, Borrower agrees to reimburse Agent and each Lender for the amounts paid by Agent and each Lender, together with penalties or interest, if any, incurred by Agent and each Lender as a result of underpayment or nonpayment.  Such amounts shall constitute a portion of the Loan Obligations, shall be secured by the Security Instrument and shall bear interest at the Default Rate from the date advanced until repaid.

10.3    <u>Performance of Agent and Lenders</u>.   At its option, upon Borrower's failure to do so, Agent or any Lender may make any payment or do any act on Borrower's behalf that Borrower or others are required to do to remain in compliance with this Agreement or any of the other Loan Documents, and Borrower agrees to reimburse Agent and each Lender, on demand, for any payment made or expense incurred by Agent or such Lender pursuant to the foregoing authorization, including, without limitation,

55

reasonable attorneys' fees, and until so repaid any sums advanced by Agent or any Lender shall constitute a portion of the Loan Obligations, shall be secured by the Security Instrument and shall bear interest at the Default Rate from the date advanced until repaid.

      10.4   <u>Indemnification</u>.  Borrower shall, at its sole cost and expense, protect, defend, indemnify and hold harmless the Indemnified Parties (as defined below) from and against any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, diminutions in value, fines, penalties, charges, fees, expenses, judgments, awards, amounts paid in settlement, punitive damages, foreseeable and unforeseeable consequential damages, of whatever kind or nature (including but not limited to attorneys' fees and other costs of defense) imposed upon or incurred by or asserted against Agent or any Lender by reason of: (a) ownership of the Note, the Security Instrument, the Property, or any interest therein or receipt of any Rents; (b) any amendment to, or restructuring of, the Loan Obligations and/or any of the Loan Documents; (c) any and all lawful action that may be taken by Agent or Lenders in connection with the enforcement of the provisions of the Security Instrument, or the Note or any of the other Loan Documents, whether or not suit is filed in connection with same, or in connection with Borrower, Manager or Guarantor and/or any partner, joint venturer, member or shareholder thereof becoming a party to a voluntary or involuntary federal or state bankruptcy, insolvency or similar proceeding; (d) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property, the Improvements or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (e) any use, nonuse or condition in, on or about the Property, the Improvements or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (f) any failure on the part of Borrower, Manager or Guarantor to perform or comply with any of the terms of this Agreement or any of the other Loan Documents; (g) any claims by any broker, person or entity claiming to have participated in arranging the making of the Loan evidenced by the Note; (h) any failure of the Property to be in compliance with any applicable laws; (i) any and all claims and demands whatsoever which may be asserted against Agent or any Lender by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants, or agreements contained in a Lease or any replacement or renewal thereof or substitution therefore; (j) performance of any labor or services or the furnishing of any materials or other property with respect to the Property, the Improvements or any part thereof; (k) the failure of any person to file timely with the Internal Revenue Service an accurate Form 1099-b, statement for recipients of proceeds from real estate, broker and barter exchange transactions, which may be required in connection with the Security Instrument, or to supply a copy thereof in a timely fashion to the recipient of the proceeds of the transaction in connection with which the Loan is made; (l) any misrepresentation made to Agent or any Lender in this Agreement or in any of the other Loan Documents; (m) any tax on the making and/or recording of any of the Security Instrument, the Note or any of the other Loan Documents; (n) the violation of any requirements of the Employee Retirement Income Security Act of 1974, as amended; (o) any fines or penalties assessed or any corrective costs incurred by Agent and Lenders if the Project or any part of the Property is determined to be in violation of any covenants, restrictions of record, or any applicable laws, ordinances, rules or regulations; or (p) the enforcement by any of the Indemnified Parties of the provisions of this <u>Section 10.4</u>.  Any amounts payable to Agent and/or Lenders by reason of the application of this <u>Section 10.4</u> shall become immediately due and payable, and shall constitute a portion of the Loan Obligations, shall be secured by the Security Instrument, and shall accrue interest at the Default Rate.  The obligations and liabilities of Borrower under this <u>Section 10.4</u> shall survive any termination, satisfaction, assignment, entry of a judgment of foreclosure or exercise of a power of sale or delivery of a deed in lieu of foreclosure of the Security Instrument.  For purposes of this <u>Section 10.4</u>, the term "Indemnified Parties" means Agent, each Lender and any Person who is or will have been involved in the origination of the Loan, any Person who is or will have been involved in the servicing of the Loan, any Person in whose name the encumbrance created by the Security Instrument is or will have been

recorded, any Person who may hold or acquire or will have held a full or partial interest in the Loan (including, without limitation, any investor in any securities backed in whole or in part by the Loan) as well as the respective directors, officers, shareholder, partners, members, employees, agents, servants, representatives, contractors, subcontractors, affiliates, subsidiaries, participants, successors and assigns of any and all of the foregoing (including, without limitation, any other Person who holds or acquires or will have held a participation or other full or partial interest in the Loan or the Property, whether during the term of the Security Instrument or as a part of or following a foreclosure of the Loan and including, without limitation, any successors by merger, consolidation or acquisition of all or a substantial portion of Lender's assets and business).

   10.5    Headings.   The headings of the Sections of this Agreement are for convenience of reference only, are not to be considered a part hereof, and shall not limit or otherwise affect any of the terms hereof.

   10.6    Survival of Covenants.   All covenants, agreements, representations and warranties made herein and in certificates or reports delivered pursuant hereto shall be deemed to have been material and relied on by Agent and Lenders, notwithstanding any investigation made by or on behalf of Agent or Lenders, and shall survive the execution and delivery to Agent and Lenders of the Note and this Agreement.

   10.7    Notices, etc.   Any notice or other communication required or permitted to be given by this Agreement or the other Loan Documents or by applicable law shall be in writing and shall be deemed received: (a) on the date delivered, if sent by hand delivery (to the person or department if one is specified below) with receipt acknowledged by the recipient thereof; (b) three (3) Business Days following the date deposited in U.S. mail, postage prepaid, certified or registered, with return receipt requested; or (c) one (1) Business Day following the date deposited with Federal Express or other national overnight carrier, and in each case addressed as follows:

| | |
|---|---|
| If to Borrower: | Cranston Apartments LLC<br>475 Oberlin Avenue South, Suite 211,<br>Lakewood, New Jersey 08701<br>Attn: Menachem Tress and Elimelech Tress |
| with a copy to: | Jeffrey Zwick & Associates, P.C.<br>266 Broadway, Suite 403<br>Brooklyn, NY 11211<br>Attention: Jeffrey Zwick, Esq. |
| If to Agent: | Capital Funding, LLC<br>1422 Clarkview Road<br>Baltimore, Maryland  21209<br>Attention:  Account Manager – Cranston Hall Apartments |
| with a copy to: | Nixon Peabody LLP<br>Tower 46<br>55 West 46th Street<br>New York, NY 10036<br>Attention: Laura Mehl Sugarman, Esq. |

Any party may change its or its attorney address to another single address by notice given as herein provided, except any change of address notice must be actually received in order to be effective.

10.8     Benefits and Information Sharing.   All of the terms and provisions of this Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and assigns.  No Person other than Borrower, Agent or each Lender shall be entitled to rely upon this Agreement or be entitled to the benefits of this Agreement.  Agent or Lenders may share with any Affiliates, any and all financial and other information about the Loan Parties obtained by Lender in connection with the Loan, and the Loan Parties hereby authorizes such information sharing.  Each of the Loan Parties acknowledges and agrees that such shared information may include "financial records" as defined in Section 1-301(c) of the Financial Institutions Article of the Code of Maryland.

10.9     Supersedes Prior Agreements; Counterparts.   This Agreement and the instruments referred to herein supersede and incorporate all representations, promises, and statements, oral or written, made by Borrower, Agent or any Lender in connection with the Loan.  This Agreement may not be varied, altered, or amended except by a written instrument executed by an authorized officer of Borrower, Agent and the Required Lenders.  This Agreement may be executed in any number of counterparts, each of which, when executed and delivered, shall be deemed an original, but such counterparts shall together constitute one and the same instrument.  Delivery of an executed signature page to this Agreement by facsimile or other electronic transmission (including in pdf format) will be effective as delivery of a manually executed counterpart to this Agreement.  This Agreement and the other Loan Documents represent the final agreement between the parties with respect to the subject matter hereof and thereof.  There are no unwritten oral agreements between the parties.

10.10    Loan Agreement Governs.  The Loan is governed by terms and provisions set forth in this Agreement and the other Loan Documents and in the event of any irreconcilable conflict between the terms of the other Loan Documents and the terms of this Agreement, the terms of this Agreement shall control; provided, however, in the event there is any apparent conflict between any particular term or provision which appears in both this Agreement and the other Loan Documents and it is possible and reasonable for the terms of both this Agreement and the Loan Documents to be performed or complied with then (except with respect to the Maturity Date or any extension thereof, in which case this Agreement shall be controlling) notwithstanding the foregoing both the terms of this Agreement and the other Loan Documents shall be performed and complied with.

10.11    **CONTROLLING LAW.    THE PARTIES HERETO AGREE THAT THE VALIDITY, INTERPRETATION, ENFORCEMENT AND EFFECT OF THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF MARYLAND AND THE PARTIES HERETO SUBMIT (AND WAIVE ALL RIGHTS TO OBJECT) TO NON-EXCLUSIVE PERSONAL JURISDICTION IN THE STATE OF MARYLAND, CITY OF BALTIMORE FOR THE ENFORCEMENT OF ANY AND ALL OBLIGATIONS UNDER THE LOAN DOCUMENTS EXCEPT THAT IF ANY SUCH ACTION OR PROCEEDING ARISES UNDER THE CONSTITUTION, LAWS OR TREATIES OF THE UNITED STATES OF AMERICA, OR IF THERE IS A DIVERSITY OF CITIZENSHIP BETWEEN THE PARTIES THERETO, SO THAT IT IS TO BE BROUGHT IN A UNITED STATES DISTRICT COURT, IT SHALL BE BROUGHT IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MARYLAND OR ANY SUCCESSOR FEDERAL COURT HAVING ORIGINAL JURISDICTION.**

10.12    **WAIVER OF JURY TRIAL.    TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAWS, BORROWER HEREBY WAIVES ANY RIGHT THAT IT MAY HAVE TO A TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT OR THE LOAN, OR (B) IN ANY WAY CONNECTED WITH OR PERTAINING OR RELATED TO OR INCIDENTAL TO ANY DEALINGS OF AGENT,**

**LENDERS AND/OR BORROWER WITH RESPECT TO THE LOAN DOCUMENTS OR IN CONNECTION WITH THIS AGREEMENT OR THE EXERCISE OF ANY PARTY'S RIGHTS AND REMEDIES UNDER THIS AGREEMENT OR OTHERWISE, OR THE CONDUCT OR THE RELATIONSHIP OF THE PARTIES HERETO, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.  BORROWER AGREES THAT AGENT MAY FILE A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY, AND BARGAINED AGREEMENT OF BORROWER IRREVOCABLY TO WAIVE ITS RIGHTS TO TRIAL BY JURY AS AN INDUCEMENT OF AGENT AND LENDERS TO MAKE THE LOAN, AND THAT, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ANY DISPUTE OR CONTROVERSY WHATSOEVER (WHETHER OR NOT MODIFIED HEREIN) AMONG BORROWER, AGENT AND LENDERS SHALL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.**

10.13   <u>Management Agreement</u>.  Agent shall have the right in its sole and absolute discretion to approve any management company with respect to the management of the Project. The management agreement will be assigned to Agent as additional security for repayment of the Loan and payment of all management fees shall be subordinate to the Loan. Agent shall have the further right to approve in its sole and absolute discretion any contract entered into by the Project with any Affiliate of Borrower for the provisions of any services to the Borrower and/or the Project. Any such ancillary service contract will be assigned to Agent as additional security for repayment of the Loan.

10.14   <u>Patriot Act Compliance</u>.

(a)     Borrower will use its good faith and commercially reasonable efforts to comply with the Patriot Act (as defined below) and all applicable requirements of governmental authorities having jurisdiction of the Borrower and the Property, including those relating to money laundering and terrorism.  Agent shall have the right to audit the Borrower's compliance with the Patriot Act and all applicable requirements of governmental authorities having jurisdiction of the Borrower and the Property, including those relating to money laundering and terrorism.  In the event that the Borrower fails to comply with the Patriot Act or any such requirements of governmental authorities, then Agent may, at its option, cause the Borrower to comply therewith and any and all reasonable costs and expenses incurred by Agent and Lenders in connection therewith shall be secured by the Security Instrument and the other Loan Documents and shall be immediately due and payable.  For purposes hereof, the term "Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, as the same may be amended from time to time, and corresponding provisions of future laws.

(b)     Neither the Borrower nor any partner, member, shareholder or other constituent (each a "<u>Constituent of Borrower</u>") or a partner, member or shareholder of a Constituent of Borrower nor any owner of a direct or indirect interest in the Borrower (i) is listed on any Government Lists (as defined below), (ii) is a person who has been determined by competent authority to be subject to the prohibitions contained in Presidential Executive Order No. 13224 (Sept. 23, 2001) or any other similar prohibitions contained in the rules and regulations of OFAC (as defined below) or in any enabling legislation or other Presidential Executive Orders in respect thereof, (iii) has been previously indicted for or convicted of any felony involving a crime or crimes of moral turpitude or for any Patriot Act Offense (as defined below), or (iv) is not currently under investigation by any governmental authority for alleged criminal activity. For purposes hereof, the term "Patriot Act Offense" means any violation of the criminal laws of the United States of America or of any of the several states, or that would be a criminal violation if committed within the jurisdiction of the United States of America or any of the several states, relating to

terrorism or the laundering of monetary instruments, including any offense under (i) the criminal laws against terrorism; (ii) the criminal laws against money laundering, (iii) the Bank Secrecy Act, as amended, (iv) the Money Laundering Control Act of 1986, as amended, or the (v) Patriot Act. "Patriot Act Offense" also includes the crimes of conspiracy to commit, or aiding and abetting another to commit, a Patriot Act Offense. For purposes hereof, the term "Government Lists" means (i) the Specially Designated Nationals and Blocked Persons Lists maintained by Office of Foreign Assets Control ("OFAC"), (ii) any other list of terrorists, terrorist organizations or narcotics traffickers maintained pursuant to any of the Rules and Regulations of OFAC that Agent notified Borrower in writing is now included in "Governmental Lists", or (iii) any similar lists maintained by the United States Department of State, the United States Department of Commerce or any other government authority or pursuant to any Executive Order of the President of the United States of America that Agent notified Borrower in writing is now included in "Governmental Lists".

      10.15   <u>Secondary Market Transactions</u>.

      (a)    Borrower hereby acknowledges that Lenders may, with Agent's prior written consent (which consent is not required for transfers of the Loan made in accordance with Section 11.17(a)(i)), in one or more transactions (i) sell, or otherwise transfer the Loan or any portion thereof (or undivided ownership interests therein) one or more times (ii) sell participation interests in the Loan one or more times, (iii) further divide or re-divide the Loan into two or more separate loans, notes or components which may take the form of senior/junior/mezzanine notes or components or senior/subordinate notes or components or multiple components of such division, and which may be secured by some or all of the Collateral, or (iv) grant, pledge, assign a security interest in or otherwise collaterally transfer all or any portion of its rights under this Agreement and the Loan Documents to secure obligations of such Lender to any other Person (the transactions referred to in clauses (i) through (iv) above, each a "<u>Secondary Market Transaction</u>", and collectively "<u>Secondary Market Transactions</u>"). With respect to any Secondary Market Transaction described in clause (iii) above, such notes or note components may be assigned different interest rates, so long as, at such time the weighted average of the relevant interest rates equals the Effective Rate; *provided, however*, that Borrower recognizes that, in the case of prepayments, the weighted average interest rate of the Loan may increase because Agent shall have the right to apply principal payments to one or more notes or components with lower rates of interest before applying principal payments to one or more notes or components with higher rates of interest. Borrower shall cooperate with Agent and Lenders and use Borrower's good faith efforts to facilitate the consummation of each Secondary Market Transaction including, without limitation, by: (i) amending or causing the amendment of any Loan Document, and executing such additional documents, instruments and agreements as may be reasonably required by Agent or Lenders in connection with the relevant Secondary Market Transaction; (ii) promptly and reasonably providing such information (including, without limitation, financial information) as may be requested in connection with the preparation of a private placement memorandum, prospectus or a registration statement required to privately place or publicly distribute the securities in a manner which does not conflict with federal or state securities laws; (iii) providing in connection with each of (A) a preliminary and a final private placement memorandum or other offering documents or (B) a preliminary and final prospectus, as applicable (each, a "<u>Disclosure Document</u>"), a certificate certifying that Borrower has carefully examined those sections of such Disclosure Documents, as applicable, pertaining to Borrower, its Affiliates, the Loan, the Manager and the Property and that such sections (and any other sections reasonably requested by a Lender) do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; (iv) causing to be rendered such opinion letters reasonably requested by Agent or any Lender for the relevant Secondary Market Transaction; (v) making such representations, warranties and covenants, as may be reasonably requested by a Lender for the Secondary Market Transaction; and (vi) providing any

60

other information and materials reasonably required in the Secondary Market Transaction. Borrower shall be responsible only for its own costs and expenses (including attorneys' fees) and shall not be responsible for any third party costs and expenses incurred by Agent or Lenders in connection with any Secondary Market Transaction.

10.16   <u>Construction</u>.  Captions in this Agreement are included solely for convenience and are not to be referred to in construing or interpreting this Agreement.  Defined terms may be used in the singular or the plural, as the context requires.  All references to time of day mean the then applicable time in Baltimore, Maryland, unless otherwise expressly provided.  Each reference in this Agreement to a particular section is a reference to a section of this Agreement unless otherwise expressly indicated.  The words "include," "includes" and "including" are deemed to be followed by the phrase "without limitation".  Unless the context in which it is used otherwise clearly requires, the word "or" has the inclusive meaning represented by the phrase "and/or".  Unless the context in which it is used otherwise clearly requires, all references to days, weeks and months mean calendar days, weeks and months.  If any portion of this Agreement is declared invalid, illegal or unenforceable by any court of competent jurisdiction, such portion shall be deemed severed from this Agreement and the remaining portions shall continue in full force and effect.  Time is strictly of the essence of each and every provision of this Agreement.  This Agreement shall be governed by and interpreted and enforced under the laws of the United States and the regulations, rules, orders, requirements and policies of any federal departments, offices, bureaus, boards and other agencies, instrumentalities and authorities that have jurisdiction over Agent or Lenders or this Agreement to the extent that Agent or Lenders or this Agreement is subject to or governed by such federal laws, regulations, rules, orders, requirements and policies.

10.17   <u>No Partnership</u>.  Borrower acknowledges and agrees that the provisions of this Agreement shall not create a partnership, joint venture or any other relationship among the Borrower, Agent and Lenders except the relationship of borrower and lenders.  Accordingly, nothing contained in this Agreement or in the other Loan Documents shall obligate or be deemed to obligate Agent or any Lender to pay any costs, fees or expenses of the Property, or to reimburse Borrower for any such costs or otherwise.  In addition, nothing in this Agreement or in any of the other Loan Documents shall be deemed to imply that Agent or any Lender is an owner or operator of the Property or any business or businesses located thereon or in connection therewith and neither Agent nor any Lender shall not be deemed to control or review Borrower's ownership or operation of the Property, or any business or businesses located thereon or in connection therewith.

10.18   <u>Financing Statements.</u>  Borrower agrees that Agent may file UCC-1 Financing Statements with the following description of the Collateral or a substantially similar description: "ALL ASSETS OF THE DEBTOR, WHEREVER LOCATED, WHETHER NOW OWNED OR EXISTING OR HEREAFTER ACQUIRED OR ARISING, TOGETHER WITH ALL PROCEEDS THEREOF."

10.19   <u>Press Releases</u>.  Borrower hereby consents to all news releases, publicity or advertising by Agent or any Lender, through any media intended to reach the general public, which refers to the Loan Documents or financing evidenced by the Loan Documents, to the Borrower or any of its Affiliates.

10.20   <u>Change in Law</u>.  If any Lender determines that any law, request, rule, guideline or directive of any Governmental Authority (whether or not having the force of law) (including the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III), or compliance therewith by such Lender (or any corporation controlling such Lender), has the effect of increasing such Lender's cost of making, issuing, funding or maintaining any extension of credit

hereunder or committing to do any of the foregoing, or increasing the amount of capital or liquidity required or expected to be maintained by such Lender (or such corporation) or reducing the rate of return on capital (taking into consideration the Lender's (or such corporation's) policies with respect to capital adequacy, liquidity and such Lender's desired return on capital) as a consequence of its obligations under any Loan Document, then, in each case, the Borrower agrees, upon demand by such Lender (which demand shall be accompanied by a written statement setting forth the basis for such demand and a statement as to the method of the calculation of the amount thereof in reasonable detail), to pay to such Lender additional amounts sufficient to compensate such Lender for such increased costs, increased capital or liquidity requirements or reduced rate of return, as the case may be.

## ARTICLE XI
## AGENT

11.1    <u>Appointment and Authorization</u>.    Each Lender hereby irrevocably appoints and authorizes Agent to enter into each of the Loan Documents to which it is a party (other than this Agreement) on its behalf and to take such actions as Agent on its behalf and to exercise such powers under the Loan Documents as are delegated to Agent by the terms thereof, together with all such powers as are reasonably incidental thereto.  Subject to the terms of Section 11.16 and to the terms of the other Loan Documents, Agent is authorized and empowered to amend, modify, or waive any provisions of this Agreement or the other Loan Documents on behalf of Lenders.  The provisions of this Article XI are solely for the benefit of Agent and Lenders and neither Borrower nor any other Loan Party shall have any rights as a third party beneficiary of any of the provisions hereof.  In performing its functions and duties under this Agreement, Agent shall act solely as agent of Lenders and does not assume and shall not be deemed to have assumed any obligation toward or relationship of agency or trust with or for Borrower or any other Loan Party.  Agent may perform any of its duties hereunder, or under the Loan Documents, by or through its agents or employees.

11.2    <u>Agent and Affiliates</u>.    Agent shall have the same rights and powers under the Loan Documents as any other Lender and may exercise or refrain from exercising the same as though it were not Agent, and Agent and its Affiliates may lend money to, invest in and generally engage in any kind of business with each Loan Party or Affiliate of any Loan Party as if it were not Agent hereunder.

11.3    <u>Action by Agent</u>.    The duties of Agent shall be mechanical and administrative in nature.  Agent shall not have by reason of this Agreement a fiduciary relationship in respect of any Lender.  Nothing in this Agreement or any of the Loan Documents is intended to or shall be construed to impose upon Agent any obligations in respect of this Agreement or any of the Loan Documents except as expressly set forth herein or therein.

11.4    <u>Consultation with Experts</u>.    Agent may consult with legal counsel, independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken by it in good faith in accordance with the advice of such counsel, accountants or experts.

11.5    <u>Liability of Agent</u>.    Neither Agent nor any of its directors, officers, agents or employees shall be liable to any Lender for any action taken or not taken by it in connection with the Loan Documents, except that Agent shall be liable with respect to its specific duties set forth hereunder but only to the extent of its own gross negligence or willful misconduct in the discharge thereof as determined by a final non-appealable judgment of a court of competent jurisdiction.  Neither Agent nor any of its directors, officers, agents or employees shall be responsible for or have any duty to ascertain, inquire into or verify (a) any statement, warranty or representation made in connection with any Loan Document or any borrowing hereunder; (b) the performance or observance of any of the covenants or agreements specified in any Loan Document; (c) the satisfaction of any condition specified in any Loan Document;

(d) the validity, effectiveness, sufficiency or genuineness of any Loan Document, any Lien purported to be created or perfected thereby or any other instrument or writing furnished in connection therewith; (e) the existence or non-existence of any Default or Event of Default; or (f) the financial condition of any Loan Party.  Agent shall not incur any liability by acting in reliance upon any notice, consent, certificate, statement, or other writing (which may be a bank wire, telex, facsimile or electronic transmission or similar writing) believed by it to be genuine or to be signed by the proper party or parties.  Agent shall not be liable for any apportionment or distribution of payments made by it in good faith and if any such apportionment or distribution is subsequently determined to have been made in error.  The sole recourse of any Lender to whom payment was due but not made, shall be to recover from other Lenders any payment in excess of the amount to which they are determined to be entitled (and such other Lenders hereby agree to return to such Lender any such erroneous payments received by them).

11.6    <u>Indemnification</u>.  Each Lender shall, in accordance with its Pro Rata Share, indemnify Agent (to the extent not reimbursed by Borrower) upon demand against any cost, expense (including counsel fees and disbursements), claim, demand, action, loss or liability (except such as result from Agent's gross negligence or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction) that Agent may suffer or incur in connection with the Loan Documents or any action taken or omitted by Agent hereunder or thereunder.  If any indemnity furnished to Agent for any purpose shall, in the opinion of Agent, be insufficient or become impaired, Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against even if so directed by Required Lenders until such additional indemnity is furnished.

11.7    <u>Right to Request and Act on Instructions</u>.  Agent may at any time request instructions from Lenders with respect to any actions or approvals which by the terms of this Agreement or of any of the Loan Documents Agent is permitted or desires to take or to grant, and if such instructions are promptly requested, Agent shall be absolutely entitled to refrain from taking any action or to withhold any approval and shall not be under any liability whatsoever to any Person for refraining from any action or withholding any approval under any of the Loan Documents until it shall have received such instructions from Required Lenders or all or such other portion of the Lenders as shall be prescribed by this Agreement.  Without limiting the foregoing, no Lender shall have any right of action whatsoever against Agent as a result of Agent acting or refraining from acting under this Agreement or any of the other Loan Documents in accordance with the instructions of Required Lenders (or all or such other portion of the Lenders as shall be prescribed by this Agreement) and, notwithstanding the instructions of Required Lenders (or such other applicable portion of the Lenders), Agent shall have no obligation to take any action if it believes, in good faith, that such action would violate applicable law or exposes Agent to any liability for which it has not received satisfactory indemnification in accordance with the provisions of Section 11.6.

11.8    <u>Credit Decision</u>.  Each Lender acknowledges that it has, independently and without reliance upon Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking any action under the Loan Documents.

11.9    <u>Collateral Matters</u>.  Lenders irrevocably authorize Agent, at its option and in its discretion, to (a) release any Lien granted to or held by Agent under any Loan Document (i) upon termination of the Loan Commitment and payment in full of all Loan Obligations; or (ii) constituting property sold or disposed of as part of or in connection with any disposition permitted under any Loan Document (it being understood and agreed that Agent may conclusively rely without further inquiry on a certificate of Borrower as to the sale or other disposition of property being made in full compliance with

the provisions of the Loan Documents); and (b) release or subordinate any Lien granted to or held by Agent under any Loan Document constituting personal property described herein (it being understood and agreed that Agent may conclusively rely without further inquiry on a certificate of Borrower as to the identification of any personal property described herein).  Upon request by Agent at any time, Lenders will confirm Agent's authority to release and/or subordinate particular types or items of Collateral pursuant to this Section 11.9.

11.10   <u>Agency for Perfection</u>.  Agent and each Lender hereby appoint each other Lender as agent for the purpose of perfecting Agent's security interest in assets which, in accordance with the Uniform Commercial Code in any applicable jurisdiction, can be perfected by possession or control. Should any Lender (other than Agent) obtain possession or control of any such assets, such Lender shall notify Agent thereof, and, promptly upon Agent's request therefor, shall deliver such assets to Agent or in accordance with Agent's instructions or transfer control to Agent in accordance with Agent's instructions. Each Lender agrees that it will not have any right individually to enforce or seek to enforce any Loan Document or to realize upon any Collateral for the Loan unless instructed to do so by Agent (or consented to by Agent, as provided in Section 11.5), it being understood and agreed that such rights and remedies may be exercised only by Agent.

11.11   <u>Notice of Default</u>.  Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default except with respect to defaults in the payment of principal, interest and fees required to be paid to Agent for the account of Lenders, unless Agent shall have received written notice from a Lender or Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default".  Agent will notify each Lender of its receipt of any such notice.  Agent shall take such action with respect to such Default or Event of Default as may be requested by Required Lenders (or all or such other portion of the Lenders as shall be prescribed by this Agreement) in accordance with the terms hereof.  Unless and until Agent has received any such request, Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable or in the best interests of Lenders.

11.12   <u>Assignment by Agent; Resignation of Agent; Successor Agent</u>.

(a)     Agent may at any time assign or participate its rights, powers, privileges and duties hereunder to (i) another Lender or (ii) any Person to whom Agent, in its capacity as a Lender, has assigned (or will assign, in conjunction with such assignment of agency rights hereunder) 50% or more of its Loan, in each case without the consent of the Lenders or Borrower.  Following any such assignment, Agent shall give notice to the Lenders and Borrower.  In no event shall Borrower have the right to consent to any removal, replacement or assignment by the Agent or the Lenders.  An assignment by Agent pursuant to this subsection (a) shall not be deemed a resignation by Agent for purposes of subsection (b) below.  The Required Lenders may, with or without cause, discharge the Agent from all of its duties and obligations hereunder and under the other Loan Documents and appoint a successor Agent.

(b)     Without limiting the rights of Agent to designate an assignee pursuant to subsection (a) above, Agent may at any time give notice of its resignation to the Lenders and Borrower. Upon receipt of any such notice of resignation, Required Lenders shall have the right to appoint a successor Agent.  If no such successor shall have been so appointed by Required Lenders and shall have accepted such appointment within ten (10) Business Days after the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the Lenders, appoint a successor Agent; provided that if Agent shall notify Borrower and the Lenders that no Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice from Agent that no Person has accepted such appointment and, from and following delivery of such notice, (i) the retiring

Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents and (ii) all payments, communications and determinations provided to be made by, to or through Agent shall instead be made by or to each Lender directly, until such time as Required Lenders appoint a successor Agent as provided for above in this paragraph.

(c)     Upon (i) an assignment permitted by subsection (a) above or (ii) the acceptance of a successor's appointment as Agent pursuant to subsection (b) above, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder and under the other Loan Documents (if not already discharged therefrom as provided above in this paragraph).  The fees payable by Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between Borrower and such successor.  After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article shall continue in effect for the benefit of such retiring Agent and its sub-agents in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting or was continuing to act as Agent.

11.13    Payment and Sharing of Payment.

(a)     Loan Payments.  Payments of principal, interest and fees in respect of the Loan will be settled on the date of receipt if received by Agent on the last Business Day of a month or on the Business Day immediately following the date of receipt if received on any day other than the last Business Day of a month.

(b)     Return of Payments.

(i)     If Agent pays an amount to a Lender under this Agreement in the belief or expectation that a related payment has been or will be received by Agent from Borrower and such related payment is not received by Agent, then Agent will be entitled to recover such amount from such Lender on demand without setoff, counterclaim or deduction of any kind, together with interest accruing on a daily basis at the Federal Funds Rate.

(ii)     If Agent determines at any time that any amount received by Agent under this Agreement must be returned to Borrower or paid to any other Person pursuant to any insolvency law or otherwise, then, notwithstanding any other term or condition of this Agreement or any other Loan Document, Agent will not be required to distribute any portion thereof to any Lender.  In addition, each Lender will repay to Agent on demand any portion of such amount that Agent has distributed to such Lender, together with interest at such rate, if any, as Agent is required to pay to Borrower or such other Person, without setoff, counterclaim or deduction of any kind.

(c)     Defaulted Lenders.  The failure of any Defaulted Lender to make any payment required by it hereunder shall not relieve any other Lender of its obligations to make payment, but neither any other Lender nor Agent shall be responsible for the failure of any Defaulted Lender to make any payment required hereunder.  Notwithstanding anything set forth herein to the contrary, a Defaulted Lender shall not have any voting or consent rights under or with respect to any Loan Document or constitute a "Lender" (or be included in the calculation of "Required Lenders" hereunder) for any voting or consent rights under or with respect to any Loan Document.

(d)     Sharing of Payments.  If any Lender shall obtain any payment or other recovery (whether voluntary, involuntary, by application of setoff or otherwise) on account of any Loan (other than pursuant to the terms of this Agreement) in excess of its Pro Rata Share of payments entitled pursuant to

the other provisions of this Section, such Lender shall purchase from the other Lenders such participations in extensions of credit made by such other Lenders (without recourse, representation or warranty) as shall be necessary to cause such purchasing Lender to share the excess payment or other recovery ratably with each of them; *provided*, *however*, that if all or any portion of the excess payment or other recovery is thereafter recovered from such purchasing Lender, the purchase shall be rescinded and each Lender which has sold a participation to the purchasing Lender shall repay to the purchasing Lender the purchase price to the ratable extent of such recovery, without interest.  Borrower agrees that any Lender so purchasing a participation from another Lender pursuant to this clause (d) may, to the fullest extent permitted by law, exercise all its rights of payment with respect to such participation as fully as if such Lender were the direct creditor of Borrower in the amount of such participation).  If under any applicable bankruptcy, insolvency or other similar law, any Lender receives a secured claim in lieu of a setoff to which this clause (d) applies, such Lender shall, to the extent practicable, exercise its rights in respect of such secured claim in a manner consistent with the rights of the Lenders entitled under this clause (d) to share in the benefits of any recovery on such secured claim.

11.14    <u>Right to Perform, Preserve and Protect</u>.  If any Loan Party fails to perform any obligation hereunder or under any other Loan Document (after giving effect to any cure periods provided for in this Agreement or such other Loan Document), Agent itself may, but shall not be obligated to, cause such obligation to be performed at Borrower's expense.  Agent is further authorized by Borrower and the Lenders to make expenditures from time to time which Agent, in its reasonable business judgment, deems necessary or desirable to (a) preserve or protect the business conducted by Borrower, the Collateral, or any portion thereof, and/or (b) enhance the likelihood of, or maximize the amount of, repayment of the Loan and other Loan Obligations.  Borrower hereby agrees to reimburse Agent on demand for any and all costs, liabilities and obligations incurred by Agent pursuant to this Section.  Each Lender hereby agrees to indemnify Agent upon demand for any and all costs, liabilities and obligations incurred by Agent pursuant to this Section, in accordance with the provisions of Section 11.6.

11.15    <u>Additional Titled Agents</u>.  Except for rights and powers, if any, expressly reserved under this Agreement to any bookrunner, arranger or to any titled agent named on the cover page of this Agreement, other than Agent (collectively, the "<u>Additional Titled Agents</u>"), and except for obligations, liabilities, duties and responsibilities, if any, expressly assumed under this Agreement by any Additional Titled Agent, no Additional Titled Agent, in such capacity, has any rights, powers, liabilities, duties or responsibilities hereunder or under any of the other Loan Documents.  Without limiting the foregoing, no Additional Titled Agent shall have nor be deemed to have a fiduciary relationship with any Lender.  At any time that any Lender serving as an Additional Titled Agent shall have transferred to any other Person (other than any Affiliates) all of its interests in the Loan, such Lender shall be deemed to have concurrently resigned as such Additional Titled Agent.

11.16    <u>Amendments and Waivers</u>.

(a)    No provision of this Agreement or any other Loan Document may be materially amended, waived or otherwise modified unless such amendment, waiver or other modification is in writing and is signed or otherwise approved by Borrower, the Required Lenders and any other Lender to the extent required under Section 11.16(b); *provided, however*, that Agent shall be entitled, in its sole and absolute discretion, to waive any financial covenant of any Loan Party.

(b)    In addition to the required signatures under Section 11.16(a), no provision of this Agreement or any other Loan Document may be amended, waived or otherwise modified unless such amendment, waiver or other modification is in writing and is signed or otherwise approved by the following Persons:

(i)        if any amendment, waiver or other modification would increase a Lender's funding obligations in respect of any Loan, by such Lender; and/or

(ii)        if the rights or duties of Agent are affected thereby, by Agent;

*provided, however*, that, in each of (i) and (ii) above, no such amendment, waiver or other modification shall, unless signed by all the Lenders directly affected thereby, (i) reduce the principal of, rate of interest on or any fees with respect to any Loan or forgive any principal, interest (other than default interest) or fees (other than late charges) with respect to any Loan; (ii) postpone the date fixed for, or waive, any payment (other than any mandatory prepayment pursuant to this Agreement) of principal of any Loan, or of interest on any Loan (other than default interest) or any fees provided for hereunder (other than late charges) or for any termination of any commitment; (iii) change the definition of the term Required Lenders or the percentage of Lenders which shall be required for Lenders to take any action hereunder; (iv) release all or substantially all of the Collateral, authorize Borrower to sell or otherwise dispose of all or substantially all of the Collateral or release any Guarantor of all or any portion of the Loan Obligations or its Guarantee obligations with respect thereto, except, in each case with respect to this clause (iv), as otherwise may be provided in this Agreement or the other Loan Documents (including in connection with any disposition permitted hereunder); (v) amend, waive or otherwise modify this or the definitions of the terms used in this Section insofar as the definitions affect the substance of this Section; or (vi) consent to the assignment, delegation or other transfer by any Loan Party of any of its rights and obligations under any Loan Document or release Borrower of its payment obligations under any Loan Document, except, in each case with respect to this clause (vi), pursuant to a merger or consolidation permitted pursuant to this Agreement.  It is hereby understood and agreed that all Lenders shall be deemed directly affected by an amendment, waiver or other modification of the type described in the preceding clauses (iii), (iv), (v) and (vi) of the preceding sentence.

11.17    Assignments and Participations.

(a)        Assignments; Participations.

(i)        Any Lender may at any time assign or sell undivided ownership interests in the Loan, participations to one or more Eligible Assignees, or all or any portion of such Lender's Loan together with all related obligations of such Lender hereunder.  Except as Agent may otherwise agree, the amount of any such assignment or participation (determined as of the date of the applicable Assignment Agreement or, if a "Trade Date" is specified in such Assignment Agreement, as of such Trade Date) shall be in a minimum aggregate amount equal to $1,000,000 or, if less, the assignor's entire interests in the outstanding Loan; *provided, however*, that, in connection with simultaneous assignments to two or more related Approved Funds, such Approved Funds shall be treated as one assignee for purposes of determining compliance with the minimum assignment size referred to above.  Borrower and Agent shall be entitled to continue to deal solely and directly with such Lender in connection with the interests so assigned to an Eligible Assignee until Agent shall have received and accepted an effective Assignment Agreement executed, delivered and fully completed by the applicable parties thereto and a processing fee of $3,500 to be paid by the assigning Lender; *provided*, *however*, that only one processing fee shall be payable in connection with simultaneous assignments to two or more related Approved Funds.

(ii)        From and after the date on which the conditions described above have been met, (A) such Eligible Assignee shall be deemed automatically to have become a party hereto and, to the extent of the interests assigned to such Eligible Assignee pursuant to such Assignment Agreement, shall have the rights and obligations of a Lender hereunder, and (B) the assigning Lender, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment Agreement, shall be released from its rights and obligations hereunder (other than those that survive termination

67

pursuant to this Agreement).  Upon the request of the Eligible Assignee (and, as applicable, the assigning Lender) pursuant to an effective Assignment Agreement, Borrower shall execute and deliver to Agent for delivery to the Eligible Assignee (and, as applicable, the assigning Lender) Notes in the aggregate principal amount of the Eligible Assignee's Loan (and, as applicable, Notes in the principal amount of that portion of the principal amount of the Loan retained by the assigning Lender).  Upon receipt by the assigning Lender of such Note, the assigning Lender shall return to Borrower any prior Note held by it.

(iii)   Agent, acting solely for this purpose as an agent of Borrower, shall maintain at its offices located in Baltimore, Maryland a copy of each Assignment Agreement delivered to it and a register for the recordation of the names and addresses of each Lender, and the commitments of, and principal amount of the Loan owing to, such Lender pursuant to the terms hereof.  The entries in such register shall be conclusive, and Borrower, Agent and Lenders may treat each Person whose name is recorded therein pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  Such register shall be available for inspection by Borrower and any Lender, at any reasonable time upon reasonable prior notice to Agent.

(iv)   Notwithstanding the foregoing provisions of this Section or any other provision of this Agreement, any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; *provided, however*, that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(v)   Notwithstanding the foregoing provisions of this Section or any other provision of this Agreement, Agent has the right, but not the obligation, to effectuate assignments of Loan via an electronic settlement system acceptable to Agent as designated in writing from time to time to the Lenders by Agent (the "Settlement Service").  At any time when the Agent elects, in its sole discretion, to implement such Settlement Service, each such assignment shall be effected by the assigning Lender and proposed assignee pursuant to the procedures then in effect under the Settlement Service, which procedures shall be consistent with the other provisions of this Section.  Each assigning Lender and proposed Eligible Assignee shall comply with the requirements of the Settlement Service in connection with effecting any assignment of Loan pursuant to the Settlement Service.  If so elected by Agent and Borrower, Agent's and Borrower's approval of such Eligible Assignee shall be deemed to have been automatically granted with respect to any transfer effected through the Settlement Service.  Assignments and assumptions of the Loan shall be effected by the provisions otherwise set forth herein until Agent notifies Lenders of the Settlement Service as set forth herein.

(b)   Replacement of Lenders.  Within thirty (30) days after: (i) receipt by Agent of notice and demand from any Lender for payment of additional costs as provided in this Agreement, which demand shall not have been revoked, (ii) Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to this Agreement, (iii) any Lender is a Defaulted Lender, and the circumstances causing such status shall not have been cured or waived; or (iv) any failure by any Lender to consent to a requested amendment, waiver or modification to any Loan Document in which Required Lenders have already consented to such amendment, waiver or modification but the consent of each Lender, or each Lender affected thereby, is required with respect thereto (each relevant Lender in the foregoing clauses (i) through (iv) being an "Affected Lender") each of Borrower and Agent may, at its option, notify such Affected Lender and, in the case of Borrower's election, the Agent, of such Person's intention to obtain, at Borrower's expense, a replacement Lender ("Replacement Lender") for such Lender, which Replacement Lender shall be an Eligible Assignee and, in the event the Replacement Lender is to replace an Affected Lender described in the preceding clause (iv), such Replacement Lender consents to the requested amendment, waiver or

68

modification making the replaced Lender an Affected Lender.  In the event Borrower or Agent, as applicable, obtains a Replacement Lender within ninety (90) days following notice of its intention to do so, the Affected Lender shall sell, at par, and assign all of its Loan and funding commitments hereunder to such Replacement Lender in accordance with the procedures set forth in Section 11.17(a); *provided, however*, that (i) Borrower shall have reimbursed such Lender for its increased costs and additional payments for which it is entitled to reimbursement under this Agreement through the date of such sale and assignment, and (ii) Borrower shall pay to Agent the $3,500 processing fee in respect of such assignment. In the event that a replaced Lender does not execute an Assignment Agreement pursuant to Section 11.17(a) within five (5) Business Days after receipt by such replaced Lender of notice of replacement pursuant to this Section and presentation to such replaced Lender of an Assignment Agreement evidencing an assignment pursuant to this Section, such replaced Lender shall be deemed to have consented to the terms of such Assignment Agreement, and any such Assignment Agreement executed by Agent, the Replacement Lender and, to the extent required pursuant to Section 11.17(a), Borrower, shall be effective for purposes of this Section and Section 11.17(a).  Upon any such assignment and payment, such replaced Lender shall no longer constitute a "Lender" for purposes hereof, other than with respect to such rights and obligations that survive termination as set forth herein.

(c)    Loan Party Assignments.  No Loan Party may assign, delegate or otherwise transfer any of its rights or other obligations hereunder or under any other Loan Document without the prior written consent of Agent and each Lender.

(d)    Participations.  Any Lender may at any time, without the consent of, or notice to, Borrower but with prior notice to and consent of Agent, sell to one or more Eligible Assignees participating interests in its respective portion of the Loan, commitments or other interests hereunder (any such Eligible Assignee, a "Participant").  In the event of a sale by a Lender of a participating interest to a Participant, (i) such Lender's obligations hereunder shall remain unchanged for all purposes, (ii) Borrower and Agent shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations hereunder, and (iii) all amounts payable by Borrower shall be determined as if such Lender had not sold such participations and shall be paid directly to such Lender.  Borrower agrees that if amounts outstanding under this Agreement are due and payable (as a result of acceleration or otherwise), each Participant shall be deemed to have the right of set-off in respect of its participating interest in amounts owing under this Agreement to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement; provided, however, that such right of set-off shall be subject to the obligation of each Participant to share with Lenders and Lenders agree to share with each Participant, as provided in Section 11.19.

11.18    Buy-Out Upon Refinancing.  Agent shall have the right to purchase from the other Lenders all of their respective interests in the Loan at par in connection with any refinancing of the Loan upon one or more new economic terms, but which refinancing is structured as an amendment and restatement of the Loan rather than a payoff of the Loan.

11.19    Lender's Rights to Offset, Set-Off.  Notwithstanding anything to the contrary contained in Section 11.5, each Lender hereby acknowledges that the exercise by any Lender of offset, set-off, banker's lien or similar rights against any deposit or other indebtedness of Borrower whether or not located in any state with certain laws restricting lenders from pursuing multiple collection methods could result under such laws in significant impairment of the ability of all Lenders to recover further amounts in respect of the Loan. **THEREFORE, EACH LENDER AGREES THAT NO LENDER SHALL EXERCISE ANY SUCH RIGHT OF SET-OFF, BANKER'S LIEN, OR OTHERWISE, AGAINST ANY ASSETS OF BORROWER (INCLUDING ALL GENERAL OR SPECIAL, TIME OR DEMAND, PROVISIONAL OR OTHER DEPOSITS AND OTHER INDEBTEDNESS OWING BY SUCH LENDER TO OR FOR THE CREDIT OR THE ACCOUNT OF BORROWER)**

69

**WITHOUT THE PRIOR WRITTEN CONSENT OF AGENT AND THE REQUIRED LENDERS.**

11.20   <u>Definitions</u>.  As used in this Article, the following terms have the following meanings:

"<u>Additional Titled Agents</u>" has the meaning set forth in Section 11.15.

"<u>Affected Lender</u>" has the meaning set forth in Section 11.17(c).

"<u>Approved Fund</u>" means any (a) investment company, fund, trust, securitization vehicle or conduit that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the Ordinary Course of Business or (b) any Person (other than a natural person) which temporarily warehouses loans for any Lender or any entity described in the preceding clause (a) and that, with respect to each of the preceding clauses (a) and (b), is administered or managed by (i) a Lender, (ii) an Affiliate of a Lender, or (iii) a Person (other than a natural person) or an Affiliate of a Person (other than a natural person) that administers or manages a Lender.

"<u>Assignment Agreement</u>" means an assignment agreement in form and substance reasonably acceptable to Agent.

"<u>Defaulted Lender</u>" means, so long as such failure shall remain in existence and uncured, any Lender which shall have failed to make any Loan or other credit accommodation, disbursement, settlement or reimbursement required pursuant to the terms of any Loan Document.

"<u>Eligible Assignee</u>" means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund, and (d) a placement agent, and (e) any other Person (other than a natural person) approved by Agent (such approval not to be unreasonably withheld, conditioned or delayed); *provided, however*, that notwithstanding the foregoing, "Eligible Assignee" shall not include Borrower or Borrower's Affiliates.

"**<u>Participant</u>**" has the meaning set forth in <u>Section 11.17(b)</u>.

"<u>Replacement Lender</u>" has the meaning set forth in <u>Section 11.17(b)</u>.

"<u>Settlement Service</u>" has the meaning set forth in <u>Section 11.17(a)(v)</u>.

ARTICLE XII
RESERVED

**[SIGNATURES APPEAR ON FOLLOWING PAGES]**

**IN WITNESS WHEREOF**, the Borrower, Agent and Lenders have caused this Agreement to be properly executed under seal, by their respective duly authorized representatives, as of the date first above written.

**BORROWER:**

**CRANSTON APARTMENTS LLC,**
a Delaware limited liability company

By: _____ (SEAL)
Name: Elimelech Tress
Title:  Authorized Signatory

Signature Page to Loan Agreement

**AGENT:**

**CAPITAL FUNDING, LLC,**
a Maryland limited liability company

By: _Jennifer M. Loucks_ (SEAL)
Name:
Title:   Jennifer M. Loucks
         Vice President

**LENDER:**

**CAPITAL FUNDING, LLC,**
a Maryland limited liability company

By: _Jennifer M. Loucks_ (SEAL)
Name:
Title:   Jennifer M. Loucks
         Vice President

Signature Page to Loan Agreement

**EXHIBIT A**

**LEGAL DESCRIPTION**

All that certain lot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the City of Wilmington, County of New Castle, State of Delaware.

ALL that certain lot, piece or parcel of land with the buildings thereon erected, situate in Christiana Hundred, New Castle County and State of Delaware, and more particularly bounded and described, as follows, to-wit:

## TRACT 1

BEGINNING at a point in the middle of the Old Capitol Trail (formerly known as Centre Road) at the distance of Three Hundred one feet five inches Northeasterly from the intersection of the middle line of the said Old Capitol Trail and the middle line of the Newport and Gap Turnpike Road, being a corner of land formerly of Eugene Woodward, now of Edwin C. Denny, Jr., et. al., Trustees; thence by the middle of said Old Capitol Trail North 40 degrees East One hundred eighteen feet to a point in the center of said road, a corner of this land and lands formerly of John A. Cranston, now known as Cranston Heights Addition; thence by line of said lands South 50 degrees East Seven hundred eighty feet to a point in a corner of land formerly of the Newport Land and Improvement Company and now known as Avalon; thence by line of said land South 86 degrees West Three hundred sixty and one-half feet to a point in line of said lands formerly of Eugene Woodward now of Edwin C. Denny, Jr., et. al., Trustees; and thence thereby North 33 degrees 50 minutes West Five hundred forty-three feet to a point in the middle of said Old Capitol Trail and place of beginning.

EXCEPTING from the tract or piece of land above described ALL THAT CERTAIN portion thereof conveyed to the State of Delaware by deed of William A. Mitchell and wife, dated the 25th day of February, A.D. 1932 and recorded in the Office of the Recorder of Deeds in and for New Castle County aforesaid in Deed Record H, Volume 35, Page 160.

THE SAID ABOVE DESCRIBED tract or piece of land being also bounded and described as follows, to-wit:

BEGINNING at a point in the Southeasterly side of Old Capitol Trail (at 60 feet wide), said point being located from the intersection of the center lines of said Old Capitol Trail and Newport and Gap Turnpike by the following two courses and distances: (1) North 40 degrees East by said center line of said Old Capitol Trail Three hundred six and twenty-two one-hundredths feet to a point: and (2) South 36 degrees 50 minutes East, crossing said Old Capitol Trail, Thirty and eighty one-hundredths feet to the Southeasterly side thereof; thence by said Southeasterly side of said Old Capitol Trail North 40 degrees East One hundred Twenty-one and twenty-two one-hundredths feet to a pipe: thence South 50 degrees 11 minutes East Six hundred seventy-five and thirty-seven one-hundredths feet to a corner distant the an same course Ninety-seven and seventeen one-hundredths feet to a corner distant South 89 degrees 4 minutes West eleven and forty-eight one-hundredths feet from a pipe: thence south 89 degrees 04 minutes West One hundred ninety-eight and seventy-eight one-hundredths feet to a monument: thence South 88 degrees 43 minutes west One hundred sixty-six and sixty-four one-hundredths feet to a corner for the tract hereby conveyed: thence North 36 degrees 50 minutes West Five hundred ten and forty-three one hundredths feet to a point on the aforesaid Southeasterly side of Old Capitol Trail, the place of Beginning.

**TRACT 2**

BEGINNING at a point on the Southeasterly side of Old Capitol Trail (at 60 feet wide), said point being located from the intersection of the center lines of said Old Capitol Trail and Newport and Gap Turnpike by the following two courses and distances: (1) North 40 degrees East by said center line of said Old Capitol Trail Four Hundred twenty and thirty-two one-hundredths feet to a point; and (2) South 50 degrees 11 minutes East, crossing said Old Capitol Trail, Thirty feet to the Southeasterly side thereof; thence from said beginning point by said Southeasterly side of said Old Capitol Trail North 40 degrees 14 minutes East One hundred and sixty-three one-hundredths (100.63) feet to a pipe in line of land now or late of U. A. W. Local 435; thence by line of said lands and lands now or late of D. Flinn Estate South 72 degrees 05 minutes East Nine hundred forty-six and three one-hundredths (946.03) feet to a pipe at a corner for lands now or late of Philip DiEgidio; thence by line of said lands South 1 degree 14 minutes 30 seconds East Two hundred sixty-nine and forty one-hundredths (269.40) feet to a stone in line of lands now or late of S. Wedwick; thence by line of said lands South 88 degrees 19 minutes West Three hundred seventy-seven and seventy-six one-hundredths (377.76) feet to a pipe, a corner for lands conveyed to Cranston Hall, Inc. by deed of Lillie M. Kershaw, Widow, and Edwin Kershaw, single man, dated the Twenty-ninth day of May, A.D. 1963, and recorded in the Office of the Recorder of Deeds in and for New Castle County aforesaid in Deed Record E, Volume 71, Page 477; thence by line of said lands North 50 degrees 11 minutes West (passing over a monument at 97.17 feet) a total distance of Seven hundred seventy-two and fifty-four one-hundredths (772.54) feet to the said Southeasterly side of the aforesaid Old Capitol, at 60 feet wide, the point and place of Beginning.

NOTE FOR INFORMATION: Being Parcel No. 0703740152 (Tract 1), 0703740151, 0703740150 and 0703740149 (Tract 2), of the City of Wilmington, County of New Castle.

**EXHIBIT B**

**COMPLIANCE CERTIFICATE**

Re:    Loan Agreement dated as of April 27, 2022 (together with amendments, if any, the "Loan Agreement") by and among CRANSTON APARTMENTS LLC, as Borrower, Capital Funding, LLC, as Agent on behalf of the Lenders (capitalized terms used but not defined herein have the meaning ascribed to them in the Loan Agreement)

The undersigned officer of the above named Borrower does hereby certify that for the financial period ending [_____]:

1.      No Default or Event of Default has occurred or exists except [_____].

2.      The Debt Service Coverage Ratio for the Borrower for the preceding 12 months was:

Required:    _____
Actual:       _____

**The manner of calculation is attached.**

3.      [Other financial covenants to be confirmed]

4.      All representations and warranties contained in the Loan Agreement and other Loan Documents are true and correct in all material respects as though given on the date hereof, except [_____].

5.      All information provided herein is true and correct.

6.      Capitalized terms not defined herein shall have the meanings given to such terms in the Loan Agreement.

Dated _____.

[_____]

By: _____

Name: _____

Title: _____

**EXHIBIT C**

**LOAN COMMITMENT**

| Lender | Loan Commitment Percentage |
|---|---|
| Capital Funding, LLC | 100% |
| **Total Loan Commitment Percentage** | **100%** |

**EXHIBIT D**

**LEASING AND TENANT MATTERS**

1.  <u>Representations and Warranties of Borrower Regarding Leases</u>.

Borrower represents and warrants that Borrower has delivered to Agent a true and correct copy of all Leases and any guaranty(ies) thereof, affecting any part of the Improvements, together with an accurate and complete rent roll for the Property, and no such Lease or guaranty contains any option or right of first refusal to purchase all or any portion of the Property or any present or future interest therein.

2.  <u>Covenants of Borrower Regarding Leases and Rents</u>.

Borrower covenants that Borrower (a) will observe and perform all of the obligations imposed upon the landlord in the Leases and will not do or permit to be done anything to impair the security thereof; (b) will use its best efforts to enforce or secure, or cause to be enforced or secured, the performance of each and every obligation and undertaking of the respective tenants under the Leases and will appear in and defend, at Borrower's sole cost and expense, any action or proceeding arising under, or in any manner connected with, the Leases; (c) will not collect any of the Rents in advance of the time when the same become due under the terms of the Leases; (d) will not discount any future accruing Rents; (e) without the prior written consent of Agent, will not execute any assignment of the Leases or the Rents; and (f) will execute and deliver, at the request of Agent, all such assignments of the Leases and Rents in favor of Agent as Agent may from time to time require.

3.  <u>Residential Leasing Guidelines</u>.

Borrower shall not enter into any Lease of space in the Improvements unless approved or deemed approved by Agent prior to execution.  Borrower's standard form of tenant lease, and any revisions thereto, must have the prior written approval of Agent.  Agent shall be "deemed" to have approved any Lease that: (a) is on the standard form lease approved by Agent with no deviations except as approved by Agent; (b) is entered into in the ordinary course of business with a bona fide unrelated third party tenant, and Borrower, acting in good faith and exercising due diligence, has determined that the tenant is financially capable of performing its obligations under the Lease; and (c) does not affect more than one (1) residential unit within the Improvements and is for a minimum term of six (6) months and a maximum term of twelve (12) months, unless otherwise agreed in writing by Agent.  If requested by Agent, Borrower shall provide to Agent a correct and complete copy of each existing and future Lease, including any exhibits, and any guaranty(ies) thereof, within seven (7) days after Agent's request (for existing Leases) or seven (7) days after execution (for future Leases).

4.  <u>Retail and Commercial Leasing Guidelines</u>.

Borrower shall not enter into any Lease of retail or commercial space in the Improvements unless approved or deemed approved by Agent prior to execution.  Borrower's standard form of tenant lease, and any revisions thereto, must have the prior written approval of Agent.

5.  <u>Delivery of Leasing Information and Documents</u>.

From time to time upon Agent's request, Borrower shall promptly deliver to Agent (a) complete executed originals of each Lease, including any exhibits thereto and any guaranty(ies) thereof, (b) a complete rent roll of the Property in such detail as Agent may require, together with such operating statements and leasing schedules and reports as Agent may require, and (c) such other information regarding tenants and prospective tenants and other leasing information as Agent may request.  From time to time upon Agent's request, Borrower shall promptly deliver to Agent (a) complete executed originals of each retail or commercial Lease, including any exhibits thereto and any guaranty(ies) thereof, (b) a complete rent roll of the Property in such detail as Agent may require, together with such operating statements and leasing schedules and reports as Agent may require, (c) any and all financial statements of the retail and commercial tenants, subtenants and any lease guarantors to the extent available to Borrower, (d) such other information regarding tenants and prospective tenants and other leasing information as Agent may request, and (e) such estoppel, nondisturbance and attornment agreements executed by retail and commercial tenants, subtenants and guarantors, if any, in such form as Agent may require.   In addition, upon the request of Agent, Borrower shall promptly obtain and deliver to Agent such estoppel certificates, subordination agreements, and/or subordination, nondisturbance, and attornment agreements in form and substance acceptable to Agent, executed by such retail and commercial tenants as Agent from time to time may require.

**EXHIBIT E**

REQUIRED REPAIRS

The Required Repairs described below must be performed within one hundred eighty (180) days of the date hereof.  Borrower must provide pictures of each completed repair line item and a copy of paid invoices (the "Reimbursement Requirements").  Borrower must comply with the Reimbursement Requirements and any other requirements set forth in the Loan Documents to be reimbursed the paid cost of the same from the or the CapEx Reserve.

| Cranston Hall Apartments Critical and Priority Repairs | | | | |
|---|---|---|---|---|
| **Item** | **Comments** | **Total Cost** | **In Cap Ex Budget** | **Repair Escrow** |
| Repair asphalt paving | Repair asphalt paving in parking lot between Buildings C and L | $1,350 | $1,350 | $0 |
| Repair damaged fencing | Several wooden pickets were missing from the fence surrounding the house structure. | $1,000 | $1,000 | $0 |
| Repair concrete sidewalks/trip hazards | Repair concrete sidewalks and trip hazards in the sidewalks leading to the building entrances. | $500 | $500 | $0 |
| Install van-accessible space | No van accessible parking spaces present. Convert ADA parking space at leasing office to one compliant van-accessible parking space (96 inch wide space with an adjacent 96 inch wide access aisle leading to a curbed ramp or flush sidewalk surface at the top of the access aisle, and to include a vertical ADA sign with a van placard at the head of the space). | $250 | $250 | $0 |
| Install signage at leasing office entrance stairs | Leasing office access is via stairs. Installing a ramp for the building entrance and lift inside the building appears to be a financial burden, therefore, EBI recommends installing signage for leasing office contact for assistance, or call box, at the base of the exterior stairs. | $500 | $500 | $0 |
| Renovate down units | Renovate 10 units that are reportedly down due to prior tenant damage.  Units are part of the renovation program that will occur. | $100,000 | $100,000 | $0 |

| | | | | |
|---|---|---|---|---|
| Mold remediation | Representative Subject Property observations and interviews revealed visual and olfactory indications of the presence of suspect mold in areas noted to be approximately 20 square feet in the basement of Building J.  Additionally, indications of active moisture infiltration were noted in the same area of Building J.  Remove building materials with suspect mold and replace with new material susequent to the correction of the moisture infiltration in the baseement window well. | $7,500 | $7,500 | $0 |
| Provide updated fire extinguisher inspection tags | The fire extinguishers are tested annually and were observed with expired tags (2019 inspection date).  Provide updated fire extinguisher inspection tags. | $1,000 | $1,000 | $0 |
| **Total** | | **$112,100** | **$112,100** | **$0** |

## EXHIBIT F

## PERMITTED ENCUMBRANCES

1.  Rights of tenants as tenants only under unrecorded leases.

2.  Rights of automated service or laundry facility providers, if any.

3.  Terms and Conditions contained in Deed from William A. Mitchell and wife to the State of Delaware dated February 25, 1932 and recorded in Deed Record H Volume 35 Page 160.

4.  Agreement made by and between Joseph A. McBride & Wilhelmina McBride, his wife and The Levy Court of New Castle County recorded on January 20, 1955 in Deed Record B Volume 56 Page 43.

5.  Agreement made by and between Joseph A. McBride & Wilhelmina A., H/W and The Levy Court of New Castle County recorded on September 17, 1962 in Deed Record E Volume 70 Page 293.

6.  Easement contained in Deed from Lillie M. Kershaw, Widow and Edwin Kershaw, Single dated May 29, 1963 and recorded in Deed Record E Volume 71 Page 477, and cited in subsequent deed in chain of title.

7.  Agreement made by and between Cranston Hall, Inc. and the Levy Court of New Castle County recorded on July 8, 1963 in Deed Record K Volume 71 Page 85.

8.  Agreement made by and between Cranston Hall, Inc. and the Levy Court of New Castle County recorded on July 8, 1963 in Deed Record K Volume 71 Page 88.

9.  Agreement made by and between Cranston Hall, Inc. and Artesian Water Company recorded on July 18, 1963 in Deed Record M Volume 71 Page 67.

10. Easements granted to the Delaware Power & Light Company and The Diamond State Telephone Company recorded on September 11, 1963 in Deed Record U Volume 71 Page 158.

11. Agreement made by and between Cranston Hall, Inc. and the Levy Court of New Castle County recorded on June 25, 1964 in Deed Record F Volume 73 Page 289.

12. Agreement made by and between Cranston Hall, Inc. and the Levy Court of New Castle County recorded on September 1, 1964 in Deed Record T Volume 73 Page 56.

13. Agreement made by and between Cranston Hall, Inc. and Artesian Water Company recorded on September 2, 1964 in Deed Record T Volume 73 Page 106.

14. Easements granted to the Delaware Power & Light Company and The Diamond State Telephone Company recorded on October 6, 1964 in Deed Record W Volume 73 Page 359.

15. Agreement made by and between Cranston Hall, Inc. and the Levy Court of New Castle County, Delaware dated July 6, 1965 and recorded in Deed Record M Volume 75 Page 353.

16. Declaration of Easements by Cranston Hall, Inc. dated January 19, 1967 and recorded in Deed Record L Volume 78 Page 112, and any amendments thereto.

17. Agreement made by and between Cranston Hall Apartments and New Castle County recorded on August 21, 1973 in Deed Record E Volume 88 Page 73.

18. Easements and setback lines as set forth on Cranston Heights Addition recorded in Microfilm No. 688 Volume 4 Page 79.

`

19.     Survey prepared by Jerome D brunner of Blew and Associates on behalf of AEI Consultants, Project/Job Number 454021 dated 1/21/2022, last revised 4/21/22, discloses the following:

A. 5' wide sewer line and manhole acquired by condemnation No. 1256 C.A.1962.
B. Sewer easement agreement as set forth in deed record E, Volume 88, Page 73.
C. Fence extends beyond northerly property line onto adjoiners;
D. Fences do not coincide with northerly and easterly property lines;
E. Rights of others, both public and private in and to meters, pedestals, cleanouts, valves manholes, signs, utility poles, utility wires and any other utility equipment on or crossing subject property.

**EXHIBIT G**

**PAYMENT RESERVES**

| FACILITY NAME (Abbreviated) | MONTHLY TAXES | MONTHLY INSURANCE | Replacement Cost | Capital Expenditures |
|---|---|---|---|---|
| Cranston | $7,688.33 | $4,704.46 | $250/Unit/Year | $650,000 |

**Approved Capital Expenditures**

Cost per Unit: 15,000
Total Units: 161

| General CapEx | |
|---|---|
| Pool | 0 |
| Pool House | 0 |
| Exterior Upgrade & remodeling | 0 |
| Hallway | |
| Upgrades | 20,000 |
| Total | 20,000 |

| | % of Units Renovated | Units | Unit Rehab Cost | % of General CapEx | General CapEx Cost | Total Cost |
|---|---|---|---|---|---|---|
| Year 1 | 26% | 42 | 630,000 | 100% | 20,000 | 650,000 |
| Total | | 42 | 630,000 | 100% | 20,000 | 650,000 |

4893-8949-7115.6

| FACILITY NAME (Abbreviated) | MONTHLY TAXES | MONTHLY INSURANCE | Replacement Cost | Capital Expenditures |
|---|---|---|---|---|

| Item | Cost |
|---|---|
| Kitchen Renovation | 5,800 |
| Bathroom Renovation | 1,800 |
| Interior Painting | 1,150 |
| LVT Flooring | 2,100 |
| Carpeting | 500 |
| Hardware / Outlets | 550 |
| Blinds | 140 |
| Lighting | 1,200 |
| Doors | 450 |
| Air Conditioner | 450 |
| Demo / Repairs | 860 |
| **Total per Unit** | **$15,000** |

**Error! Unknown document property name.**
4893-8949-7115.6

**EXHIBIT H**

**EXIT FEE**

1% of proposed Agency Financing

**SCHEDULE 3.17**

**CHIEF EXECUTIVE OFFICE AND PRINCIPAL PLACE OF BUSINESS**

Chief Executive Office 475 Oberlin Avenue South, Suite 211, Lakewood, New Jersey 08701

Principal Place of Business: 475 Oberlin Avenue South, Suite 211, Lakewood, New Jersey 08701

**SCHEDULE 3.21**
**ORGANIZATIONAL CHART**

[Attached]



128604795.2

**SCHEDULE 3.23**

**CARES ACT OBLIGATIONS**

None.

## SCHEDULE 4.28

## POST-CLOSING COVENANTS

As soon as practicable and in any event within thirty (30) days following the Closing Date, at Borrower's sole cost and expense, Agent shall receive copies of such UCC and real property lien searches as Agent and/or Lender shall determine to be necessary to evidence the perfection and first-priority nature of the security interests granted to Lender pursuant to the Loan Documents.

As soon as practicable and in any event within sixty (60) days following the Closing Date, Agent shall receive the completed and executed Permanent Financing Contract, which shall be in form and substance satisfactory to Agent and Lender in all respects.

EFiled:  Jun 21 2024 02:23PM EDT
Transaction ID 73455797
Case No. N24C-06-188 FWW

# **Exhibit C**

## <u>FIRST AMENDMENT TO LOAN AGREEMENT</u>

THIS FIRST AMENDMENT TO LOAN AGREEMENT (this "<u>Amendment</u>") is made as of February 28, 2023, by and among **CRANSTON APARTMENTS LLC**, a Delaware limited liability company, having its principal office at 475 Oberlin Avenue South, Suite 211, Lakewood, New Jersey 08701 (together with its successors and assigns, "<u>Borrower</u>"), and **CAPITAL FUNDING, LLC**, a Maryland limited liability company, having its principal offices at 1422 Clarkview Road, Baltimore, Maryland 21209 (together with its successors and assigns, individually as a "<u>Lender</u>" and as "<u>Agent</u>").

RECITALS:

A.      Pursuant to that certain Loan Agreement between Borrower, Agent, and Lender dated as of April 27, 2022 (as the same has been and may be amended, restated, supplemented or otherwise modified from time to time, the "<u>Loan Agreement</u>") Lender agreed to make available to Borrower a loan in the original maximum principal amount of TWENTY ONE MILLION FIFTY THOUSAND AND NO/100 DOLLARS ($21,050,000.00) (the "<u>Loan</u>"). Capitalized terms used but not defined in this Amendment shall have the meanings set forth in the Loan Agreement.

B.      Borrower has requested that Lender increase the Loan to TWENTY TWO MILLION SEVEN HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($22,750,000.00).

C.      Agent and Lender have agreed to: (i) increase the Loan to Twenty Two Million Seven Hundred Fifty Thousand and No/100 Dollars ($22,750,000.00), and (ii) make certain other amendments to the Loan Agreement, all on the terms and conditions set forth herein.

**NOW, THEREFORE,** in consideration of the foregoing, the terms and conditions set forth in this Amendment, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Agent, Lender, and Borrower hereby agree as follows:

1.      <u>**Recitals.**</u> The above statement of facts set forth in the Recitals is true and correct, and the Recitals are hereby incorporated herein as an agreement of Borrower, Agent, and Lender.

2.      <u>**Fees**</u>.  On or before the date of this Amendment, Borrower shall have paid to Agent, for the benefit of the Lender, an origination fee in an amount equal to one percent (1.00%) of the amount of the increase in the Loan (i.e., 1.00% of $1,700,000.00) ("<u>Origination Fee</u>"); and Borrower shall have paid or reimbursed Agent for the fees and costs of Agent's counsel and all other third party out of pocket expenses incurred in connection with the Loan increase. The Origination Fee shall be deemed to be fully earned upon the date hereof, and shall be non-refundable upon payment. The Origination Fee shall be due and payable on the date hereof.

**3.**      **Amendments to Loan Agreement.**

(a)      Recitals. The first paragraph in the Recitals of the Loan Agreement is hereby deleted in its entirety and replaced with the following:

"Borrower has requested that Lender make a term loan to Borrower in the aggregate principal sum of up to TWENTY TWO MILLION SEVEN HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($22,750,000.00) (the "Loan") for the purpose of financing the Borrower's acquisition of and financing capital expenditures at the Property (as hereinafter defined) and funding certain reserves and to pay closing costs and fees."

(b)      Section 1.1 Definitions.  The following definitions set forth in the Loan Agreement are hereby deleted in their entireties and replaced with the following:

"Loan Commitment" means the obligation hereunder of Lender to make a term loan in the original principal amount of up to $22,750,000.00.

"Margin" means, through December 31, 2023, two hundred ninety five (295) basis points (i.e., 2.95 percentage points), and after December 31, 2023, three hundred ninety five (395) basis points (i.e., 3.95 percentage points).

(c)      Section 2.1(a). Section 2.1(a) is hereby deleted in its entirety and replaced with the following:

"Loan.  On the Closing Date, Lender made a Loan to Borrower in the amount of $21,050,000. On February 28, 2023, Lender increased the amount of the Loan by $1,700,000 to further fund capital expenditures, resulting in a total Loan amount of $22,750,000. The proceeds of the Loan shall continue to be used to finance the acquisition of the Property and the Project, and to finance capital expenditures at the Property and the Project and to fund certain reserves and pay closing costs and fees."

(d)      Section 2.1(b)(ii). The following sentence is added to the end of Section 2.1(b)(ii):

"Notwithstanding the foregoing, the interest rate reduction for the remainder of the year 2023 (see definition of Margin, above) of 100 basis points (i.e., 1.00 percentage points) is to be classified as a deference of interest, the value of which shall be paid by Borrower to Lender on December 31, 2023."

(e)      Section 4.12(a)(ii)  Debt Service Coverage Ratio.  Section 4.12(a)(ii) is hereby deleted in its entirety and replaced with the following:

"'Debt Service Coverage Ratio' means the ratio for the applicable period in which: the numerator is the Net Operating Income for such period; and the denominator is the Debt Service due and payable for such period."

(f)      Section 4.12(a)(v) Minimum Debt Service Coverage Ratio.  The definition of Minimum Debt Service Coverage Ratio is hereby deleted in its entirety and replaced with the following:

"'<u>Minimum Debt Service Coverage Ratio</u>' means a Debt Service Coverage Ratio of not less than (i) 1.00:1.00 for the Test Periods ending on June 30, 2023 and September 30, 2023; (ii) 1.05:1.00 for the Test Period ending on December 31, 2023; and (iii) 1.10:1.00 for the ending of each Test Period thereafter."

     (g)    Section 4.12(a)(vi) Net Operating Income.  Section 4.12(a)(vi) is hereby deleted in its entirety and replaced with the following:

"'<u>Net Operating Income</u>' means Net Income of Borrower before depreciation, amortization and interest expense, all calculated on a monthly basis in accordance with GAAP consistently applied.  'Net Income' means the sum of Gross Income from Operations minus Operating Expenses."

     (h)    The definition of "Operating Expenses" is deleted in its entirety and replaced as set forth in the following, which shall be added as a new Section 4.12(a)(viii):

"'<u>Operating Expenses</u>' means the total of all expenditures of whatever kind relating to the operation, maintenance and management of the Property and the Project that are incurred on a regular monthly or other periodic basis, including without limitation, utilities, ordinary repairs and maintenance, insurance, license fees, taxes and assessments, advertising expenses, management fees not to exceed three percent (3%) of Gross Income from Operations (or such greater amount as Agent may consent to in its sole discretion), administrative service fees, professional fees, payroll and related taxes, computer processing charges, operational, equipment or other lease payments as approved by Agent, and other similar costs, but excluding depreciation, Debt Service, and capital expenditures, all calculated on a monthly basis in accordance with GAAP consistently applied."

     (i)    <u>Section 4.12(b)(i)(A) Debt Service Coverage Ratio</u>.  Section 4.12(b)(i)(A) is hereby deleted in its entirety and replaced with the following:

"(A)    <u>Debt Service Coverage Ratio</u>.  Borrower shall achieve and maintain compliance with the Minimum Debt Service Coverage Ratio, tested quarterly beginning with the period ending June 30, 2023, as follows: (1) for the Test Period ending June 30, 2023, on a trailing three (3) month basis; (2) for the Test Period ending September 30, 2023, on a trailing six (6) month basis; (3) for the Test Period ending December 31, 2023, on a trailing nine (9) month basis; and (4) for all other Test Periods thereafter, on a trailing twelve (12) month basis."

     (j)    <u>Exhibit G</u>. Exhibit G to the Loan Agreement is hereby deleted in its entirety and replaced with Exhibit G attached hereto.

     (k)    <u>Exhibit H</u>.  Exhibit H to the Loan Agreement is hereby deleted in its entirety and replaced with Exhibit H attached hereto.

     **4.**    **Reaffirmation of Loan.** Borrower reaffirms its obligations under the Loan Documents, and Borrower acknowledges that it has no claims against Agent or any Lender, or any offsets or defenses with respect to the payment of any sums due under the Note or any other Loan Document, or with respect to the enforcement of the Loan Documents.

**5.**    **Confirmation of Representations and Warranties.** Borrower hereby (a) confirms that all of the representations and warranties set forth in the Loan Agreement are true and correct, except to the extent any representation or warranty relates to a specific date in which case such representation or warranty shall be true and correct as of such earlier date, (b) covenants to perform its obligations under the Loan Agreement and all other Loan Documents, (c) grants to, and ratified, reaffirms, confirms and approves its prior grant to Agent and Lenders, of a continuing first priority Lien on and security interest in, upon and to the Collateral, (d) confirms that all Collateral remains free and clear of any Liens other than those granted to Agent and Lenders and Permitted Encumbrances, and (e) specifically represents and warrants to Agent and Lenders that it has good and marketable title to all of its respective Collateral, free and clear of any lien or security interest in favor of any other Person (other than Permitted Encumbrances). Borrower hereby confirms (i) as of the date hereof, the Loan Agreement and the Loan Documents and security interests and Liens created thereby are in full force and effect, and (ii) no Default or Event of Default has occurred or is continuing under the Loan Agreement or any other Loan Document. Borrower further represents and warrants that (1) the execution, delivery and performance of this Amendment and the other Loan Documents required to be delivered herewith have been duly authorized by all necessary action, (2) it has duly executed and delivered this Amendment and the other Loan Documents to which it is a party, and (3) each of this Amendment, the Loan Agreement and the Loan Documents is a legal, valid and binding obligation of such Person, enforceable against such Person in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings at law or in equity).

**6.**    **Conditions to Effectiveness.** This Amendment shall become effective as of the date on which each of the following conditions has been satisfied (the "Effective Date"):

(a)    Borrower shall have executed and delivered to Agent this Amendment, duly executed by an authorized officer of Borrower;

(b)    Borrower shall have executed and delivered to Agent the Amended and Restated Promissory Note;

(c)    Borrower shall have executed and delivered to Agent the First Modification to Mortgage, Security Agreement, Assignment of Leases and Rents, Financing Statement and Fixture Filing;

(d)    Borrower shall have caused each of Menachem Tress and Elimelech Tress to execute and deliver to Agent the (i) Amended and Restated Limited Guaranty, and (ii) Guaranty of Completion;

(e)    Borrower shall have executed and caused each of Menachem Tress and Elimelech Tress to execute and deliver to Agent the Amended and Restated Environmental Indemnity Agreement;

(f)    Borrower shall have paid to Agent all fees referenced in Section 2 above, except the SOFR PIK fee, which is due and payable on December 31, 2023;

(g)    Borrower shall have executed and delivered all other loan documents requested by Agent in connection with this Amendment.

**7.**        **Reference to the Effect on the Loan Agreement.**  Upon the effectiveness of this Amendment, each reference in the Loan Agreement to "this Agreement," "hereunder," "hereof," "herein" or words of similar import shall mean and be a reference to the Loan Agreement as modified by this Amendment. Nothing herein is intended to impair or limit the validity, priority or extent of Agent's and each Lender's security interests in and Liens upon the Collateral.

**8.**        **Affirmation.**  Except as specifically modified pursuant to the terms hereof, the Loan Agreement, and all other Loan Documents (and all covenants, terms, conditions and agreements therein), shall remain in full force and effect, and are hereby ratified and confirmed in all respects by Borrower. Borrower covenants and agrees to comply with all of the terms, covenants and conditions of the Loan Documents, as modified hereby, notwithstanding any prior course of conduct, waivers, releases or other actions or inactions on Agent's and/or Lender's part which might otherwise constitute or be construed as a waiver of or amendment to such terms, covenants and conditions.

**9.**        **No Waiver or Novation.** The execution, delivery and effectiveness of this Amendment shall not, except as expressly provided in this Amendment, operate as a waiver of any right, power or remedy of Agent, Lender, nor constitute a waiver of any provision of the Loan Agreement, the Loan Documents or any other documents, instruments and agreements executed or delivered in connection with any of the foregoing. Nothing herein is intended or shall be construed as a waiver of any existing defaults or Events of Default under the Loan Agreement or other Loan Documents or any of Agent's or any Lender's rights and remedies in respect of such defaults or Events of Default, except as expressly set forth herein. This Amendment (together with any other document executed in connection herewith) is not intended to be, nor shall it be construed as, a novation of the Loan Agreement or any of the other Loan Documents. This Amendment cannot be amended without the prior written consent of Agent and Lenders.

**10.**        **Loan Document.** The parties acknowledge and agree that this Amendment and all agreements and instruments delivered to Agent and Lenders in connection herewith shall each constitute a "Loan Document" under the Loan Agreement and the other Loan Documents.

**11.        GOVERNING LAW. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF MARYLAND, WITHOUT REFERENCE TO THE CONFLICTS OR CHOICE OF LAW PRINCIPLES THEREOF.**

**12.**        **Headings.** Section headings in this Amendment are included for convenience of reference only and shall not constitute a part of this Amendment for any other purpose.

**13.**        **Counterparts.** This Amendment may be executed in counterparts, and all counterparts taken together shall be deemed to constitute one and the same instrument.

**(SIGNATURES APPEAR ON FOLLOWING PAGES)**

**BORROWER:**

**CRANSTON APARTMENTS LLC,**
a Delaware limited liability company

By: _____
Name: Elimelech Tress
Title: Authorized Signatory

[Signature Page to First Amendment to Loan Agreement]

**AGENT:**

**CAPITAL FUNDING, LLC,**
a Maryland limited liability company

By:
Name:
Title:      Jennifer M. Loucks
            Vice President

**LENDER:**

**CAPITAL FUNDING, LLC,**
a Maryland limited liability company

By:
Name:
Title:      Jennifer M. Loucks
            Vice President

[Signature Page to First Amendment to Loan Agreement]

4883-3503-8545.2

## EXHIBIT G

| FACILITY NAME (Abbreviated) | MONTHLY TAXES | MONTHLY INSURANCE | Replacement Cost | Capital Expenditures |
|---|---|---|---|---|
| **Cranston** | $7,688.33 | $4,704.46 | $250/Unit/Year | $2,350,000 |

## CapEx Assumptions

| Cost per Unit | 15,000 | | General CapEx | | | |
|---|---|---|---|---|---|---|
| Total Units | 161 | | Pool | | 50,000 | |
| | | | Pool House | | 50,000 | |
| | | | Exterior Upgrade & remodeling | | 200,000 | |
| | | | Hallway Upgrades | | 100,000 | |
| | | | Total | | 400,000 | |

| | | Units | Unit Rehab Cost | % of General CapEx | General CapEx Cost | Total Cost |
|---|---|---|---|---|---|---|
| Year 1 | 25% | 40 | 603,750 | 50% | 200,000 | 803,750 |
| Year 2 | 25% | 40 | 603,750 | 50% | 200,000 | 803,750 |
| Year 3 | 25% | 40 | 603,750 | 0% | 0 | 603,750 |
| Year 4 | 20% | 32 | 483,000 | 0% | 0 | 483,000 |
| Year 5 | 5% | 8 | 120,750 | 0% | 0 | 120,750 |
| Total | 100% | 160 | 2,415,000 | 100% | 400,000 | 2,815,000 |

| Item | Cost |
|---|---|
| Kitchen Renovation | 5,800 |
| BathroomRenovation | 1,800 |
| Interior Painting | 1,150 |
| LVT Flooring | 2,100 |
| Carpeting | 500 |
| Hardware / Outlets | 550 |
| Blinds | 140 |
| Lighting | 1,200 |
| Doors | 450 |
| Air Conditioner | 450 |
| Demo / Repairs | 860 |
| **Total per Unit** | **$15,000** |

**EXHIBIT H**

**EXIT FEE**

1% of proposed Agency Financing.

0.25% SOFR deference fee on the $22,750,000 Loan.

EFiled:  Jun 21 2024 02:23PM EDT
Transaction ID 73455797
Case No. N24C-06-188 FWW

# **Exhibit D**

# PROMISSORY NOTE

$21,050,000.00                                                    Baltimore, Maryland
                                                                 April 27, 2022

**FOR VALUE RECEIVED**, CRANSTON APARTMENTS LLC, a Delaware limited liability company (together with its successors and assigns, the "<u>Borrower</u>"), hereby unconditionally promises to pay to the order of CAPITAL FUNDING, LLC, a Maryland limited liability company (together with its successors and assigns, "<u>Lender</u>"), at the office of Agent (as defined herein) at 1422 Clarkview Road, Baltimore, Maryland 21209, or at such other place as Agent may from time to time designate in writing, in lawful money of the United States of America and in immediately available funds, in the principal sum of TWENTY-ONE MILLION FIFTY THOUSAND AND NO/100 DOLLARS ($21,050,000.00) pursuant to the terms of that certain Loan Agreement dated as of the date hereof (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Loan Agreement</u>"), by and among Borrower, various financial institutions as are, or may from time to time become, parties thereto as lenders and Capital Funding, LLC, individually as a lender (collectively or individually as the context may require, referred to herein as "<u>Lender</u>" or "<u>Lenders</u>"), and as agent for the Lenders (in such capacity and together with its successors and assigns, "<u>Agent</u>"). All capitalized terms used herein (which are not otherwise specifically defined herein) shall be as defined in the Loan Agreement.

The outstanding principal balance of the Loan evidenced by this Promissory Note (as amended, restated, supplemented or otherwise modified from time to time, this "<u>Note</u>") shall be payable in full on the Maturity Date, or on such earlier date as provided for in the Loan Agreement.

This Note is issued in accordance with the provisions of the Loan Agreement and is entitled to the benefits and security of the Loan Agreement and the other Loan Documents, and reference is hereby made to the Loan Agreement for a statement of the terms and conditions under which the Loan evidenced hereby was made and is required to be repaid.

Borrower promises to pay principal and interest from the date hereof until payment in full hereof on the unpaid principal balance of the Loan evidenced hereby at the per annum rate or rates set forth in the Loan Agreement. Interest on the unpaid principal balance of the Loan evidenced hereby shall be payable on the dates and in the manner set forth in the Loan Agreement. Interest as aforesaid shall be calculated in accordance with the terms of the Loan Agreement. All payments of principal and interest shall be made in U.S. dollars in immediately available funds and as specified in the Loan Agreement.

Upon and after the occurrence of an Event of Default, and as provided in the Loan Agreement, the Loan evidenced by this Note may be declared, and immediately shall become, due and payable without demand, notice or legal process of any kind; *provided, however*, that upon the occurrence of an Event of Default pursuant to the provisions of <u>Section 8.1(g)</u> of the Loan Agreement, the Loan evidenced by this Note shall automatically be due and payable, without demand, notice or acceleration of any kind whatsoever.

Payments received in respect of the Loan shall be applied as provided in the Loan Agreement.

This Note is secured by, among other things, liens on and security interests in certain property of Borrower that have been granted to the Agent pursuant to the Loan Documents. Reference is hereby made to the Loan Documents for a description of the Collateral securing this Note, the terms and conditions upon which such liens and security interests were granted and the rights of the holder of this Note in respect thereof.

Presentment, demand, protest and notice of presentment, demand, nonpayment and protest are each hereby waived by Borrower.

No waiver by Agent or any Lender of any one or more defaults by the undersigned in the performance of any of its obligations under this Note shall operate or be construed as a waiver of any future default or defaults, whether of a like or different nature, or as a waiver of any obligation of Borrower to any other lender under the Loan Agreement.

No provision of this Note may be amended, waived or otherwise modified unless such amendment, waiver or other modification is in writing and is signed or otherwise approved by Borrower, the Required Lenders and any other lender under the Loan Agreement to the extent required under the Loan Agreement.

**THIS NOTE AND EACH OTHER LOAN DOCUMENT, AND ALL MATTERS RELATING HERETO OR THERETO OR ARISING THEREFROM (WHETHER SOUNDING IN CONTRACT LAW, TORT LAW OR OTHERWISE), SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF MARYLAND, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES. BORROWER HEREBY CONSENTS TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN BALTIMORE COUNTY, STATE OF MARYLAND, AND IRREVOCABLY AGREES THAT, SUBJECT TO AGENT'S ELECTION, ALL ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS NOTE OR THE OTHER LOAN DOCUMENTS SHALL BE LITIGATED IN SUCH COURTS. BORROWER EXPRESSLY SUBMITS AND CONSENTS TO THE JURISDICTION OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS. BORROWER HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE UPON BORROWER BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO BORROWER AT THE ADDRESS SET FORTH IN THIS NOTE AND SERVICE SO MADE SHALL BE COMPLETE TEN (10) DAYS AFTER THE SAME HAS BEEN POSTED.**

**BORROWER HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. BORROWER ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO AGENT AND LENDER TO ENTER INTO A BUSINESS RELATIONSHIP, THAT LENDER HAS RELIED ON THE WAIVER IN ENTERING INTO THE LOAN AGREEMENT AND THE OTHER LOAN DOCUMENTS, AND THAT LENDER WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS WITH BORROWER. BORROWER WARRANTS AND REPRESENTS THAT IT HAS HAD THE OPPORTUNITY OF REVIEWING THIS JURY WAIVER WITH LEGAL COUNSEL, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS.**

Upon the occurrence of an Event of Default, the Borrower hereby authorizes any attorney designated by the Lender or any clerk of any court of record to appear for the Borrower in any court of record and confess judgment without prior hearing against the Borrower in favor of the Lender for and in the amount of the unpaid Principal Sum, all interest accrued and unpaid thereon, all other amounts payable by the Borrower to the Lender under the terms of this Note or any of the other Loan Documents, costs of suit, and attorneys' fees of fifteen percent (15%) of the unpaid Principal Sum and interest then due hereunder. By its acceptance of this Note, the Lender agrees that in the event the Lender exercises at any time its right to confess judgment under this Note, the Lender shall use its best efforts to obtain legal counsel

who will charge the Lender for its services on an hourly basis, at its customary hourly rates and only for the time and reasonable expenses incurred.  In no event shall the Lender enforce the legal fees portion of a confessed judgment award for an amount in excess of the fees and expenses actually charged to the Lender for services rendered by its counsel in connection with such confession of judgment and/or the collection of sums owed to the Lender.  In the event the Lender receives, through execution upon a confessed judgment, payments on account of attorneys' fees in excess of such actual attorneys' fees and expenses incurred by the Lender, then, after full repayment and satisfaction of all of the obligations under and in connection with this Note, the Loan Agreement and all of the other Loan Documents, the Lender shall refund such excess amount to the Borrower.  The Borrower hereby releases, to the extent permitted by applicable law, all errors and all rights of exemption, appeal, stay of execution, inquisition, and other rights to which the Borrower may otherwise be entitled under the laws of the United States of America or of any state or possession of the United States of America now in force or which may hereafter be enacted.  The authority and power to appear for and enter judgment against the Borrower shall not be exhausted by one or more exercises thereof or by any imperfect exercise thereof and shall not be extinguished by any judgment entered pursuant thereto.  Such authority may be exercised on one or more occasions or from time to time in the same or different jurisdictions as often as the Lender shall deem necessary or desirable, for all of which this Note shall be a sufficient warrant.

Whenever possible each provision of this Note shall be interpreted in such manner as to be effective and valid under applicable law, but in case any provision of or obligation under this Note shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

Whenever in this Note reference is made to Agent, Lender or Borrower, such reference shall be deemed to include, as applicable, a reference to their respective successors and assigns.  The provisions of this Note shall be binding upon Borrower and its successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.  If more than one person or entity executes this Note as Borrower, all of said parties shall be jointly and severally liable for payment of the indebtedness evidenced hereby.

In addition to and without limitation of any of the foregoing, this Note shall be deemed to be a Loan Document and shall otherwise be subject to all of general terms and conditions contained in the Loan Agreement, *mutatis mutandis*.

*(Signatures Appear on Following Page)*

IN WITNESS WHEREOF, intending to be legally bound, and intending that this Note constitute an agreement executed under seal, the undersigned have executed this Note under seal as of the day and year first hereinabove set forth.

**BORROWER:**

**CRANSTON APARTMENTS LLC**
a Delaware limited liability company

By: _____ (SEAL)
Name: Elimelech Tress
Title:  Authorized Signatory

[Signature Page to Promissory Note]

EFiled:  Jun 21 2024 02:23PM EDT
Transaction ID 73455797
Case No. N24C-06-188 FWW

# **Exhibit E**

## AMENDED AND RESTATED PROMISSORY NOTE

$22,750,000.00

Baltimore, Maryland
February 28, 2023

**FOR VALUE RECEIVED**, CRANSTON APARTMENTS LLC, a Delaware limited liability company (together with its successors and assigns, the "Borrower"), hereby unconditionally promises to pay to the order of CAPITAL FUNDING, LLC, a Maryland limited liability company (together with its successors and assigns, "Lender"), at the office of Agent (as defined herein) at 1422 Clarkview Road, Baltimore, Maryland 21209, or at such other place as Agent may from time to time designate in writing, in lawful money of the United States of America and in immediately available funds, in the principal sum of TWENTY TWO MILLION SEVEN HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($22,750,000.00) pursuant to the terms of that certain Loan Agreement dated as of April 27, 2022 ("Original Loan Agreement"), as amended by that certain First Amendment to Loan Agreement dated of even date herewith (the "First Amendment"; and collectively with the Original Loan Agreement, the "Loan Agreement"), by and among Borrower, various financial institutions as are, or may from time to time become, parties thereto as lenders and Capital Funding, LLC, individually as a lender (collectively or individually as the context may require, referred to herein as "Lender" or "Lenders"), and as agent for the Lenders (in such capacity and together with its successors and assigns, "Agent"). This Amended and Restated Promissory Note (this "Note") amends, restates, replaces in its entirety, and is in substitution for, the Promissory Note dated as of April 27, 2022 made by Borrower payable to the order of Lender in the original principal amount of Twenty One Million Fifty Thousand and No/100 Dollars ($21,050,000.00) (the "Original Note"). The indebtedness evidenced by the Original Note is continuing indebtedness of Borrower, and nothing herein shall be deemed to constitute a payment, settlement or novation of the Original Note or the indebtedness evidenced thereunder, or to release or otherwise adversely affect any lien, mortgage or security interest securing such indebtedness or any rights of the Lender against any party primarily or secondarily liable for such indebtedness.  The Original Note shall be of no further force and effect upon the execution of this Note.  All capitalized terms used herein (which are not otherwise specifically defined herein) shall be as defined in the Loan Agreement.

The outstanding principal balance of the Loan evidenced by this Note shall be payable in full on the Maturity Date, or on such earlier date as provided for in the Loan Agreement.

This Note is issued in accordance with the provisions of the Loan Agreement and is entitled to the benefits and security of the Loan Agreement and the other Loan Documents, and reference is hereby made to the Loan Agreement for a statement of the terms and conditions under which the Loan evidenced hereby was made and is required to be repaid.

Borrower promises to pay principal and interest from the date hereof until payment in full hereof on the unpaid principal balance of the Loan evidenced hereby at the per annum rate or rates set forth in the Loan Agreement.  Interest on the unpaid principal balance of the Loan evidenced hereby shall be payable on the dates and in the manner set forth in the Loan Agreement.  Interest as aforesaid shall be calculated in accordance with the terms of the Loan Agreement.  All payments of principal and interest shall be made in U.S. dollars in immediately available funds and as specified in the Loan Agreement.

Upon and after the occurrence of an Event of Default, and as provided in the Loan Agreement, the Loan evidenced by this Note may be declared, and immediately shall become, due and payable without demand, notice or legal process of any kind; *provided, however*, that upon the occurrence of an Event of Default pursuant to the provisions of Section 8.1(g) of the Loan Agreement, the Loan evidenced by this Note shall automatically be due and payable, without demand, notice or acceleration of any kind whatsoever.

4860-0379-9121.2

Note shall automatically be due and payable, without demand, notice or acceleration of any kind whatsoever.

Payments received in respect of the Loan shall be applied as provided in the Loan Agreement.

This Note is secured by, among other things, liens on and security interests in certain property of Borrower that have been granted to the Agent pursuant to the Loan Documents.  Reference is hereby made to the Loan Documents for a description of the Collateral securing this Note, the terms and conditions upon which such liens and security interests were granted and the rights of the holder of this Note in respect thereof.

Presentment, demand, protest and notice of presentment, demand, nonpayment and protest are each hereby waived by Borrower.

No waiver by Agent or any Lender of any one or more defaults by the undersigned in the performance of any of its obligations under this Note shall operate or be construed as a waiver of any future default or defaults, whether of a like or different nature, or as a waiver of any obligation of Borrower to any other lender under the Loan Agreement.

No provision of this Note may be amended, waived or otherwise modified unless such amendment, waiver or other modification is in writing and is signed or otherwise approved by Borrower, the Required Lenders and any other lender under the Loan Agreement to the extent required under the Loan Agreement.

**THIS NOTE AND EACH OTHER LOAN DOCUMENT, AND ALL MATTERS RELATING HERETO OR THERETO OR ARISING THEREFROM (WHETHER SOUNDING IN CONTRACT LAW, TORT LAW OR OTHERWISE), SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF MARYLAND, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.  BORROWER HEREBY CONSENTS TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN BALTIMORE COUNTY, STATE OF MARYLAND, AND IRREVOCABLY AGREES THAT, SUBJECT TO AGENT'S ELECTION, ALL ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS NOTE OR THE OTHER LOAN DOCUMENTS SHALL BE LITIGATED IN SUCH COURTS.  BORROWER EXPRESSLY SUBMITS AND CONSENTS TO THE JURISDICTION OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS.  BORROWER HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE UPON BORROWER BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO BORROWER AT THE ADDRESS SET FORTH IN THIS NOTE AND SERVICE SO MADE SHALL BE COMPLETE TEN (10) DAYS AFTER THE SAME HAS BEEN POSTED.**

**BORROWER HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.  BORROWER ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO AGENT AND LENDER TO ENTER INTO A BUSINESS RELATIONSHIP, THAT LENDER HAS RELIED ON THE WAIVER IN ENTERING INTO THE LOAN AGREEMENT AND THE OTHER LOAN DOCUMENTS, AND THAT LENDER WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS WITH BORROWER.  BORROWER WARRANTS AND REPRESENTS THAT IT HAS HAD THE**

**OPPORTUNITY OF REVIEWING THIS JURY WAIVER WITH LEGAL COUNSEL, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS.**

Upon the occurrence of an Event of Default, the Borrower hereby authorizes any attorney designated by the Lender or any clerk of any court of record to appear for the Borrower in any court of record and confess judgment without prior hearing against the Borrower in favor of the Lender for and in the amount of the unpaid Principal Sum, all interest accrued and unpaid thereon, all other amounts payable by the Borrower to the Lender under the terms of this Note or any of the other Loan Documents, costs of suit, and attorneys' fees of fifteen percent (15%) of the unpaid Principal Sum and interest then due hereunder.  By its acceptance of this Note, the Lender agrees that in the event the Lender exercises at any time its right to confess judgment under this Note, the Lender shall use its best efforts to obtain legal counsel who will charge the Lender for its services on an hourly basis, at its customary hourly rates and only for the time and reasonable expenses incurred.  In no event shall the Lender enforce the legal fees portion of a confessed judgment award for an amount in excess of the fees and expenses actually charged to the Lender for services rendered by its counsel in connection with such confession of judgment and/or the collection of sums owed to the Lender.  In the event the Lender receives, through execution upon a confessed judgment, payments on account of attorneys' fees in excess of such actual attorneys' fees and expenses incurred by the Lender, then, after full repayment and satisfaction of all of the obligations under and in connection with this Note, the Loan Agreement and all of the other Loan Documents, the Lender shall refund such excess amount to the Borrower.  The Borrower hereby releases, to the extent permitted by applicable law, all errors and all rights of exemption, appeal, stay of execution, inquisition, and other rights to which the Borrower may otherwise be entitled under the laws of the United States of America or of any state or possession of the United States of America now in force or which may hereafter be enacted.  The authority and power to appear for and enter judgment against the Borrower shall not be exhausted by one or more exercises thereof or by any imperfect exercise thereof and shall not be extinguished by any judgment entered pursuant thereto.  Such authority may be exercised on one or more occasions or from time to time in the same or different jurisdictions as often as the Lender shall deem necessary or desirable, for all of which this Note shall be a sufficient warrant.

Whenever possible each provision of this Note shall be interpreted in such manner as to be effective and valid under applicable law, but in case any provision of or obligation under this Note shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

Whenever in this Note reference is made to Agent, Lender or Borrower, such reference shall be deemed to include, as applicable, a reference to their respective successors and assigns.  The provisions of this Note shall be binding upon Borrower and its successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.  If more than one person or entity executes this Note as Borrower, all of said parties shall be jointly and severally liable for payment of the indebtedness evidenced hereby.

In addition to and without limitation of any of the foregoing, this Note shall be deemed to be a Loan Document and shall otherwise be subject to all of general terms and conditions contained in the Loan Agreement, *mutatis mutandis.*

*(Signatures Appear on Following Page)*

4860-0379-9121.2

IN WITNESS WHEREOF, intending to be legally bound, and intending that this Note constitute an agreement executed under seal, the undersigned have executed this Note under seal as of the day and year first hereinabove set forth.

**BORROWER:**

**CRANSTON APARTMENTS LLC**
a Delaware limited liability company

By: _____ (SEAL)
Name: Elimelech Tress
Title:   Authorized Signatory

[Signature Page to Amended and Restated Promissory Note]

4860-0379-9121.2

EFiled:  Jun 21 2024 02:23PM EDT
Transaction ID 73455797
Case No. N24C-06-188 FWW

# **Exhibit F**



**20220519-0053480**
P: 1 of 12   F:$192.00
5/19/2022 10:58:31 AM
Michael E. Kozikowski      T20220028511
New Castle Recorder                    MISC

**Tax Parcel Numbers:**
07-037.40-152,
07-037.40-151,
07-037.40-150,
07-037.40-149

**Prepared By:**
Nixon Peabody LLP
Tower 46, 55 West 46th Street
New York, New York 10036
Attn: Laura Mehl Sugarman, Esq.

**Return To:**
Capital Funding, LLC
1422 Clarkview Road
Baltimore, MD 21209
Attn: Stephanie Jenifer

## ASSIGNMENT OF RENTS AND LEASES

CRANSTON APARTMENTS LLC
a Delaware limited liability company
(as Assignor)

CAPITAL FUNDING, LLC
a Maryland limited liability company
(as Assignee)

Dated: April 27, 2022

3310 and 3314 Old Capitol Trail
Wilmington, Delaware 19808

12

4882-8755-5354.2

## ASSIGNMENT OF RENTS AND LEASES

THIS ASSIGNMENT OF RENTS AND LEASES (the "Assignment") is made as of APR by and between CRANSTON APARTMENTS LLC, having its principal office at 475 Oberlin Avenue South, Suite 211, Lakewood, New Jersey 08701 (together with its successors and assigns, the "Assignor"), and CAPITAL FUNDING, LLC, a Maryland limited liability company, having its principal office at 1422 Clarkview Road, Baltimore, Maryland 21209 (together with its successors and assigns, the "Agent"), in its capacity as administrative agent for the Lenders (as hereinafter defined). All capitalized terms not defined herein shall have the respective meanings set forth in the Loan Agreement (as hereinafter defined).

### RECITALS

This Assignment is made as additional security for a loan by Lenders to, among others, Assignor in the principal amount of $21,050,000.00 (the "Loan") which Loan is made pursuant to a Loan Agreement dated of even date herewith among the Assignor, Agent and other financial institutions who are or hereafter become parties to the Loan Agreement (together with Agent, collectively or individually, as the context may require, referred to herein as a "Lender" or collectively as the "Lenders") (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "Loan Agreement"), and evidenced by that certain Promissory Note, dated of even date herewith made by the Assignor, as maker, in favor of the Lenders in the principal amount of the Loan (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "Note"), and secured by, among other things, that certain [Mortgage/Deed of Trust] and Security Agreement dated of even date herewith from Assignor in favor of Agent, for the benefit of the Lenders (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "Security Instrument") as security for certain other Loan Obligations (as defined in the Loan Agreement). The Loan is secured in part by the real property in the City of Wilmington, County of New Castle, State of Delaware, as more particularly described on Exhibit A attached hereto, and the improvements and certain personal property now or hereafter located thereon (collectively, the "Property").

Definitions. All capitalized terms not defined herein shall have the respective meanings set forth in the Loan Agreement.

### GRANTING CLAUSES

In consideration of the sum of Ten and no/100 Dollars ($10.00) and other good and valuable consideration and to secure the payment of the Note and any and all renewals, extensions, modifications, and replacements thereof, and to assure performance of the agreements contained herein and in the Loan Documents, Assignor hereby absolutely and unconditionally assigns to Agent for the benefit of the Lenders all of Assignor's right, title and interest in and to the following:

All leases, subleases, licenses, residency agreements, occupancy agreements and other agreements for the use or occupancy of all or any part of the Property made or agreed to by, any person or entity and any and all amendments, extensions, renewals, modifications and replacements thereof pertaining to all or any part of the Property, or any possessory interest therein, whether such leases or other agreements are oral or written or have been heretofore or are hereafter

4882-8755-5354.2

made or agreed to, together with all options therefor, amendments thereto and renewals, modifications and guarantees thereof (such leases and other use and occupancy agreements being collectively referred to herein as the "Leases");

The rents, issues and profits, and any other payments by any and all lessees under the Leases in addition to rent, including, without limitation, any cash or securities deposited thereunder to secure performance by the lessees of their obligations, whether such cash or securities are to be held until the expiration of the terms of the applicable agreements or applied to one or more of the installments of rent coming due (collectively, the "Rents") which may hereafter become due pursuant to any of the Leases pertaining to all or any part of the Property;

Any and all moneys, awards or other payments made or payable by any and all lessees under the Leases in lieu of rent, including, but not limited to, any damages (all such moneys, awards or payments, including, but not limited to, damages, are collectively referred to herein as the "Damages") which may hereafter become due pursuant to any of the Leases pertaining to all or any part of the Property;

Any and all guaranties (collectively, the "Guaranties") of any of the Leases, and the rights, powers, privileges, and other benefits of Assignor under the Guaranties;

All rights, powers, privileges, options and other benefits (collectively the "Rights") of Assignor under the Leases, including without limitation all of the following:

the immediate and continuing right to receive and collect all insurance proceeds, condemnation awards, moneys and security deposits or the like pursuant to any of the provisions thereof, whether as rents or otherwise (except sums payable directly to any person other than the lessor thereunder);

the right to make all waivers and agreements, including waivers of obligations of lessees;

the right to give all notices, permissions, consents and releases, including consent to the subordination of the interest of a lessee;

the right to take such action upon the happening of a default under the Leases (including the commencement, conduct and consummation of proceedings at law or in equity) as shall be permitted under any provisions of the Leases or by law;

the right to do any and all other things whatsoever which Assignor is or may become entitled to under the Leases;

the right to exercise any option required or permitted;

and during an Event of Default and to the extent permitted by law, Assignor hereby authorizes Agent:

to manage the Property and let and relet the Property, or any part thereof according to Agent's own discretion;

2

<blockquote>

to prosecute or defend any suits in connection with the Property in the name of any or all of Agent or Lenders or Assignor as it may consider desirable;

to enforce or take any other action in connection with the Leases in the name of any or all of Agent, Lenders or Assignor;

to make such repairs to the Property as Agent may deem advisable; and

to do anything in or about the Property that Agent may deem advisable or that Assignor has the right or power to do.

</blockquote>

**TO HAVE AND TO HOLD** unto Agent, for its benefit and the benefit of Lenders, its successors and assigns, forever, subject to and upon the terms set forth herein.

Although this instrument constitutes a present assignment of the foregoing Leases, Rights, Rents, Guaranties, Damages, interests and privileges, Assignor shall have the right and license to collect and use all rentals due under the Leases, and, subject to the covenants and restrictions on Assignor contained in Section 3 and the other sections or paragraphs of this Assignment, to exercise the Rights herein, provided, however, that such license shall be revoked upon the occurrence of an Event of Default.

COVENANTS

No Other Assignment. Assignor warrants, represents, and covenants that (a) it is the sole owner of the entire lessor's interest in the Leases and has full right to assign the Leases and the rents due or to become due thereunder, (b) there have been no previous subleases, encumbrances or assignments (as collateral or otherwise) of Assignor's right, title and interest in any of the Leases or Rents and, without Agent's prior written consent as to form and substance, Assignor will permit no future subleases, encumbrances or assignment (as collateral or otherwise) of Assignor's right, title, and interest in any of the Leases, (c) the Leases are in full force and effect in accordance with their terms and have not been altered, modified, or amended in any manner whatsoever, except as otherwise disclosed to Agent, (d) Assignor has delivered to Agent Assignor's standard form of tenant lease and an accurate and complete rent roll for the Property, and no Lease or lease guaranty contains any option or right of first refusal to purchase all or any portion of the Property or any present or future interest therein, (e) neither Assignor nor the lessees are in default under the Leases nor has any event occurred which would with the passage of time become a default, (f) the lessees have no defenses, setoffs, or counterclaims against the lessor under the Leases, (g) no rent reserved in the Leases has been assigned or anticipated, and (h) no rent for any period subsequent to the date hereof has been collected for more than one month in advance of the time when the said rent becomes or would become due under the terms of the Leases except for security deposits and except as otherwise disclosed in writing to Agent by Assignor.

Management. At all times until this Assignment is released, or until the assignment granted hereby is exercised by Agent, and at all times thereafter during which Agent is not in actual or constructive possession of the Property, Assignor shall cause the Property to be managed in accordance with sound business practices and cause to be performed all obligations imposed upon the lessor under the Leases and not do or permit to be done anything to impair the security thereof.

3

4882-8755-5354.2

Assignor shall not collect any of the Rents in advance, except that monthly rent due and payable under the Leases may be collected for each current month in advance. Assignor shall not make any other assignment of any interest in the Leases or the Rents accruing from such Leases or from the Property, or subordinate any of the Leases to any security deed, mortgage, or other encumbrance, or permit, consent, or agree to such subordination without the prior written consent of Agent in Agent's sole and absolute discretion. Except to the extent that Assignor is acting in the ordinary course of business, and to the extent commercially reasonable, Assignor shall cause prompt action, including legal proceedings, for enforcement of any of the Leases and all other remedies available to lessor thereunder to be commenced against any delinquent or defaulting lessee as soon as necessary to protect such lessor's interest or immediately upon written request from Agent, and in the event Agent requests that such a specific action be taken, to use all commercially reasonable efforts to cause such action to be taken promptly. Assignor shall execute and deliver, at the written request of Agent, all such further assurances and assignments as Agent from time to time shall require. If Assignor becomes aware that any lessee proposes to do, or is doing, any act or thing that may give rise to any right of set-off against rent, Assignor shall take such steps as shall be calculated to prevent the accrual of any right to a set-off against rent, notify Agent thereof and of the amount of said set-offs, and within ten (10) days after such accrual, reimburse the lessee who shall have acquired such right to set-off or take such other steps in furtherance of the effective discharge of such  set-off (and diligently pursues the same to completion) and as shall assure that rents thereafter due shall continue to be payable without set-off or deduction.

Execution of Leases.  Except as herein permitted and as permitted under the Loan Agreement, Assignor shall not permit any leases to be made hereafter of all or any portion of the Property except with Agent's prior written consent, which consent is in Agent's sole and absolute discretion. Assignor shall furnish, from time to time at Agent's request, a rent roll for the Property, certified by Assignor, showing the name of each lessee and, for each lessee, the space occupied, the lease expiration date, the amount of the security deposit and the rent paid.

Notice of Landlord's Default.  Assignor shall cause notice to be given to Agent of any notice of default by the lessor under any of the Leases, promptly upon the receipt of notice of such default, but in all events in sufficient time to afford to Agent an opportunity to cure any such default prior to the lessee under the subject Lease having any right to terminate the Lease by reason of such default.

Agent and Lenders to be Creditor of Lessee.  To the extent permitted by law, Agent and Lenders shall be deemed to be the creditor of each lessee in the Leases in respect of any and all claims for Damages, assignments for the benefit of creditors and bankruptcy, reorganization, insolvency, dissolution or receivership proceedings affecting such lessee (without obligation on the part of Agent or Lenders, however, to file or make timely filings of claims in such proceedings or otherwise to pursue creditor's rights therein). Assignor hereby assigns to Agent, for its benefit and the benefit of Lenders, any and all Damages and any and all money received in connection with such assignment for the benefit of creditors or in any such bankruptcy, reorganization, insolvency, dissolution or receivership proceedings, with Agent and Lenders to receive such Damages and monies and hold them in escrow for the purposes of applying Damages or any money received by Agent and/or Lenders as such creditor in payment of the principal and interest installments secured by or to be paid under the Loan next falling due. To the extent permitted by

4

law, Assignor hereby appoints Agent as its irrevocable attorney-in-fact to appear in any action and/or collect any such money, award or payment.

Revocation of License. Upon revocation of the license referred to in Section 2.2 above, (a) following notification to the tenants under the Leases by Agent that all Rents are to be paid to it, all Rents shall be paid directly to Agent and not through Assignor, it being understood that a demand by Agent on any tenant under the Leases for the payment of rent shall be sufficient to warrant payment by such tenant of future payments of rent to Agent without the necessity of further consent by Assignor; (b) Agent shall be entitled to take possession of the Property and to have, hold, manage, lease and operate the same on such terms and for such period of time as Agent may deem proper; (c) Agent shall be entitled to make from time to time all alterations, renovations, repairs or replacements to the Property as may seem proper to Agent; and (d) Agent may apply Rents and Damages as otherwise provided herein and in the Security Instrument.

## DEFAULTS AND REMEDIES

Defaults. The occurrence of an Event of Default under the Loan Agreement or any of the other Loan Documents shall constitute an Event of Default hereunder.

Exercise of This Assignment of Rents and Leases.

Agent may exercise the assignment hereby granted upon the occurrence and during the continuation of any Event of Default and pursue its rights to collect the Rents or manage the Property, or both, and otherwise exercise its rights as provided in this Assignment without regard to the adequacy of the security and without waiving any other remedy available to Agent and Lenders without waiving such Event of Default.

In the event Agent elects to invoke any of its rights hereunder, and thereafter for any reason relinquishes to Assignor such rights, this Assignment shall in no respect be terminated but instead remain in full force and effect until the indebtedness represented by the Note is paid in full, it being the intent of the parties that Agent and Lenders, from time to time upon the occurrence of any Event of Default under this Assignment, shall have all the rights granted hereby.

Nature of Remedies. No delay or omission on the part of Agent or Lenders in the exercise of any remedy for an Event of Default shall operate as a waiver thereof. The remedies available to Agent and Lenders under this Assignment shall be in addition to, and exercisable in any combination with, any and all remedies available by operation of law and under the Note and the other Loan Documents. The said remedies shall be cumulative and concurrent, may be pursued separately, successively or together against Assignor or the Property, or either of them, at the sole discretion of Agent and may be exercised as often as occasion therefor shall arise.

Application of Rents. Agent shall have the power to apply the Rents and Damages in such order as Agent may determine, to the payment of the indebtedness represented by the Note, including without limitation the payment of all advances and expenses incurred by Agent and/or Lenders hereunder or under the Security Instrument and all expenses for the care and management of the Property, including taxes, insurance (as required by the terms of the Loan Agreement), assessments, usual and customary commissions to a real estate broker for leasing real estate and collecting rents, and the expenses and fees of all attorneys, agents, and servants, which expenses

4882-8755-5354.2

Agent may deem to be necessary to exercise the powers granted to Agent and Lenders hereunder (subject, however, to the terms of the Loan Agreement). The receipt by Agent of any Rents pursuant to this Assignment following an Event of Default and the exercise of any remedies provided for in the Note or the other Loan Documents shall not cure such Event of Default or affect or prejudice the exercise of such remedies.

Limitation of Agent's Obligations. Agent's obligations as to any Rents actually collected shall be discharged by application of such Rents for the purposes described in this Assignment. Agent shall not be liable for uncollected rents or for any claim for damages or set-offs arising out of Agent's management of the Property other than for damages arising from Agent's gross negligence or willful misconduct. Agent shall not be liable to any lessee under the Leases for the return of any security deposit made under any Lease of any portion of the Property unless Agent shall have received such security deposit from the lessor or such lessee. Agent shall not by reason of this Assignment or the exercise of any right granted herein be obligated to perform any obligation of the lessor under any of the Leases, nor shall Agent be responsible for any act committed by the lessor or any breach or failure to perform by the lessor with respect to any of the Leases. Nothing contained herein shall be deemed to have the effect of making Agent a mortgagee in possession of the Property or any part thereof.

Reimbursement. Assignor shall reimburse, indemnify, and hold harmless Agent and Lenders for and from any and all expenses, losses, damages, and liabilities which Agent and Lenders may incur by reason of this Assignment, or any of the rights granted in this Assignment, except for any such expense, loss, damage or liability caused by Agent's gross negligence or willful misconduct. Any and all amounts due to Agent and Lenders under this Section 4.6 shall be immediately due and payable following written notice to Assignor, and shall be added to the principal amount of the Notes and secured by this Assignment and the other Loan Documents.

Authorization to Lessees. Each present and future lessee under any of the Leases is hereby authorized and directed to pay the rent payable thereunder to Agent upon written demand from Agent stating that an Event of Default has occurred and is continuing under this Assignment without inquiry as to whether any such Event of Default has occurred or whether Agent is rightfully entitled to such rent.

## MISCELLANEOUS

Modification of Loan Terms. If the time of payment of all indebtedness secured hereby or any part thereof be extended at any time or times, or if the Loan is renewed, modified, or replaced, or if any security for the Loan is released, Assignor and any other parties now or hereafter liable therefor or interested in the Property shall be held to consent to such extensions, renewals, modifications, replacements, and releases, and their liability and the lien hereof and of the other Loan Documents shall not be released and the rights created hereby and thereby shall continue in full force, the right of recourse against all such parties being reserved by Agent and Lenders.

Successors and Assigns. This Assignment shall inure to the benefit of and be binding upon the respective successors and assigns of Assignor, Agent and Lenders and all persons and entities (including owners and lessees) which may hereafter obtain any interest in the Property.

4882-8755-5354.2

Notices. The provisions of the Loan .Agreement concerning the giving and receipt of notices shall apply to any notice or other communication given under this Assignment.

Governing Law. This Assignment shall be governed by and construed in accordance with the laws of the State of Texas.

Severability. If any term, restriction or covenant of this Assignment is deemed illegal or unenforceable, all other terms, restrictions and covenants and the application thereof to all persons and circumstances subject hereto shall remain unaffected to the extent permitted by law; and if any application of any term, restriction or covenant to any person or circumstances is deemed illegal or unenforceable, the application of such term, restriction, or covenant to any other persons or circumstances shall remain unaffected to the extent permitted by law.

Termination. The recording of a satisfaction of the Security Instrument executed by Assignor to Agent as security for the Loans by Agent and Lenders shall terminate this Assignment.

Waiver of Jury Trial. **ASSIGNOR WAIVES ANY RIGHT TO TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING OUT OF OR IN ANY WAY RELATED TO THIS ASSIGNMENT OR THE LOAN, OR (B) IN ANY WAY CONNECTED WITH OR PERTAINING OR RELATED TO OR INCIDENTAL TO ANY DEALINGS OF AGENT, LENDERS AND/OR ASSIGNOR WITH RESPECT TO THE LOAN DOCUMENTS OR IN CONNECTION WITH THIS ASSIGNMENT OR THE EXERCISE OF ANY PARTY'S RIGHTS AND REMEDIES UNDER THIS ASSIGNMENT OR OTHERWISE, OR THE CONDUCT OR THE RELATIONSHIP OF THE PARTIES HERETO, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. ASSIGNOR AGREES THAT AGENT OR LENDERS MAY FILE A COPY OF THIS ASSIGNMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY, AND BARGAINED AGREEMENT OF ASSIGNOR IRREVOCABLY TO WAIVE ITS RIGHTS TO TRIAL BY JURY AS AN INDUCEMENT OF LENDER TO MAKE THE LOANS, AND THAT, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ANY DISPUTE OR CONTROVERSY WHATSOEVER (WHETHER OR NOT MODIFIED HEREIN) BETWEEN ASSIGNOR AND LENDERS OR AGENT SHALL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.**

[Signatures begin on following page]

4882-8755-5354.2

IN WITNESS WHEREOF, the undersigned has caused this instrument to be executed by its duly authorized representative on the day and year first above written.

ASSIGNOR:

**CRANSTON APARTMENTS LLC**
a Delaware limited liability company

By: _____
Name: Elimelech Tress
Title:   Authorized Signatory

## NOTARY ACKNOWLEDGMENT

STATE OF _New Jersey_____ }

COUNTY OF _Ocean_____ }

On _April 21, 2022_____ before me, _Elisheva Kanner_____Notary Public,
<small>(here insert name and title of the officer)</small>
personally appeared Elimelech Tress, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of _New Jersey_____ that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature: _E Kanner_____

> ELISHEVA KANNER
> NOTARY PUBLIC OF NEW JERSEY
> Commission # 50116118
> My Commission Expires 11/6/2024

(Seal)

Signature Page to Assignment of Rents and Leases

4882-8755-5354.2

AGENT:

**CAPITAL FUNDING, LLC**
a Maryland limited liability company

By: _Jennifer M. Loucks_
Name: Jennifer M. Loucks
Title: Vice President

STATE OF MARYLAND        :
                                         :SS
CITY/COUNTY OF BALTIMORE  :

ON THIS, the 21st day of April , 2022, before me, the undersigned Notary Public of said State, personally appeared Jennifer M Loucks, who acknowledged himself/herself to be the Vice President of Capital Funding, LLC, a Maryland limited liability company, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument, and acknowledged that he/she executed the same for the purposes therein contained as the duly authorized _Vice President_ of said limited liability company by signing the name of the limited liability company by himself/herself as _Vice President_ (title).

WITNESS my hand and Notarial Seal.

_Ashleigh K. Roksiewicz_ Notary Public
Name: Ashleigh K. Roksiewicz

My Commission Expires:

> **ASHLEIGH K. ROKSIEWICZ**
> NOTARY PUBLIC
> Baltimore County
> State of Maryland
> My Comm. Expires March 17, 2025

(SEAL)

Signature Page to Assignment of Rents and Leases

4882-8755-5354.2

## EXHIBIT A

## LEGAL DESCRIPTION

All that certain lot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the City of Wilmington, County of New Castle, State of Delaware.

ALL that certain lot, piece or parcel of land with the buildings thereon erected, situate in Christiana Hundred, New Castle County and State of Delaware, and more particularly bounded and described, as follows, to-wit:

## TRACT 1

BEGINNING at a point in the middle of the Old Capitol Trail (formerly known as Centre Road) at the distance of Three Hundred one feet five inches Northeasterly from the intersection of the middle line of the said Old Capitol Trail and the middle line of the Newport and Gap Turnpike Road, being a corner of land formerly of Eugene Woodward, now of Edwin C. Denny, Jr., et. al., Trustees; thence by the middle of said Old Capitol Trail North 40 degrees East One hundred eighteen feet to a point in the center of said road, a corner of this land and lands formerly of John A. Cranston, now known as Cranston Heights Addition; thence by line of said lands South 50 degrees East Seven hundred eighty feet to a point in a corner of land formerly of the Newport Land and Improvement Company and now known as Avalon; thence by line of said land South 86 degrees West Three hundred sixty and one-half feet to a point in line of said lands formerly of Eugene Woodward now of Edwin C. Denny, Jr., et. al., Trustees; and thence thereby North 33 degrees 50 minutes West Five hundred forty-three feet to a point in the middle of said Old Capitol Trail and place of beginning.

EXCEPTING from the tract or piece of land above described ALL THAT CERTAIN portion thereof conveyed to the State of Delaware by deed of William A. Mitchell and wife, dated the 25th day of February, A.D. 1932 and recorded in the Office of the Recorder of Deeds in and for New Castle County aforesaid in Deed Record H, Volume 35, Page 160.

THE SAID ABOVE DESCRIBED tract or piece of land being also bounded and described as follows, to-wit:

BEGINNING at a point in the Southeasterly side of Old Capitol Trail (at 60 feet wide), said point being located from the intersection of the center lines of said Old Capitol Trail and Newport and Gap Turnpike by the following two courses and distances: (1) North 40 degrees East by said center line of said Old Capitol Trail Three hundred six and twenty-two one-hundredths feet to a point: and (2) South 36 degrees 50 minutes East, crossing said Old Capitol Trail, Thirty and eighty one-hundredths feet to the Southeasterly side thereof; thence by said Southeasterly side of said Old Capitol Trail North 40 degrees East One hundred Twenty-one and twenty-two one-hundredths feet to a pipe: thence South 50 degrees 11 minutes East Six hundred seventy-five and thirty-seven one-hundredths feet to a monument, and continuing the an same course Ninety-seven and seventeen one-hundredths feet to a corner distant South 89 degrees 4 minutes West eleven and forty-eight one-hundredths feet from a pipe: thence south 89 degrees 04 minutes West One hundred ninety-eight and seventy-eight one-hundredths feet to a monument: thence South 88 degrees 43 minutes west One hundred sixty-six and sixty-four one-hundredths feet to a corner for the tract hereby conveyed: thence North 36 degrees 50 minutes West Five hundred ten and forty-three one hundredths feet to a point on the aforesaid Southeasterly side of Old Capitol Trail, the place of Beginning.

4882-8755-5354.2

## TRACT 2

BEGINNING at a point on the Southeasterly side of Old Capitol Trail (at 60 feet wide), said point being located from the intersection of the center lines of said Old Capitol Trail and Newport and Gap Turnpike by the following two courses and distances: (1) North 40 degrees East by said center line of said Old Capitol Trail Four Hundred twenty and thirty-two one-hundredths feet to a point; and (2) South 50 degrees 11 minutes East, crossing said Old Capitol Trail, Thirty feet to the Southeasterly side thereof; thence from said beginning point by said Southeasterly side of said Old Capitol Trail North 40 degrees 14 minutes East One hundred and sixty-three one-hundredths (100.63) feet to a pipe in line of land now or late of U. A. W. Local 435; thence by line of said lands and lands now or late of D. Flinn Estate South 72 degrees 05 minutes East Nine hundred forty-six and three one-hundredths (946.03) feet to a pipe at a corner for lands now or late of Philip DiEgidio; thence by line of said lands South 1 degree 14 minutes 30 seconds East Two hundred sixty-nine and forty one-hundredths (269.40) feet to a stone in line of lands now or late of S. Wedwick; thence by line of said lands South 88 degrees 19 minutes West Three hundred seventy-seven and seventy-six one-hundredths (377.76) feet to a pipe, a corner for lands conveyed to Cranston Hall, Inc. by deed of Lillie M. Kershaw, Widow, and Edwin Kershaw, single man, dated the Twenty-ninth day of May, A.D. 1963, and recorded in the Office of the Recorder of Deeds in and for New Castle County aforesaid in Deed Record E, Volume 71, Page 477; thence by line of said lands North 50 degrees 11 minutes West (passing over a monument at 97.17 feet) a total distance of Seven hundred seventy-two and fifty-four one-hundredths (772.54) feet to the said Southeasterly side of the aforesaid Old Capitol, at 60 feet wide, the point and place of Beginning.

NOTE FOR INFORMATION: Being Parcel No. 0703740152 (Tract 1), 0703740151, 0703740150 and 0703740149 (Tract 2), of the City of Wilmington, County of New Castle.

EFiled:  Jun 21 2024 02:23PM EDT
Transaction ID 73455797
Case No. N24C-06-188 FWW

## **Exhibit G**



**EFiled: Jun 21 2024 02:23PM EDT**
**Transaction ID 73455797**
**Case No. N24C-06-188 FWW**



**20220519-0053479**
P: 1 of 31    F:$439.00
5/19/2022 10:58:31 AM
Michael E. Kozikowski    T20220028511
New Castle Recorder    MTG

**Tax Parcel Numbers:** 07-037.40-152, 07-037.40-151, 07-037.40-150, 07-037.40-149

**Prepared By:**
Nixon Peabody LLP
Tower 46, 55 West 46th Street
New York, New York 10036
Attn: Laura Mehl Sugarman, Esq.

**Return To:**
Capital Funding, LLC
1422 Clarkview Road
Baltimore, MD 21209
Attn: Stephanie Jenifer

MORTGAGE, SECURITY AGREEMENT, ASSIGNMENT OF LEASES AND RENTS, FINANCING STATEMENT AND FIXTURE FILING

made by

CRANSTON APARTMENTS, as Grantor

to

CAPITAL FUNDING, LLC, as Agent (as Grantee)

Dated as of April 27, 2022
Location: 3314 Old Capitol Trail, Wilmington, DE 19808
County of New Castle

**THIS MORTGAGE SECURES FUTURE ADVANCES.**

**NOTE TO RECORDER:** THIS INSTRUMENT IS TO BE INDEXED AND/OR FILED AS BOTH A MORTGAGE AND A FINANCING STATEMENT FILED AS A FIXTURE FILING.

31

EFiled: Jun 21 2024 02:23PM EDT
Transaction ID 73455797
Case No. N24C-06-188 FWW

MORTGAGE, SECURITY AGREEMENT, ASSIGNMENT OF LEASES AND RENTS,
FINANCING STATEMENT AND FIXTURE FILING

    THIS MORTGAGE, SECURITY AGREEMENT, ASSIGNMENT OF LEASES
AND RENTS, FINANCING STATEMENT AND FIXTURE FILING, dated as of April 27,
2022 is made by CRANSTON APARTMENTS LLC, a Delaware limited liability company
("Grantor"), whose address is 475 Oberlin Avenue South, Suite 211, Lakewood, NJ 08701, to
CAPITAL FUNDING, LLC, a Maryland limited liability company, in its capacity as Agent
(together with its successors and assigns in such capacity, "Agent") for Lenders (as defined
below), having its principal offices at 1422 Clarkview Road, Baltimore, Maryland 21209, as
grantee. All capitalized terms not defined herein shall have the respective meanings set forth in
the Loan Agreement (as defined below).

    WHEREAS, pursuant to a certain Loan Agreement dated as of the date hereof (as the
same may be amended, restated, replaced, supplemented or otherwise modified from time to
time, the "Loan Agreement"), by and among Grantor ("Borrower"), Agent and the other various
financial institutions who are or hereafter become parties to the Loan Agreement (together with
Agent, collectively or individually, as the context may require, referred to herein as "Lender" or
"Lenders"), Grantor has agreed to borrow from Lenders the aggregate sum of $21,050,000.00
(the "Loan"), which Loan is evidenced by that certain Promissory Note, dated as of the date
hereof, made, jointly and severally, by Borrower in favor of Lenders (as the same may be
amended, restated, replaced, supplemented or otherwise modified from time to time, including
all schedules, riders, allonges, endorsements, addenda or amendments together with any
renewals, replacements, substitutions or extensions thereof, the "Note");

    WHEREAS, Grantor wishes and intends, by the execution and delivery of this Security
Instrument, to (a) secure the full and punctual payment and performance of the Loan Obligations,
and (b) induce the Lenders to make the Loan;

    WHEREAS, Grantor IRREVOCABLY GRANTS, BARGAINS, PLEDGES, ASSIGNS,
WARRANTS, TRANSFERS AND CONVEYS to Agent, for the benefit of Agent and Lenders,
in FEE SIMPLE, subject only to Permitted Encumbrances, WITH POWER OF SALE, and
grants a security interest to Agent, as agent for the benefit of the Lenders, to secure the prompt
and complete payment and performance when due of all obligations, all of its present and future
estate, right, title and interest in and to the Land (as defined herein) located in the City of
Wilmington, County of New Castle, State of Delaware, together with all of the other Mortgaged
Property (as defined herein); and

    WHEREAS, Grantor covenants that Grantor is lawfully seized of the estate hereby
conveyed in fee simple and has the right to give, grant, bargain, sell, assign, mortgage, transfer
and convey the Mortgaged Property, that the Mortgaged Property is unencumbered, and that
Grantor will warrant and defend generally the title to the Mortgaged Property against all claims
and demands, subject only to Permitted Encumbrances; and

**EFiled: Jun 21 2024 02:23PM EDT**
**Transaction ID 73455797**
**Case No. N24C-06-188 FWW**

TO HAVE AND TO HOLD the Mortgaged Property unto Agent and its successors and assigns forever, subject to the matters listed in the Permitted Encumbrances and the provisions, terms and conditions of this Security Instrument.

NOW, THEREFORE, THIS SECURITY INSTRUMENT WITNESSETH, that Grantor, in consideration of the premises and the sum of Ten Dollars ($10.00) lawful money of the United States of America to the Grantor in hand paid, the receipt and sufficiency of which are hereby acknowledged, to secure the timely repayment and performance of the Loan Obligations, has given, granted, bargained, sold, assigned, mortgaged, transferred and conveyed, and by these presents does give, grant, bargain, sell, assign, mortgage, transfer and convey to Agent, its successors and assigns, all of the Land (as more fully described on Exhibit A attached hereto and made a part hereof) and the other Mortgaged Property IN FEE SIMPLE forever.

1.     **DEFINITIONS**.  The following terms, when used in this Security Instrument (including when used in the above Recitals), shall have the following meanings:

(a)     "Appurtenant Rights" means all air rights, development rights, zoning rights, easements, rights-of-way, strips and gores of land, vaults, streets, roads, alleys, tenements, passages, sewer rights, waters, water courses, water rights and powers, minerals, flowers, shrubs, crops, trees, timber and other emoluments now or hereafter appurtenant to, or used or useful in connection with, or located on, under or above the Land, or any part or parcel thereof, and all ground leases, estates, rights, titles, interests, privileges, liberties, tenements, hereditaments and appurtenances, reversions, and remainders whatsoever, in any way belonging, relating or appertaining to the Land, or any part thereof, now or hereafter.

(b)     "Assignment of Rents" means that certain Assignment of Rents and Leases of even date herewith from Grantor in favor of Agent, for its benefit and the benefit of the Lenders.

(c)     "Collateral" means, collectively, all of Grantor's right, title and interest in and to the Mortgaged Property, all whether now owned or hereafter acquired, and including replacements, additions, accessions, substitutions, and products thereof and thereto, and all other property which is or hereafter may become subject to a Lien in favor of Agent for its benefit and the benefit of Lenders as security for any of the Loan Obligations.

(d)     "Collateral Agreements" means collectively, as applicable, any security agreements, assignments, pledges or escrow agreements granted for the benefit of Agent and/or Lenders as additional security for the Loan and Loan Obligations.

(e)     "Debt" means the aggregate of the principal of and interest on the Note due and owing from time to time and all expenses, charges and other amounts due and owing from time to time under the Note, the Loan Agreement, this Security Instrument or any other Loan Document, including, without limitation, prepayment premiums, loan fees, late charges, default interest and advances to protect the security of this Security Instrument under Section 7, if any.

(f)     "Event of Default" means the occurrence of any event listed in Section 14, hereof.

(g)    "Fixtures" means all property which is now or hereafter so attached to the Land or the Improvements as to constitute a fixture under applicable law and all renewals and replacements thereof and substitutions therefore, including, without limitation: machinery, equipment, engines, boilers, incinerators, installed building materials; systems and equipment for the purpose of supplying or distributing heating, cooling, electricity, gas, water, air, or light; antennas, cable, wiring and conduits used in connection with radio, television, security, fire prevention, or fire detection or otherwise used to carry electronic signals; telephone systems and equipment; elevators and related machinery and equipment; fire detection, prevention and extinguishing systems and apparatus; security and access control systems and apparatus; plumbing systems; water heaters, ranges, stoves, microwave ovens, refrigerators, dishwashers, garbage disposers, washers, dryers and other appliances; light fixtures, awnings, storm windows and storm doors; pictures, screens, blinds, shades, curtains and curtain rods; mirrors; cabinets, paneling, rugs and floor and wall coverings; fences, trees and plants; and exercise equipment.

(h)    "Impositions" and "Imposition Deposits" are defined in Section 5, hereof.

(i)    "Improvements" means all buildings, structures and improvements of every nature whatsoever now or hereafter situated on the Land, including, but not limited to, all gas and electric fixtures, radiators, heaters, engines and machinery, boilers, ranges, elevators and motors, plumbing and heating fixtures, carpeting and other floor coverings, water heaters, awnings and storm sashes, and cleaning apparatus which are or shall be attached to the Mortgaged Property or said buildings, structures or improvements.

(j)    "Land" means the land described in Exhibit A attached hereto and incorporated herein.

(k)    "Laws" means all federal, state and local laws, statutes, rules, ordinances, regulations, codes, licenses, authorizations, decisions, injunctions, interpretations, orders or decrees of any court or other Governmental Authority having jurisdiction as may be in effect from time to time.

(l)    "Leases" means all oral or written leases, subleases, licenses, concessions, rental agreements, occupancy agreement and other agreements for the use or occupancy made or agreed to by, any person or entity and any and all amendments, extensions, renewals, modifications and replacements thereof pertaining to all or any part of the Mortgaged Property, or any possessory interest either now or hereafter in force, whether oral or written, pertaining to all or any part of the Mortgaged Property, whether such leases or other agreements have been heretofore or are hereafter made or agreed to.

(m)    "Money" means all monies, cash, rights to deposit or savings accounts or other items of legal tender obtained from or for use in connection with the operation of the Mortgaged Property.

(n)    "Mortgaged Property" means all of Grantor's present and future right, title and interest in and to all of the following:

(1)    the Land;

4887-7161-4491.1

EFiled: Jun 21 2024 02:23PM EDT
Transaction ID 73455797
Case No. N24C-06-188 FWW

    (2)    all Accounts;

    (3)    all Appurtenant Rights;

    (4)    all Documents;

    (5)    all Equipment;

    (6)    all Fixtures;

    (7)    all General Intangibles;

    (8)    all Improvements;

    (9)    all Instruments;

    (10)    all Inventory;

    (11)    all Leases;

    (12)    all Money;

    (13)    all Permits (to the extent legally assignable);

    (14)    all Personalty;

    (15)    all Proceeds;

    (16)    all Rents;

    (17)    all contracts, options and other agreements for the sale of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property entered into by Grantor now or in the future, including cash or securities deposited to secure performance by parties of their obligations;

    (18)    all Imposition Deposits;

    (19)    all refunds or rebates of Impositions by any municipal, state or federal authority or insurance company (other than refunds applicable to periods before the real property tax year in which this Security Instrument is dated);

    (20)    to the extent transferable, all names under or by which any of the above Mortgaged Property may be operated or known, and all trademarks, trade names, and goodwill relating to any of the Mortgaged Property;

EFiled: Jun 21 2024 02:23PM EDT
Transaction ID 73455797
Case No. N24C-06-188 FWW

(21)   all other assets of Grantor, wherever located, whether now owned or existing or hereafter acquired or arising, including replacements, accessions, additions, substitutions, and products thereof and thereto, together with all proceeds thereof, and all other property which is or hereafter may become subject to a Lien in favor of Agent as security for any of the Loan Obligations; and

(22)   all renewals, replacements and proceeds of any of the foregoing and any substitutions therefore.

(o)   "Payment" with reference to the Loan Obligations means the payment of the Debt and the performance of the Loan Obligations.

(p)   "Personalty" means all furniture, furnishings, Equipment, machinery, building materials, appliances, goods, supplies, tools, books, records (whether in written or electronic form), computer equipment (hardware and software) and other tangible personal property (other than fixtures) which are owned by Grantor and which are used now or in the future in connection with the ownership, management or operation of the Land or the Improvements or are located on the Land or in the Improvements, and any operating agreements relating to the Land or the Improvements, including, without limitation and any surveys, plans and specifications and contracts for architectural, engineering and construction services relating to the Land or the Improvements; provided, however, that if, now or in the future, any of the Loan Obligations secured by this Security Instrument, or covered by any lien created hereby, include any Special Flood Zone Loan (as hereinafter defined), then the following shall apply: any such Special Flood Zone Loan shall not be secured pursuant to any security interest or lien created by this Security Instrument in personal property that would constitute "contents" located within any Flood Zone Improvements (as hereinafter defined) securing such Special Flood Zone Loan. For purposes of the foregoing, (a) the term "Flood Zone Improvements" shall mean any "improved" real property that is located within a Special Flood Hazard Area, (b) a "Special Flood Zone Loan" means a loan, line of credit or other credit facility which is secured by Flood Zone Improvements, and (c) the terms "improved" real property, "Special Flood Hazard Area," and "contents" shall have the meanings ascribed to them by the Flood Disaster Protection Act of 1973, 42 U.S.C. § 4001 et seq., and implementing regulations, 44 C.F.R. Parts 59 et seq., and/or the Federal Emergency Management Agency, all as may be amended from time to time.

2.    **UNIFORM COMMERCIAL CODE; SECURITY AGREEMENT**.

(a)   This Security Instrument is also a security agreement under the Uniform Commercial Code as adopted in the State of Delaware for the Mortgaged Property which, under applicable Law, may be subject to a security interest under the Uniform Commercial Code as adopted in the State of Delaware whether acquired now or in the future, including, without limitation, the Personalty, and all of Grantor's collateral products and cash and non-cash proceeds thereof (collectively, "UCC Collateral"), and Grantor hereby assigns and grants to Agent, for its benefit and the benefit of the Lenders, a security interest in the Personalty and the other UCC Collateral. Grantor has good title to the UCC Collateral, and the UCC Collateral is not subject to any Lien or encumbrance other than Permitted Encumbrances. Agent is authorized by Grantor to file such financing statements and any extensions, renewals and amendments thereof, of any termination statements and, upon Agent's request, financing statements,

EFiled: Jun 21 2024 02:23PM EDT
Transaction ID 73455797
Case No. N24C-06-188 FWW

continuation statements and amendments, in such form as Agent may require to perfect or continue the perfection of this security interest. Any such financing statement may describe the collateral as "All assets of Debtor wherever located, whether now owned or hereafter existing or hereafter acquired or arising, together with all proceeds thereof" or a similar description describing all assets or all personal property of Grantor. Grantor shall pay all filing costs and all costs and expenses of any record searches for financing statements that Agent may require. Without the prior written consent of Agent, Grantor shall not create or permit to exist any other lien or security interest in any of the UCC Collateral. If an Event of Default has occurred and is continuing, Agent and Lenders shall have the remedies of a secured party under the Uniform Commercial Code as adopted in the State of Delaware in addition to all remedies provided by this Security Instrument or existing under applicable Law. In exercising any remedies, Agent and Lenders may exercise their remedies against the UCC Collateral separately or together and in any order, without in any way affecting the availability of Agent's or Lenders' other remedies under and/or under applicable Law.

(b)     This Security Instrument covers goods which are to become fixtures on the Land, and this Security Instrument constitutes and is filed as a financing statement and a "fixture filing" (as the term is defined in the UCC) upon such of the Mortgaged Property which is or may become fixtures. Grantor has an interest of record in the Land. For purposes of the UCC, the following information is furnished, and Grantor represents and warrants to Agent and Lenders that the following information is correct: The name and address of Grantor, which is the record owner of the Land described in this Security Instrument is CRANSTON APARTMENTS LLC, a Delaware limited liability company with an address of 475 Oberlin Avenue South, Suite 211, Lakewood, NJ 08701.

3.     **INTENTIONALLY DELETED.**

4.     **LEASES.**  Grantor shall not, without the prior written consent and approval of Agent, which consent may be granted or refused for any reason or for no reason whatsoever in Agent's sole and absolute discretion enter into any Lease after the date of this Security Instrument except in accordance with the Loan Agreement, including Exhibit D thereto.

5.     **ASSIGNMENT OF RENTS AND LEASES.**  In connection with this Loan, Grantor hereby absolutely and unconditionally assigns to Agent for its benefit and the benefit of Lenders all of Grantor's right, title and interest in all current and future Leases and Rents pursuant to 25 Del. C. § 2121, it being intended by Grantor that such assignment constitutes a present, absolute assignment and not an assignment for additional security only, as more fully set forth in the Assignment of Rents and Leases executed concurrently herewith. Grantor has not affirmatively done any act which would prevent Grantee from, or limit Grantee in, acting under of the provisions of the foregoing assingnment.

6.     **DEPOSITS FOR TAXES, INSURANCE AND OTHER CHARGES.**

(a)     At the sole option of the Agent, Grantor shall deposit with Agent on the day monthly installments of principal and/or interest, or both, are due under the Note (or on another day designated in writing by Agent), until Loan Obligations are paid in full, an additional amount estimated by Agent sufficient to accumulate with Agent the entire sum

required to pay, when due (1) to the extent applicable, the yearly water and sewer charges which may be levied on all or any part of the Mortgaged Property, (2) the premiums for fire and other hazard insurance, business interruption insurance and such other insurance as Agent may require under the Loan Agreement, (3) the yearly Taxes, and (4) amounts for other charges and expenses which Agent at any time reasonably deems necessary to protect the Mortgaged Property, to prevent the imposition of liens on the Mortgaged Property, or otherwise to protect Agent's and Lenders' interests, all as reasonably estimated from time to time by Agent, plus one-twelfth of such estimate. The amounts deposited under the preceding sentence are collectively referred to in this Security Instrument as the "Imposition Deposits." The obligations of Grantor for which the Imposition Deposits are required are collectively referred to in this Security Instrument as "Impositions." The amount of the Imposition Deposits shall be sufficient to enable Agent to pay each Imposition before the last date upon which such payment may be made without any penalty or interest charge being added plus one- twelfth of such annual estimate. Agent shall maintain records indicating how much of the monthly Imposition Deposits and how much of the aggregate Imposition Deposits held by Agent are held for the purpose of paying property taxes, insurance premiums and each other obligation of Grantor for which Imposition Deposits are required. Any waiver by Agent of the requirement that Grantor remit Imposition Deposits to Agent may be revoked by Agent, in Agent's sole and absolute discretion, at any time upon notice to Grantor.

(b)     Imposition Deposits shall be held in an institution (which may be Agent or Lenders if Agent or Lenders are such an institution) whose deposits or accounts are insured or guaranteed by a federal agency. Agent shall not be obligated to open additional accounts or deposit Imposition Deposits in additional institutions when the amount of the Imposition Deposits exceeds the maximum amount of the federal deposit insurance or guaranty. Agent shall apply the Imposition Deposits to pay Impositions so long as no Event of Default has occurred and is continuing. Unless applicable Law requires, Agent shall not be required to pay Grantor any interest, earnings or profits on the Imposition Deposits. Grantor hereby pledges and grants to Agent and Lenders a security interest in the Imposition Deposits as additional security for all of Grantor's obligations under this Security Instrument and the other Loan Documents. Any amounts deposited with Agent under this Section 6 shall not be trust funds, nor shall they operate to reduce Loan Obligations, unless applied by Agent for that purpose under Section 6(e).

(c)     If Agent elects to require Imposition Deposits, Grantor shall direct the applicable Governmental Authority to deliver the invoices and bills for all Impositions to Agent. If Agent receives a bill or invoice for an Imposition, Agent shall pay the Imposition from the Imposition Deposits held by Agent so long as no Event of Default has occurred or is continuing. Agent shall have no obligation to pay any Imposition to the extent it exceeds Imposition Deposits then held by Agent. Agent may pay an Imposition according to any bill, statement or estimate from the appropriate public office or insurance company without inquiring into the accuracy of the bill, statement or estimate or into the validity of the Imposition.

(d)     If at any time the amount of the Imposition Deposits held by Agent for payment of a specific Imposition exceeds the amount reasonably deemed necessary by Agent, the excess shall be credited against future installments of Imposition Deposits. If at any time the amount of the Imposition Deposits held by Agent for payment of a specific Imposition is less than the amount reasonably estimated by Agent to be necessary, Grantor shall pay to Agent the amount of the deficiency within fifteen (15) days after notice from Agent.

4887-7161-4491.1

**EFiled: Jun 21 2024 02:23PM EDT**
**Transaction ID 73455797**
**Case No. N24C-06-188 FWW**

(e)    If an Event of Default has occurred and is continuing, Agent may apply any Imposition Deposits, in any amounts and in any order as Agent determines, in Agent's sole discretion, to pay any Impositions or as a credit against Loan Obligations. Upon payment in full of Loan Obligations, Agent shall refund to Grantor any Imposition Deposits held by Agent.

7.    **APPLICATION OF PAYMENTS.** If at any time Agent receives, from Grantor or otherwise, any amount applicable to Loan Obligations which is less than all amounts due and payable at such time, then, except to the extent otherwise required by Law, Agent may apply that payment in such manner and in such order of priority as Agent shall determine in Agent's sole discretion. Neither Agent's acceptance of an amount which is less than all amounts then due and payable nor Agent's application of such payment in the manner authorized in the immediately preceding sentence shall constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction. Notwithstanding the application of any such amount to Loan Obligations, Grantor's obligations under this Security Instrument and the Note shall remain unchanged.

8.    **USE OF PROPERTY; ADDITIONAL IMPROVEMENTS.** Unless required by applicable Law or in connection with the development of the Project as contemplated as of the Closing Date, Grantor shall not (a) except for any change in use approved by Agent, allow changes in the use for which all or any part of the Mortgaged Property is being used at the time this Security Instrument was executed, (b) convert any part of the Project to commercial use other than the use as of the date hereof, or (c) initiate or acquiesce in a change in the zoning classification of the Mortgaged Property. Grantor will not construct any Improvements other than those presently on the Land and those described in the Loan Agreement without the prior written consent of Agent, which may be granted, withheld and/or conditioned in Agent's sole discretion.

9.    **PROTECTION OF LENDERS' SECURITY.**

(a)    If Grantor fails to perform any of its obligations under this Security Instrument or any other Loan Document, or if any action or proceeding is commenced which purports to affect the Mortgaged Property, Agent's and Lender's security, Agent's and Lenders' rights under this Security Instrument, including eminent domain, insolvency, code enforcement, civil or criminal forfeiture, enforcement of Hazardous Materials Laws, fraudulent conveyance or reorganizations or proceedings involving a bankrupt or decedent, then Agent at Agent's option and upon notice to Grantor may make such appearances, disburse such sums and take such actions as Agent reasonably deems necessary to perform such obligations of Grantor and to protect Agent's and Lenders' interest, including (1) disbursement of fees and out of pocket expenses of attorneys, accountants, inspectors and consultants, (2) entry upon the Mortgaged Property to make repairs or secure the Mortgaged Property, (3) procurement of the insurance coverages required under the Loan Agreement, and (4) payment of amounts which Grantor has failed to pay under Section 11.

(b)    Any amounts disbursed by Agent under this Section 9, under any other provision of this Security Instrument, or under any of the other Loan Documents, that treats such disbursement as being made under this Section 9, shall be added to, and become part of Loan

Obligations, shall be immediately due and payable and shall bear interest from the date of disbursement until paid at the "Default Rate", as defined in the Loan Agreement.

(c)     Nothing in this Section 9 shall require Agent to incur any expense or take any action.

10.     **INSPECTION**. Agent, Lenders, their agents, representatives, and designees may make or cause to be made entries upon and inspections of the Mortgaged Property (including environmental inspections and tests) during normal business hours, or at any other reasonable time, upon reasonable advance notice to Grantor (which may be oral) except in an emergency or during the continuance of an Event of Default.

11.     **TAXES; OPERATING EXPENSES.**

(a)     Subject to the provisions of Section 11(c) and Section 11(d), Grantor shall pay, or cause to be paid, all Taxes when due and before the addition of any interest, fine, penalty or cost for nonpayment.

(b)     Subject to the provisions of Section 11(c), Grantor shall pay or cause to be paid the expenses of operating, managing, maintaining and repairing the Mortgaged Property (including insurance premiums, utilities, repairs and replacements) before the last date upon which each such payment may be made without any penalty or interest charge being added or lien imposed.

(c)     As long as no Event of Default has occurred and is continuing, Grantor shall not be obligated to pay Taxes, insurance premiums or any other individual Imposition to the extent that Imposition Deposits are held by Agent pursuant to Section 6 for the purpose of paying that specific Imposition. If an Event of Default exists, Agent may exercise any rights Agent may have with respect to Imposition Deposits without regard to whether Impositions are then due and payable.

(d)     Grantor, at its own expense, may contest by appropriate legal proceedings, conducted diligently and in good faith, the amount or validity of any Imposition other than insurance premiums, if (1) Grantor notifies Agent of the commencement or expected commencement of such proceedings, (2) the Mortgaged Property is not in danger of being sold or forfeited as determined by Agent in its sole and absolute discretion, (3) if requested by Agent, Grantor deposits with Agent cash reserves or other collateral sufficient to pay the contested Imposition and all interest and penalties, as determined by Agent in its sole and absolute discretion, (4) Grantor furnishes whatever security is required in the proceedings or is reasonably requested by Agent, which may include the delivery to Agent of the reserves established by Grantor to pay the contested Imposition and all interest and penalties, as determined by Agent in its sole and absolute discretion, as additional security, and (5) such contest operates to suspend enforcement of such Imposition.

(e)     Grantor shall promptly deliver to Agent a copy of all notices of, and invoices for, Impositions, and if Grantor pays any Imposition directly, Grantor shall promptly furnish to Agent receipts evidencing such payments.

12. **LIENS; ENCUMBRANCES**. Grantor acknowledges that the existence of any Lien on the Mortgaged Property, other than Permitted Encumbrances, whether voluntary, involuntary or by operation of law, is a "Transfer" which constitutes an Event of Default as provided under Section 16.

13. **PRESERVATION, MANAGEMENT AND MAINTENANCE OF MORTGAGED PROPERTY**. Grantor (a) shall not commit waste or permit impairment or deterioration of the Mortgaged Property, (b) shall not abandon the Project, (c) shall restore or repair promptly, in a good and workmanlike manner, any damaged part of the Mortgaged Property to the equivalent of its original condition, or such other condition as Agent may approve in writing, whether or not insurance proceeds or condemnation awards are available to cover any costs of such restoration or repair except to the extent Agent applies such insurance proceeds or condemnation awards to reduce the Debt, (d) shall keep the Mortgaged Property in good repair, including the replacement of Personalty and Fixtures with items of equal or better function and quality, (e) shall provide for professional management of the Mortgaged Property by a manager satisfactory to Agent, in its sole discretion, under a contract approved by Agent in writing, and (f) shall give notice to Agent of and, unless otherwise directed in writing by Agent, shall appear in and defend any action or proceeding purporting to affect the Mortgaged Property, Agent's and Lenders' security or Agent's and Lenders' rights under this Security Instrument. Grantor shall not (and shall not permit any other person to) remove, demolish or alter the Mortgaged Property or any part of the Mortgaged Property except in connection with the replacement of tangible Personalty.

14. **CONDEMNATION.**

(a) Grantor shall promptly notify Agent of any action or proceeding relating to any condemnation or other taking, or conveyance in lieu thereof, of all or any part of the Mortgaged Property, whether direct or indirect (a "Condemnation"). Grantor shall appear in and prosecute or defend any proceeding relating to any Condemnation unless otherwise directed by Agent in writing. Grantor authorizes and appoints Agent as attorney-in-fact for Grantor to commence, appear in and prosecute, in Agent's or Grantor's name, any action or proceeding relating to any Condemnation and to settle or compromise any claim in connection with any Condemnation. This power of attorney is coupled with an interest and therefore is irrevocable. However, nothing contained in this Section 14 shall require Agent or Lenders to incur any expense or take any action. Grantor hereby transfers and assigns to Agent, for the benefit of Lenders all right, title and interest of Grantor in and to any award or payment with respect to (i) any Condemnation, or any conveyance in lieu of Condemnation, and (ii) any damage to the Mortgaged Property caused by governmental action that does not result in a Condemnation.

(b) Subject to the provisions of Section 4.5 of the Loan Agreement, Agent, in its sole and absolute discretion, may apply such awards or proceeds, after the deduction of Agent's and Lenders' expenses incurred in the collection of such amounts, at Agent's option, to the restoration or repair of the Mortgaged Property or to the payment of Loan Obligations, with the balance, if any, to Grantor. Unless Agent otherwise agrees in writing, any application of any awards or proceeds to Loan Obligations shall not extend or postpone the due date of any monthly installments referred to in the Note, Section 5 of this Security Instrument or any Collateral

EFiled: Jun 21 2024 02:23PM EDT
Transaction ID 73455797
Case No. N24C-06-188 FWW

Agreement, or change the amount of such installments. Grantor agrees to execute such further evidence of assignment of any awards or proceeds as Agent may require.

15.     **TRANSFER RESTRICTIONS.**

(a)     Except as otherwise permitted under this Section 15, Transfers shall not be permitted. Any Transfer made in violation of this Section shall constitute an Event of Default. Notwithstanding any provision of this Section to the contrary, in no event shall a Transfer resulting in a change in control of Grantor or the Mortgaged Property be permitted without Agent's prior written consent, which may be granted or denied for any reason or for no reason whatsoever in Agent's sole and absolute discretion.

(b)     Subject to the provisions of Section 15(c) below, the following Transfers shall be permitted, subject to Agent's prior written consent, which consent shall not be unreasonably withheld or delayed, provided that (1) no such Transfer (in a series of one or more transactions) shall result in a change in control of Grantor, (2) in no event shall Grantor or, if Grantor is a limited partnership, the general partner of Grantor (or the general partner of the general partner of Grantor) or, if Grantor is a limited liability company, any corporate member of Grantor which is a Single-Purpose Entity, cease to be a Single-Purpose Entity, and (3) in no event shall any such Transfer result in the dissolution or termination of Grantor, any general partner of Grantor or any general partner of any general partner of Grantor, if applicable, or, if Grantor is a limited liability company, any corporate and limited liability company member or manager of Grantor:

i.      Transfers of Stock among existing holders of the Grantor's stock (A) in Grantor if Grantor is a corporation or (B) in any general or limited partner or member of Grantor (if such entity is a corporation);

ii.     Transfers of limited partnership interests among existing limited partners of Grantor in Grantor if Grantor is a limited partnership; and

iii.    Transfers of membership interests in Grantor among the existing members of Grantor if Grantor is a limited liability company.

(c)     Notwithstanding any provision herein to the contrary, no Transfer otherwise permitted under this Section 15 shall occur unless Grantor shall have given Agent not less than thirty (30) Business Days prior notice of the intended Transfer together with a certificate of an officer of Grantor stating (i) the nature and size of the interest to be the subject of the Transfer, (ii) the name and address of the Person to which such interest shall be conveyed, sold or transferred unless such interest is to be conveyed, sold or transferred pursuant to a registered public sale pursuant to applicable securities laws, and (iii) that the proposed transaction is a bona fide sale, transfer or conveyance solely for cash or equivalent consideration, if applicable. Agent reserves the right to condition any consent required pursuant to this Section 15 with respect to a Transfer upon (A) the payment of all expenses incurred by Agent as set forth below and, in connection with the Transfer of any fee interest in the Mortgaged Property, an assumption fee equal to one percent (1.0%) of the outstanding balance of the Loan, (B) Agent's approval of the financial condition, managerial capabilities and ownership structure of the

**EFiled: Jun 21 2024 02:23PM EDT**
**Transaction ID 73455797**
**Case No. N24C-06-188 FWW**

proposed transferee, including requiring that the transferee of any fee interest in the Mortgaged Property be a Single-Purpose Entity, (C) if the Transfer shall result in a change in control of Grantor or the Mortgaged Property, execution of an assumption agreement by the proposed transferee, in form and content acceptable to Agent, (D) the Loan being in good standing and free from any default, and (E) if required by Agent, receipt of an Opinion of Counsel reasonably satisfactory to Agent stating that, if effected, the proposed Transfer would have no effect on the enforceability of the Security Instrument or the other Loan Documents, and would not result in the dissolution or termination of Grantor, the managing member of Grantor, if applicable, any general partner of Grantor or any general partner of any general partner of Grantor, if applicable. Each request for approval shall be accompanied by a $3,500 nonrefundable review fee paid to the Agent in cash, which will be credited to the 1% assumption fee if the transfer is approved. Grantor agrees to pay on demand all expenses (including, without limitation, reasonable attorney's fees and disbursements, title search costs and title insurance endorsement premiums) incurred by Agent in connection with the review, approval and documentation of any Transfer. In no event shall any Transfer otherwise permitted under this Section occur if such Transfer is required to be registered under the Securities Act of 1933, as amended (the "1933 Act"), or any state securities or Blue Sky laws, or offered pursuant to Rule 144A promulgated under the 1933 Act.

(d)     Notwithstanding any other provision of this Section 15 to the contrary, Transfers of partnership interests, membership interests or corporate shares in Grantor or any Person holding an interest in Grantor between or among partners, members or shareholders existing as such on the date hereof, or Transfers of such interests to immediate family members of existing partners, members or shareholders or to trusts for estate planning purposes for the benefit of existing partners, members or shareholders or members of the transferor's immediate family shall be permitted with Agent's consent, without an assumption fee or review fee, provided that (i) no Event of Default shall have occurred and be continuing, (ii) in no event shall Grantor and any Person holding an interest in Grantor who is a Single-Purpose Entity cease to be a Single-Purpose Entity, (iii) no such Transfer results in a change of control of Grantor, and (iv) Grantor shall pay on demand all expenses (including, without limitation, reasonable attorney's fees and disbursements, title search costs and title insurance endorsement premiums) incurred by Agent in connection with the review, approval and documentation.

16.    **EVENTS OF DEFAULT.** The occurrence of any one or more of the following shall constitute an Event of Default under this Security Instrument:

(a)     any failure by Grantor to pay or deposit within five (5) days after the same becomes due any amount required by the Note, this Security Instrument or any other Loan Document;

(b)     any failure by Grantor to maintain the insurance coverage required under the Loan Agreement, which is not cured within five (5) days after Grantor's receipt of written notice thereof from Agent;

(c)     any failure by Grantor to comply with the provisions of Section 27 ("Single Purpose Entity");

**EFiled: Jun 21 2024 02:23PM EDT**
**Transaction ID 73455797**
**Case No. N24C-06-188 FWW**

(d)      fraud or material misrepresentation or material omission by Grantor, any of its officers, directors, members, general partners or managers or any Guarantor in connection with (i) the application for or creation of Loan Obligations, (ii) any financial statement, financial report, certification, or other report or information required under the Loan Agreement required to be provided to Agent during the term of Loan Obligations, or (iii) any request for Agent's consent to any proposed action, including a request for disbursement of funds under any Collateral Agreement;

(e)      a failure of Grantor to comply with the provisions of Section 15 ("Transfer Restrictions");

(f)      the commencement of a forfeiture action or proceeding, whether civil or criminal, which, in Agent's reasonable judgment, could result in a forfeiture of the Mortgaged Property or otherwise materially impair the lien created by this Security Instrument or Agent's or Lenders' interest in the Mortgaged Property;

(g)      any failure by Grantor to perform any of its obligations under this Security Instrument (other than those specified in Sections 16 (a) through (f) hereof) as and when required, thirty (30) days after written notice of such failure by Agent to Grantor; provided, however, that if such default cannot be cured within such thirty (30) day period, then such cure period shall be extended for an additional sixty (60) days as long as Grantor is diligently and in good faith prosecuting such cure to completion. However, no such notice or grace period shall apply in the case of any such failure which could, in Agent's judgment, absent immediate exercise by Agent of a right or remedy under this Security Instrument, result in harm to Agent or Lenders, impairment of the Note or this Security Instrument or any other security given under any other Loan Document;

(h)      any Event of Default under any other Loan Document, or any failure by Grantor to perform any of its obligations as and when required under any Loan Document other than this Security Instrument which continues beyond the applicable cure period, if any, specified in that Loan Document;

(i)      any exercise by the holder of any debt instrument secured by a mortgage, deed of trust or deed to secure debt on the Mortgaged Property of a right to declare all amounts due under that debt instrument immediately due and payable;

(j)      the Mortgaged Property becomes part of a bankrupt debtor's estate pursuant to any chapter of the United States Bankruptcy Code or the Mortgaged Property otherwise becomes subject to any reorganization, receivership (other than a receivership proceeding instituted by Agent) or insolvency proceeding or any similar proceeding pursuant to any federal, state or foreign law affecting debtor and creditor rights;

(k)      any failure of Grantor to obtain the approval of Agent for any Manager other than Riverwood Management LLC, a New Jersey limited liability company, with respect to the management of the Project, which approval shall be in the sole and absolute discretion of Agent;

**EFiled: Jun 21 2024 02:23PM EDT**
**Transaction ID 73455797**
**Case No. N24C-06-188 FWW**

(l)     any change in any zoning ordinance or regulation or any other public restriction is enacted, adopted or implemented that limits or defines the uses which may be made of the Mortgaged Property such that the present or intended use of the Mortgaged Property, as specified in the Loan Documents, would be in violation of such zoning ordinance or regulation or public restriction, as changed;

(m)     Grantor fails duly to perform its obligations under any Lease, and such failure is not cured within the grace period, if any, provided in the Lease;

(n)     any execution or attachment is levied against any of the Mortgaged Property, and such execution or attachment is not set aside, discharged or stayed within thirty (30) days after the same is levied; or

(o)     This Security Instrument and any other mortgages or deeds of trust securing the Loan are collectively referred to in as the "Mortgage Instruments." Grantor agrees that the Note, the other Loan Documents and the Mortgage Instruments delivered to secure the Loan Agreement are hereby cross-collateralized and cross-defaulted with each other so that (i) an Event of Default under either of the Mortgage Instruments shall constitute an Event of Default under the other Mortgage Instrument; (ii) an Event of Default under the Loan Agreement, the Note or any of the Loan Documents shall constitute an Event of Default under each of the Mortgage Instruments; (iii) each of the Mortgage Instruments shall constitute security for the Loan Agreement which secures the Loan Obligations as if a single blanket lien were placed on all of the properties thereunder as security for the Loan Agreement and the Loan Obligations thereby secured; and (iv) such cross-collateralization shall in no event be deemed to constitute a fraudulent conveyance.

Notwithstanding anything to the contrary contained herein, in the event of any conflict or inconsistency between any provision of this Section 16 and any provision of the Loan Agreement, the provisions of the Loan Agreement shall govern.

17.     **REMEDIES.**

(a)     Acceleration of Maturity. If an Event of Default shall have occurred, then the entire Debt (and all other Loan Obligations) shall, at the option of Agent, immediately become due and payable without notice or demand, time being of the essence of this Security Instrument, and no omission on the part of Agent to exercise such option when entitled to do so shall be construed as a waiver of such right.

(b)     Right to Enter and Take Possession.

(1)     If an Event of Default shall have occurred and is continuing, Grantor, upon demand of Agent, shall forthwith surrender to Agent the actual possession of the Mortgaged Property and, if and to the extent permitted by Law, Agent or Lenders themselves, or by such officers or agents as it may appoint, may, and Grantor shall permit such parties to, enter and take possession of all or any part of the Mortgaged Property without the appointment of a receiver or an application therefor, and may exclude Grantor and its agents and employees wholly therefrom, and take possession of the books, papers and accounts of Grantor relating thereto.

EFiled: Jun 21 2024 02:23PM EDT
Transaction ID 73455797
Case No. N24C-06-188 FWW

(2)     If Grantor shall for any reason fail to surrender or deliver the Mortgaged Property or any part thereof after such demand by Agent, Agent may apply for the appointment of a receiver or obtain a judicial order, judgment or decree conferring upon Agent the right to immediate possession or requiring Grantor to deliver immediate possession of the Mortgaged Property to Agent.  Grantor will pay to Agent, upon demand, all expenses of obtaining such judgment or decree, including costs and expense incurred by any Lender, Agent their attorneys and agents, and all such expenses and costs shall, until paid, become part of Loan Obligations and shall be secured by this Security Instrument.

(3)     Upon every such entering or taking of possession, and to the extent permitted by Law, Agent may hold, store, use, operate, manage and control the Mortgaged Property and conduct the business thereof, and, from time to time (i) make all necessary and proper maintenance, repairs, renewals, replacements, additions, betterments and improvements thereto and thereon and purchase or otherwise acquire additional Fixtures, Personalty and Equipment; (ii) insure or keep the Mortgaged Property insured; (iii) manage and operate the Mortgaged Property and exercise all of the rights and powers of Grantor to the same extent as Grantor could in its own name; and/or (iv) enter into any and all agreements with respect to the exercise by others of any of the powers herein granted to Agent and Lenders, all as Agent from time to time may determine to be in its best interest.  Agent may collect and receive all the Rents, including those past due as well as those accruing thereafter, and, after deducting (A) all expenses of taking, holding, managing and operating the Mortgaged Property (including compensation for the services of all persons employed for such purposes); (B) the cost of all such maintenance, repairs, renewals, replacements, additions, betterments, improvements, purchases and acquisitions; (C) the cost of such insurance required to be maintained by the Loan Agreement; (D) such taxes, assessments and other similar charges as Agent may at its option pay; (E) other proper charges upon the Mortgaged Property or any part thereof; and (F) the actual reasonable fees, expenses and disbursements of the attorneys and agents of Agent, Lenders, Agent shall apply the remainder of the monies and proceeds so received by Agent, first, to the payment of accrued interest; second, to the payment of Imposition Deposits and to other sums required to be paid hereunder; and third, to the payment of overdue installments of principal and any other unpaid Debt then due with the balance (if any) to be remitted to Grantor.  Anything in this Section to the contrary notwithstanding, Agent shall not incur any liability as a result of any exercise by Agent of its rights under this Security Instrument, except due to Agent's willful misconduct or gross negligence, and Agent shall be liable to account only for the Rents actually received by Agent.

(4)     If an Event of Default shall have occurred and is continuing, Agent may require that Grantor cause all of its Accounts to be paid to a lockbox or to one or more deposit accounts with Agent, or at Agent's option, with another financial institution approved by Agent.  Grantor assigns and grants to Agent a security interest in, pledge of and right of setoff against all moneys from time to time held in such deposit accounts, to the extent permitted by applicable Law.  Grantor agrees to promptly notify all of its account debtors to the extent permitted under applicable Law and to the extent Grantor maintains such Accounts, to make payments to one or more such deposit accounts upon Agent's request and as designated by Agent, and Grantor agrees to provide any necessary endorsements to checks, drafts and other forms of payment so that such payments will be properly deposited in such accounts.  Without limitation to the generality of the foregoing, Agent may notify Grantor's account debtors to make

EFiled: Jun 21 2024 02:23PM EDT
Transaction ID 73455797
Case No. N24C-06-188 FWW

payments to such deposit accounts or directly to Agent, and following such notice all Accounts shall be paid directly to Agent and not to Grantor or any other Person than as directed by Agent, it being understood that a demand by Agent on any account debtor shall be sufficient to warrant payment by such account debtor without the necessity of further consent by Grantor. Agent may cause moneys to be withdrawn from such deposit accounts and applied to Loan Obligations in such order as Agent may elect, whether or not then due. Grantor appoints Agent as Grantor's attorney-in-fact, which appointment is coupled with an interest and is irrevocable, to provide any notice, endorse any check, draft or other payment for deposit, or take any other action which Grantor agrees to undertake in accordance with this Section. Agent shall not be liable for failure to collect or to enforce any Accounts or for any action or omission on the part of Agent, Lenders, their officers, agents and employees in collecting or enforcing such Accounts.

(5)     Whenever all Loan Obligations shall have been paid and all Events of Default shall have been cured, Agent shall surrender possession of the Mortgaged Property to Grantor, its successors and/or assigns. The same right of taking possession, however, shall exist if any subsequent Event of Default shall occur and be continuing.

(c)     Performance by Agent. Upon the occurrence of any Event of Default and during the continuation thereof, Agent may, at its sole option, pay, perform or observe the same, and all payments made or costs or expenses incurred by Agent in connection therewith, with interest thereon at the Default Rate (as defined in the Loan Agreement) or at the maximum rate from time to time allowed by applicable Law, whichever is less, shall be secured hereby and shall be, within ten (10) days after demand, repaid by Grantor to Agent or Lenders, as applicable. Notwithstanding anything to the contrary herein, neither Agent nor any Lender shall have any obligation, explicit or implied to pay, perform, or observe any term, covenant, or condition.

(d)     Receiver. If any Event of Default shall have occurred and be continuing Agent, to the extent permitted by applicable laws, upon application to a court of competent jurisdiction, shall be entitled as a matter of strict right, without notice and without regard to the sufficiency or value of any security for Loan Obligations or the solvency of any party bound for its payment, to the appointment of a receiver to take possession of and to operate the Mortgaged Property and to collect and apply the Rents. The receiver shall have all the rights and powers permitted under the Laws of the State where the Mortgaged Property is situated. Grantor will pay unto Agent and Lenders upon demand all expenses, including receiver's fees, reasonable attorney's fees, costs and agent's compensation, incurred pursuant to the provisions of this Section, and upon any Grantor's failure to pay the same, any such amounts shall be added to Loan Obligations and shall be secured by this Security Instrument.

(e)     Agent's Power of Enforcement. If an Event of Default shall have occurred and be continuing, Agent may, either with or without entry or taking possession as herein provided or otherwise, proceed by suit or suits at law or in equity or any other appropriate proceeding or remedy (1) to enforce payment of the Loan Obligations; (2) to foreclose this Security Instrument judicially or non-judicially; (3) to enforce or exercise any right under any Loan Document; and (4) to pursue any one (1) or more other remedies provided in this Security Instrument or in any other Loan Document or otherwise afforded by applicable Law. Each right and remedy provided in this Security Instrument or any other Loan Document is distinct from all other rights or remedies under this Security Instrument or any other Loan Document or otherwise

EFiled: Jun 21 2024 02:23PM EDT
Transaction ID 73455797
Case No. N24C-06-188 FWW

afforded by applicable Law, and each shall be cumulative and may be exercised concurrently, independently, or successively, in any order. Grantor has the right to bring an action to assert the nonexistence of an Event of Default or any other defense of Grantor to acceleration and sale. Agent may foreclose this Security Instrument and to sell, as an entirety or in separate lots or parcels, the Mortgaged Property, as provided by applicable Law, and pursue any other remedy available to it, all as Agent shall deem most effectual for such purposes. Grantor authorizes Agent, at Agent's option, to foreclose this Security Instrument subject to the rights of any tenants of the Mortgaged Property; provided, however, that all leases executed subsequent to the recordation of this Security Instrument shall at all times be subject and subordinate to the Security Instrument and to all the terms and conditions of this Security Instrument and to the rights and liens of the holder of this Security Instrument and to all renewals, modifications, consolidations, replacements, and extensions thereof. The failure to make any such tenants parties defendant to any such foreclosure proceedings and to foreclose their rights will not be, nor may be asserted by Grantor to be, a defense to any proceedings instituted by Agent to recover Loan Obligations secured hereby or any deficiency remaining unpaid after the foreclosure sale of the Mortgaged Property. Upon any such foreclosure sale, Agent may bid for and purchase the Mortgaged Property and, upon compliance with the terms of sale, may hold, retain, possess and dispose of the Mortgaged Property in its own absolute right without further accountability.

(f) Power of Sale. If any Event of Default shall have occurred and be continuing, Agent may, ether with or without entry or taking possession of the Mortgaged Property as provided in this Security Instrument or Otherwise, personally or by its agents or attorneys, and without prejudice to the right to bring an action for foreclosure of this Security Instrument, sell the Property or portion thereof, and all estate, right, title and interest, of Grantor therein, and terminate all rights of redemption with respect thereto, pursuant to any procedures provided by applicable law. Any sale or sales pursuant hereto shall be for the Property as a whole or in parcels and shall be held at such time and place, upon such terms and after such notice thereof as may be required or permitted by applicable law. All notices hereunder or under any applicable law pertaining hereto shall be in writing and shall be deemed sufficiently served for all purposes when given pursuant to Section 26 of this Security Instrument or as otherwise permitted by applicable laws. For purposes hereof, notices may be given by the parties hereto or by their respective attorneys.

(g) Purchase by Agent. Upon any foreclosure sale, Agent may bid for and purchase the Mortgaged Property and shall be entitled to apply all or any part of Loan Obligations as a credit to the purchase price.

(h) Application of Proceeds of Sale. In the event of a foreclosure or other sale of all or any portion of the Mortgaged Property, the proceeds of said sale shall be applied, first, to the expenses of such sale and of all proceedings in connection therewith, including actual reasonable attorney's fees and expenses (and such reasonable attorney's fees and expenses shall become absolutely due and payable whenever foreclosure is commenced); then to insurance premiums, liens, assessments, Impositions and charges, including utility charges and any other amounts advanced by Agent and Lenders hereunder, and interest thereon; then to payment of Loan Obligations in such order of priority as Agent shall determine, in its sole discretion; and

EFiled: Jun 21 2024 02:23PM EDT
Transaction ID 73455797
Case No. N24C-06-188 FWW

finally the remainder, if any, shall be paid to Grantor, or to the person or entity lawfully entitled thereto.

(i)     Grantor as Tenant Holding Over. In the event of any such foreclosure sale, Grantor (if Grantor shall remain in possession) shall be deemed a tenant holding over and shall forthwith deliver possession to the purchaser or purchasers at such sale or be summarily dispossessed according to provisions of Law applicable thereto.

(j)     Waiver of Appraisement, Valuation, Etc. Grantor agrees, to the full extent permitted by Law, that in case of an Event of Default on the part of Grantor hereunder, neither Grantor nor anyone claiming through or under Grantor will assert, claim or seek to take advantage of any appraisement, redemption, valuation, stay, homestead, extension, exemption or laws now or hereafter in force, in order to prevent or hinder the enforcement of foreclosure of this Security Instrument, or the absolute sale of the Mortgaged Property, or the delivery of possession thereof immediately after such sale to the purchaser at such sale.

(k)     Discontinuance of Proceedings. In case Agent shall have proceeded to enforce any right, power or remedy under this Security Instrument by foreclosure, entry or otherwise, and such proceedings shall have been discontinued or abandoned for any reason, or shall have been determined adversely to Agent, then in every such case, Grantor and Agent shall be restored to their former positions and rights hereunder, and all rights, powers and remedies of Agent shall continue as if no such proceedings had occurred.

(l)     Waiver.

(1)     No delay or omission by Agent or Lenders or by any holder of the Note to exercise any right, power or remedy accruing upon any default shall exhaust or impair any such right, power or remedy or shall be construed to be a waiver of any such default, or acquiescence therein, and every right, power and remedy given by this Security Instrument to Agent and Lenders may be exercised from time to time and as often as may be deemed expedient by Agent and/or Lenders. No consent or waiver expressed or implied by Agent and Lenders to or of any breach or default by Grantor in the performance of the obligations of Grantor hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance of the same or any other obligations of Grantor hereunder. Failure on the part of Agent and Lenders to complain of any act or failure to act or failure to declare an Event of Default, irrespective of how long such failure continues, shall not constitute a waiver by Agent or Lenders of its rights hereunder or impair any rights, powers or remedies of Agent or Lenders hereunder.

(2)     No act or omission by Agent or Lenders or the failure to perfect any lien or security interest created hereby shall release, discharge, modify, change or otherwise affect the original liability under the Note, this Security Instrument, other Loan Documents or any other obligation of Grantor or any subsequent purchaser of the Mortgaged Property or any part thereof, or any maker, co-signer, endorser, surety or guarantor, nor preclude Agent or Lenders from exercising any right, power or privilege herein granted or intended to be granted upon any Event of Default then existing or any subsequent default, nor alter the lien of this Security Instrument, except as expressly provided in an instrument or instruments executed by

Agent. Without limiting the generality of the foregoing, Agent may (A) grant forbearance or an extension of time for the payment of all or any portion of Loan Obligations; (B) take other or additional security for the payment of any of Loan Obligations; (C) waive or fail to exercise any right granted herein, in the Note or in other Loan Documents; (D) release any part of the Mortgaged Property from the security interest or lien of this Security Instrument or otherwise change any of the terms, covenants, conditions or agreements of the Note, this Security Instrument or other Loan Documents; (E) consent to the filing of any map, plat or replat affecting the Land; (F) consent to the granting of any easement or other right affecting the Mortgaged Property; (G) make or consent to any agreement subordinating the security title or lien hereof, or (H) take or omit to take any action whatsoever with respect to the Note, this Security Instrument, the other Loan Documents, the Mortgaged Property or any document or instrument evidencing, securing or in any way related to this Security Instrument, in accordance with the terms hereof and thereof, all without releasing, discharging, modifying, changing or affecting any such liability, or precluding Agent or Lenders from exercising any such right, power or privilege with respect to the lien of this Security Instrument. In the event of the sale or transfer by operation of law or otherwise of all or any part of the Mortgaged Property, Agent, without notice, is hereby authorized and empowered to deal with any such vendee or transferee with respect to the Mortgaged Property or Loan Obligations, or with reference to any of the terms, covenants, conditions or agreements hereof, as fully and to the same extent as it might deal with the original parties hereto and without in any way releasing or discharging any liabilities, obligations or undertakings of Grantor, any guarantor of Loan Obligations or others.

(3)     Grantor waives and relinquishes any and all rights it may have, whether at law or equity, to require Agent to proceed to enforce or exercise any rights, powers and remedies it may have under the Loan Documents in any particular manner, in any particular order, or in any particular state or other jurisdiction. Grantor expressly waives and relinquishes any and all rights and remedies that Grantor may have or be able to assert by reason of the Laws of the Property Jurisdiction (as hereinafter defined) pertaining to the rights and remedies of sureties.

(4)     Grantor makes these arrangements, waivers and relinquishments knowingly and as a material inducement to Agent in making the Loan, after consulting with and considering the advice of independent legal counsel selected by Grantor.

(m)     Suits to Protect the Mortgaged Property. Agent shall have power to institute and maintain such suits and proceedings as it may deem expedient (1) to prevent any impairment of the Mortgaged Property by any acts which may be unlawful or constitute an Event of Default under this Security Instrument; (2) to preserve or protect its interest in the Mortgaged Property and in the Rents arising therefrom; and (3) to restrain the enforcement of or compliance with any legislation or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid, if the enforcement of or compliance with such enactment, rule or order would materially impair the security hereunder or be prejudicial to the interest of Agent or Lenders.

(n)     Proofs of Claim. In the case of any receivership, insolvency, bankruptcy, reorganization, arrangement, adjustment, composition or other proceedings affecting Grantor, its creditors or its properties, Agent, to the extent permitted by Law, shall be entitled to file such

4887-7161-4491.1

**EFiled: Jun 21 2024 02:23PM EDT**
**Transaction ID 73455797**
**Case No. N24C-06-188 FWW**

proofs of claim and other documents as may be necessary or advisable in order to have the claims of Agent and Lenders allowed in such proceedings for the entire amount due and payable by Grantor under this Security Instrument at the date of the institution of such proceedings and for any additional amount which may become due and payable by Grantor hereunder after such date.

(o)   Uniform Commercial Code.  Agent may exercise any or all of its rights and remedies under the Uniform Commercial Code as adopted by the State as in effect from time to time, (or under the Uniform Commercial Code in force from time to time in any other state to the extent the same is applicable law) or other applicable law as well as all other rights and remedies possessed by Lender, all of which shall be cumulative.  Agent is hereby authorized and empowered to enter the Property or other place where the Personalty may be located without legal process, and to take possession of the Personalty without notice or demand, which hereby are waived to the maximum extent permitted by the laws of the State.  Upon demand by Agent, Grantor shall make the Personalty available to Agent at a place reasonably convenient to Agent.  Agent may proceed under the Uniform Commercial Code as to all or any part of the Personalty, and in conjunction therewith may exercise all of the rights, remedies and powers of a secured creditor under the Uniform Commercial Code.  Any notification required by the Uniform Commercial Code shall be deemed reasonably and properly given if sent in accordance with the Notice provisions of this Security Instrument at least ten (10) days before any sale or other disposition of the Personalty.  Agent may choose to dispose of some or all of the property, in any combination consisting of both Personalty and Land and Improvements (the "Real Property"), in one or more public or private sales to be held in accordance with the Law and procedures applicable to real property, as permitted by Article 9 of the Uniform Commercial Code.  Grantor agrees that such a sale of Personalty together with Real Property constitutes a commercially reasonable sale of the Personalty.

(p)   Other Remedies.  Agent shall have the right from time to time to protect, exercise and enforce any legal or equitable remedy against Grantor provided under the Loan Documents or by applicable Laws.

(q)   Possession of Property Not Required.  Upon any sale of any item of the Mortgaged Property made pursuant to a Judicial, it will not be necessary for any Selling Official to have any of the Mortgaged Property present or constructively in his possession.

18.   **REMEDIES CUMULATIVE**.  Each right and remedy provided in this Security Instrument is distinct from all other rights or remedies under this Security Instrument or any other Loan Document or afforded by applicable Law, and each shall be cumulative and may be exercised concurrently, independently, or successively, in any order.

19.   **FORBEARANCE.**

(a)   Agent may agree with Grantor, from time to time, at Agent's option and without giving notice to, or obtaining the consent of, or having any effect upon the obligations of any Guarantor or other third party obligor, extend the time for payment of all or any part of Loan Obligations, reduce the payments due under this Security Instrument, the Note, or any other Loan Document, release anyone liable for the payment of any amounts under this Security

EFiled: Jun 21 2024 02:23PM EDT
Transaction ID 73455797
Case No. N24C-06-188 FWW

Instrument, the Note, or any other Loan Document, accept a renewal of the Note, modify the terms and time of payment of Loan Obligations, consolidate the Notes, join in any extension or subordination agreement, release any Mortgaged Property, take or release other or additional security, modify the rate of interest or period of amortization of the Note or change the amount of the monthly installments payable under the Note, or otherwise modify this Security Instrument, the Note, or any other Loan Document.

(b)     Any forbearance by Agent in exercising any right or remedy under the Note, this Security Instrument, or any other Loan Document or otherwise afforded by applicable Law, shall not be a waiver of or preclude the exercise of any right or remedy.  The acceptance by Agent of payment of all or any part of Loan Obligations after the due date of such payment, or in an amount which is less than the required payment, shall not be a waiver of Agent's and Lenders' right to require prompt payment when due of all other payments on account of Loan Obligations or to exercise any remedies for any failure to make prompt payment.  Enforcement by Agent of any security for Loan Obligations shall not constitute an election by Agent of remedies so as to preclude the exercise of any other right available to Agent and Lenders. Agent's receipt of any insurance and/or condemnation proceeds shall not operate to cure or waive any Event of Default.

20.     **LOAN CHARGES**.  If any applicable Law limiting the amount of interest or other charges permitted to be collected from Grantor is interpreted so that any charge provided for in any Loan Document, whether considered separately or together with other charges levied in connection with any other Loan Document, violates that law, and Grantor is entitled to the benefit of that law, that charge is hereby reduced to the extent necessary to eliminate that violation.  The amounts, if any, previously paid to Agent in excess of the permitted amounts shall be applied by Agent to reduce the principal of Loan Obligations.  For the purpose of determining whether any applicable Law limiting the amount of interest or other charges permitted to be collected from Grantor has been violated, all Debt which constitutes interest, as well as all other charges levied in connection with Loan Obligations which constitute interest, shall be deemed to be allocated and spread over the stated term of the Note.  Unless otherwise required by applicable Law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of the Note.

21.     **WAIVER OF STATUTE OF LIMITATIONS**.  Grantor hereby waives the right to assert any statute of limitations as a bar to the enforcement of the lien of this Security Instrument or to any action brought to enforce any Loan Document.

22.     **WAIVER OF MARSHALING**.  Notwithstanding the existence of any other security interests in the Mortgaged Property (or in any other property held by Agent and/or Lenders as security for all or any part of Loan Obligations) held by Agent or Lenders or by any other party, Agent shall have the right to determine the order in which any or all of the Mortgaged Property shall be subjected to the remedies provided in this Security Instrument, the Note, any other Loan Document or applicable Law.  Agent shall have the right to determine the order in which any or all portions of Loan Obligations are satisfied from the proceeds realized upon the exercise of such remedies.  Grantor and any party who now or in the future acquires a security interest in the Mortgaged Property (or in any other property held by Agent as security for all or any part of Loan Obligations) and who has actual or constructive notice of this Security

EFiled: Jun 21 2024 02:23PM EDT
Transaction ID 73455797
Case No. N24C-06-188 FWW

Instrument waives any and all right to require the marshaling of assets or to require that any of the Mortgaged Property be sold in the inverse order of alienation or that any of the Mortgaged Property (or any other property held by Agent or Lenders as security for all or any part of Loan Obligations) be sold in parcels or as an entirety in connection with the exercise of any of the remedies permitted by applicable Law or provided in this Security Instrument.

23.     **FURTHER ASSURANCES**. Grantor shall execute, acknowledge, and deliver, at its sole cost and expense, all further acts, deeds, conveyances, assignments, estoppel certificates, financing statements, transfers and assurances as Agent may require from time to time in order to better assure, grant, and convey to Agent and Lenders the rights intended to be granted, now or in the future, to Agent and Lenders under this Security Instrument and the Loan Documents.

24.     **ESTOPPEL CERTIFICATE**. Within ten (10) days after a request from Agent, Grantor shall deliver to Agent a written statement, signed and acknowledged by Grantor, certifying to Agent and Lenders or any person designated by Agent, as of the date of such statement: (a) that the Loan Documents are unmodified and in full force and effect (or, if there have been modification, that the Loan Documents are in full force and effect as modified and setting forth such modifications); (b) the unpaid principal balance of the Note; (c) the date to which interest under the Note has been paid; (d) that Grantor is not in default in paying Loan Obligations or in performing or observing any of the covenants or agreements contained in this Security Instrument or any of the other Loan Documents (or, if the Grantor is in default, describing such default in reasonable detail); (e) whether or not there are then existing any setoff or defenses known to Grantor against the enforcement of any right or remedy of Agent and Lenders under the Loan Documents; and (f) any additional facts requested by Agent.

25.     **GOVERNING LAW; CONSENT TO JURISDICTION AND VENUE.**

(a)     This Security Instrument, and any Loan Document which does not itself expressly identify the law that is to apply to it, shall be governed by the Laws of the jurisdiction in which the Mortgaged Property is located (the "Property Jurisdiction).

(b)     Each of Grantor, Agent and Lenders consents to the exclusive jurisdiction of any and all state and federal courts with jurisdiction in the Property Jurisdiction over Grantor and Grantor's assets. Grantor agrees, to the extent permitted by Law, that its assets shall be used first to satisfy all claims of creditors organized or domiciled in the United States and that no assets of Grantor in the United States shall be considered part of any foreign bankruptcy estate.

(c)     Each of Grantor and Agent agrees that any controversy arising under or in relation to the Note, this Security Instrument, or any other Loan Document shall be litigated exclusively in the Property Jurisdiction. The state and federal courts and authorities with jurisdiction in the Property Jurisdiction shall have exclusive jurisdiction over all controversies which shall arise under or in relation to the Note, any security for Loan Obligations, or any other Loan Document. Grantor irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

EFiled:  Jun 21 2024 02:23PM EDT
Transaction ID 73455797
Case No. N24C-06-188 FWW

26.    **NOTICE.**  Any notice or other communication required or permitted to be given by this Security Instrument or the other Loan Documents or by applicable Law shall be in writing and shall be deemed received: (a) on the date delivered, if sent by hand delivery (to the person or department if one is specified below) with receipt acknowledged by the recipient thereof; (b) three (3) Business Days following the date deposited in U.S. mail, postage prepaid, certified or registered, with return receipt requested; or (c) one (1) Business Day following the date deposited with Federal Express or other national overnight carrier, and in each case addressed as follows:

| | |
|---|---|
| If to Grantor: | Cranston Apartments LLC<br>475 Oberlin Avenue South, Suite 211,<br>Lakewood, New Jersey 08701<br>Attn: Menachem Tress and Elimelech Tress |
| with a copy to: | Jeffrey Zwick & Associates, P.C.<br>266 Broadway, Suite 403<br>Brooklyn, NY 11211<br>Attention: Jeffrey Zwick, Esq. |
| If to Agent: | Capital Funding, LLC<br>1422 Clarkview Road<br>Baltimore, Maryland 21209<br>Attention:  Account Manager – Cranston Hall Apartments |
| with a copy to: | Nixon Peabody LLP<br>Tower 46<br>55 West 46th Street<br>New York, NY 10036<br>Attention: Laura Mehl Sugarman, Esq. |

Any party may change its or its attorney address to another single address by notice given as herein provided, except any change of address notice must be actually received in order to be effective.

27.    **SINGLE PURPOSE ENTITY.**  Until Loan Obligations are paid in full, Grantor shall maintain its status as a Single Purpose Entity and comply with all those covenants with respect to its status as a Single Purpose Entity as set forth in the Loan Agreement.

28.    **JOINT AND SEVERAL LIABILITY.**  If more than one Person signs this Security Instrument as Grantor, the obligations of such Persons shall be joint and several.

29.    **RELATIONSHIP OF PARTIES; NO THIRD PARTY BENEFICIARY.**  The relationship between Agent and Grantor shall be solely that of creditor and debtor, respectively, and nothing contained in this Security Instrument shall create any other relationship between Agent and Grantor.  No creditor of any party to this Security Instrument and no other person shall be a third party beneficiary of this Security Instrument or any other Loan Document.

EFiled: Jun 21 2024 02:23PM EDT
Transaction ID 73455797
Case No. N24C-06-188 FWW

30.   **SEVERABILITY; AMENDMENTS.** The invalidity or unenforceability of any provision of this Security Instrument shall not affect the validity or enforceability of any other provision, and all other provisions shall remain in full force and effect. This Security Instrument contains the entire agreement among the parties as to the rights granted and the obligations assumed in this Security Instrument. Subject to the provisions of Section 19 herein, this Security Instrument may not be amended or modified except by a writing signed by the party against whom enforcement is sought.

31.   **MISCELLANEOUS PROVISIONS.** The captions and headings of the sections of this Security Instrument are for convenience only and shall be disregarded in construing this Security Instrument. Any reference in this Security Instrument to an "Exhibit" or a "Section" shall, unless otherwise explicitly provided, be construed as referring, respectively, to an Exhibit attached to this Security Instrument or to a section of this Security Instrument. All Exhibits attached to or referred to in this Security Instrument are incorporated by reference into this Security Instrument. Any reference in this Security Instrument to a statute or regulation shall be construed as referring to that statute or regulation as amended from time to time. Use of the singular in this Security Instrument includes the plural and use of the plural includes the singular. As used in this Security Instrument, the term "including" means "including, but not limited to."

32.   **WAIVER OF TRIAL BY JURY. EACH OF GRANTOR, AGENT AND LENDERS (A) COVENANTS AND AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE THAT IS TRIABLE OF RIGHT BY A JURY AND (B) WAIVES ANY RIGHT TO TRIAL BY JURY TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL, AND THIS WAIVER IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A JURY TRIAL WOULD OTHERWISE EXIST. GRANTOR, AGENT AND LENDERS ARE AUTHORIZED TO SUBMIT THIS SECURITY INSTRUMENT TO ANY COURT HAVING JURISDICTION OVER THE SUBJECT MATTER AND THE PARTIES TO ANY LOAN DOCUMENT, SO AS TO SERVE AS CONCLUSIVE EVIDENCE OF GRANTOR'S, AGENT'S AND LENDERS' WAIVER OF THE RIGHT TO JURY TRIAL. FURTHER, EACH OF GRANTOR, AGENT AND LENDERS CERTIFIES THAT NONE OF GRANTOR'S, AGENT'S OR ANY LENDER'S REPRESENTATIVES OR AGENTS HAVE REPRESENTED, EXPRESSLY OR OTHERWISE, THAT ENFORCEMENT OF THIS WAIVER WILL NOT BE SOUGHT.**

33.   **WAIVER OF AUTOMATIC STAY. TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, GRANTOR HEREBY AGREES THAT, IN CONSIDERATION OF AGENT'S AND LENDER'S AGREEMENT TO MAKE THE LOAN AND IN RECOGNITION THAT THE FOLLOWING COVENANT IS A MATERIAL INDUCEMENT FOR LENDERS TO MAKE THE LOAN, IN THE EVENT THAT GRANTOR SHALL (I) FILE WITH ANY BANKRUPTCY COURT OF COMPETENT JURISDICTION OR BE THE SUBJECT OF ANY PETITION UNDER ANY SECTION OR CHAPTER OF TITLE 11 OF THE UNITED STATES CODE, AS AMENDED ("BANKRUPTCY CODE"), OR SIMILAR LAW OR STATUTE; (II) BE**

EFiled: Jun 21 2024 02:23PM EDT
Transaction ID 73455797
Case No. N24C-06-188 FWW

THE SUBJECT OF ANY ORDER FOR RELIEF ISSUED UNDER THE BANKRUPTCY CODE OR SIMILAR LAW OR STATUTE; (III) FILE OR BE THE SUBJECT OF ANY PETITION SEEKING ANY REORGANIZATION, ARRANGEMENT, COMPOSITION, READJUSTMENT, LIQUIDATION, DISSOLUTION, OR SIMILAR RELIEF UNDER ANY PRESENT OR FUTURE FEDERAL OR STATE ACT OR LAW RELATING TO BANKRUPTCY, INSOLVENCY, OR OTHER RELIEF FOR DEBTORS; (IV) HAVE SOUGHT OR CONSENTED TO OR ACQUIESCED IN THE APPOINTMENT OF ANY RECEIVER, CONSERVATOR, OR LIQUIDATOR; OR (V) BE THE SUBJECT OF AN ORDER, JUDGMENT OR DECREE ENTERED BY ANY COURT OF COMPETENT JURISDICTION APPROVING A PETITION FILED AGAINST GRANTOR FOR ANY REORGANIZATION, ARRANGEMENT, COMPOSITION, READJUSTMENT, LIQUIDATION, DISSOLUTION, OR SIMILAR RELIEF UNDER ANY PRESENT OR FUTURE FEDERAL OR STATE ACT OR LAW RELATING TO BANKRUPTCY, INSOLVENCY OR RELIEF FOR DEBTORS, THEN, SUBJECT TO COURT APPROVAL, AGENT AND LENDERS SHALL THEREUPON BE ENTITLED AND GRANTOR HEREBY IRREVOCABLY CONSENTS TO, AND WILL NOT CONTEST, AND AGREES TO STIPULATE TO RELIEF FROM ANY AUTOMATIC STAY OR OTHER INJUNCTION IMPOSED BY SECTION 362 OF THE BANKRUPTCY CODE, OR SIMILAR LAW OR STATUTE (INCLUDING, WITHOUT LIMITATION, RELIEF FROM ANY EXCLUSIVE PERIOD SET FORTH IN SECTION 1121 OF THE BANKRUPTCY CODE) OR OTHERWISE, ON OR AGAINST THE EXERCISE OF THE RIGHTS AND REMEDIES OTHERWISE AVAILABLE TO AGENT AND LENDERS AS PROVIDED IN THE LOAN DOCUMENTS, AND AS OTHERWISE PROVIDED BY LAW, AND GRANTOR HEREBY IRREVOCABLY WAIVES ITS RIGHTS TO OBJECT TO SUCH RELIEF.

34.     **SUCCESSORS AND ASSIGNS BOUND.** This Security Instrument shall bind, and the rights granted by this Security Instrument shall inure to, the respective successors and assigns of Agent, Lenders and Grantor.

35.     **PATRIOT ACT COMPLIANCE.**

(a)     Grantor will use its good faith and commercially reasonable efforts to comply with the Patriot Act (as defined below) and all applicable requirements of governmental authorities having jurisdiction of the Grantor and the Mortgaged Property, including those relating to money laundering and terrorism. Agent shall have the right to audit the Grantor's compliance with the Patriot Act and all applicable requirements of governmental authorities having jurisdiction of the Grantor and the Mortgaged Property, including those relating to money laundering and terrorism. In the event that the Grantor fails to comply with the Patriot Act or any such requirements of governmental authorities, then Agent may, at its option, cause the Grantor to comply therewith and any and all reasonable costs and expenses incurred by the Agent and/or Lenders in connection therewith shall be secured by this Security Instrument, the Guaranty Agreement and the other Loan Documents and shall be immediately due and payable. For purposes hereof, the term "Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, as the same may be amended from time to time, and corresponding provisions of future laws.

EFiled: Jun 21 2024 02:23PM EDT
Transaction ID 73455797
Case No. N24C-06-188 FWW

(b)     Neither the Grantor nor any partner, member, shareholder or other constituent (each a "Constituent of Grantor") or a partner, member or shareholder of a Constituent of Grantor nor any owner of a direct or indirect interest in the Grantor (i) is listed on any Government Lists (as defined below), (ii) is a person who has been determined by competent authority to be subject to the prohibitions contained in Presidential Executive Order No. 13224 (Sept. 23, 2001) or any other similar prohibitions contained in the rules and regulations of OFAC (as defined below) or in any enabling legislation or other Presidential Executive Orders in respect thereof, (iii) has been previously indicted for or convicted of any felony involving a crime or crimes of moral turpitude or for any Patriot Act Offense (as defined below), or (iv) is not currently under investigation by any governmental authority for alleged criminal activity. For purposes hereof, the term "Patriot Act Offense" means any violation of the criminal laws of the United States of America or of any of the several states, or that would be a criminal violation if committed within the jurisdiction of the United States of America or any of the several states, relating to terrorism or the laundering of monetary instruments, including any offense under (i) the criminal laws against terrorism; (ii) the criminal laws against money laundering, (iii) the Bank Secrecy Act, as amended, (iv) the Money Laundering Control Act of 1986, as amended, or the (v) Patriot Act. "Patriot Act Offense" also includes the crimes of conspiracy to commit, or aiding and abetting another to commit, a Patriot Act Offense. For purposes hereof, the term "Government Lists" means (i) the Specially Designated Nationals and Blocked Persons Lists maintained by Office of Foreign Assets Control ("OFAC"), (ii) any other list of terrorists, terrorist organizations or narcotics traffickers maintained pursuant to any of the Rules and Regulations of OFAC that Agent notified Grantor in writing is now included in "Governmental Lists", or (iii) any similar lists maintained by the United States Department of State, the United States Department of Commerce or any other government authority or pursuant to any Executive Order of the President of the United States of America that Agent notified Grantor in writing is now included in "Governmental Lists".

36.     **ADDITIONAL     WARRANTIES,     REPRESENTATIONS     AND COVENANTS**.

(a)     Grantor has made certain representations and warranties to Agent and Lenders pursuant to Article III of the Loan Agreement (entitled "Borrower's Representations and Warranties") which concern or relate to Grantor, the Mortgaged Property (or the various items comprising the same as set forth in Section 1(p) above) the Stock of Grantor and the Project, which warranties and representations are incorporated herein by reference (the "Warranties and Representations"). Grantor warrants and represents to Agent and Lenders that the Warranties and Representations are true and correct in all material respects and are not misleading.

(b)     Pursuant to the Loan Agreement, Grantor has agreed to perform certain Loan Obligations and engage in or refrain from engaging in certain conduct, and Grantor will engage in or refrain from engaging in certain conduct, which performance and conduct are referred to herein as the "Additional Obligations". Grantor covenants and agrees for the benefit of Agent and Lenders, that Grantor will perform all of the Additional Obligations.

37.   **STATE SPECIFIC PROVISIONS.**

(a)      [local counsel to confirm]

(1)      Conflicts.  To the extent of any inconsistency between this Section and the other provisions of this Security Instrument, the terms and provisions of this Section shall govern and control.

(2)      Future Advances.  This Security Instrument is intended to apply to future advances pursuant to 25 Del. C. § 2118.  This Security Interest secures not only existing indebtedness or advances made contemporaneously with the execution hereof, if any, but also future principal advances, with all interest accrued thereon, to or for the benefit of Mortgagor, made pursuant to the terms of this Security Instrument, and other documents evidencing the secured indebtedness (as the same may be modified, amended or supplemented from time to time), the terms of all of which are incorporated herein by reference.  All such future advances, whether such advances are obligatory, optional or both and whether made before or after default or maturity or other similar event, shall be secured by this Security Instrument to the same extent as if such future advances were made contemporaneously with the execution of this Security Instrument, even though no advance may have been made at the time of execution of this Security Instrument and even though no indebtedness is outstanding at the time any advance is made.  Any lien attaching to the Mortgaged Property after the date hereof shall be under, subject and subordinate to all indebtedness, including, without limitation, future advances (regardless of when made) secured hereby.  This Security Instrument shall also secure disbursements and other advances made for the payment of taxes, assessments, maintenance, care, protection or insurance on the Mortgaged Property, for the discharge of liens having priority over the lien of this Security Instrument, for the curing of waste of the Mortgaged Property, for indemnification obligations regarding environmental liabilities of the Mortgaged Property, and for service charges and expenses incurred by reason of a default hereunder, including, without limitation, late charges, attorneys' fees and court costs, together with interest on all such disbursements at the rate then in effect under the Loan Documents, and all other charges, disbursements, advances, costs and expenses now or hereafter permitted by law.  The preference and priority of the lien of this Security Instrument shall extend to any and all modifications of this Security Instrument or of the obligations secured by this Security Instrument, except to the extent expressly limited by applicable law.  Notwithstanding the foregoing, Grantee shall have no obligation to make any disbursements or advance any sums as a result of this section.

(3)      Defeasance.  Upon payment of the debt secured or performance of the other conditions of the Security Instrument, the Security Instrument shall become void and of no effect.

[Signature appears on following page]

**EFiled: Jun 21 2024 02:23PM EDT**
**Transaction ID 73455797**
**Case No. N24C-06-188 FWW**

IN WITNESS WHEREOF, Grantor has caused this Security Instrument to be executed under seal as of the day and year first written above.

### GRANTOR:

**CRANSTON APARTMENTS LLC,**
a Delaware limited liability company

By: _____

Name: Elimelech Tress
Title:  Authorized Signatory

### NOTARY ACKNOWLEDGMENT

STATE OF New Jersey }

COUNTY OF Ocean }

On April 21, 2022 before me, Elisheva Kanner _____ Notary Public,

(here insert name and title of the officer)

personally appeared Elimelech Tress, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of New Jersey that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature: _____

> **ELISHEVA KANNER**
> NOTARY PUBLIC OF NEW JERSEY
> Commission # 50116118
> My Commission Expires 11/6/2024

(Seal)

**EFiled: Jun 21 2024 02:23PM EDT**
**Transaction ID 73455797**
**Case No. N24C-06-188 FWW**

## EXHIBIT A

## LEGAL DESCRIPTION

All that certain lot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the City of Wilmington, County of New Castle, State of Delaware.

ALL that certain lot, piece or parcel of land with the buildings thereon erected, situate in Christiana Hundred, New Castle County and State of Delaware, and more particularly bounded and described, as follows, to-wit:

## TRACT 1

BEGINNING at a point in the middle of the Old Capitol Trail (formerly known as Centre Road) at the distance of Three Hundred one feet five inches Northeasterly from the intersection of the middle line of the said Old Capitol Trail and the middle line of the Newport and Gap Turnpike Road, being a corner of land formerly of Eugene Woodward, now of Edwin C. Denny, Jr., et. al., Trustees; thence by the middle of said Old Capitol Trail North 40 degrees East One hundred eighteen feet to a point in the center of said road, a corner of this land and lands formerly of John A. Cranston, now known as Cranston Heights Addition; thence by line of said lands South 50 degrees East Seven hundred eighty feet to a point in a corner of land formerly of the Newport Land and Improvement Company and now known as Avalon; thence by line of said land South 86 degrees West Three hundred sixty and one-half feet to a point in line of said lands formerly of Eugene Woodward now of Edwin C. Denny, Jr., et. al., Trustees; and thence thereby North 33 degrees 50 minutes West Five hundred forty-three feet to a point in the middle of said Old Capitol Trail and place of beginning.

EXCEPTING from the tract or piece of land above described ALL THAT CERTAIN portion thereof conveyed to the State of Delaware by deed of William A. Mitchell and wife, dated the 25th day of February, A.D. 1932 and recorded in the Office of the Recorder of Deeds in and for New Castle County aforesaid in Deed Record H, Volume 35, Page 160.

THE SAID ABOVE DESCRIBED tract or piece of land being also bounded and described as follows, to-wit:

BEGINNING at a point in the Southeasterly side of Old Capitol Trail (at 60 feet wide), said point being located from the intersection of the center lines of said Old Capitol Trail and Newport and Gap Turnpike by the following two courses and distances: (1) North 40 degrees East by said center line of said Old Capitol Trail Three hundred six and twenty-two one-hundredths feet to a point: and (2) South 36 degrees 50 minutes East, crossing said Old Capitol Trail, Thirty and eighty one-hundredths feet to the Southeasterly side thereof; thence by said Southeasterly side of said Old Capitol Trail North 40 degrees East One hundred Twenty-one and twenty-two one-hundredths feet to a pipe: thence South 50 degrees 11 minutes East Six hundred seventy-five and thirty-seven one-hundredths feet to a monument, and continuing the an same course Ninety-seven and seventeen one-hundredths feet to a corner distant South 89 degrees 4 minutes West eleven and forty-eight one-hundredths feet from a pipe: thence south 89 degrees 04 minutes West One hundred ninety-eight and seventy-eight one-hundredths feet to a monument: thence South 88 degrees 43 minutes west One hundred sixty-six and sixty-four one-hundredths feet to a corner for the tract hereby conveyed: thence North 36 degrees 50 minutes West Five hundred ten and forty-three one hundredths feet to a point on the aforesaid Southeasterly side of Old Capitol Trail, the place of Beginning.

4887-7161-4491.1

EFiled: Jun 21 2024 02:23PM EDT
Transaction ID 73455797
Case No. N24C-06-188 FWW

## TRACT 2

BEGINNING at a point on the Southeasterly side of Old Capitol Trail (at 60 feet wide), said point being located from the intersection of the center lines of said Old Capitol Trail and Newport and Gap Turnpike by the following two courses and distances: (1) North 40 degrees East by said center line of said Old Capitol Trail Four Hundred twenty and thirty-two one-hundredths feet to a point; and (2) South 50 degrees 11 minutes East, crossing said Old Capitol Trail, Thirty feet to the Southeasterly side thereof; thence from said beginning point by said Southeasterly side of said Old Capitol Trail North 40 degrees 14 minutes East One hundred and sixty-three one-hundredths (100.63) feet to a pipe in line of land now or late of U. A. W. Local 435; thence by line of said lands and lands now or late of D. Flinn Estate South 72 degrees 05 minutes East Nine hundred forty-six and three one-hundredths (946.03) feet to a pipe at a corner for lands now or late of Philip DiEgidio; thence by line of said lands South 1 degree 14 minutes 30 seconds East Two hundred sixty-nine and forty one-hundredths (269.40) feet to a stone in line of lands now or late of S. Wedwick; thence by line of said lands South 88 degrees 19 minutes West Three hundred seventy-seven and seventy-six one-hundredths (377.76) feet to a pipe, a corner for lands conveyed to Cranston Hall, Inc. by deed of Lillie M. Kershaw, Widow, and Edwin Kershaw, single man, dated the Twenty-ninth day of May, A.D. 1963, and recorded in the Office of the Recorder of Deeds in and for New Castle County aforesaid in Deed Record E, Volume 71, Page 477; thence by line of said lands North 50 degrees 11 minutes West (passing over a monument at 97.17 feet) a total distance of Seven hundred seventy-two and fifty-four one-hundredths (772.54) feet to the said Southeasterly side of the aforesaid Old Capitol, at 60 feet wide, the point and place of Beginning.

NOTE FOR INFORMATION: Being Parcel No. 0703740152 (Tract 1), 0703740151, 0703740150 and 0703740149 (Tract 2), of the City of Wilmington, County of New Castle.

EFiled:  Jun 21 2024 02:23PM EDT
Transaction ID 73455797
Case No. N24C-06-188 FWW

# **Exhibit H**

**Tax Parcel Numbers:**
07-037.40-152,
07-037.40-151,
07-037.40-150,
07-037.40-149

**20230303-0013981**
P: 1 of 7   F:$126.00
Michael E. Kozikowski     3/3/2023 8:40:25 AM
New Castle Recorder     T20230007858
                               MTG MOD

**Prepared By:**
Nixon Peabody LLP
Tower 46, 55 West 46th Street
New York, New York 10036
Attn:  Laura Mehl Sugarman, Esq.

**Return To:**
Capital Funding, LLC
1422 Clarkview Road
Baltimore, MD 21209
Attn: Stephanie Jenifer

FIRST MODIFICATION TO MORTGAGE, SECURITY AGREEMENT, ASSIGNMENT OF
LEASES AND RENTS,
FINANCING STATEMENT AND FIXTURE FILING

made by

CRANSTON APARTMENTS, as Grantor

to

CAPITAL FUNDING, LLC, as Agent (as Grantee)

Dated as of February 28, 2023
Location:
3310 and 3314 Old Capital Trail, Wilmington, DE 19808
County of New Castle

**THIS MORTGAGE SECURES FUTURE ADVANCES.**

**NOTE TO RECORDER:**  THIS INSTRUMENT IS TO BE INDEXED AND/OR FILED AS
BOTH A MORTGAGE AND A FINANCING STATEMENT FILED AS A FIXTURE FILING.

FIRST MODIFICATION TO MORTGAGE, SECURITY AGREEMENT, ASSIGNMENT OF
LEASES AND RENTS, FINANCING STATEMENT AND FIXTURE FILING

THIS FIRST MODIFICATION TO DEED OF TRUST, SECURITY AGREEMENT, ASSIGNMENT OF LEASES AND RENTS, FINANCING STATEMENT AND FIXTURE FILING (this "Modification"), is made as of February 28, 2023, by CRANSTON APARTMENTS LLC, a Delaware limited liability company ("Grantor"), whose address is 475 Oberlin Avenue South, Suite 211, Lakewood, New Jersey 08701, for the benefit of CAPITAL FUNDING, LLC, a Maryland limited liability company, in its capacity as Agent (together with its successors and assigns in such capacity, "Agent") for Lenders (as defined below). All capitalized terms not defined herein shall have the respective meanings set forth in the Loan Agreement (as defined below).

RECITALS:

WHEREAS, this Modification is a modification to that certain DEED OF TRUST, SECURITY AGREEMENT, ASSIGNMENT OF LEASES AND RENTS, FINANCING STATEMENT AND FIXTURE FILING, dated April 27, 2022 and recorded on May 19, 2022 as Instrument No. 20220519-0053479 (the "Original Security Instrument") in the real estate records of New Castle County, Delaware, which Original Security Instrument encumbers certain real property and improvements more particularly described on Exhibit A attached hereto (the "Property").

WHEREAS, the Original Security Instrument secures, inter alia, Grantor's obligations with respect to a loan ("Loan") from Lenders to Grantor in the original maximum principal amount of Twenty One Million Fifty Thousand and No/100 Dollars ($21,050,000.00), which Loan is evidenced by, among other documents, a Promissory Note, dated as of April 27, 2022, made by Grantor in favor of CAPITAL FUNDING, LLC, a Maryland limited liability company (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "Note") and the terms of which Loan are governed, in part, by that certain Loan Agreement dated as of April 27, 2022 (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "Original Loan Agreement"), by and among Grantor, various financial institutions as are, or may from time to time become, parties thereto as lenders (collectively, "Lenders") and Agent;

WHEREAS, Grantor has requested, and Lenders have agreed to increase the maximum principal amount of the Loan from Twenty One Million Fifty Thousand and No/100 Dollars ($21,050,000.00) to **Twenty Two Million Seven Hundred Fifty Thousand and No/100 Dollars ($22,750,000.00),** which is evidenced by: (a) that certain First Amendment to Loan Agreement dated as of the date hereof by and among Grantor, Agent and Lenders (as amended, restated, supplemented or otherwise modified from time to time, the "First Amendment to Loan Agreement") which amends the Original Loan Agreement, and (b) a certain Amended and Restated Promissory Note dated as of the date hereof which amends and restates the Note (the "A&R Note");

WHEREAS, it is the intention of each party hereto that neither the execution nor delivery of, nor anything set forth in this Modification shall be construed in any manner to affect the

validity, enforceability or priority of the Original Security Instrument, or the liens and security interests created thereby, and that the Original Security Instrument shall remain valid, effective and in force.

NOW, THEREFORE, in consideration of the First Amendment to Loan Agreement and the disbursements of $1,700,000,000 of additional Loan proceeds, and intending to be legally bound hereby, Grantor covenants and agrees as follows:

1.     **RECITALS.** The aforesaid Recitals are incorporated herein as a part of this Modification. As used herein or in the Original Security Instrument, the term "this Security Instrument" or "the Security Instrument" shall mean and refer to the Original Security Instrument, as amended by this Modification unless the context dictates otherwise. Capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Original Security Instrument.

2.     **AMENDMENT TO ORIGINAL SECURITY AGREEMENT.**

The third paragraph of the Original Security Agreement is hereby amended and restated in its entirety as follows:

"WHEREAS, pursuant to a certain Loan Agreement dated as of April 27, 2022, as amended by that certain First Amendment to Loan Agreement dated as of the date hereof (as the same may be further amended, restated, replaced, supplemented or otherwise modified from time to time, collectively, the "Loan Agreement") by and among Grantor, Agent and the other financial institutions who are or hereafter become parties to the Loan Agreement (together with Agent, collectively or individually, as the context may require, referred to herein as "Lender" or "Lenders"), Grantor has agreed to borrow from Lender the aggregate sum of Twenty Two Million Seven Hundred Fifty Thousand and No/100 Dollars ($22,750,000.00) (the "Loan"), and evidenced by that certain Amended and Restated Promissory Note, dated as of the date hereof, made by Grantor in favor of Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "Note")";

3.     **ADDITIONAL   WARRANTIES,   REPRESENTATIONS   AND   COVENANTS.**

Grantor has made certain representations and warranties to Agent and the Lenders pursuant to Article III of the Loan Agreement (entitled "Borrower's Representations and Warranties") which concern or relate to Grantor, and the Mortgaged Property (or the various items comprising the same as set forth in herein), which warranties and representations are incorporated herein by reference (the "Warranties and Representations"). Grantor warrants and represents to Agent that the Warranties and Representations are true and correct in all material respects and are not misleading.

a. Pursuant to the Loan Agreement, Grantor has agreed to perform certain Loan Obligations and engage in or refrain from engaging in certain conduct, and Grantor will engage in or refrain from engaging in certain conduct, which performance and conduct are referred to herein as the "Additional Obligations." Grantor covenants and agrees for the benefit of Agent and Lenders, that Grantor will perform all of the Additional Obligations.

4.    **MISCELLANEOUS.**

This Security Instrument shall be binding upon Grantor and its heirs, devisees, representatives, successors and assigns, including successors in interest of Grantor in and to all or any part of the Mortgaged Property, and shall inure to the benefit of and may be enforced by Lenders and their heirs, successors, legal representatives, substitutes and assigns. Grantor shall not assign any of its rights or obligations under this Modification. If any term, covenant or condition of this Modification is held to be invalid, illegal or unenforceable in any respect, this Modification shall be construed without such provision. This Modification shall be governed and construed in accordance with the laws of the state in which the Mortgaged Property is located and the applicable laws of the United States of America, except as expressly provided otherwise by the applicable Uniform Commercial Code with respect only to matters of the perfection and the priority of any security interests in a deposit account created pursuant to this Modification. This Modification may be signed in multiple counterparts by the parties hereto, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Grantor has caused this Security Instrument to be executed under seal as of the day and year first written above.

GRANTOR:

CRANSTON APARTMENTS LLC,
a Delaware limited liability company

By: _____

Name: Elimelech Tress
Title:  Authorized Signatory

## NOTARY ACKNOWLEDGMENT

STATE OF _____New Jersey_____ }

COUNTY OF _____Ocean_____ }

On __2/23/23__ before me, ___Elimelech Tress_____ Notary Public,
(here insert name and title of the officer)
personally appeared Elimelech Tress, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of ___New Jersey___ that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature: _____                    (Seal)

ELISHEVA KANNER
NOTARY PUBLIC OF NEW JERSEY
Commission # 50116116
My Commission Expires 11/6/2024

[Signature Page to First Modification to Mortgage]

4878-8258-5937.2

**EXHIBIT A**

**LEGAL DESCRIPTION**

All that certain lot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the City of Wilmington, County of New Castle, State of Delaware.

ALL that certain lot, piece or parcel of land with the buildings thereon erected, situate in Christiana Hundred, New Castle County and State of Delaware, and more particularly bounded and described, as follows, to-wit:

**TRACT 1**

BEGINNING at a point in the middle of the Old Capitol Trail (formerly known as Centre Road) at the distance of Three Hundred one feet five inches Northeasterly from the intersection of the middle line of the said Old Capitol Trail and the middle line of the Newport and Gap Turnpike Road, being a corner of land formerly of Eugene Woodward, now of Edwin C. Denny, Jr., et. al., Trustees; thence by the middle of said Old Capitol Trail North 40 degrees East One hundred eighteen feet to a point in the center of said road, a corner of this land and lands formerly of John A. Cranston, now known as Cranston Heights Addition; thence by line of said lands South 50 degrees East Seven hundred eighty feet to a point in a corner of land formerly of the Newport Land and Improvement Company and now known as Avalon; thence by line of said land South 86 degrees West Three hundred sixty and one-half feet to a point in line of said lands formerly of Eugene Woodward now of Edwin C. Denny, Jr., et. al., Trustees; and thence thereby North 33 degrees 50 minutes West Five hundred forty-three feet to a point in the middle of said Old Capitol Trail and place of beginning.

EXCEPTING from the tract or piece of land above described ALL THAT CERTAIN portion thereof conveyed to the State of Delaware by deed of William A. Mitchell and wife, dated the 25th day of February, A.D. 1932 and recorded in the Office of the Recorder of Deeds in and for New Castle County aforesaid in Deed Record H, Volume 35, Page 160.

THE SAID ABOVE DESCRIBED tract or piece of land being also bounded and described as follows, to-wit:

BEGINNING at a point in the Southeasterly side of Old Capitol Trail (at 60 feet wide), said point being located from the intersection of the center lines of said Old Capitol Trail and Newport and Gap Turnpike by the following two courses and distances: (1) North 40 degrees East by said center line of said Old Capitol Trail Three hundred six and twenty-two one-hundredths feet to a point: and (2) South 36 degrees 50 minutes East, crossing said Old Capitol Trail, Thirty and eighty one-hundredths feet to the Southeasterly side thereof; thence by said Southeasterly side of said Old Capitol Trail North 40 degrees East One hundred Twenty-one and twenty-two one-hundredths feet to a pipe: thence South 50 degrees 11 minutes East Six hundred seventy-five and thirty-seven one-hundredths feet to a monument, and continuing the an same course Ninety-seven and seventeen one-hundredths feet to a corner distant South 89 degrees 4 minutes West eleven and forty-eight one-hundredths feet from a pipe: thence south 89 degrees 04 minutes West One hundred ninety-eight and seventy-eight one-hundredths feet to a monument: thence South 88 degrees 43 minutes west One hundred sixty-six and sixty-four one-hundredths feet to a corner for the tract hereby conveyed: thence North 36 degrees 50 minutes West Five hundred ten and forty-three one hundredths feet to a point on the aforesaid Southeasterly side of Old Capitol Trail, the place of Beginning.

## TRACT 2

BEGINNING at a point on the Southeasterly side of Old Capitol Trail (at 60 feet wide), said point being located from the intersection of the center lines of said Old Capitol Trail and Newport and Gap Turnpike by the following two courses and distances: (1) North 40 degrees East by said center line of said Old Capitol Trail Four Hundred twenty and thirty-two one-hundredths feet to a point; and (2) South 50 degrees 11 minutes East, crossing said Old Capitol Trail, Thirty feet to the Southeasterly side thereof; thence from said beginning point by said Southeasterly side of said Old Capitol Trail North 40 degrees 14 minutes East One hundred and sixty-three one-hundredths (100.63) feet to a pipe in line of land now or late of U. A. W. Local 435; thence by line of said lands and lands now or late of D. Flinn Estate South 72 degrees 05 minutes East Nine hundred forty-six and three one-hundredths (946.03) feet to a pipe at a corner for lands now or late of Philip DiEgidio; thence by line of said lands South 1 degree 14 minutes 30 seconds East Two hundred sixty-nine and forty one-hundredths (269.40) feet to a stone in line of lands now or late of S. Wedwick; thence by line of said lands South 88 degrees 19 minutes West Three hundred seventy-seven and seventy-six one-hundredths (377.76) feet to a pipe, a corner for lands conveyed to Cranston Hall, Inc. by deed of Lillie M. Kershaw, Widow, and Edwin Kershaw, single man, dated the Twenty-ninth day of May, A.D. 1963, and recorded in the Office of the Recorder of Deeds in and for New Castle County aforesaid in Deed Record E, Volume 71, Page 477; thence by line of said lands North 50 degrees 11 minutes West (passing over a monument at 97.17 feet) a total distance of Seven hundred seventy-two and fifty-four one-hundredths (772.54) feet to the said Southeasterly side of the aforesaid Old Capitol, at 60 feet wide, the point and place of Beginning.

NOTE FOR INFORMATION: Being Parcel No. 0703740152 (Tract 1), 0703740151, 0703740150 and 0703740149 (Tract 2), of the City of Wilmington, County of New Castle.

EFiled:  Jun 21 2024 02:23PM EDT
Transaction ID 73455797
Case No. N24C-06-188 FWW

# **Exhibit I**

March 6, 2024

***VIA FEDERAL EXPRESS-NEXT DAY DELIVERY***

Cranston Apartments LLC
475 Oberlin Avenue South, Suite 211
Lakewood, New Jersey 08701
Attn: Menachem Tress and Elimelech Tress

**Re:    NOTICE OF OCCURRENCE OF EVENT OF DEFAULT; RESERVATION OF RIGHTS;
         DEMAND FOR PAYMENT**

To Whom It May Concern:

Reference is hereby made to that certain Loan Agreement dated April 27, 2022 (as amended, restated, modified and/or supplemented from time to time, the "***Loan Agreement***") by and between **CRANSTON APARTMENTS LLC**, a Delaware limited liability company ("***Borrower***"), the lenders time to time party thereto (collectively, "***Lenders***") and **CAPITAL FUNDING, LLC**, a Maryland limited liability company ("***Agent***"). All capitalized terms used but not defined herein shall have the meanings assigned to them in the Loan Agreement. This letter is to inform you that Events of Default have occurred and are continuing under the Loan Agreement and Loan Documents as more fully set forth herein.

You are hereby notified that the following Default or Event of Default have occurred and is continuing (each individually and collectively, the "***Specified Event of Default***"): Borrower failed to timely pay interest due February 1, 2024 (the "***Overdue Amount***"), as required by Section 2.1(b) of the Loan Agreement, which is an Event of Default under Section 8.1(b) of the Loan Agreement.

The Specified Event of Default continues, has not been waived and in some cases may not be cured. Other Events of Default may exist and may continue to exist.

Agent and Lenders reserve their rights to assert all of their available rights and remedies under the Loan Agreement and other Loan Documents, and any and all rights and remedies under applicable law as Agent or Lenders each determines to be appropriate. Agent and Lenders may exercise each right and remedy available to them from time to time and as often and in such order as it may determine in its sole discretion and the exercise or beginning of the exercise of any such right or remedy shall not be construed as a waiver of the right to exercise at the same time or thereafter any other right or remedy available to it. Any action or inaction Agent or any Lender determines, in its sole discretion, to take during the existence of any Event of Default (including, without limitation, the imposition of default interest) shall not operate as a waiver of any Event of Default or any right or remedy under the Loan Documents, and will not be deemed to establish a course of conduct nor justify an expectation by Borrower that Agent or Lenders will take further action or continue not to take any action and will not preclude Agent or Lenders from exercising any and all remedies available at any time thereafter. Agent and Lenders each hereby further expressly reserves every right, power and remedy specifically provided by the Loan Agreement, the other Loan Documents and any related documents, now existing or hereafter existing at law, in equity or by statute and each and every right, power and remedy, whether specifically given by Borrower or otherwise existing, which may be exercised from time to time and as often and in such order as may be deemed

expedient by Agent or Lenders and the exercise or beginning of the exercise of any such right, power or remedy shall not be construed as a waiver of the right to exercise at the same time or thereafter any other right, power or remedy.

Without limiting the foregoing or any right of Agent and Lenders under the Loan Documents, Agent and Lenders reserve the right to (i) collect interest at any default rate of interest (including the Default Rate in accordance with Section 2.1(c)(vii) of the Loan Agreement) at any time from and after the occurrence of the Specified Event of Default or any other Events of Default on any amounts outstanding after such date, (ii) collect any late charge (including the Late Charge in accordance with Section 2.1(c)(viii) of the Loan Agreement) payable in respect of any late payment, and (iii) apply any balance in the Payment Reserves upon an Event of Default against the Loan Obligations in whatever order Agent shall determine in Agent's sole and absolute discretion in accordance with Section 7.10(b) of the Loan Agreement, it being understood that to the extent Agent withdraws any funds from the Payment Reserves as a result of Borrower's Default, Borrower is obligated to replenish the Payment Reserves within fourteen (14) days of Agent's demand as provided in such Section 7.10(b). Collection of any default rate interest or late charge or application of any Payment Reserves by Agent shall not be deemed to cure any Default or Event of Default, including the Specified Event of Default.

Agent, Lenders and Borrower have engaged in discussions concerning the Specified Event of Default, and Agent and Lenders anticipate that additional discussions may take place in the future. However, Agent, Lenders and Borrower shall not be obligated to engage or to attempt to engage in discussions or negotiations, and whether or not Agent, Lenders and/or Borrower participate in, continue or terminate any such discussions or negotiations at any time is wholly at the election of Agent, Lenders and Borrower, each acting independently and in its sole and absolute discretion without incurring liability to the other. During the course of such discussions, Agent, Lenders and Borrower may touch upon and potentially reach a preliminary understanding on one or more issues prior to concluding negotiations. Notwithstanding this fact, and absent an express written waiver by Agent or Lenders, Agent and Lenders will not be bound by an agreement on any individual issue unless and until an agreement is reached on all issues and such agreement is reduced to writing and signed by Agent, Lenders and the Borrower.

As of the date of this letter, there are no offers outstanding from Agent or Lenders to Borrower nor are there any oral agreements among Agent, Lenders and Borrower concerning the Borrower's obligations under the Loan Agreement and the other Loan Documents. Rather, all agreements concerning such obligations are expressed solely in the existing Loan Documents, and the respective duties and obligations of the Borrower, Lenders and Agent shall be only as set forth in the Loan Documents.

Nothing in this letter is intended to modify any of the provisions of the Loan Documents, to waive any of Agent's or Lenders' rights, remedies, or powers against the Borrower or any other Person, or the Collateral, or to waive any Events of Default which may now exist or hereafter arise. Agent and Lenders each hereby expressly reserves all of their rights, remedies, and powers under the Loan Documents, at law, in equity, or otherwise.

This notice is not intended and shall not be construed as an election of remedies or a waiver of Agent's or Lenders' right to exercise any prejudgment or self-help rights or remedies or any other rights or remedies which may now or hereafter be available to Agent or Lenders pursuant to the terms of the Loan Documents, or that are otherwise available at law or in equity. No delay by Agent or Lenders in exercising any rights or remedies shall operate as a waiver of any rights or remedies Agent or Lenders may have. Any and all rights and remedies available to Agent and Lenders shall be cumulative and may be exercised separately, successively or concurrently at the sole discretion of Agent and Lenders.

**This notice serves as a formal demand that Borrower immediately pays the Overdue Amount.**

Please do not hesitate to contact us should you require any further information.

[signature on following page]

Very truly yours,

CAPITAL FUNDING, LLC,
as Agent and Lender

By: _____
Name: *Laura Deutsch*
Title: *Managing Director*

Cc:    Jeffrey Zwick & Associates, P.C.
      266 Broadway, Suite 403
      Brooklyn, NY 11211
      Attention: Jeffrey Zwick, Esq.

EFiled:  Jun 21 2024 02:23PM EDT
Transaction ID 73455797
Case No. N24C-06-188 FWW

# **Exhibit J**

April 5, 2024

***VIA FEDERAL EXPRESS-NEXT DAY DELIVERY***

Cranston Apartments LLC
475 Oberlin Avenue South, Suite 211
Lakewood, New Jersey 08701
Attn: Menachem Tress and Elimelech Tress

**Re:   NOTICE OF OCCURRENCE OF EVENTS OF DEFAULT; RESERVATION OF RIGHTS; DEMAND FOR PAYMENT**

To Whom It May Concern:

Reference is hereby made to that certain Loan Agreement dated April 27, 2022 (as amended, restated, modified and/or supplemented from time to time, the "***Loan Agreement***") by and between **CRANSTON APARTMENTS LLC**, a Delaware limited liability company ("***Borrower***"), the lenders time to time party thereto (collectively, "***Lenders***") and **CAPITAL FUNDING, LLC**, a Maryland limited liability company ("***Agent***"). All capitalized terms used but not defined herein shall have the meanings assigned to them in the Loan Agreement. This letter is to inform you that Events of Default have occurred and are continuing under the Loan Agreement and Loan Documents as more fully set forth herein.

You are hereby notified that the following Defaults or Events of Default have occurred and are continuing (each individually and collectively, the "***Specified Event of Default***"): Borrower failed to timely pay interest due February 1, 2024 and March 1, 2024 (the "***Overdue Amount***"), as required by Section 2.1(b) of the Loan Agreement, which are Events of Default under Section 8.1(b) of the Loan Agreement.

The Specified Event of Default continues, has not been waived and in some cases may not be cured. Other Events of Default may exist and may continue to exist.

Agent and Lenders reserve their rights to assert all of their available rights and remedies under the Loan Agreement and other Loan Documents, and any and all rights and remedies under applicable law as Agent or Lenders each determines to be appropriate. Agent and Lenders may exercise each right and remedy available to them from time to time and as often and in such order as it may determine in its sole discretion and the exercise or beginning of the exercise of any such right or remedy shall not be construed as a waiver of the right to exercise at the same time or thereafter any other right or remedy available to it. Any action or inaction Agent or any Lender determines, in its sole discretion, to take during the existence of any Event of Default (including, without limitation, the imposition of default interest) shall not operate as a waiver of any Event of Default or any right or remedy under the Loan Documents, and will not be deemed to establish a course of conduct nor justify an expectation by Borrower that Agent or Lenders will take further action or continue not to take any action and will not preclude Agent or Lenders from exercising any and all remedies available at any time thereafter. Agent and Lenders each hereby further expressly reserves every right, power and remedy specifically provided by the Loan Agreement, the other Loan Documents and any related documents, now existing or hereafter existing at law, in equity or by statute and each and every right, power and remedy, whether specifically given by Borrower or otherwise existing, which may be exercised from time to time and as often and in such order as may be deemed

expedient by Agent or Lenders and the exercise or beginning of the exercise of any such right, power or remedy shall not be construed as a waiver of the right to exercise at the same time or thereafter any other right, power or remedy.

Without limiting the foregoing or any right of Agent and Lenders under the Loan Documents, Agent and Lenders reserve the right to (i) collect interest at any default rate of interest (including the Default Rate in accordance with Section 2.1(c)(vii) of the Loan Agreement) at any time from and after the occurrence of the Specified Event of Default or any other Events of Default on any amounts outstanding after such date, (ii) collect any late charge (including the Late Charge in accordance with Section 2.1(c)(viii) of the Loan Agreement) payable in respect of any late payment, and (iii) apply any balance in the Payment Reserves upon an Event of Default against the Loan Obligations in whatever order Agent shall determine in Agent's sole and absolute discretion in accordance with Section 7.10(b) of the Loan Agreement, it being understood that to the extent Agent withdraws any funds from the Payment Reserves as a result of Borrower's Default, Borrower is obligated to replenish the Payment Reserves within fourteen (14) days of Agent's demand as provided in such Section 7.10(b). Collection of any default rate interest or late charge or application of any Payment Reserves by Agent shall not be deemed to cure any Default or Event of Default, including the Specified Event of Default.

Agent, Lenders and Borrower have engaged in discussions concerning the Specified Event of Default, and Agent and Lenders anticipate that additional discussions may take place in the future. However, Agent, Lenders and Borrower shall not be obligated to engage or to attempt to engage in discussions or negotiations, and whether or not Agent, Lenders and/or Borrower participate in, continue or terminate any such discussions or negotiations at any time is wholly at the election of Agent, Lenders and Borrower, each acting independently and in its sole and absolute discretion without incurring liability to the other. During the course of such discussions, Agent, Lenders and Borrower may touch upon and potentially reach a preliminary understanding on one or more issues prior to concluding negotiations. Notwithstanding this fact, and absent an express written waiver by Agent or Lenders, Agent and Lenders will not be bound by an agreement on any individual issue unless and until an agreement is reached on all issues and such agreement is reduced to writing and signed by Agent, Lenders and the Borrower.

As of the date of this letter, there are no offers outstanding from Agent or Lenders to Borrower nor are there any oral agreements among Agent, Lenders and Borrower concerning the Borrower's obligations under the Loan Agreement and the other Loan Documents. Rather, all agreements concerning such obligations are expressed solely in the existing Loan Documents, and the respective duties and obligations of the Borrower, Lenders and Agent shall be only as set forth in the Loan Documents.

Nothing in this letter is intended to modify any of the provisions of the Loan Documents, to waive any of Agent's or Lenders' rights, remedies, or powers against the Borrower or any other Person, or the Collateral, or to waive any Events of Default which may now exist or hereafter arise. Agent and Lenders each hereby expressly reserves all of their rights, remedies, and powers under the Loan Documents, at law, in equity, or otherwise.

This notice is not intended and shall not be construed as an election of remedies or a waiver of Agent's or Lenders' right to exercise any prejudgment or self-help rights or remedies or any other rights or remedies which may now or hereafter be available to Agent or Lenders pursuant to the terms of the Loan Documents, or that are otherwise available at law or in equity. No delay by Agent or Lenders in exercising any rights or remedies shall operate as a waiver of any rights or remedies Agent or Lenders may have. Any and all rights and remedies available to Agent and Lenders shall be cumulative and may be exercised separately, successively or concurrently at the sole discretion of Agent and Lenders.

**This notice serves as a formal demand that Borrower immediately pays the Overdue Amount.**

Please do not hesitate to contact us should you require any further information.

[signature on following page]

Very truly yours,

CAPITAL FUNDING, LLC,
as Agent and Lender

By: _____
Name: _Laura Deutsch_
Title: _Managing Director_

Cc:     Jeffrey Zwick & Associates, P.C.
        266 Broadway, Suite 403
        Brooklyn, NY 11211
        Attention: Jeffrey Zwick, Esq.

EFiled:  Jun 21 2024 02:23PM EDT
Transaction ID 73455797
Case No. N24C-06-188 FWW

# Exhibit K

May 3, 2024

*__VIA FEDERAL EXPRESS-NEXT DAY DELIVERY__*

Cranston Apartments LLC
475 Oberlin Avenue South, Suite 211
Lakewood, New Jersey 08701
Attn: Menachem Tress and Elimelech Tress

Re:     **NOTICE OF OCCURRENCE OF EVENT OF DEFAULT; RESERVATION OF RIGHTS;
        DEMAND FOR PAYMENT**

To Whom It May Concern:

Reference is hereby made to that certain Loan Agreement dated April 27, 2022 (as amended, restated, modified and/or supplemented from time to time, the "***Loan Agreement***") by and between **CRANSTON APARTMENTS LLC**, a Delaware limited liability company ("***Borrower***"), the lenders time to time party thereto (collectively, "***Lenders***") and **CAPITAL FUNDING, LLC**, a Maryland limited liability company ("***Agent***"). All capitalized terms used but not defined herein shall have the meanings assigned to them in the Loan Agreement. This letter is to inform you that Events of Default have occurred and are continuing under the Loan Agreement and Loan Documents as more fully set forth herein.

In addition to the Events of Default set forth in that certain Notice of Occurrence of Event of Default; Reservation of Rights; Demand for Payment Letter dated as of March 6, 2024, and the Notice of Occurrence of Event of Default; Reservation of Rights; Demand for Payment Letter dated as of April 4, 2024 (collectively, the "***Prior Specified Defaults***"), you are hereby notified that the following Default or Event of Default has occurred and is continuing (together with the Prior Specified Defaults, each individually and collectively, the "***Specified Event of Default***"): Borrower failed to timely pay interest due April 1, 2024 (the "***Overdue Amount***"), as required by Section 2.1(b) of the Loan Agreement, which is an Event of Default under Section 8.1(b) of the Loan Agreement.

**This notice serves as a formal demand that Borrower immediately pays the Overdue Amount. If Borrower fails to timely and properly remit to Agent the amount demanded herein, <u>Lenders may accelerate the Maturity Date of the Loan</u> which will cause the outstanding principal balance of the Loan, all accrued interest (contract and otherwise) and all other appropriate amounts due under the Loan Documents (including, without limitation, yield maintenance, default interest, late charges, attorney fees, costs of collection, etc.) to be immediately due and payable without further demand.**

The Specified Event of Default continues, has not been waived and in some cases may not be cured. Other Events of Default may exist and may continue to exist.

Agent and Lenders reserve their rights to assert all of their available rights and remedies under the Loan Agreement and other Loan Documents, and any and all rights and remedies under applicable law as Agent or Lenders each determines to be appropriate. Agent and Lenders may exercise each right and remedy available to them from time to time and as often and in such order as it may determine in its sole discretion and the exercise or beginning of the exercise of any such right or remedy shall not be construed

as a waiver of the right to exercise at the same time or thereafter any other right or remedy available to it. Any action or inaction Agent or any Lender determines, in its sole discretion, to take during the existence of any Event of Default (including, without limitation, the imposition of default interest) shall not operate as a waiver of any Event of Default or any right or remedy under the Loan Documents, and will not be deemed to establish a course of conduct nor justify an expectation by Borrower that Agent or Lenders will take further action or continue not to take any action and will not preclude Agent or Lenders from exercising any and all remedies available at any time thereafter.  Agent and Lenders each hereby further expressly reserves every right, power and remedy specifically provided by the Loan Agreement, the other Loan Documents and any related documents, now existing or hereafter existing at law, in equity or by statute and each and every right, power and remedy, whether specifically given by Borrower or otherwise existing, which may be exercised from time to time and as often and in such order as may be deemed expedient by Agent or Lenders and the exercise or beginning of the exercise of any such right, power or remedy shall not be construed as a waiver of the right to exercise at the same time or thereafter any other right, power or remedy.

Without limiting the foregoing or any right of Agent and Lenders under the Loan Documents, Agent and Lenders reserve the right to (i) collect interest at any default rate of interest (including the Default Rate in accordance with Section 2.1(c)(vii) of the Loan Agreement) at any time from and after the occurrence of the Specified Event of Default or any other Events of Default on any amounts outstanding after such date, (ii) collect any late charge (including the Late Charge in accordance with Section 2.1(c)(viii) of the Loan Agreement) payable in respect of any late payment, and (iii) apply any balance in the Payment Reserves upon an Event of Default against the Loan Obligations in whatever order Agent shall determine in Agent's sole and absolute discretion in accordance with Section 7.10(b) of the Loan Agreement, it being understood that to the extent Agent withdraws any funds from the Payment Reserves as a result of Borrower's Default, Borrower is obligated to replenish the Payment Reserves within fourteen (14) days of Agent's demand as provided in such Section 7.10(b).  Collection of any default rate interest or late charge or application of any Payment Reserves by Agent shall not be deemed to cure any Default or Event of Default, including the Specified Event of Default.

Agent, Lenders and Borrower have engaged in discussions concerning the Specified Event of Default, and Agent and Lenders anticipate that additional discussions may take place in the future.  However, Agent, Lenders and Borrower shall not be obligated to engage or to attempt to engage in discussions or negotiations, and whether or not Agent, Lenders and/or Borrower participate in, continue or terminate any such discussions or negotiations at any time is wholly at the election of Agent, Lenders and Borrower, each acting independently and in its sole and absolute discretion without incurring liability to the other. During the course of such discussions, Agent, Lenders and Borrower may touch upon and potentially reach a preliminary understanding on one or more issues prior to concluding negotiations. Notwithstanding this fact, and absent an express written waiver by Agent or Lenders, Agent and Lenders will not be bound by an agreement on any individual issue unless and until an agreement is reached on all issues and such agreement is reduced to writing and signed by Agent, Lenders and the Borrower.

As of the date of this letter, there are no offers outstanding from Agent or Lenders to Borrower nor are there any oral agreements among Agent, Lenders and Borrower concerning the Borrower's obligations under the Loan Agreement and the other Loan Documents.  Rather, all agreements concerning such obligations are expressed solely in the existing Loan Documents, and the respective duties and obligations of the Borrower, Lenders and Agent shall be only as set forth in the Loan Documents.

Nothing in this letter is intended to modify any of the provisions of the Loan Documents, to waive any of Agent's or Lenders' rights, remedies, or powers against the Borrower or any other Person, or the Collateral, or to waive any Events of Default which may now exist or hereafter arise.  Agent and Lenders

each hereby expressly reserves all of their rights, remedies, and powers under the Loan Documents, at law, in equity, or otherwise.

This notice is not intended and shall not be construed as an election of remedies or a waiver of Agent's or Lenders' right to exercise any prejudgment or self-help rights or remedies or any other rights or remedies which may now or hereafter be available to Agent or Lenders pursuant to the terms of the Loan Documents, or that are otherwise available at law or in equity. No delay by Agent or Lenders in exercising any rights or remedies shall operate as a waiver of any rights or remedies Agent or Lenders may have. Any and all rights and remedies available to Agent and Lenders shall be cumulative and may be exercised separately, successively or concurrently at the sole discretion of Agent and Lenders.

**AGENT AND LENDERS ARE ATTEMPTING TO COLLECT THE INDEBTEDNESS EVIDENCED BY THE LOAN DOCUMENTS AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

Please do not hesitate to contact us should you require any further information.

[signature on following page]

Very truly yours,

CAPITAL FUNDING, LLC,
as Agent and Lender

By:  *Laura Deutsch*
Name:  Laura Deutsch
Title:  Sr. Vice President, Managing Director


Cc:      Jeffrey Zwick & Associates, P.C.
         266 Broadway, Suite 403
         Brooklyn, NY 11211
         Attn: Jeffrey Zwick, Esq.

EFiled:  Jun 21 2024 02:23PM EDT
Transaction ID 73455797
Case No. N24C-06-188 FWW

# **Exhibit L**

May 29, 2024

**_VIA FEDERAL EXPRESS-NEXT DAY DELIVERY_**

Cranston Apartments LLC
475 Oberlin Avenue South, Suite 211
Lakewood, New Jersey 08701
Attn: Menachem Tress and Elimelech Tress

**Re:    NOTICE OF OCCURRENCE OF EVENT OF DEFAULT; RESERVATION OF RIGHTS; DEMAND FOR PAYMENT**

To Whom It May Concern:

Reference is hereby made to that certain Loan Agreement dated April 27, 2022 (as amended, restated, modified and/or supplemented from time to time, the "**_Loan Agreement_**") by and between **CRANSTON APARTMENTS LLC**, a Delaware limited liability company ("**_Borrower_**"), the lenders time to time party thereto (collectively, "**_Lenders_**") and **CAPITAL FUNDING, LLC**, a Maryland limited liability company ("**_Agent_**").  All capitalized terms used but not defined herein shall have the meanings assigned to them in the Loan Agreement.  This letter is to inform you that Events of Default have occurred and are continuing under the Loan Agreement and Loan Documents as more fully set forth herein.

In addition to the Events of Default set forth in that certain Notice of Occurrence of Event of Default; Reservation of Rights; Demand for Payment Letter dated as of March 6, 2024; Demand for Payment Letter dated as of April 5, 2024; and Demand for Payment Letter dated as of May 3, 2024 (collectively, the "**_Prior Specified Defaults_**"), you are hereby notified that the following Default or Event of Default has occurred and is continuing (together with the Prior Specified Defaults, each individually and collectively, the "**_Specified Event of Default_**"): Borrower failed to timely pay interest due May 1, 2024 (the "**_Overdue Amount_**"), as required by Section 2.1(b) of the Loan Agreement, which is an Event of Default under Section 8.1(b) of the Loan Agreement.

**This notice serves as a formal demand that Borrower immediately pays the Overdue Amount. If Borrower fails to timely and properly remit to Agent the amount demanded herein, <u>Lenders may accelerate the Maturity Date of the Loan</u> which will cause the outstanding principal balance of the Loan, all accrued interest (contract and otherwise) and all other appropriate amounts due under the Loan Documents (including, without limitation, yield maintenance, default interest, late charges, attorney fees, costs of collection, etc.) to be immediately due and payable without further demand.**

The Specified Event of Default continues, has not been waived and in some cases may not be cured. Other Events of Default may exist and may continue to exist.

Agent and Lenders reserve their rights to assert all of their available rights and remedies under the Loan Agreement and other Loan Documents, and any and all rights and remedies under applicable law as Agent or Lenders each determines to be appropriate.  Agent and Lenders may exercise each right and remedy available to them from time to time and as often and in such order as it may determine in its sole discretion and the exercise or beginning of the exercise of any such right or remedy shall not be construed

as a waiver of the right to exercise at the same time or thereafter any other right or remedy available to it. Any action or inaction Agent or any Lender determines, in its sole discretion, to take during the existence of any Event of Default (including, without limitation, the imposition of default interest) shall not operate as a waiver of any Event of Default or any right or remedy under the Loan Documents, and will not be deemed to establish a course of conduct nor justify an expectation by Borrower that Agent or Lenders will take further action or continue not to take any action and will not preclude Agent or Lenders from exercising any and all remedies available at any time thereafter.  Agent and Lenders each hereby further expressly reserves every right, power and remedy specifically provided by the Loan Agreement, the other Loan Documents and any related documents, now existing or hereafter existing at law, in equity or by statute and each and every right, power and remedy, whether specifically given by Borrower or otherwise existing, which may be exercised from time to time as and often and in such order as may be deemed expedient by Agent or Lenders and the exercise or beginning of the exercise of any such right, power or remedy shall not be construed as a waiver of the right to exercise at the same time or thereafter any other right, power or remedy.

Without limiting the foregoing or any right of Agent and Lenders under the Loan Documents, Agent and Lenders reserve the right to (i) collect interest at any default rate of interest (including the Default Rate in accordance with Section 2.1(c)(vii) of the Loan Agreement) at any time from and after the occurrence of the Specified Event of Default or any other Events of Default on any amounts outstanding after such date, (ii) collect any late charge (including the Late Charge in accordance with Section 2.1(c)(viii) of the Loan Agreement) payable in respect of any late payment, (iii) apply any balance in the Payment Reserves upon an Event of Default against the Loan Obligations in whatever order Agent shall determine in Agent's sole and absolute discretion in accordance with Section 7.10(b) of the Loan Agreement, it being understood that to the extent Agent withdraws any funds from the Payment Reserves as a result of Borrower's Default, Borrower is obligated to replenish the Payment Reserves within fourteen (14) days of Agent's demand as provided in such Section 7.10(b), and (iv) without notice, seek the appointment of a receiver to take possession of and to operate the Mortgaged Property in accordance with Section 17(d) of the Security Instrument. Collection of any default rate interest or late charge or application of any Payment Reserves by Agent shall not be deemed to cure any Default or Event of Default, including the Specified Event of Default.

Agent, Lenders and Borrower have engaged in discussions concerning the Specified Event of Default, and Agent and Lenders anticipate that additional discussions may take place in the future.  However, Agent, Lenders and Borrower shall not be obligated to engage or to attempt to engage in discussions or negotiations, and whether or not Agent, Lenders and/or Borrower participate in, continue or terminate any such discussions or negotiations at any time is wholly at the election of Agent, Lenders and Borrower, each acting independently and in its sole and absolute discretion without incurring liability to the other. During the course of such discussions, Agent, Lenders and Borrower may touch upon and potentially reach a preliminary understanding on one or more issues prior to concluding negotiations. Notwithstanding this fact, and absent an express written waiver by Agent or Lenders, Agent and Lenders will not be bound by an agreement on any individual issue unless and until an agreement is reached on all issues and such agreement is reduced to writing and signed by Agent, Lenders and the Borrower.

As of the date of this letter, there are no offers outstanding from Agent or Lenders to Borrower nor are there any oral agreements among Agent, Lenders and Borrower concerning the Borrower's obligations under the Loan Agreement and the other Loan Documents.  Rather, all agreements concerning such obligations are expressed solely in the existing Loan Documents, and the respective duties and obligations of the Borrower, Lenders and Agent shall be only as set forth in the Loan Documents.

Nothing in this letter is intended to modify any of the provisions of the Loan Documents, to waive any of Agent's or Lenders' rights, remedies, or powers against the Borrower or any other Person, or the

Collateral, or to waive any Events of Default which may now exist or hereafter arise. Agent and Lenders each hereby expressly reserves all of their rights, remedies, and powers under the Loan Documents, at law, in equity, or otherwise.

This notice is not intended and shall not be construed as an election of remedies or a waiver of Agent's or Lenders' right to exercise any prejudgment or self-help rights or remedies or any other rights or remedies which may now or hereafter be available to Agent or Lenders pursuant to the terms of the Loan Documents, or that are otherwise available at law or in equity. No delay by Agent or Lenders in exercising any rights or remedies shall operate as a waiver of any rights or remedies Agent or Lenders may have. Any and all rights and remedies available to Agent and Lenders shall be cumulative and may be exercised separately, successively or concurrently at the sole discretion of Agent and Lenders.

**AGENT AND LENDERS ARE ATTEMPTING TO COLLECT THE INDEBTEDNESS EVIDENCED BY THE LOAN DOCUMENTS AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

Please do not hesitate to contact us should you require any further information.

[signature on following page]

Very truly yours,

CAPITAL FUNDING, LLC,
as Agent and Lender

By: _____

Name:

Title:
            Lau~ ~~isch
            Managing Director
            Capital Funding, LLC

Cc:     Jeffrey Zwick & Associates, P.C.
        266 Broadway, Suite 403
        Brooklyn, NY 11211
        Attn: Jeffrey Zwick, Esq.

EFiled:  Jun 21 2024 02:23PM EDT
Transaction ID 73455797
Case No. N24C-06-188 FWW

# **Exhibit M**

June 13, 2024

*<u>VIA FEDERAL EXPRESS-NEXT DAY DELIVERY</u>*

Cranston Apartments LLC                                      Menachem Tress
475 Oberlin Avenue South, Suite 211                          4 Cameo Ridge Road
Lakewood, New Jersey 08701                                   Monsey, New York 10952
Attn: Menachem Tress and Elimelech Tress

Elimelech Tress
40 High Street
Lakewood, New Jersey 08701

**Re:    NOTICE OF OCCURRENCE OF EVENT OF DEFAULT; NOTICE OF ACCELERATION, RESERVATION OF RIGHTS; DEMAND FOR PAYMENT**

To Whom It May Concern:

Reference is hereby made to that certain Loan Agreement dated April 27, 2022 (as amended, restated, modified and/or supplemented from time to time, the "***Loan Agreement***") by and between **CRANSTON APARTMENTS LLC**, a Delaware limited liability company ("***Borrower***"), the lenders time to time party thereto (collectively, "***Lenders***") and **CAPITAL FUNDING, LLC**, a Maryland limited liability company ("***Agent***").  All capitalized terms used but not defined herein shall have the meanings assigned to them in the Loan Agreement.  This letter is to inform you that Events of Default have occurred and are continuing under the Loan Agreement and Loan Documents as more fully set forth herein.

In addition to the Events of Default set forth in those certain (i) Notice of Occurrence of Event of Default; Reservation of Rights; Demand for Payment Letter dated as of March 6, 2024; (ii) Notice of Occurrence of Events of Default; Reservation of Rights; Demand for Payment Letter dated as of April 5, 2024; (iii) Demand for Payment Letter dated as of May 3, 2024; and (iv) Notice of Occurrence of Event of Default; Reservation of Rights; Demand for Payment Letter dated as of May 29, 2024 (collectively, the "***Prior Specified Defaults***"), you are hereby notified that the following Default or Event of Default has occurred and is continuing (together with the Prior Specified Defaults, each individually and collectively, the "***Specified Event of Default***"): In addition to continuing Events of Default, Borrower failed to timely pay interest due June 1, 2024 (the "***Overdue Amount***"), as required by Section 2.1(b) of the Loan Agreement, which is an Event of Default under Section 8.1(b) of the Loan Agreement.

**As a result of the occurrence and continuation of the Events of Default, pursuant to Section 8.2(a) of the Loan Agreement and Paragraph 5 of the Note, <u>the Maturity Date and all Loan Obligations are hereby accelerated</u>. The entire unpaid balance of principal of, and accrued interest on the Note, as well as all other amounts due under the Loan Documents (including, without limitation, yield maintenance, default interest, late charges, attorney fees, costs of collection, etc.) are hereby immediately due and payable in full.  Further as a result of the occurrence and continuation of the Events of Default, pursuant to Section 7.10(b) of the Loan Agreement, as of June 12, 2024, the balance in the Payment Reserves has been applied to the outstanding Loan Obligations. You may contact Laura Deutsch, Managing Director with Agent and Lender, at LDeutsch@capfundinc.com to determine the total amount due.**

This notice further acknowledges that Agent received a partial payment in the amount of $120,000.00 on June 7, 2024 ("***Partial Payment***").   Notwithstanding Agent's receipt and application of the Partial Payment, (i) all amounts due under the Loan Documents continue to be due and payable in full, (ii) the Events of Default referenced above are continuing, (iii) Agent reserves the right to apply any and all payments it receives in such manner and order or priority as it determines in its sole and absolute discretion, consistent with Section 2.1(c)(v) of the Loan Agreement; and (iv) Agent and Lender reserves the right to pursue any and all rights and remedies expressly set forth in the Loan Documents and/or applicable law.

As of June 14, 2024, the total amount due and payable under the Loan Documents is not less than $25,204,663.94 (the "***Loan Balance***").   The Loan Balance includes the following amounts:

| | |
|---|---:|
| Principal | $22,361,258.42 |
| Interest Due | $583,890.33 |
| Default Interest | $1,658,854.17 |
| Late Fees | $83,041.44 |
| Exit Fee (1.00%) | $223,612.58 |
| Legal Fees | $100,000.00 |
| Deferred Interest | $194,007.00 |
| **Total:** | **$25,204,663.94** |

The Loan will continue to accrue interest in the total amount of $10,422.83 *per diem* from and after June 14, 2024. It is hereby **DEMANDED** that Borrower pay the Loan Balance, plus any *per diem*, immediately.

Agent's receipt of the Partial Payment, and Agent's and/or Lender's receipt of any partial payment in the future shall not be deemed to constitute in any way (direct, indirect, express and/or implied) a cure, waiver, forbearance, or postponement of any and/or all rights available to Agent and/or Lender under the Loan Agreement and Loan Documents, or otherwise at law and/or in equity.  Agent and Lenders reserve their rights to assert all of their available rights and remedies under the Loan Agreement and other Loan Documents, and any and all rights and remedies under applicable law as Agent or Lenders each determines to be appropriate.  Agent and Lenders may exercise each right and remedy available to them from time to time and as often and in such order as it may determine in its sole discretion and the exercise or beginning of the exercise of any such right or remedy shall not be construed as a waiver of the right to exercise at the same time or thereafter any other right or remedy available to it.  Any action or inaction Agent or any Lender determines, in its sole discretion, to take during the existence of any Event of Default (including, without limitation, the imposition of default interest) shall not operate as a waiver of any Event of Default or any right or remedy under the Loan Documents, and will not be deemed to establish a course of conduct nor justify an expectation by Borrower that Agent or Lenders will take further action or continue not to take any action and will not preclude Agent or Lenders from exercising any and all remedies available at any time thereafter.  Agent and Lenders each hereby further expressly reserves every right, power and remedy specifically provided by the Loan Agreement, the other Loan Documents and any related documents, now existing or hereafter existing at law, in equity or by statute and each and every right, power and remedy, whether specifically given by Borrower or otherwise existing, which may be exercised from time to time and as often and in such order as may be deemed expedient by Agent or Lenders and the exercise or beginning of the exercise of any such right, power or remedy shall not be construed as a waiver of the right to exercise at the same time or thereafter any other right, power or remedy.

Without limiting the foregoing or any right of Agent and Lenders under the Loan Documents, Agent and Lenders reserve the right to (i) collect interest at any default rate of interest (including the Default Rate in accordance with Section 2.1(c)(vii) of the Loan Agreement) at any time from and after the occurrence of the Specified Event of Default or any other Events of Default on any amounts outstanding after such date, (ii) collect any late charge (including the Late Charge in accordance with Section 2.1(c)(viii) of the Loan Agreement) payable in respect of any late payment, (iii) apply any balance in the Payment Reserves upon an Event of Default against the Loan Obligations in whatever order Agent shall determine in Agent's sole and absolute discretion in accordance with Section 7.10(b) of the Loan Agreement, it being understood that to the extent Agent withdraws any funds from the Payment Reserves as a result of Borrower's Default, Borrower is obligated to replenish the Payment Reserves within fourteen (14) days of Agent's demand as provided in such Section 7.10(b), and (iv) without notice, seek the appointment of a receiver to take possession of and to operate the Mortgaged Property in accordance with Section 17(d) of the Security Instrument. Collection of any default rate interest or late charge or application of any Payment Reserves by Agent shall not be deemed to cure any Default or Event of Default, including the Specified Event of Default.

Agent, Lenders and Borrower have engaged in discussions concerning the Specified Event of Default, and Agent and Lenders anticipate that additional discussions may take place in the future.  However, Agent, Lenders and Borrower shall not be obligated to engage or to attempt to engage in discussions or negotiations, and whether or not Agent, Lenders and/or Borrower participate in, continue or terminate any such discussions or negotiations at any time is wholly at the election of Agent, Lenders and Borrower, each acting independently and in its sole and absolute discretion without incurring liability to the other. During the course of such discussions, Agent, Lenders and Borrower may touch upon and potentially reach a preliminary understanding on one or more issues prior to concluding negotiations. Notwithstanding this fact, and absent an express written waiver by Agent and Lenders, Agent and Lenders will not be bound by an agreement on any individual issue unless and until an agreement is reached on all issues and such agreement is reduced to writing and signed by Agent, Lenders and the Borrower (and Agent, Lenders, and their representatives lack authority to orally waive this requirement).

As of the date of this letter, there are no offers outstanding from Agent or Lenders to Borrower nor are there any oral agreements among Agent, Lenders and Borrower concerning the Borrower's obligations under the Loan Agreement and the other Loan Documents.  Rather, all agreements concerning such obligations are expressed solely in the existing Loan Documents, and the respective duties and obligations of the Borrower, Lenders and Agent shall be only as set forth in the Loan Documents.

Nothing in this letter is intended to modify any of the provisions of the Loan Documents, to waive any of Agent's or Lenders' rights, remedies, or powers against the Borrower or any other Person, or the Collateral, or to waive any Events of Default which may now exist or hereafter arise.  Agent and Lenders each hereby expressly reserves all of their rights, remedies, and powers under the Loan Documents, at law, in equity, or otherwise.

This notice is not intended and shall not be construed as an election of remedies or a waiver of Agent's or Lenders' right to exercise any prejudgment or self-help rights or remedies or any other rights or remedies which may now or hereafter be available to Agent or Lenders pursuant to the terms of the Loan Documents, or that are otherwise available at law or in equity.  No delay by Agent or Lenders in exercising any rights or remedies shall operate as a waiver of any rights or remedies Agent or Lenders may have.  Any and all rights and remedies available to Agent and Lenders shall be cumulative and may be exercised separately, successively or concurrently at the sole discretion of Agent and Lenders.

**AGENT AND LENDERS ARE ATTEMPTING TO COLLECT THE INDEBTEDNESS EVIDENCED BY THE LOAN DOCUMENTS AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

Please do not hesitate to contact us should you require any further information.

[signature on following page]

Very truly yours,

CAPITAL FUNDING, LLC,
as Agent and Lender

By: *Laura Deutsch*
Name: Laura Deutsch
Title: Managing Director


Cc:     Jeffrey Zwick & Associates, P.C.
         266 Broadway, Suite 403
         Brooklyn, NY 11211
         Attn: Jeffrey Zwick, Esq.

         King & Spalding LLP
         1185 Avenue of the Americas, 34th Floor
         New York, New York 10036
         Attn: Israel Dahan





ORIGIN ID:RFGA        (214) 969-1190
JAMES HRSISKIOPOULOS
HOLLAND & KNIGHT
1722 ROUTH ST
SUITE 1500
DALLAS, TX 75201
UNITED STATES US

TO  MENACHEM TRESS
    MENACHEM TRESS
    4 CAMEO RIDGE RD

    MONSEY NY 10952
(214) 969-1190

PO: 48255

SHIP DATE: 13JUN24
ACTWGT:1.00 LB
CAD: 255365809/WSXI3600

BILL SENDER

REF: 8369803.00037

DEPT:

FedEx
Express

MON - 17 JUN 8:00P
** 2DAY **
RES
10952
NY-US    SWF

TRK#
0201   2758 8249 1067

K5 PSBA

583J5/B21D/9AE3



ORIGIN ID:RFGA   (214) 989-1190
JAMES HRISSIKOPOULOS
HOLLAND & KNIGHT
1722 ROUTH ST
SUITE 1500
DALLAS, TX 75201
UNITED STATES US

TO ELIMELECH TRESS
ELIMELECH TRESS
40 HIGH ST

(214) 989-1190
LAKEWOOD NJ 08701

REF: 836080.00037
PO: 48255
INV:
DEPT:

SHIP DATE: 13JUN24
ACTWGT: 1.00 LB
CAD: 255368528/WSXI0500

BILL SENDER

583J5/B21D/9AE3

TRK#  [0281]  2758 8239 4865

K1 MJXA

MON — 17 JUN 8:00P
** 2DAY **

08701
RES
NJ-US   EWR





**SUPERIOR COURT**
**CIVIL CASE INFORMATION STATEMENT (CIS)**

EFILED Jul 01 2024 02:23PM EDT
Transaction ID 73455797
Case No. N24C-06-188 FWW

COUNTY:  Ⓝ   K   S          CIVIL ACTION NUMBER: _____

| | |
|---|---|
| Caption:<br><br>CAPITAL FUNDING, LLC, Plaintiff v.<br><br>CRANSTON APARTMENTS LLC, Defendant | Civil Case Code: __CDBT__<br><br>Civil Case Type: __Debt/Breach of Contract__<br>(SEE REVERSE SIDE FOR CODE AND TYPE)<br><br>MANDATORY NON-BINDING ARBITRATION (MNA) _____<br><br>Name and Status of Party filing document:<br>Capital Funding LLC, Plaintiff<br><br>Document Type: (E.G.; COMPLAINT; ANSWER WITH COUNTERCLAIM)<br>Complaint<br><br>JURY DEMAND:   YES_____ No __X__ |
| ATTORNEY NAME(S):<br>Michael J. Barrie; Kevin M. Capuzzi; John C. Gentile<br><br>ATTORNEY ID(S):<br>DE: 4684; DE: 5462; DE: 6159<br><br>FIRM NAME:<br>Benesch, Friedlander, Coplan & Aronoff LLP<br><br>ADDRESS:<br>1313 North Market Street, Suite 1201<br>Wilmington, DE 19801<br><br>TELEPHONE NUMBER:<br>(302) 442-7010<br><br>FAX NUMBER:<br>(302) 442-7012<br><br>E-MAIL ADDRESS:<br>mbarrie@beneschlaw.com; kcapuzzi@beneschlaw.com; jgentile@beneschlaw.com | IDENTIFY ANY RELATED CASES NOW PENDING IN THE SUPERIOR COURT OR ANY RELATED CASES THAT HAVE BEEN CLOSED IN THIS COURT WITHIN THE LAST TWO YEARS BY CAPTION AND CIVIL ACTION NUMBER INCLUDING JUDGE'S INITIALS:<br>See Attachment 1<br><br>EXPLAIN THE RELATIONSHIP(S):<br>See Attachment 1<br><br>OTHER UNUSUAL ISSUES THAT AFFECT CASE MANAGEMENT:<br>See Attachment 1<br><br>(IF ADDITIONAL SPACE IS NEEDED, PLEASE ATTACH PAGE) |

THE PROTHONOTARY WILL NOT PROCESS THE COMPLAINT, ANSWER, OR FIRST RESPONSIVE PLEADING IN THIS MATTER FOR SERVICE UNTIL THE CASE INFORMATION STATEMENT (CIS) IS FILED. THE FAILURE TO FILE THE CIS AND HAVE THE PLEADING PROCESSED FOR SERVICE MAY RESULT IN THE DISMISSAL OF THE COMPLAINT OR MAY RESULT IN THE ANSWER OR FIRST RESPONSIVE PLEADING BEING STRICKEN.

Revised 10/2022

## **ATTACHMENT 1**
OTHER UNUSUAL ISSUES THAT AFFECT CASE MANAGEMENT:

This complaint is being filed contemporaneously with a complaint captioned Capital Funding, LLC, Plaintiff, v. Cranston Apartments LLC, Defendant, regarding Defendant's default of a certain mortgage granted on April 27, 2022 by Defendant to Plaintiff. Plaintiff is simultaneously filing two additional actions involving the same claims against an entity affiliated with Defendant Cranston Apartments LLC. The titles of those two actions are (i) Capital Funding, LLC v. Galloway Apartments GEM LLC, for breach of promissory note, and (ii) Capital Funding, LLC v. Galloway Apartments GEM LLC, for mortgage foreclosure.

EFiled:  Jun 24 2024 01:07PM EDT
Transaction ID 73466152
Case No. N24C-06-188 FWW

**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

CAPITAL FUNDING, LLC,    :
    :
      Plaintiff,    :    C.A. No. N24C-06-188 FWW
    :
  v.    :
    :
CRANSTON APARTMENTS LLC,    :    PRAECIPE
    :
      Defendant.    :

TO THE PROTHONOTARY:

Please issue a Summons to be served by the Sheriff of Sussex County upon the following Defendant at the following address:

Cranston Apartments LLC
c/o File Right Corporate Services LLC, Registered Agent
17032 Minos Conaway Road
Lewes, DE 19958

Dated:  June 24, 2024        **BENESCH, FRIEDLANDER,
          COPLAN & ARONOFF LLP**

        */s/ Michael J. Barrie*
        Michael J. Barrie (DE Bar # 4684)
        Kevin M. Capuzzi (DE Bar #5462)
        John C. Gentile (DE Bar #6159)
        1313 N. Market Street, Suite 1201
        Wilmington, Delaware 19801
        Telephone: (302) 442-7010
        Facsimile: (302) 442-7012
        mbarrie@beneschlaw.com
        kcapuzzi@beneschlaw.com
        jgentile@beneschlaw.com

24550074

EFiled:  Jun 24 2024 01:07PM EDT
Transaction ID 73466152
Case No. N24C-06-188 FWW

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CAPITAL FUNDING, LLC, | : | C.A. No. N24C-06-188 FWW |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | SUMMONS |
| CRANSTON APARTMENTS LLC, | : | |
| | : | |
| Defendant. | : | |

THE STATE OF DELAWARE,

TO THE SHERIFF OF SUSSEX COUNTY

**YOU ARE COMMANDED:**

To summon the above named Defendant so that, within 20 days after service hereof upon Defendant, exclusive of the day of service, Defendant shall serve upon John C. Gentile, Esquire, Plaintiff's attorney, whose address is 1313 N. Market Street, Suite 1201, Wilmington, Delaware 19801, an answer to the complaint (and, if the complaint contains a specific notation requiring the Defendant to answer any or all allegations of the complaint by affidavit, an affidavit of defense).

To serve upon defendant a copy hereof and of the complaint.

Dated: _____

*Colleen Redmond* _____
Prothonotary

_____

Per Deputy

24550118

TO THE ABOVE NAMED DEFENDANT:

In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on plaintiff's attorney named above an answer to the complaint (and, if the complaint contains a specific notation requiring the defendant to answer any or all allegations of the complaint by affidavit, an affidavit of defense), judgment by default will be rendered against you for the relief demanded in the complaint.

_Colleen Redmond_
Prothonotary


_____
Per Deputy

Date: June ___, 2024

24550118

EFiled: Jul 01 2024 11:55AM EDT
Transaction ID 73524368
Case No. N24C-06-188 FWW

*6-27-24*

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

CAPITAL FUNDING, LLC,      :
     :
      Plaintiff,      :     C.A. No. N24C-06-188 FWW
     :
      v.      :
     :
CRANSTON APARTMENTS LLC,      :     PRAECIPE
     :
      Defendant.      :

*(1) Writ for Sussex
Chk #525681  30.ᵃ*

TO THE PROTHONOTARY:

Please issue a Summons to be served by the Sheriff of Sussex County upon the following Defendant at the following address:

Cranston Apartments LLC
c/o File Right Corporate Services LLC, Registered Agent
17032 Minos Conaway Road
Lewes, DE 19958

Dated: June 24, 2024         **BENESCH, FRIEDLANDER,
COPLAN & ARONOFF LLP**

*(1) WRIT ISSUED
DATE: 6-27-24
NCC
CHECK NO.:
AMT:*

        /s/ Michael J. Barrie
        Michael J. Barrie (DE Bar # 4684)
        Kevin M. Capuzzi (DE Bar #5462)
        John C. Gentile (DE Bar #6159)
        1313 N. Market Street, Suite 1201
        Wilmington, Delaware 19801
        Telephone: (302) 442-7010
        Facsimile: (302) 442-7012
        mbarrie@beneschlaw.com
        kcapuzzi@beneschlaw.com
        jgentile@beneschlaw.com

24550074

EFiled:  Jul 16 2024 09:49AM EDT
Transaction ID 73673396
Case No. N24C-06-188 KMV

# SUSSEX COUNTY SHERIFF'S OFFICE
## SERVED SUMMONS
### (SUBSTITUTE SERVICE)

| Agency | Case Number |
|---|---|
| BENESCH, FRIEDLANDER, COLAN AND ARONOFF, LLP | N24C-06-188 |

| **Case Name** | **Description** |
|---|---|
| CAPITAL FUNDING, LLC vs. CRANSTON APARTMENTS LLC | SER |

| **Type** | **Circuit** |
|---|---|
| Summons | |

| **Return To** | **Date Received** | **Date expired** |
|---|---|---|
| New Castle SUPERIOR | 7/3/2024 | |

**Party to be Served**
CRANSTON APARTMENTS LLC

| **Last Name** | **First Name** | **Middle Name** | **Jr/Sr** |
|---|---|---|---|
| CRANSTON APARTMENTS LLC | | | |

| **Date of Birth** | **SS#** | **Sex** |
|---|---|---|
| | | |

**Service Address**
17032 MINOS CONAWAY ROAD C/O FILE RIGHT CORPORATE SERVICES LLC, REG AGENT Lewes, DE 19958

**Work Name**
CRANSTON APARTMENTS LLC

| **Home phone** | **Bus Phone** | **Work Phone** | **Alt Phone** |
|---|---|---|---|
| | | | |

| **Served on:** 7/8/2024 | **Service Fee: $30.00** |
|---|---|

**Additional Notes**

Deputy served RABBI VOGEL, AGENT at above address where he/she resides/employed and person is of legal age (at least 18 years of age).

So Answered — Robert T. Lee
Sheriff
Returned — Pat Allegro-Smith
Deputy Clerk

**Papers Served** Summons